# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | | |
|---|---|---|
| MICHAEL MUIR, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.** |
| | ) | |
| UNITED STATES; ALEJANDRO | ) | |
| MAYORKAS, Secretary, United States | ) | |
| Department of Homeland Security; JEN | ) | |
| EASTERLY, Director, Cybersecurity and | ) | |
| Infrastructure Security Agency, United | ) | |
| States Department of Homeland Security; | ) | |
| DAVID PEKOSKE, Administrator, United | ) | |
| States Transportation Security | ) | |
| Administration; JOHN DOE, Supervisor, | ) | |
| Phoenix-Mesa Gateway Airport, United | ) | |
| States Transportation Security | ) | |
| Administration; JOHN DOE, Supervisor, | ) | |
| General Wayne A. Downing Peoria | ) | |
| International Airport, United States | ) | |
| Transportation Security Administration; | ) | |
| PHOENIX-MESA GATEWAY AIRPORT | ) | |
| AUTHORITY, an Arizona Joint Powers | ) | |
| Airport Authority; METROPOLITAN | ) | |
| AIRPORT AUTHORITY OF PEORIA, an | ) | |
| Illinois municipal corporation; L3HARRIS | ) | |
| TECHNOLOGIES, INC., a Delaware | ) | |
| corporation; ALLEGIANT AIR, LLC, a | ) | |
| Nevada company; LEIDOS, INC., a Virginia | ) | |
| company; BATTELLE MEMORIAL | ) | |
| INSTITUTE, an Ohio corporation; | ) | |
| JENNIFER GRANHOLM, Secretary, | ) | |
| United States Department of Energy; | ) | |
| UNITED STATES TRANSPORTATION | ) | |
| SECURITY ADMINISTRATION; UNITED | ) | |
| STATES DEPARTMENT OF ENERGY; | ) | |
| JOHN S. PISTOLE, Fifth Administrator, | ) | |
| United States Transportation Security | ) | |
| Administration, in his individual capacity; | ) | |

PETER V. NEFFENGER, Sixth 

Administrator, United States 

Transportation Security Administration, 

in his individual capacity; UNKNOWN 

JANE DOE(S) 1-X, 

        Defendants.

)
)
)
)
)
)
)

## Complaint and Demand for a Jury Trial, Challenge to the Constitutionality of 49 U.S.C. § 46110, Declaratory Relief Requested, Preliminary and Permanent Injunctive Relief Requested

1.     Plaintiff Michael Muir brings this action pursuant to the Federal Tort Claims Act (28 U.S.C. §§ 1346(b), 2671 *et seq*.), *Bivens* (403 U.S. 388 (1971)), 28 U.S.C. § 2241, the Rehabilitation Act (29 U.S.C. § 701 *et seq*.), the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq*.), the Biometric Information Privacy Act (740 ILCS 14/1 *et seq*.), and Amend. I, IV, V, and XIV to the U.S. Constitution.

2.     Plaintiff demands a jury trial on Claim 20 and all issues so triable.

## I.   Introduction

3.     This is a Challenge to the Constitutionality of 49 U.S.C. § 46110, a Petition for a Writ of digital Habeas Corpus, a request for injunctive relief, and a concert of action FTCA lawsuit regarding Defendants' unlawful, unconstitutional, abnormally dangerous, and conscience-shocking conduct in the United States Transportation Security Administration advanced imaging technology passenger screening program administered at domestic airports under 49 C.F.R. Part 1540.

4.     Plaintiff Muir seeks: (1) a Writ of digital Habeas Corpus requiring Defendants to produce Muir's digital full-body avatars created during advanced imaging technology ("AIT") passenger screening in August 2018 and June 2019 for examination into Defendants' grounds for the executive branch confinement of all four of Muir's separate and distinct digital body avatars, (2) a declaratory judgment that 49 U.S.C. § 46110, as over-broadly amended to back-import the AIT passenger screening program, violates the First Amendment, (3) to have the Court strike down as unconstitutional the TSA AIT passenger screening related amendments to Section 46110 set forth in Pub. L. 107–71 § 140(b)(1)(2001) and Pub. L. 115–254 § 1991(f)(1)(2018), (4) declaratory judgments regarding the unlawful, unconstitutional, and abnormally dangerous conditions created by 49 C.F.R. Part 1540, (5) monetary damages against Defendant United States under the FTCA, (6) injunctive relief against U.S. federal government defendants under BIPA, the Rehabilitation Act, and the U.S. Constitution, (7) monetary damages against private/corporate Defendants under BIPA and Restatement (2d) of Torts § 876, (8) monetary damages against individual Defendants under *Bivens* and Restatement (2d) of Torts § 876, (9) injunctive relief against private Defendants under BIPA and the ADA, and, most importantly, (10) injunctive relief requiring the return of, in a "visual image" format viewable with human retina as required by 49 U.S.C. § 44901(l), Plaintiff Muir's very rare and very valuable private health information representing the human tissue and human tissue disability beneath his skin unlawfully taken and controlled by Defendants at the TSA Checkpoint.

## II.   Jurisdiction and Venue

5.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2241, and 1346(b)(1), and supplemental jurisdiction under 28 U.S.C. § 1367 and 740 ILCS 14/20.

6.    Venue is proper under 28 U.S.C. § 1391(e)(1)(A),  (e)(1)(C).

## III.  Parties

7.    Plaintiff Michael Muir ("Muir") is forty-one years old and currently resides in Sarasota, Florida. He is a natural married man, a United States citizen, and a qualified individual with a disability under 42 U.S.C. § 12102. Muir's congenital disorder and hidden physical disability that manifests symptoms as a right-groin hernia is entirely human tissue, entirely beneath his skin, and entirely consistent with his expected reproductive anatomy. It is due only to Defendants' unlawful and unauthorized taking, control, and use of Muir's private protected health information representing his hidden disability and his private marital healthcare choices regarding his disability that he cannot access the commercial airport sterile area, which wrongfully denies him the right to the benefit of the public right of transit by air as granted by 49 U.S.C. § 40103(a)(2).

8.    Defendant United States is sued under the Federal Tort Claims Act ("FTCA", 28 U.S.C. §§ 1346(b), 2671 *et seq.*) for personal injury and property loss caused by the negligent and wrongful acts of Phoenix-Mesa Gateway Airport

("IWA") TSA Supervisor John Doe while acting within the scope of his employment at IWA on June 6, 2019, for personal injury and property loss caused by the negligent and wrongful acts of General Wayne A. Downing Peoria International Airport ("PIA") TSA Supervisor John Doe while acting within the scope of his employment at PIA on June 9, 2019, and for personal injury and property loss caused by the negligent and wrongful acts of Secretary Mayorkas, Director Easterly, Secretary Granholm, and Administrator Pekoske while acting within the scope of their employment as it pertains to the execution of 49 C.F.R. Part 1540 at commercial airports in Arizona and Illinois.

9.      Defendants Alejandro Mayorkas ("Mayorkas"), Secretary of the Department of Homeland Security; Jen Easterly ("Easterly"), Director, Cybersecurity and Infrastructure Security Agency at the Department of Homeland Security; David Pekoske ("Pekoske"), TSA Administrator; Jennifer Granholm ("Granholm"), Secretary of the Department of Energy; John S. Pistole ("Pistole"), Fifth TSA Administrator; and Peter V. Neffenger ("Neffenger"), Sixth TSA Administrator, are current or former United States officers sworn to support and defend the Constitution of the United States against all enemies.

10.      Defendant John Doe, Supervisor, Phoenix-Mesa Gateway Airport, United States Transportation Security Administration ("IWA TSA Supervisor John Doe") is the TSA Checkpoint Supervisor at Phoenix-Mesa Gateway Airport in Maricopa County, Arizona.

11.     Defendant John Doe, Supervisor, General Wayne A. Downing Peoria International Airport, United States Transportation Security Administration ("PIA TSA Supervisor John Doe") is the TSA Checkpoint Supervisor at General Wayne A. Downing Peoria International Airport in Peoria County, Illinois.

12.     Defendant L3Harris Technologies, Inc. ("L3") is a Delaware for-profit corporation headquartered in Melbourne, Brevard County, Florida, a United States government contractor, and manufacturer of the millimeter-wave security portals and *Automated Target Detection* "software solution" used during AIT passenger screening at IWA and PIA in June 2019.

13.     Defendant Allegiant Air, LLC ("Allegiant") is a Nevada for-profit commercial airline, a major air carrier, a "Covered Air Carrier" under the FAA Reauthorization Act of 2018 and 49 U.S.C. 40102(a)(2), and a "carrier" under 14 C.F.R. Part 382.

14.     Defendant Phoenix-Mesa Gateway Airport Authority ("PMGAA") is an Arizona Joint Powers Airport Authority under Ariz. Rev. Stat. § 28-8527. Defendant PMGAA owns and operates Phoenix-Mesa Gateway Airport ("IWA") in Maricopa County, Arizona.

15.     Defendant Metropolitan Airport Authority of Peoria ("MAAP") is an Illinois municipal corporation created under the laws of the State of Illinois. Defendant MAAP owns and operates General Wayne A. Downing Peoria International Airport ("PIA") in Peoria County, Illinois.

16.     Defendant Leidos, Inc. ("Leidos") is a Virginia for-profit company and a United States government contractor. Defendant Leidos became relevant to this action on May 4, 2020 (*see* instant Complaint, Attachment 2, Central District of Illinois Case No. 1:20-cv-01280,  Doc. 43-1, p. 1, Declaration of Director of Contracts, Leidos Security Detection & Automation, Inc.) when it purchased L3 Security & Detection Systems, Inc. from Defendant L3 for one billion dollars in cash.

17.     Defendant Battelle Memorial Institute ("Battelle") is an Ohio corporation and manager of the Pacific Northwest National Laboratory ("PNNL") in Richland, WA for the United States Department of Energy. Millimeter-wave scanning technology was developed, and the intellectual property "captured" at PNNL before being licensed to Defendant L3.

18.     Defendant United States Department of Energy is a United States agency, and Defendant United States Transportation Security Administration ("TSA") is a sub-agency of the United States Department of Homeland Security.

19.     Defendants Unknown Jane Doe(s) 1-X are any unknown actors in the TSA AIT passenger screening program, including owners of the artificial intelligence agents, compression software, fiber networks, and server networks used during AIT screening, as well as any party that accessed or retained any segment of Muir's private protected health information representing the human tissue and human tissue disability beneath his skin at any time.

## IV.  Allegations of Fact

20.    On September 11, 2001, at 8:46:40, American Airlines Flight 11 crashed into the north face of the North Tower (1 WTC) of the World Trade Center, between floors 93 and 99.

21.    On November 25, 2002, Congress enacted Public Law 107-296, 116 Stat. 2238, the Support Anti-terrorism by Fostering Effective Technologies Act ("SAFETY Act", 6 U.S.C. § 441 *et seq*.).

22.    On July 1, 2004, Defendant L3 consummated the "Earliest Date of Sale" of the SAFETY Act "Technology" at issue in this case (*see* Case No. 1:20-cv-01280, Doc. 43-1, pp. 5, 12; Case No. 2:19-cv-05887, Doc. 14, filing system p. 7).

23.    On June 8, 2006, DHS published 6 C.F.R. Part 25 (71 FR 33159).

24.    On October 3, 2008, the Biometric Information Privacy Act ("BIPA", 740 ILCS 14/1 *et seq*.) took effect in Illinois.

25.    On September 17, 2010, with Defendant Pistole's approval, TSA's Checkpoint Screening Procedure was revised to direct the use of AIT machines (*see Roberts v. Napolitano*, 798 F. Supp. 2d 7, 9 (D.D.C. 2011) and *Blitz v. Napolitano*, 700 F. 3d 733, 736 (4th Cir. 2012)).

26.    On February, 14, 2012, Congress enacted the FAA Modernization and Reform Act (Pub. L. 112−95, § 826, 126 Stat. 11, 132), which defined

advanced imaging technology ("AIT") as "a device used in the screening of passengers that creates a visual image of an individual showing the surface of the skin and revealing other objects on the body".

27. On May 16, 2013, again with Defendant Pistole's explicit approval, TSA completed the removal, from airports, of all AIT units that could not accommodate automatic target recognition ("ATR") software, a "software solution" that "eliminates passenger-specific images" (81 FR 11369).

28. On March 3, 2016, with Defendant Neffenger's approval, DHS/TSA promulgated final rule 49 C.F.R. Part 1540, *Passenger Screening Using Advanced Imaging Technology,* in Federal Register Vol. 81, No. 42., which noted that "current versions of AIT do not have the capability to create an image; rather, they create internal code of the passenger using proprietary software" (81 FR 11383).

29. On October 26, 2016, with Defendant Neffenger's knowledge, the Deputy Under Secretary for Science and Technology for the United States Department of Homeland Security issued a renewal Certification and renewal Designation for Defendant L3's millimeter wave scanner security portal, supposedly in use at IWA and PIA under the SAFETY Act, which describes the Technology as "a security portal that uses millimeter-wave scanning technology to produce three-dimensional images to detect threat objects, if present, on scanned subjects" (*see* Case No. 1:20-cv-01280, Doc. 43-1, "Exhibit A", pp. 8, 17).

### Arizona – June 6, 2019 Occurrence

30.     Muir was a ticketed guest traveling through Phoenix-Mesa Gateway Airport ("IWA") in Maricopa County, Arizona on June 6, 2019, around two hours before his scheduled flight time.

31.     While at IWA on June 6, 2019, Muir experienced an unpredictable, uncontrollable, and potentially life-threatening disability-caused health emergency, was uncontrollably and intermittently symptomatic at his right groin due to his hidden physical disorder and his private marital healthcare choices regarding that disorder, and was well-within his 49 U.S.C. § 40103(a)(2) right to the benefit of the public right of transit through navigable United States airspace because his serious health emergency was a danger only to him.

32.     In order to access the airport sterile area to board his flight, Muir is required to submit to TSA security screening in accordance with 49 C.F.R. §§ 1540.107, 1540.109.

33.     Due to the barbaric and dehumanizing nature of a prior TSA Checkpoint screening incident that occurred at IWA on August 9, 2018 (*see* Superior Court of Arizona in Maricopa County Case No. CV2019-013495, District of Arizona Case No. 2:19-cv-05887-DGC) and his level of disability-related symptom manifestation (June 6, 2019 was at least ten percent worse than August 9, 2018), Muir deeply feared for his immediate physical safety as he approached

the TSA security checkpoint where, less than a year before, he was shocked to be impermissibly singled-out (disability revelation via AIT), publicly humiliated, psychologically tortured, unlawfully coerced, and physically brutalized under almost identical circumstances, due solely to his beneath the skin congenital disability and his private marital healthcare choices regarding his disability.

34.     Muir presented himself for mandatory passenger screening and TSA personnel scanned Muir's valid Allegiant Air boarding pass and verified his identity using his REAL ID.

35.     Muir was not given fair notice or warning about, and never implicitly consented to: (1) a mandatory passenger screening process occurring outside the legal parameters set forth by Congress in 49 U.S.C. § 44901, (2) automatically surrendering his liberties and well-established constitutional rights, including his right to privacy, his right to due process, and his right to the equal protection of the laws, (3) automatically surrendering protections granted by 29 U.S.C. § 794, (4) automatically surrendering his private health information representing the human tissue and human tissue disability beneath his skin, (5) having his private health information representing the human tissue and human tissue disability beneath his skin converted into proprietary "code", or (6) the use, in any way, of his private health information during AIT passenger screening.

36.     Muir placed his personal property on the x-ray machine belt and Defendant IWA TSA Supervisor John Doe acquired total physical control of Muir,

as Muir was at that point prevented by federal law from disobeying TSA personnel or leaving the checkpoint without TSA personnel permission, and he could not act in his own best interest, protect himself from harm, or unilaterally end the screening process for any reason, including a serious medical emergency, without facing punishment which included civil fines up to $10,000, criminal fines up to $250,000, criminal prosecution and up to ten years imprisonment (18 U.S.C. § 3571, 49 U.S.C. §§ 46301, 46503).

37.     The extent of Defendant IWA TSA Supervisor John Doe's legal authority to totally control Muir and deliberately and indifferently ignore his serious, disability-caused medical emergency had been well-illustrated on August 9, 2018 at the IWA TSA checkpoint when Muir's public pleas not to be touched at the site of his serious, disability-related medical emergency were callously, deliberately, and indifferently ignored by IWA TSOs (one of whom was the first person _ever_ to touch Muir at his right groin during a serious medical emergency as not even Muir's wife, his doctor, or several first-responders had touched him at all, let alone applied significant physical pressure to the exact site of his severe pain during a serious medical emergency) in order to clear a false AIT threat alarm at his right groin that was based solely on his hidden, beneath-the-skin disability, and based on this shocking incident it was abundantly clear that: (1) Muir was totally unable to defend himself, (2) Muir's pleas for mercy fell on callous, uncaring and indifferent ears, (3) Muir could not act in his own best

interest, (4) Muir's qualified disability was not acknowledged, (5) Muir could not unilaterally end the screening due to a serious disability-related medical emergency, and (6) Muir could not disobey TSA personnel in any way.

38.    Muir did not give informed consent to have his private protected health information representing the human tissue and human tissue disability beneath his skin taken, converted, controlled, disclosed, or in any way used by Defendants at any time during or after AIT passenger screening.

39.    Under Defendant IWA TSA Supervisor John Doe's supervision, TSA personnel correctly identified Muir as a male traveler and initiated the AIT passenger screening scan of Muir's full body in required "hands-up" position using the millimeter-wave security portal.

40.    Defendants, including IWA TSA Supervisor John Doe, made a contemporaneous physical impact on Muir using electromagnetic waves actively emitted from the security portal ("The technology bounces electromagnetic waves off the body to detect anomalies." 81 Fed. Reg. 11,365, March 3, 2016) and began creation of Muir's June 6, 2019 digital full-body avatar by taking between 200 thousand and 200 billion body dimension data points (the exact number is sensitive security information).

41.    Under Defendant IWA TSA Supervisor John Doe's supervision, IWA TSA personnel used the millimeter-wave security portal in accordance with 49

C.F.R. Part 1540 and seized Muir's private property when they finalized creation of his June 6, 2019 digital full-body avatar and, without his consent, converted his private health information representing the human tissue and human tissue disability beneath his skin (chattel which is a very valuable "biometric identifier" and "unique characteristic" that can be used to positively identify him and the precise details of his beneath the skin congenital disability) into Defendant L3's proprietary code, which Defendant L3 intentionally controlled via the proprietary software application programming interface specifications, proprietary credential authentication keys, and proprietary code decryption keys, and which Defendant IWA TSA Supervisor John Doe jointly controlled during passenger screening.

42.     Defendants had no policies or procedures in place on June 6, 2019 with regard to the use of artificial intelligence during the TSA AIT passenger screening process because the very first artificial intelligence strategies (which did <u>not</u> include standards of care) were still being formulated by all of the United States government agencies involved with the AIT passenger screening scheme until, at the very earliest, December 3, 2020, when DHS published its "Artificial Intelligence Strategy" and the White House issued Executive Order 13960.

43.     Defendants did not provide a retention schedule or guidelines for permanently destroying the private health information they were collecting and storing, which included Muir's June 6, 2019 digital full-body avatar created using Defendant L3's proprietary software.

44.     With Defendant L3's express permission to access Muir's private health information representing the human tissue and human tissue disability beneath his skin (through its voluntary disclosure of the proprietary application programming interface specifications, credential authentication keys, and code decryption key), Defendant IWA TSA Supervisor John Doe initiated the search of Muir by using Defendant L3's proprietary *Automated Target Detection* ("ATD") "ATR" (*see* 44901(l)(1)(C))  "software solution" to "analyze" Muir's scanned data.

45.     Defendant L3's proprietary ATD "software solution" expressly disclosed Muir's private health information representing his hidden disability and the human tissue and organs beneath his skin to Defendant IWA TSA Supervisor John Doe when it willfully advanced Muir's analyzed passenger screening data through the AIT passenger screening program application stack and allowed, through proprietary interface specifications and proprietary credentials acceptance, Defendant IWA TSA Supervisor John Doe to access and control Muir's analyzed screening data.

46.     Defendant IWA TSA Supervisor John Doe accessed Muir's analyzed screening data using an interface key, and after taking control of Muir's data, granted the unidentified, unmonitored, narrow artificial intelligence threat and anomaly decision-making agent unlawful access to Muir's electronic protected health information ("ePHI") representing the human tissue and human tissue disability beneath his skin, as Muir's natural human tissue beneath his skin is not

15

an object on the surface of his skin and is therefore clearly beyond the explicit limitations set forth in the privacy protection amendment to the AIT passenger screening program established by Congress in Pub. L. 112-95 § 826 (2012) and codified as 49 U.S.C. § 44901(l).

47.    Muir was terrified and his fear for his immediate physical safety was greatly magnified as he awaited the final and unreviewable outcome of the unmonitored artificial intelligence agent's instantaneous medical judgment of his private health information representing the human tissue disability beneath his skin (which bore an insubstantial relationship to the security needs of TSA because the requirement to detect threat objects on the body and the surface of the skin is the limit of AIT screening, *see* 49 U.S.C. § 44901(l), and does not include Muir's ePHI regarding his human tissue or human tissue disability beneath his skin).

48.    Defendants' threat and anomaly decision-making A.I agent unilaterally judged that, at the exact moment the electromagnetic waves emitted from the security portal penetrated Muir's skin and reflected back off his internal organs to the security portal sensors in order to create his passenger screening data, Muir's symptoms of his hidden physical disability at his right groin had not manifested to the extent necessary for the threat and anomaly decision-making A.I. agent to trigger a false threat alarm at his right groin (as had occurred at IWA on August 9, 2018 when Muir's natural human tissue and peritoneal fluid did, in

16

sufficient measure, move through his inguinal canal into his right scrotum to present as a right groin hernia) as his tissue had unpredictably remained, according to the A.I. algorithm's predetermined model of a "normal" human man, far enough inside his body cavity for Muir to be classified as "ok".

49.     Defendant IWA TSA Supervisor John Doe and Defendant L3 jointly allowed the disclosure of the threat and anomaly decision-making A.I agent's algorithmic comparison results back to Defendant L3's ATD "software solution" which "highlights threats and anomalies on a generic mannequin that resembles a human outline for end-user interpretation".

50.     Despite experiencing a serious medical emergency that continued for several hours (including immediately after Muir was cleared to enter the IWA sterile area and all the way through his flight to Illinois), Muir was granted an unpredictable, unnerving, and seemingly unexplainable reprieve from a coerced, invasive, and potentially life-threatening mandatory physical "pat-down".

51.     Muir suffered severe and irreversible psychological damage (including painful physical manifestations which extend beyond the bounds of human decency) as a result of IWA TSA Supervisor John Doe's reckless, unlawful, and abnormally dangerous conduct at IWA on June 6, 2019, and Defendants' concert of action with IWA TSA Supervisor John Doe at IWA on June 6, 2019, which directly interfered in Muir's personal relationship with the Creator because prior to his encounter with TSA on June 6, 2019, the only way

Muir could explain the savage brutality of what happened to him at the IWA Checkpoint on August 9, 2018 was that he was being punished by the Creator. After Muir was granted an unexplainable reprieve from what was likely to be another severely cruel and unusual punishment, Muir could not help but begin to wonder (when the Shadow suddenly appeared to him in August, 2019) if what had happened to him at IWA on August 9, 2018 wasn't really a result of the Creator's unfathomable will unfolding, but instead the disgusting, inhumane, and intolerable result of his own government's unconscionable and outrageous wrongdoing.

### Illinois – June 9, 2019 Occurrence

52.     Muir was a ticketed guest traveling through General Wayne A. Downing Peoria International Airport ("PIA") in Peoria County, Illinois on June 9, 2019 around two hours before his scheduled flight time.

53.     While at PIA on June 9, 2019, Muir experienced an unpredictable, uncontrollable and potentially life-threatening health emergency, was uncontrollably and intermittently symptomatic at his right groin due to his hidden physical disorder and his private marital healthcare choices regarding that disorder, and was within his 49 U.S.C. § 40103(a)(2) right to the benefit of domestic air travel because his serious health emergency was a danger only to him.

18

54.    In order to access the airport sterile area to board his flight, Muir is required to submit to TSA security screening in accordance with 49 C.F.R. §§ 1540.107, 1540.109.

55.    Based on the inhumane nature and brutal severity of a prior TSA Checkpoint screening incident that occurred at PIA on August 12, 2018 (*see* Central District of Illinois Case No. 1:20-cv-01280, Seventh Circuit Court of Appeals Case No. 21-1312) and his level of symptom manifestation (June 9, 2019 was similar to August 12, 2018), Muir deeply feared for his immediate physical safety as he approached the TSA security checkpoint where, less than a year before, he was shocked to be impermissibly singled-out, physically moved, psychologically tortured, unlawfully coerced, and physically brutalized under almost identical circumstances, due solely to his disability and his private marital healthcare choices regarding his disability.

56.    Muir presented himself for mandatory passenger screening and TSA personnel scanned Muir's valid Allegiant Air boarding pass and verified his identity using his REAL ID.

57.    Muir was not given fair notice or warning about, and never implicitly consented to: (1) a mandatory passenger screening process occurring outside the legal parameters set forth by Congress in 49 U.S.C. § 44901, (2) automatically surrendering his inalienable, fundamental personal liberties and well-established constitutional rights, including his right to privacy, his right to due process, and

his right to the equal protection of the laws, (3) automatically surrendering protections granted by 29 U.S.C. § 794, (4) automatically surrendering his private health information representing the human tissue and human tissue disability beneath his skin, (5) having his private health information representing the human tissue and human tissue disability beneath his skin converted into proprietary "code", or (6) the use, in any way, of his private health information during AIT passenger screening.

58.     Muir placed his personal property on the x-ray machine belt and Defendant PIA TSA Supervisor John Doe acquired total physical control of Muir, as Muir was at that point prevented by federal law from disobeying TSA personnel or leaving the checkpoint without TSA personnel permission, and he could not act in his own best interest, protect himself from harm, or unilaterally end the screening process for any reason, including a serious medical emergency, without facing punishment which included civil fines up to $10,000, criminal fines up to $250,000, criminal prosecution and up to ten years imprisonment (18 U.S.C. § 3571, 49 U.S.C. §§ 46301, 46503).

59.     The extent of Defendant PIA TSA Supervisor John Doe's legal authority to totally control Muir had been well-illustrated on August 12, 2018 at PIA when, based on a false AIT threat alarm at his right groin (which was based solely on the uncontrollable symptom manifestation of his hidden, beneath-the-skin physical disability) raised by the unmonitored artificial intelligence threat

and anomaly decision-making software agent, Muir was moved to a private area where his repeated pleas not to be touched at the site of his serious medical emergency were callously and deliberately ignored, and his reasonable offer to show PIA TSOs his right groin hernia instead of having significant physical pressure applied to the exact site of his disability-related medical emergency in order to clear the false threat alarm was deliberately and indifferently disregarded.

60.     Muir did not give informed consent to have his biometric identifiers or private health information representing the human tissue and human tissue disability beneath his skin taken, converted, controlled, disclosed, or in any way used by Defendants at any time during screening.

61.     Under Defendant PIA TSA Supervisor John Doe's supervision, TSA personnel correctly identified Muir as a male traveler and initiated the AIT passenger screening scan of Muir's full body in required "hands-up" position using the millimeter-wave security portal.

62.     Defendants, including PIA TSA Supervisor John Doe, made a contemporaneous physical impact on Muir using electromagnetic waves actively emitted from the security portal ("The technology bounces electromagnetic waves off the body to detect anomalies." 81 Fed. Reg. 11,365, March 3, 2016) and began creation of Muir's June 9, 2019 digital full-body avatar by taking between 200

thousand and 200 billion body dimension data points (the exact number is sensitive security information).

63.     Under Defendant PIA TSA Supervisor John Doe's supervision, TSA personnel used the millimeter-wave security portal in accordance with 49 C.F.R. Part 1540 and seized Muir's private property when they finalized creation of his June 9, 2019 digital full-body avatar and, without his consent, converted his private health information representing the human tissue and human tissue disability beneath his skin (chattel which can be used to positively identify him and the precise details of his beneath the skin congenital disability) into Defendant L3's proprietary code, which Defendant L3 intentionally controlled via the proprietary software application programming interface specifications, proprietary credential authentication keys, and proprietary code decryption keys, and which Defendant PIA TSA Supervisor John Doe jointly controlled during passenger screening.

64.     Defendants had no policies or procedures in place on June 9, 2019 with regard to the use of artificial intelligence during the TSA AIT passenger screening process because the very first artificial intelligence strategies (which did not include standards of care) were still being formulated by all of the United States government agencies involved with the AIT passenger screening scheme until, at the very earliest, December 3, 2020, when DHS published its "Artificial Intelligence Strategy" and the White House issued Executive Order 13960.

65.    Defendants did not provide a retention schedule or guidelines for permanently destroying the biometric identifiers and private health information they were collecting and storing, which included Muir's June 9, 2019 digital full-body avatar created using Defendant L3's proprietary software.

66.    With Defendant L3's express permission to access Muir's private health information representing the human tissue and human tissue disability beneath his skin (through its voluntary disclosure of the proprietary application programming interface specifications, credential authentication keys, and code decryption key) Defendant PIA TSA Supervisor John Doe initiated the search of Muir by using Defendant L3's proprietary *Automated Target Detection* ("ATD") automatic target recognition "ATR" (*see* 44901(l)(1)(C)) "software solution" to "analyze" Muir's scanned data.

67.    Defendant L3's proprietary ATD "software solution" expressly disclosed Muir's private health information representing his hidden disability and the human tissue and organs beneath his skin to Defendant PIA TSA Supervisor John Doe when it willfully advanced Muir's analyzed passenger screening data through the AIT passenger screening program application stack and allowed, through proprietary interface specifications and proprietary credentials acceptance, Defendant PIA TSA Supervisor John Doe to access and control Muir's analyzed screening data.

68.    Defendant PIA TSA Supervisor John Doe accessed Muir's analyzed screening data using an interface key, and after taking control of Muir's data, granted the unidentified, unmonitored, narrow artificial intelligence threat and anomaly decision-making agent unlawful access to Muir's electronic protected health information ("ePHI") representing the human tissue and human tissue disability beneath his skin, as Muir's natural human tissue beneath his skin is not an object on the surface of his skin, cannot be a threat item, and is therefore well beyond the limitations of the privacy protection amendment to the AIT passenger screening program established by Congress in Pub. L. 112-95 § 826 (2012) and codified as 49 U.S.C. § 44901(l).

69.    Muir was terrified and his fear for his immediate physical safety was greatly magnified as he awaited the final and unreviewable outcome of the unmonitored artificial intelligence agent's instantaneous medical judgment of his private health information representing the human tissue disability beneath his skin (which bore an insubstantial relationship to the security needs of TSA because the requirement to detect threat objects on the body and the surface of the skin is the limit of AIT screening, *see* 49 U.S.C. § 44901(l).

70.    Defendants' threat and anomaly decision-making A.I agent unilaterally judged that, at the exact moment the electromagnetic waves emitted from the security portal penetrated Muir's skin and reflected back off his internal organs to the security portal sensors in order to create his passenger screening

24

data, Muir's symptoms of his hidden physical disability at his right groin had not manifested to the extent necessary for the threat and anomaly decision-making A.I. agent to trigger a false threat alarm at his right groin (as had occurred at PIA on August 12, 2018 when Muir's natural human tissue and peritoneal fluid did, in sufficient measure, move through his inguinal canal into his right scrotum to present as a right groin hernia), as his tissue had unpredictably remained, according to the algorithm's predetermined model of a "normal" human man, far enough inside his body cavity for Muir to be classified as "ok" to enter the airport sterile area to board his flight.

71.     Defendant PIA TSA Supervisor John Doe and Defendant L3 jointly allowed the disclosure of the unidentified threat and anomaly decision-making artificial intelligence agent's instantaneous algorithmic comparison results back to Defendant L3's proprietary ATD "software solution" which "highlights threats and anomalies on a generic mannequin that resembles a human outline for end-user interpretation" via an "alarm box" displayed on the millimeter wave scanner public display screen.

72.     Despite experiencing a serious medical emergency that continued for several hours (including immediately after Muir was cleared to enter the sterile area and all the way through Muir's very painful flight back to Arizona), Muir was granted an unpredictable, unnerving, and seemingly unexplainable reprieve from an invasive, and potentially life-threatening mandatory physical "pat-down".

73.    Muir suffered severe, irreversible psychological damage beyond the bounds of human decency as a result of PIA TSA Supervisor John Doe's conduct at PIA on June 9, 2019, and Defendants' concert of action with PIA TSA Supervisor John Doe at PIA on June 9, 2019, which caused; (1) the trigger to the final crystallization of Muir's August 2018 TSA checkpoint experiences at IWA and PIA, (2) the shocking sudden arrival of post-traumatic stress with intense anxiety, paranoia, painful and disturbing involuntary physical movements, and physical manifestations including throat constriction, shortness of breath, right groin pain, right leg pain, disturbing synesthesia, and a feeling of irreversible physical invasion, and (3) the trigger to the appearance of a dark ghost known to Muir as "The Shadow" in early August 2019, which daily haunts Muir's waking psyche as a sinister and threatening presence in the lower right corner of his vision. Muir cannot help but twitch, shudder, close his right eye, snap his head to the left, and hold out his right hand to push it away. And even though it has no name, has never spoken, and there is zero scientific evidence that ghosts are real (Muir had no history of feeling haunted or invaded in any way, and never had a tick or any involuntary physical movements), Muir has addressed it out loud several times with the word "No" when it has physically invaded the right side of his body by unknown means and bonded with his past pain and caused him mental pain and physical pain and painful involuntary movements. And it has given Muir the feeling that it has a bluish-green-red, metallic, electric, geometric essence (Muir has felt/tasted it) and wants to paint the walls with Muir's blood.

74.     Defendants' willful conduct during AIT passenger screening at TSA checkpoints at IWA and PIA was an abuse of power that exceeded their authority, and degraded, dehumanized, and permanently changed Muir, and directly caused him: (1) a significant loss of enjoyment of life by interfering in his personal relationship with the Creator and making him daily question his own sanity, (2) a significant loss of personal liberty by wrongfully taking away his well-established constitutional right to the benefit of air travel between the several states solely because of his qualified congenital physical disability, (3) a significant loss of personal property through Defendants' unlawful taking, control and use of his private protected health information representing his human tissue and human tissue disability beneath his skin, (4) a significant loss of personal privacy by disclosing the precise details of his hidden physical disability which could be used to positively identify him, and (5) a significant loss of marital privacy by revealing, depending on his level of symptom manifestation, his private marital healthcare choices regarding his most private of physical ailments.

## V.     Claims for Relief

75.     Muir filed TSA Claim Nos. 2021071271840 and 2021071271858 on June 5, 2021 based on the negligent or wrongful acts or omissions of TSA personnel that occurred at IWA on June 6, 2019 and at PIA on June 9, 2019, and TSA denied Claim Nos. 2021071271840 and 2021071271858 on December 2, 2021 (mailed Dec. 6, 2021) via certified mail No. 7020 1290 0002 3171 6344.

76.     Muir has therefore satisfied the prerequisites of 28 U.S.C. § 2675 and has the ability to institute the following claims for relief.

77.     Defendants are all highly-sophisticated actors with regard to scientific measurements, including time increments as small as a hundred billionth of a second and distance measurements as precise as a ten millionth of a millimeter.

78.     Time is defined as a non-spatial continuum that is measured in terms of events which succeed one another from past through present to future, and the passage of linear time as measured by calendar days between September 11, 2001 and the present is clear and undisputed. Therefore, the Court can take judicial notice of the Gregorian calendar, which will allow us to clearly define what happened when, and what came before or after what.

**Request for Judicial Notice - Rule 201**

79.     It is appropriate for the Court to take notice of relevant facts obtained from the public record and to take judicial notice of public court documents. The effect of taking judicial notice under Federal Rules of Evidence Rule 201 is to preclude a party from introducing contrary evidence, and the doctrine of judicial estoppel is "an equitable concept", and its application is therefore within the court's sound discretion (*see US ex rel. Osheroff v. Humana Inc.,* 776 F. 3d 805, 811 (11th Cir. 2015); *Lozman v. City of Riviera Beach,* 713 F.3d 1066, 1075 n. 9 (11th Cir.Fla.2013); *US v. Jones,* 29 F. 3d 1549, 1553 (11th

Cir. 1994); *Gen. Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074,

1083 (7th Cir. 1997); *Motorola, Inc. v. CBS, Inc.,* 672 F.Supp. 1033

(N.D.Ill.1986); *Matter of Cassidy*, 892 F. 2d 637, 642 (7th Cir. 1990); *Cannon-*

*Stokes v. Potter,* 453 F. 3d 446, 448 (7th Cir. 2006).

80.     Therefore, Muir respectfully requests that the Court take judicial

notice of the public court documents containing Defendants' pleadings in District

of Arizona Case No. 2:19-cv-05887-DGC, Central District of Illinois Case No.

1:20-cv-01280-JBM-JEH, and Seventh Circuit Court of Appeals Case No. 21-1312

as evidence of the facts therein because Muir, in the instant Complaint, refers to

specific prior representations [e.g. that Defendant L3's millimeter wave security

portal is "authorized and designed to detect objects located directly beneath the

surface of the skin" (*see* Attachment 1, 2:19-cv-05887-DGC, Doc. 19, filing system

p. 6), and true copies of official U.S. government-issued documents (including a

crucial, highly-technical SAFETY Act Designation and Certification for Defendant

L3's security portal, *see* Attachment 2, 1:20-cv-01280, Doc. 43-1)] regarding the

TSA AIT passenger screening program previously introduced by private and

government parties. See *188 LLC v. Trinity Industries, Inc.*, 300 F. 3d 730, 736

(7th Cir. 2002); *Daniel v. Cook Cty.*, 833 F.3d 728, 742 (7th Cir. 2016).

**The Supremacy Clause - U.S. Const., art. VI, cl. 2.**

81.     Federal courts generally apply the law of the forum with regard to

matters of pleading and how the litigation shall be conducted, and follow the

choice-of-law rules of the state in which the district court sits. *See* Restatement (Second) of Conflict of Laws §§ 122, 127 (1971); *see generally* 16 Am.Jur.2d Conflict of Laws §§ 153, 163 (1998) (noting that, in matters of pleading and how litigation is conducted, the law of the forum state governs).

82.     Illinois and Arizona both have two-year statutes of limitations for personal injury actions. See *Neita v. City of Chicago*, 830 F.3d 494, 498 (7th Cir. 2016) (applying 735 ILCS 5/13-202); and *Ellis v. Salt River Project*, 432 F. Supp. 3d 1070, 1087 (D. Ariz. 2020) (applying A.R.S. § 12-542). A statute of limitations is generally considered part of the forum state's substantive law. *Evans v. Lederle Laboratories*, 167 F.3d 1106, 1112 (7th Cir. 1999). Illinois courts presume that the Illinois statute of limitations will apply, even when the substantive law of a non-forum state applies, because a statute of limitations fixes the time in which a remedy may be sought and does not typically alter any substantive rights. *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012).

83.     The supremacy clause provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof * * * shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. The Supremacy Clause makes those laws `the supreme Law of the Land,' and charges state courts with a coordinate responsibility to enforce that law according to their regular modes of procedure."

*See Taylor v. General Motors Corp.*, 875 F. 2d 816, 822 (11th Cir. 1989); *Howlett v. Rose*, 496 U.S. 356, 367, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990); *Italia Foods, Inc. v. Sun Tours, Inc.*, 986 NE 2d 55, 62 - Ill: Supreme Court 2011.

84.    "Preemption of state law depends on either a comprehensive federal regimen ("occupation of the field"), usually established by express statutory declaration, or a clash between state and federal norms (a fight that the federal rules win under the Supremacy Clause)." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984). (citations omitted). *Bieneman v. City of Chicago*, 864 F. 2d 463, 471 (7th Cir.1988). The key inquiry in any preemption analysis is to determine the intent of Congress. See *City of Chicago v. Comcast Cable Holdings, L.L.C.,* 231 Ill.2d 399, 405, 326 Ill.Dec. 620, 900 N.E.2d 256 (2008).

85.    Congress has expressly implemented a comprehensive regulatory scheme in the field of civil actions against the United States under 28 U.S.C. §§ 1346(b), 2671 *et seq.,* and because this is a permissible exercise of Congress' authority, the Supremacy Clause, U.S. Const. art. VI, cl. 2., squarely supports the legitimacy of giving precedence to federal law in this area, which under 28 U.S.C § 2401(b), sets the statute of limitations for claims against the United States at two years.

86.    Therefore, Muir has preserved his claims against named Defendants other than Defendant United States using the anchor and umbilical "life-line" of

the mandatory FTCA statute of limitations expressly set forth by Congress in 28 U.S.C § 2401(b), see *Henderson v. Bolanda*, 253 F.3d 928, 932 (7th Cir. 2001), as claims brought in the instant Complaint for concert of action tort liability under Restatement (2d) of Torts § 876 are not independent causes of action in Arizona or Illinois and must be pleaded in accordance with the FTCA's express statute of limitations in 28 U.S.C § 2401(b) and administrative process in 28 U.S.C. § 2675.

### "Sensitive Security Information" and "High-tech" Preemption

87.     The a-priori physics and basic principles of computer science underlying the advanced technology and artificial intelligence used by Defendants in the TSA AIT passenger screening program are not secret, nor are the laws of logic and propositional calculus underlying Muir's claims.

88.     Therefore, any assertions by Defendants that this lawsuit touches on sensitive security information, as defined by 49 C.F.R. Part 1520, are facially illogical because none of the public documents in this case are secret or proprietary, and all prior representations by Defendants regarding AIT passenger screening were made in open court.

89.     The technology at issue is not "high-tech equipment" because, under 6 U.S.C. § 441(b)(2), the "Technology" must be available for immediate deployment in public settings, and "[h]igh-tech equipment is defined as that which only has use in combat and which has no civilian analog." *Bentzlin v. Hughes Aircraft Co.*, 833 F. Supp. 1486, 1489, CD California 1993.

90.     The artificial intelligence threat and anomaly decision-making software used in AIT passenger screening is not "high-tech equipment" because: (1) it is used in a civilian setting within the borders of Arizona and Illinois during peacetime by TSA, a non-military sub-agency of the non-military Department of Homeland Security, and (2) the millimeter wave scanning technology and corresponding "privacy software" used during AIT passenger screening at commercial airports in the United States were developed at the request of the Federal Aviation Administration by the Department of Energy at the Pacific Northwest National Laboratory under the management of Defendant Battelle Memorial Institute, which "captured" the intellectual property that was then licensed to Defendant L3 for use in its security portal product at issue.

### Impermissible Construction - 49 U.S.C. § 44901 vs. 49 C.F.R. Part 1540

91.     DHS/TSA final rule 49 C.F.R. Part 1540.107 is an impermissible construction of 49 U.S.C. § 44901(l) by DHS/TSA because it: (1) irrationally violates, in three obvious ways, the inviolable natural law of non-contradiction, (2) creates, in six ways, coercive unconstitutional conditions, (3) broadly stifles, in multiple ways, fundamental personal liberties through unreasonable and outrageous conduct, and (4) utilizes and relies on unmonitored artificial intelligence, which is uninsurable, abnormally dangerous activity occurring without a direct, unambiguous congressional mandate.

92.     When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions: First, whether Congress has directly spoken to the precise question at issue, and second, whether the agency's construction of the statute is permissible. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 US 837, 842-843 (1984) (internal citations omitted).

93.     When terms used in a statute are undefined, courts give them their ordinary meaning, which is usually derived from a dictionary, see *FDIC v. Meyer,* 510 U.S. 471, 476 (1994), *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179 (1995), *CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277 (2011), and "[i]t is ... a cardinal principle of statutory construction that [courts] must give effect, if possible, to every clause and word of a statute." *See Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal quotation marks omitted), *Alabama Ass'n of Realtors* v. UNITED STATES HHS, 539 F. Supp. 3d 29, 40 – D.D.C., 2021.

**Permissible Construction Violation 1 - Law of Non-Contradiction**

94.    "In propositional calculus the law of non-contradiction is: 'It is not the case that both *p* and not *p*'. In predicate calculus: 'For any *x*, it is not the case that *x* is *F* and *x* is not *F*'" Logical Laws. (2005). In T. Honderich (Ed.), The Oxford companion to philosophy (2nd ed., p. 540). Oxford, UK: Oxford University Press.

95.    As with other basic laws of nature and fundamental principles of science, like the second law of thermodynamics, the law of non-contradiction is not derived or proved, but arises because we merely observe that such a law is never violated.

**Law of Non-contradiction Violation 1: "Visual Image" vs. "Internal Code"**

96.    Congress, via enactment of Pub. L. 112−95 § 826 (126 Stat. 132, Feb. 14, 2012), *Privacy Protections for Air Passenger Screening with Advanced Imaging Technology*, codified as 49 U.S.C. § 44901(l), placed explicit limitations on the screening of air passengers using AIT. Section 44901(l)(1) states: "In this subsection, the following definitions apply: (A) Advanced imaging technology.— The term "advanced imaging technology"— (i) means a device used in the screening of passengers that creates a visual image of an individual showing the surface of the skin and revealing other objects on the body; and may include

devices using backscatter x-rays or millimeter waves and devices referred to as 'whole-body imaging technology' or 'body scanning machines'."

97.    Defendant L3 has demonstrated its ability to understand and follow the law of non-contradiction with regard to advanced technology imaging systems through its work integrating components for both the Integrated Science Instrument Module (which hosts four cameras and spectrographs for gathering data), and the Optical Telescope Element, a.k.a. the "eye", of NASA's ten billion dollar James Webb space telescope.

98.    Defendant L3's millimeter wave security portals used in passenger screening by DHS/TSA at IWA in Arizona and PIA in Illinois are "advanced imaging technology" devices (*see* Declaration of George Salimbas, 1:20-cv-01280, Doc. 43-1, p. 2), employing "whole body imaging technology" and Congress has spoken clearly and definitively on the precise technical requirements of AIT devices used in passenger screening, which expressly include the capability to create a "visual image" (*see* 49 U.S.C. § 44901(l)(1)).

99.    In promulgating final rule 49 C.F.R. Part 1540, *Passenger Screening Using Advanced Imaging Technology,* on March 3, 2016, DHS/TSA noted that "current versions of AIT do not have the capability to create an image; rather, they create internal code of the passenger using proprietary software" Federal Register, Vol. 81, No. 42, Thursday, March 3, 2016, Pg. 11,383, U. *Protection of Images*.

100.   On October 26, 2016, over seven months after TSA promulgation of final rule 49 C.F.R. Part 1540, Defendant L3 was issued a renewal Designation and renewal Certification under the SAFETY Act (6 U.S.C. § 441 *et seq.* (2018)) for its security portal, which under the "Terms and Conditions" (1:20-cv-01280, Doc. 43-1, pp. 5, 11), apply only to "a security portal that uses millimeter-wave scanning technology to produce three-dimensional images of subjects to detect threat objects, if present, on scanned subjects" (Doc. 43-1, pp. 8, 17).

101.   Based on the inviolable law of non-contradiction, a "visual image", commonly defined by the dictionary as an artificial representation that can be seen by the eye, which is precisely stated by Congress in 49 U.S.C. § 44901(l), cannot be produced by AIT devices that "do not have the capability to create an image". And no amount of Defendants' linguistic gymnastics can violate a basic law of nature to declare that "visual image" is actually, somehow, miraculously, the same as "internal code" because there is not a human being alive that could, with their natural, retina-based eyes, look at the proprietary "code" created by the AIT during passenger screening and see a "visual image" or have any idea of what the "code" represented.

102.   DHS/TSA also unequivocally stated: "[T]he individual image has been eliminated and there is no longer any need for a TSO in a remote location to view the image." Federal Register, Vol. 81, No. 42, Thursday, March 3, 2016, Pg. 11,383, U. *Protection of Images.*

103.   It is therefore undisputed that human experience, judgment, and empathy have been removed from the AIT passenger screening process as the human TSO in a remote location who viewed the individual image and decided on threats and anomalies has been replaced with an artificial intelligence agent.

**Law of Non-contradiction Violation 2: Surface/On vs. Beneath/Under**

104.   Defendant L3 has demonstrated its ability to overcome myriad high-tech burdens in order to successfully operate in a complex business environment of precise measurements much smaller than the millimeter waves of its AIT security portal, again, through its component integration work on the James Webb space telescope, which utilizes 132 small motors to position the mirror with 10 nanometer (10 millionths of a millimeter) accuracy, and the idea that Defendant L3 could possibly entertain the notion that it could pretend at any time that $x$ could be F and not F is not only ludicrous, but an insult to every engineer in history.

105.   "WBI [whole body imaging] creates an image of the full body, showing the surface of the skin and revealing objects that are on the body, not in the body." *DHS Privacy Impact Assessment for TSA Whole Body Imaging*, January 2, 2008, page 2, emphasis added.

106.   On November 16, 2010, at the "eleventh hour" of the last day before the sixty day window to challenge any aspect of the secret September 17, 2010

revision to TSA's Checkpoint Screening Procedure (which, with Defendant Pistole's personal approval, directed the use of AIT machines as part of TSA's standard security screening procedures and was still in effect as of June 2019) through a petition for review in the Court of Appeals pursuant to 49 U.S.C. § 46110 was forever closed, Defendant Pistole, while serving as TSA Administrator and addressing public concerns regarding the recently implemented TSA screening procedures, stated on CNN: "obviously this is not, you know, an internal, uh, scanner or screener in any way" (see *Anderson Cooper 360*, at 3:56 of the video, https://www.youtube.com/watch?v=0GOGMEO7RuA).

107.   On November 22, 2010, one week after the permanent preclusion of <u>all</u> AIT-related claims under the FTCA (as per widespread judicial interpretation of 49 U.S.C. § 46110), Defendant Pistole stated: "[AIT] will pick up any anomaly outside of the body", and "we're not gonna get in the business of, of doing body cavities" (*see* 11/22/2010 Christian Science Monitor Breakfast, starting at 1:52 of the video, https://www.youtube.com/watch?v=pIHE0bS7KO8).

108.   "In the NPRM, TSA proposed to amend 49 CFR 1540.107 by adding a new paragraph to specify that the screening and inspection of an individual prior to entering a sterile area of an airport or boarding an aircraft may include the use of AIT. TSA defined AIT as "screening technology used to detect concealed anomalies without requiring physical contact with the individual being screened."" (81 Fed. Reg. 11,366, March 3, 2016).

109.   Defendant L3 previously represented that its millimeter wave security portal AIT device is "authorized and designed to detect objects located directly beneath the surface of the skin" (*see* Case 2:19-cv-05887-DGC, Doc. 19, filing system p. 6).

110.   TSA's proposed use of the term "concealed anomalies" in its NPRM proposed AIT definition brazenly ignores the privacy protections and screening limitations put in place by Congress in 2012, as the clear lack of specificity and qualification with regard to the term "concealed" means not just under clothing, but under travelers' skin as well. It is therefore undisputed that TSA willfully intended to remove the capability of AIT devices to create images, and also willfully intended to search health information representing human tissue beneath travelers' skin using artificial intelligence software agents because all factory-made modifications to Defendant L3's millimeter wave AIT devices in use at commercial airports allowing for the creation of internal code instead of the congressionally-mandated "visual image" of the individual traveler were completed by May 16, 2013, and Defendant L3, the manufacturer of the AIT at issue, has explicitly confirmed that the device is in fact <u>designed</u> to detect objects located beneath travelers' skin.

111.   "TSA has determined not to define AIT using the term "anomaly"; instead, TSA has adopted the statutory definition of AIT, *i.e.,* a device used in the screening of passengers that creates a visual image of an individual showing the

surface of the skin and revealing other objects on the body." (81 Fed. Reg. 11,371, March 3, 2016).

112.   "Surface" is not defined in the statute. Its ordinary meaning is "an outermost boundary".

113.   "Skin" is not defined in the statute. Its ordinary meaning is "epidermis of a living person". The epidermis is composed of the outermost layers of the skin. It forms a protective barrier over the body's surface, responsible for keeping water in the body and preventing pathogens from entering. It is the human body's largest organ and a natural barrier/boundary.

114.   Based on the inviolable law of non-contradiction and the ordinary meaning of words, "in" the body cannot be "on" the body, and an object "on" the surface of the skin cannot be "beneath" the surface of the skin.

115.   It is axiomatic, under the concept of Westphalian Sovereignty, that state governments cannot unilaterally change a well-defined, established, and recognized boundary as it threatens the entire democratic system of our world.

116.   DHS/TSA clearly recognizes that travelers' skin is a biological boundary because it has publicly acknowledged the difference between inside the body and outside the body since at least January 2, 2008 (pre-BIPA), and Defendant Pistole, while serving as TSA Administrator, made clear public statements recognizing the difference between inside and outside the body.

117.    Defendant Pistole also suggested members of the public "assuage concerns" about AIT screening by doing their own research. Muir has done the open source research and this Complaint is the result, as is the relevant question: *if Muir doesn't have privacy under his skin, then where does he have it?*

**Law of Non-contradiction Violation 3: Threat Item vs. Natural Human Tissue**

118.    "TSA uses AIT solely for purposes of identifying objects that may be threat items." *DHS Privacy Impact Assessment  Update for TSA Advanced Imaging Technology*, December 18, 2015, p. 5.

119.    It is undisputed that the technology at issue does not have the ability to decipher the difference between natural human tissue and foreign objects, an AIT device feature which Defendant L3 has argued would, while simultaneously displaying significant technical achievements on the James Webb telescope, "impose an impractical burden" (Case 2:19-cv-05887-DGC,  Doc. 19, p. 12).

120.    "Object" is not defined. It means "a tangible and visible thing".

121.    "Threat" means "an indication of imminent harm".

122.    "Item" means "a thing or unit".

123.    "Human Tissue" is defined as "a group of cells that possess a similar structure and perform a specific function". This includes muscle, connective, nervous and epithelial tissue.

124.   "Human organ" is defined as "a self-contained group of tissues that performs a specific function in the body".

125.   Due to their organic nature and specific predetermined functions within the human body, natural human tissue, fluids, and organs cannot be threat items and are therefore, by explicit congressional mandate via 49 U.S.C. § 44901(l) and DHS/TSA's own clearly stated privacy policies, totally excluded from AIT passenger screening based on their cellular structure, biological classification, and physical location beneath the skin.

126.   "The ATR software does <u>not</u> produce an <u>individual image</u> but instead produces a <u>generic</u> outline that is publicly displayed on the equipment." Federal Register, Vol. 81, No. 42, Thursday, March 3, 2016, Pg. 11,383, U. *Protection of Images*, emphasis added.

127.   The exact locations of potential threats and anomalies are disclosed by the threat and anomaly decision-making artificial intelligence agent to Defendant L3's *Automated Target Detection* ("ATD") translation software, which then simply overlays the resulting information on a <u>two-dimensional</u> generic figure resembling a human outline.

128.   It is obvious that something described as "two-dimensional" cannot be the same as something described as "three-dimensional", which dispels any possibility that the "three-dimensional image" clearly described in Defendant L3's Safety Act Designation and Certification "Exhibit A, (F-26-E)" could be the

"two-dimensional generic figure" generated by the second function of the *ATD* "software solution".

129.   "Note that the current versions of AIT do not have the capability to create an image; rather, they create internal code of the passenger using proprietary software that it analyzes and uses to show an alarm box on the generic outline, <u>if appropriate</u>." Federal Register, Vol. 81, No. 42, Thursday, March 3, 2016, Pg. 11,383, U. *Protection of Images*, emphasis added.

130.   "For travelers who have sensitivities to being touched, the majority of passengers can be screened without a pat-down so long as there is no need to resolve alarms." Federal Register, Vol. 81, No. 42, Thursday, March 3, 2016, Pg. 11,387, X. *AIT Technology Screening Procedures for Families and Individuals With Medical Issues.*

131.   Muir's hidden congenital disability is not an appropriate reason to show an alarm box because any such threat alarm is based solely on his qualified physical disability and his private protected health information, which bears an insubstantial relationship to the security needs of TSA and is protected by his right to privacy, his right to be free from unreasonable search and seizure, his right to due process, and his right to the equal protection of the laws.

132.   Defendants' March 3, 2016 final rule 49 C.F.R. Part 1540 is an impermissible construction of 49 U.S.C. § 44901 because it clearly contradicts Congress' unambiguous and technically precise requirement for the use of AIT

"that creates a visual image of an individual" by expressly employing AIT that does not have the capability to create an image, which places TSA AIT passenger screening totally contradictory to, and therefore, by default, outside of the legal requirements set forth by Congress, which, by definition, renders it unlawful.

133.    The seemingly trivial difference between "visual image" and "internal code" is, at its heart, actually a root matter of great importance to the citizens of our great republic because Congress never authorized: (1) the use of AIT that does not create a visual image or, (2) the use of artificial intelligence in the TSA AIT passenger screening program, as there were no A.I. policies and procedures in place, the technology of care in artificial intelligence is totally undeveloped, and the use of artificial intelligence to make final, unreviewable decisions without human beings in the decision-making loop is totally uninsurable.

134.    Congress has directly spoken to the precise question at issue (air passenger privacy and the technical limitations of AIT passenger screening) and the intent of Congress is crystal clear. Therefore, it is the end of the matter, for the court must give effect to the unambiguously expressed intent of Congress to protect the privacy of air travelers during TSA AIT passenger screening through the placement of explicit limitations on the use of advanced imaging technology, *see* 49 U.S.C. § 44901(l), which protects the inalienable, fundamental liberty of travelers, explicitly recognizes the natural, biological barrier of travelers' skin, and implicitly recognizes the inviolable privacy inherently resting beneath it.

## Permissible Construction Violation 2 - Unconstitutional Conditions

135.    The `unconstitutional conditions' doctrine is recognized in the Seventh Circuit, and premised on the notion that what a government cannot compel, it should not be able to coerce. Understood at its most basic level, the doctrine aims to prevent the government from achieving indirectly what the Constitution prevents it from achieving directly. Thus, "[t]he denial of a public benefit may not be used by the government for the purpose of creating an incentive enabling it to achieve what it may not command directly." See *Libertarian Party of Ind. v. Packard,* 741 F.2d 981, 988 (7th Cir.1984); *Elrod v. Burns,* 427 U.S. 347, 361, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion).

136.    The doctrine prevents the government from withholding a public benefit for the purpose of coercing the beneficiary to give up a constitutional right or to penalize his exercise of a constitutional right. As the Supreme Court explained the doctrine in *Perry v. Sindermann,* "even though a person has no "right" to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests...." 408 U.S. 593, 597,

92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). See *Planned Parenthood v. Com'r of Dept. Health*, 699 F. 3d 962, 986 (7th Cir. 2012).

137.    The first step in any unconstitutional-conditions claim is to identify the nature and scope of the constitutional right arguably imperiled by the denial of a public benefit. *Id*.

138.    The word "travel" is not found in the text of the Constitution, yet it is undisputed that the right to travel is: (1) a part of the "liberty" of which the citizen cannot be deprived without due process of law under the Fifth Amendment (*see Kent v. Dulles*, 357 U.S. 116, 125 (1958)), (2) "firmly embedded" within the jurisprudence of the Supreme Court (*see United States* v. *Guest,* 383 U. S. 745, 757 (1966), *Saenz v. Roe*, 526 U.S. 489, 498 (1999)), and (3) as Justice Stewart reminded us in his concurrence, so important that it is "assertable against private interference as well as governmental action . . . a virtually unconditional personal right, guaranteed by the Constitution to us all." *See Shapiro* v. *Thompson,* 394 U. S. 618, 643 (1969).

139.    Muir has a strong, well-established liberty interest in domestic travel by air, and his choice to travel across this great land, from sea to shining sea, is basic in our scheme of values and very much as close to his heart as the choice of what he eats and reads. See *Kent* 357 U.S. at 126; *Shapiro* 394 U.S. at 630; *Kashem v. Barr*, 941 F.3d 358, 378 (9th Cir. 2019).

140.   Muir's unconstitutional-conditions claim is likely to succeed because the AIT passenger screening program imposes an undue burden on Muir's: (1) right to the benefit of the TSA Checkpoint, (2) right to the benefit of protection under 29 U.S.C. § 794, (3) right to the benefit of protection under the ADA (42 U.S.C. § 12101 *et seq*.), and (4) right to the benefit of the public right of transit between the several states by air under 49 U.S.C. § 40103(a)(2).

141.   In order to secure his federal benefits related to domestic air travel and use of the TSA Checkpoint, and also to exercise his right to travel under the Liberty provision of the Due Process Clause of Amendment V to the United States Constitution, Muir is coerced into giving up his well-established constitutional right to: (1) free exercise under Amendment I, (2) be free from unreasonable search under Amendment IV, (3) be free from unreasonable seizure under Amendment IV, (4) due process under the Property provision of Amendment V, (5), the equal protection of the laws under the Equal Protection Clause of Amendment XIV via reverse incorporation into Amendment V, and (6) privacy.

142.   (1) Amendment I, Free Exercise: While the Department of Defense may compel enlisted men with severely-disabling and life-threatening symptom manifestations of congenital disabilities like Muir to have two hernia surgeries, Muir is a civilian citizen and it is against his most deeply held beliefs to engage in compulsory medical treatment, especially emergency exploratory surgery as

would certainly be performed against his will if he was unable to decline medical treatment, as he has done before, due to temporary, pain-induced incapacity.

143.    Muir previously submitted Maricopa County Police Incident Report #1801638 (Case No. 1:20-cv-01280, Doc. 6) detailing his serious health emergency on November 8, 2018 at Chandler Gilbert Community College (which presented almost identical symptoms as Muir experienced in August 2018 and on June 6, 2019 and June 9, 2019), and Muir experienced an even worse event on Frog Mountain at Summerhaven, AZ that seriously threatened his life on June 22, 2018, and despite being just feet from a manned fire department station and helipad, did not seek medical assistance during the excruciatingly painful, five-hour-long medical emergency.

144.    Defendant L3 has acknowledged that Muir's congenital disorder "is no doubt a serious matter affecting Plaintiff's health..." (Case No. 2:19-cv-05887-DGC, Doc. 19, pg. 2).

145.    Due to the Free Exercise Clause of Amend. I to the United States Constitution, Defendants cannot compel Muir to have very risky, highly-invasive surgery, so instead, they use advanced technology to identify and expose his most private of ailments (his beneath-the-skin, human tissue congenital disability), and then callously and indifferently brutalize him if the symptoms of his disability manifest to an extent determined by the soulless A.I. to be anomalous as compared to the position of a "normal" man's internal organs and human

tissue inside his body cavity in order to coerce from Muir what they cannot command, as the implication is that, by at least the second attempt, this unproven, hypothetical hernia surgery (which often goes very, very poorly) will be "successful" (in Defendants' very limited-application appraisal with regard to AIT), in allowing Muir to pass through AIT passenger screening without his congenital disability being classified as anomalous by the artificial intelligence threat and anomaly decision-making software.

146.    (2) Amendment IV, Unreasonable Search: Defendants' AIT search of Muir was irrational, and what is irrational cannot be, by definition, reasonable. Defendants' fatal logical flaw in their AIT search of Muir during passenger screening has been well-recognized for a least a century as the principle of the drunkard's search, a.k.a. the "streetlight effect". Defendants' search of Muir's private health information representing the human tissue beneath his skin for objects on the surface of his skin that could be threat items is analogous to the eponymous drunk in his search for his keys, not where he knew he lost them, but instead where the light was.

147.    Defendants cannot compel Muir to allow an unlawful search of his private health information in order to board his flight, so they coerce him by simply denying him the public benefit of the TSA Checkpoint if he does not acquiesce to their unreasonable search procedure.

148.   (3) Amendment IV, Unreasonable Seizure: Defendants' seizure of Muir's private health information property in order to create his digital full-body avatar during AIT passenger screening was unreasonable because it was: (1) used to conduct an irrational search which bore an insubstantial relationship to the security needs of TSA because the requirement to detect threat objects <u>on</u> the body and the <u>surface</u> of the skin is the limit of AIT screening, (2) a violation of BIPA Section 15(a) and (b), as Muir never gave implicit or explicit consent to having his private health information taken as a part of AIT passenger screening and Defendants never made publicly available a retention schedule and guidelines for permanently destroying the biometric identifiers and information they were collecting and storing, and (3) a violation of his right to privacy found in the United States Constitution through *Griswold* and *Katz*, and under Article II § 8 of the Arizona Constitution, and Article I, Section 6, of the Illinois Constitution because Muir never consented to having his private health information representing his hidden disability and his private marital healthcare choices regarding his disability taken, disclosed, or used by Defendants during AIT passenger screening.

149.   Defendants cannot compel Muir to disclose his private health information representing the human tissue and human tissue disability beneath his skin, so they coerce him by denying him all public benefits related to commercial air travel between the several states if he does not totally surrender his private data.

150.   (4) Amendment V, Due Process, Property interest: Muir's interest in his private property is created under state law and protected by the Fifth Amendment, and, under BIPA, Muir has a well-established property interest in his "biometric identifiers" which could be used to positively identify him, and Defendants violated Muir's well-established property interest when they seized his private health information property from beneath the surface of his skin.

151.   Defendants cannot compel Muir to give up his property rights under BIPA, or his right to privacy and right to be free from unreasonable seizure under Article I, Section 6 of the Constitution of the State of Illinois, so they coerce him by severely inhibiting his use of public benefits available at the TSA Checkpoint, and as a consequence, his use of common air carriers.

152.   (5) Amendment XIV, Equal Protection via reverse incorporation: As a qualified individual with a disability, Muir is protected by 29 U.S.C. § 794 when participating in a federal program, but Muir automatically loses that protection during AIT passenger screening at the TSA Checkpoint as it is undisputed that the threat and anomaly decision-making artificial intelligence is, due to the basic principles and logic of computer science, totally precluded from empathizing with Muir's disability and serious medical needs because an A.I. agent is not a human being and therefore cannot: (1) understand what it means to be human, (2) understand human disability, or (3) feel the guilt, shame, and discomfort that

dehumanizing a living, breathing person usually generates, and therefore cannot ever enforce Muir's right to the equal protection of the laws.

153.    Defendants cannot compel Muir to give up his Section 794 protections while participating in a federal program, so they coerce him by significantly inhibiting his use of the TSA Checkpoint because Muir cannot know if he is symptomatic at his right groin to the extent necessary to be classified as anomalous until he has already been scanned and cannot escape.

154.    (6) *Griswold v. Connecticut*, Marital Privacy: Muir's healthcare choices with regard to his hidden congenital disability are constitutionally protected by Muir's right to marital privacy and Muir cannot be denied the public benefits of the TSA Checkpoint simply because he made the choice (within the confines of his marriage, as the decision had a very large spiritual, emotional, and financial impact on Mrs. Muir) to not have surgery, and he cannot be coerced to violate his most deeply held beliefs through outrageous, conscience-shocking treatment during AIT passenger screening simply because Defendants cannot compel him to take known, serious medical risks in an attempt to use medical science and technology to alter how he was born.

155.    Defendants cannot compel Muir to surrender his right to marital privacy, so they coerce him to abandon his private healthcare decision to not have surgery by denying him the ability to travel through every public airport in the United States that is subject to Part 1540, which is all of them.

## Permissible Construction Violation 3 - Outrageous Conduct that Broadly Stifles Fundamental Personal Liberties

156.   The right to privacy, the right to due process (travel), and the right to the equal protection of the laws were clearly-established fundamental liberties in June 2019.

157.   Defendants' conduct in the AIT passenger screening program broadly stifles travelers' fundamental personal liberties, and the willful, considered, and repeated decision to keep the unlawful configuration of Defendant L3's millimeter wave AIT devices in place after officially adopting the congressional definition of AIT on March 3, 2016 (and thereby implicitly accepting the corresponding privacy protections set forth in 49 U.S.C. § 44901(l)) is outrageous conduct because it displays an open defiance of Congress, an outright disregard for the United States Constitution and Bill of Rights, and an unacceptable abuse of trust and authority.

158.   Contrary to Defendant Pistole's unambiguous assertion on November 22, 2010 at the *Monitor Breakfast*, Defendants are very much in the "business of doing body cavities" and have been since at least September 17, 2010 (*see* Seventh Circuit Court of Appeals Case 21-1312, Doc. 20, p. 41).

159.   It is objectively outrageous that a mirror on a telescope in outer space gets more attention paid to the technical precision and performance of its advanced technology systems than do human travelers with inalienable rights

moving through commercial airports on earth. And while learning about the origins of our vast universe is very important to United States citizens, it is certainly not more important than: (1) the preservation of citizens' fundamental liberties and statutory rights and constitutional rights at public facilities of interstate commerce, or (2) upholding the explicit, clear and technically precise privacy protections shielding travelers from excessive and oppressive executive branch prying and intimidation set forth by Congress in 44901(l).

### Fundamental Personal Liberty Violation 1 - Constitutional Right to Privacy

160.   The right to privacy is a clearly-established fundamental right in that, "[w]e deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred." *Griswold v. Connecticut*, 381 US 479, 486 (1965). See also *Bowers v. Hardwick*, 478 US 186, 191 (1986).

161.   In the Seventh Circuit, a reasonable expectation of privacy exists when: (1) the claimant exhibits an actual (subjective) expectation of privacy; and (2) the expectation is one that society is prepared to recognize as reasonable. *United States v. French,* 291 F.3d 945, 951 (7th Cir.2002)." *Doe v. Heck*, 327 F. 3d 492, 511 (7th Cir. 2003).

162.    Muir exhibited an actual expectation of privacy because his disability was hidden beneath his skin, he kept his hidden physical disability private, and he intended it to remain so.

163.    Muir's expectation of privacy with regard to his hidden physical disability is one that society is prepared to recognize as reasonable, and indeed has recognized as reasonable, in Amendment IV, *Griswold*, BIPA, HIPAA, the right to privacy under Article II § 8 of the Arizona Constitution, and the right to privacy under Article I, Section 6, of the Illinois Constitution.

164.    "Privacy basically means concealment. People conceal things in order to fool other people about them. People want to appear healthier than they are... Medical records are increasingly being digitized... once something is digitized it's out there, your privacy is lost because, I'm not sure everybody realizes this, but digitized materials... tend to be in multiple copies on different servers." – Judge Posner: Privacy, *Big Think* interview, April 23, 2012.

165.    "Individuals have a constitutionally protected interest in avoiding "disclosure of personal matters," including medical information." See *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), and, we cannot ignore the "totality of the circumstances" surrounding the AIT passenger screening search, or the manner in which the "advance of technology" has affected "the degree of privacy secured to citizens by the Fourth Amendment." See *Kyllo v. United States,* 533 U.S. 27, 33-34, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). "We

cannot ignore technological developments in the Fourth Amendment context, but instead must confront "what limits there are upon this power of technology to shrink the realm of guaranteed privacy."" *Id.* at 34, 121 S.Ct. 2038." *US v. Kincade*, 379 F. 3d 813, 867 (9th Cir. 2004) GOULD, Circuit Judge, concurring.

166.    In the Ninth Circuit, it has been held that: "the right to informational privacy is not absolute; rather, it is a conditional right which may be infringed upon a showing of proper governmental interest." See *Lawall II,* 307 F.3d at 790 (internal quotation marks omitted).

167.    The following factors are balanced to determine whether the governmental interest in obtaining information outweighs the individual's privacy interest: (1) the type of information requested, (2) the potential for harm in any subsequent non-consensual disclosure, (3) the adequacy of safeguards to prevent unauthorized disclosure, (4) the degree of need for access, and (5) whether there is an express statutory mandate, articulated public policy, or other recognizable public interest militating toward access. *Id.* "In *Lawall II,* we held that the right to informational privacy "applies both when an individual chooses not to disclose highly sensitive information to the government and when an individual seeks assurance that such information will not be made public." *Id.* at 789-90. Even if a law adequately protects against *public* disclosure of a patient's private information, it may still violate informational privacy rights if an unbounded, large number of government employees have access to the

information." *Tucson Woman's Clinic v. Eden*, 379 F. 3d 531, 551-552 (9th Cir. 2004).

168.   The type of information requested by Defendants, which wasn't simply requested, but, without consent, taken, was private protected health information representing Muir's human tissue and human tissue disability beneath his skin, which was beyond the explicit limits of AIT passenger screening, and the taking of which bore an insubstantial relationship to the needs of TSA to search passengers for threat objects on the surface of their skin.

169.   The potential for harm in any subsequent non-consensual disclosure has been well-established by the events of August 9, 2018 at IWA and August 12, 2018 at PIA, which, due to the unauthorized use of Muir's private health information, led to Muir's dehumanization.

170.   The adequacy of safeguards to prevent unauthorized disclosure is reduced to zero through the basic facts of computer science that Defendants are, without consent, disclosing Muir's private protected health information representing the human tissue and human tissue disability beneath his skin back and forth to each other as a part of the AIT passenger screening process under 49 C.F.R. Part 1540, and the fiber optic path Muir's private health data traveled is a mystery.

171.   The degree of Defendants' need for access to Muir's private health information regarding the human tissue and human tissue disability beneath his

skin is zero because human tissue and organs beneath the surface of the skin are, by their very biological nature and physical location, completely precluded from being threat items on the surface of the skin.

172.    There is no express statutory mandate, articulated public policy, or other recognizable public interest militating toward access because Defendants: (1) are operating outside of the limits and precise technical requirements of 49 U.S.C. § 44901 by using AIT that does not have the capability to create an image, but instead creates proprietary code, (2) have not published data retention or destruction policies, (3) have not disclosed where the servers that host the artificial intelligence agents that perform the search of Muir's private health information proprietary code are located, and (4) have not disclosed the fiber path that Muir's data travels.

173.    Weighing the relevant factors, and the fact that Muir never gave consent, express or implied, to have his private health information taken, converted, or searched, it is clear that the governmental interest in obtaining information about foreign objects on the surface of Muir's skin does not outweigh Muir's privacy interest in the human tissue and human tissue disability beneath his skin because it bears no substantial relationship to the security needs of TSA because human tissue is not, and cannot be, a threat object.

174.    "Even if there were no possibility that a patient's identity might be learned from a redacted medical record, there would be an invasion of privacy.

Imagine if nude pictures of a woman, uploaded to the Internet without her consent though without identifying her by name, were downloaded in a foreign country by people who will never meet her. She would still feel that her privacy had been invaded. The revelation of the intimate details contained in the record of a late-term abortion may inflict a similar wound" *Northwestern Memorial Hosp. v. Ashcroft*, 362 F. 3d 923, 929 (7th Cir. 2004).

175.   Muir's privacy was invaded when Defendants intruded upon his seclusion and took, without consent, his private, intimate health details regarding his hidden physical disability, which is his most private and painful of ailments, and then disclosed them.

176.   In HIPAA, Congress expressed a reasonable expectation of digital ePHI privacy. As the Fourth Circuit has noted, Congress intended through this legislation to "recogniz[e] the importance of protecting the privacy of health information in the midst of the rapid evolution of health information systems."" See *S.C. Med. Ass'n v. Thompson,* 327 F.3d 346, 348 (4th Cir. 2003).  HIPAA emphasizes privacy and authorizes the adoption of standards that will "ensure the integrity and confidentiality of [individuals' health] information [and protect against]... unauthorized uses or disclosures of the information." *See* 42 U.S.C. § 1320d-2." See *Webb v. Smart Document Solutions, LLC*, 499 F. 3d 1078, 1084 (9th Cir. 2007).

177.   Defendants knew or should have known with substantial certainty that AIT passenger screening created "ePHI" because many companies utilizing millimeter wave scanning technology, including "MeAlity", "Abacus", "Alton Lane", and Defendant PNNL (*see* HIPAA reference at *Introduction*, p. 263, D. McMakin et al., "New Improvements to Millimeter-Wave Body Scanners", in *Proc. of 3DBODY.TECH 2017 - 8th Int. Conf. and Exh. on 3D Body Scanning and Processing Technologies*, Montreal QC, Canada, 11-12 Oct. 2017, pp. 263-271, which can be found at https://doi.org/10.15221/17.263, by Douglas MCMAKIN, et al.), know that the millimeter wave technology creates up to 200 billion body dimension data points during each scan, and Defendant L3 acknowledged that the technology is <u>designed</u> to detect objects and human tissue beneath the skin, and TSA acknowledges that its "SSI", the disclosure of which could constitute an <u>invasion of privacy</u>, includes "medical" files (see 49 C.F.R. § 1520.5(a)(1)), Defendant L3 demonstrated its understanding of medical information privacy via its L3Harris Geospatial "IDL" proprietary code language used for medical imaging, and Defendant Leidos has demonstrated its understanding of HIPAA and data privacy in its role as prime contractor in the Malaria Vaccine Development Program (MVDP) Contract AID-OAA-C-15-00071.

178.   The difference between Muir's experiences at the TSA Checkpoint in August 2018 and June 2019 (the root difference being the position of Muir's natural tissue and organs inside his body cavity at the exact moment the millimeter waves penetrated his skin and reflected back to the portal sensors)

clearly demonstrates that AIT passenger screening violates Muir's well-established right to privacy when Defendant L3's security portal takes Muir's private health information representing the human tissue and human tissue disability beneath his skin and then discloses it to Defendant United States' artificial intelligence agent, which algorithmically judges Muir's health status based on a split-second comparison to the data of a "normal" man.

179.   Despite Muir's unpredictable manifestation of a cycle of symptoms occurring over a period of up to seven days, the artificial intelligence threat and anomaly decision-making agent lets Muir pass through the TSA Checkpoint completely untouched, as occurred on June 6, 2019 and June 9, 2019, if his symptoms do not present to the extent required as to classify him as "anomalous" according to the A.I.'s machine-learning, rules-based, anatomical parameters of a "normal" human man, or, alternatively, orders him to be brutalized in a most cruel, unusual, and inhumane fashion, as occurred on August 9, 2018 and August 12, 2018, if his symptoms are severe enough to place him outside of the anatomically "normal" model to which he is rapidly compared without the possibility for any human review of its high-impact, rapid-fire decision.

180.   The TSA AIT passenger screening program, as administered by Defendants under 49 C.F.R. Part 1540, encroaches on Muir's fundamental right to privacy because it involves an unauthorized breach of the well-established biological boundary of his skin, an unauthorized taking of his private health

information property from beneath his skin, and an unauthorized algorithmic judging of his health information with no human beings in the decision-making loop.

181.   Defendants' reasonable belief that the objective of detecting threat items on air passengers was legitimate is not carte blanche to pursue that objective by outrageous means, including willful, ultrahazardous conduct in certain opposition to Congress (altering the AIT to remove required image production capability) *See McGrath v. Fahey*, 126 Ill.2d 78, 88 (1988).

## Fundamental Personal Liberty Violation 2 - Substantive Due Process - Liberty

182.   The Due Process Clause of the Fifth Amendment provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law". Substantive due process prevents the government from engaging in conduct that "shocks the conscience," see *Rochin* v. *California,* 342 U. S. 165, 172 (1952), or interferes with rights "implicit in the concept of ordered liberty" see *Palko* v. *Connecticut,* 302 U. S. 319, 325-326 (1937); *United States v. Salerno*, 481 US 739, 746 (1987).

183.   "Both the Supreme Court and this Court have "emphasized how limited the scope of the substantive due process doctrine is." *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225,* 158 F.3d 962, 965 (7th Cir.1998) (citing *Washington v. Glucksberg,* 521 U.S. 702, 117 S.Ct. 2258, 138 L.Ed.2d 772

(1997))... Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational. *See Glucksberg,* 521 U.S. at 728, 117 S.Ct. 2258." *Lee v. City of Chicago*, 330 F. 3d 456, 467 (7th Cir. 2003).

184.   The AIT passenger screening program impinges upon Muir's fundamental right to privacy and his freedom to travel, and even though the governmental practice of administering the AIT passenger screening program under 49 C.F.R. Part 1540 encroaches on fundamental liberties, the Court need not look beyond the rational relationship standard to hold that the program is irrefutably irrational, because if the eponymous drunkard looking for his keys is unable to even stand (rational relationship scrutiny), there is no reason to make him walk a straight line (intermediate scrutiny), or hop on one foot while touching his nose (strict scrutiny).

185.   Illinois courts independently construe the scope of due process rights under article I, section 2, of the Illinois Constitution of 1970 (See *Rollins v. Ellwood,* 141 Ill.2d 244, 275, 152 Ill.Dec. 384, 565 N.E.2d 1302 (1990)), and have interpreted the Illinois due process clause to provide greater protections than its federal counterpart where an appropriate basis to do so is found. See *People v. Washington,* 171 Ill.2d 475, 485-86, 216 Ill.Dec. 773, 665 N.E.2d 1330 (1996);

*People v. McCauley,* 163 Ill.2d 414, 440, 206 Ill.Dec. 671, 645 N.E.2d 923 (1994)." *Lewis E. v. Spagnolo*, 710 NE 2d 798, 812 - Ill: Supreme Court 1999.

186.    Defendants engaged in conscience-shocking conduct when Defendants treated and scanned Muir like luggage instead of a person with human feelings, removed human beings and human judgment and human empathy from the decision-making loop of a state custodial interrogation, threw Muir into an unavoidable, advanced technology "snake pit" to have his private health information instantaneously judged by an ignorant A.I. "Golem" without giving him fair notice of the advanced imaging technology threat assessment process occurring outside of the legal parameters set forth by Congress, or disclosing known, state-created safety risks of the threat assessment process that, as a non-negotiable term of the contract of carriage, Muir could not unilaterally avoid, and then turned their backs on him while his well-established constitutional rights and human dignity were violated under color of law, solely because of his qualified disability.

187.    Defendants engaged in irrational conduct when they searched the human tissue and organs and human tissue disability beneath Muir's skin for foreign objects that could be threat items on the surface of his skin. When the drunk in the street continues his search for his keys not where he lost them, but where the light is, he is clearly engaged in irrational behavior, just as Defendants were when they violated Muir's privacy and unlawfully searched his ePHI.

## Fundamental Personal Liberty Violation 3 - Substantive Due Process – Property

188.   When a substantive-due-process challenge involves only the deprivation of a property interest, a plaintiff must show "either the inadequacy of state law remedies or an independent constitutional violation" before the court will engage in a review. *See Doherty v. City of Chicago,* 75 F.3d 318, 323-26 (7th Cir.1996); *see also Wudtke v. Davel,* 128 F.3d 1057, 1062 (7th Cir.1997) ("[I]n cases where the plaintiff complains that he has been unreasonably deprived of a state-created property interest, without alleging a violation of some other substantive constitutional right or that available state remedies are inadequate, the plaintiff has not stated a substantive due process claim." (quotations omitted))." *Lee v. City of Chicago*, 330 F. 3d 456, 467 (7th Cir.2003).

189.   Muir's substantive due process property claim regarding a governmental practice (execution of 49 C.F.R. Part 1540.107 through an impermissible construction of 49 U.S.C. § 44901) implicates a fundamental right to privacy and a fundamental right to interstate travel, and while an intermediate or strict scrutiny standard of review is therefore appropriate, as demonstrated above, Defendants cannot even pass a rational relationship standard of review.

190.   In the instant case, all state law remedies available to Muir through the FTCA are, through widespread judicial interpretation of 49 U.S.C. § 46110, completely removed by the "jurisdictional funneling" function of the statute.

191.    The "streetlight effect" is on full display in Defendants' unlawful construction and execution of 49 C.F.R. Part 1540 and it is a clearly irrational violation of the inviolable Law of Non-Contradiction and therefore cannot be tolerated in our republic. Defendants': (1) unlawful taking of passengers' private protected health information property and "biometric identifiers" regarding the human tissue beneath their skin which could be used to positively identify them, (2) unauthorized conversion of travelers' protected health information into ePHI "proprietary code" that Defendants L3 and United States alone controlled, and (3) use of unmonitored artificial intelligence to judge passengers' private health information against a presupposed "normal" human form are irrational because this behavior bears no substantial relationship to screening for weapons, explosives or other contraband because human tissue, by definition, cannot be a threat item and therefore Defendants' conduct cannot be considered rational.

**Fundamental Personal Liberty Violation 4 - Procedural Due Process**

192.    Government action depriving a person of life, liberty, or property must be implemented in a fair manner. This requirement has traditionally been referred to as procedural due process. *See Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976); *United States v. Salerno*, 481 US 739, 746 (1987).

193.    Application of the *Mathews* balancing test to the instant case, *see Kashem v. Barr*, 941 F. 3d 358, 377 (9th Cir. 2019); *Hamdi v. Rumsfeld,* 542 U.S.

507, 528-29, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004) (plurality opinion); *Al Haramain II,* 686 F.3d at 979, the three-part inquiry to determine whether administrative procedures provided to protect a liberty or property interest are constitutionally sufficient will demonstrate that AIT passenger screening as administered under 49 C.F.R. Part 1540 violates travelers' procedural due process, and the administrative procedures in place are wholly insufficient.

194. First, the private interest that will be affected by the official action; Muir undoubtedly has a strong liberty interest in domestic travel. *See Kent v. Dulles,* 357 U.S. 116, 125-26, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958) ("The right to travel is a part of the `liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment. ... Freedom of movement across frontiers in either direction, and inside frontiers as well ... is basic in our scheme of values."); *Gilmore,* 435 F.3d at 1136-37 (noting "the fundamental right to interstate travel").

195. Second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; "As the *Mathews* balancing test makes clear, we must carefully assess the precise `procedures used' by the government, `the value of additional safeguards,' and `the burdens of additional procedural requirements.'" *Al Haramain II,* 686 F.3d at 980 (quoting *Foss v. Nat'l Marine Fisheries Serv.,* 161 F.3d 584, 589 (9th Cir. 1998)). "[T]he Constitution certainly does not require

that the government take actions that would endanger national security; nor does it require the government to undertake every possible effort to mitigate the risk of erroneous deprivation and the potential harm to the private party. But the Constitution does require that the government take reasonable measures to ensure basic fairness to the private party and that the government follow procedures reasonably designed to protect against erroneous deprivation of the private party's interests." The risk of deprivation in this case is very substantial because Defendants are taking and utilizing the private health information of travelers without informed consent and operating outside the lawful parameters of AIT passenger screening set forth by Congress in a custodial interrogation situation with guaranteed invasive bodily impacts and an unmonitored artificial intelligence that cannot understand human feelings as the final authority in determining threats and anomalies that result in mandatory physical pat-downs.

196.    Finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; "[N]ational security is a compelling government interest," *In re Nat'l Sec. Letter,* 863 F.3d 1110, 1123 (9th Cir. 2017), and the government clearly has interests of the highest order in combatting terrorism and securing air travel.

197.    The only procedural requirement necessary to protect Muir's private interests during the AIT passenger screening process is fair notice and a fair

warning based on Defendants' constructive knowledge with substantial certainty, which could be issued in plain language on a sign: "Warning: Encounters with this device may reveal private health information, including hidden disabilities." No reasonable person could conclude that the creation of signs containing these thirteen words is an undue burden, or discloses any sensitive information not already scattered throughout the public record, and Defendants had total control of Muir and therefore had a duty under Restatement (2d) of Torts § 314A to warn of state-created dangers he could not unilaterally avoid during AIT passenger screening.

198.    Defendants' construction of 49 U.S.C. § 44901 does not satisfy procedural due process. Congress has mandated that the limitations on use of advanced imaging technology in air passenger screening require that the AIT used is a device that "creates a visual image of an individual showing the surface of the skin and revealing other objects on the body". By doing so, Congress has made a reasonable judgment and explicit declaration about the limits of AIT passenger screening and has decided that travelers' liberty interest and privacy interest during AIT passenger screening is substantial, and while it must be balanced against the government's urgent interest in combatting terrorism and the public's manifest interest in aviation safety, the use of AIT that does not have the capability to create images violates procedural due process.

199. The administrative procedures provided to protect Muir's liberty and property and privacy interests are not constitutionally sufficient, and because the burden required to prevent Muir's unconscionable injuries is so low, the test must be decided in favor of citizens' fundamental liberty and privacy interests in the right to interstate travel and the right to health information privacy.

**Fundamental Personal Liberty Violation 5 - Equal Protection Clause**

200. "With… denials of fundamental rights, the government's justification for the regulation must satisfy the strict scrutiny test to pass muster under the Equal Protection Clause." *Srail v. Village of Lisle, Ill.*, 588 F. 3d 940, 943 (7th Cir. 2009).

201. "Even though there is no explicit equal protection clause in the Fifth Amendment, the equal protection guarantee in the Fourteenth Amendment has been read into the Due Process Clause of the Fifth Amendment through the process of reverse incorporation. *See Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 695, 98 L.Ed. 884 (1954); *Vance v. Bradley,* 440 U.S. 93, 94-95 n. 1, 99 S.Ct. 939, 942 n. 1, 59 L.Ed.2d 171 (1979) ("the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws").

202. "[T]he Equal Protection Clause does not require the government to give everyone identical treatment. The Equal Protection Clause does, however,

require the state to treat each person with equal regard, as having equal worth, regardless of his or her status." *Nabozny v. Podlesny*, 92 F. 3d 446, 456 (7th Cir. 1996). "Under the doctrine of qualified immunity, liability is not predicated upon the existence of a prior case that is directly on point. *See McDonald v. Haskins,* 966 F.2d 292, 293 (7th Cir.1992). The question is whether a reasonable state actor would have known that his actions, viewed in the light of the law at the time, were unlawful. *Id.* at 294." *Nabozny v. Podlesny*, 92 F. 3d 446, 456 (7th Cir. 1996).

203.   Muir is denied the fundamental right to privacy under *Griswold* and *Katz*, which is recognized in Illinois under the Illinois Constitution and BIPA.

204.   Muir is denied the fundamental right to travel under Amendment V.

205.   Therefore, we must answer the crucial question: *did the state treat each person subject to AIT passenger screening as having equal worth?*

## Facial Constitutional Violation - Rational Relation Standard

206.   Because "the disabled do not constitute a suspect class" for equal protection purposes, a governmental policy that purposefully treats the disabled differently from the non-disabled need only be "rationally related to legitimate legislative goals" to pass constitutional muster. *Does 1-5 v. Chandler,* 83 F.3d 1150, 1155 (9th Cir.1996) (citing *City of Cleburne,* 473 U.S. at 440, 105 S.Ct. 3249). *Lee v. City of Los Angeles*, 250 F. 3d 668, 687 (9th Cir. 2001).

207.   29 U.S.C. § 794 states in relevant part: "No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity conducted by any Executive agency."

208.   AIT passenger screening is a program conducted by a federal agency. Therefore, statutes binding on federal programs cannot be ignored and 29 U.S.C. § 794 applies to TSA AIT passenger screening.

209.   Defendants failed to follow the specific Congressional directives contained in 29 U.S.C. § 794 regarding the application of Rehabilitation Act Section 504 to all federal programs. In this case, there was no room for choice or judgment, and ignoring Section 504 was not an option. "DHS Directive 065-01 established a policy that affirms the DHS's commitment to Section 504's nondiscrimination obligations, which applies to all TSA-conducted programs and activities" (TSA's *Section 504 Component Plan for Nondiscrimination of Individuals with Disabilities*, July 12, 2018, Pg. 7).

210.   Once Defendants undertook the AIT passenger screening program, they were required to do so in accordance with their established policies. See *Kim v. US*, 940 F. 3d 484, 488 (9th Cir. 2019). Therefore, Defendants had no choice but to follow the law set forth in 29 U.S.C. § 794 with regards to the federal AIT passenger screening program, and the regulations set forth in 6 C.F.R. Part 25.

211. Through deductive reasoning it can be definitively proven that Defendants violated the Equal Protection Clause, willingly failed to treat each citizen subject to AIT passenger screening as having equal worth, and did so with deliberate indifference in a situation that every reasonable officer would know was unlawful and violated travelers' rights.

212. "Narrow AI" is a term generally used to describe artificial intelligence systems that are specified to handle a singular or limited task." *See* https://deepai.org/machine-learning-glossary-and-terms/narrow-ai.

213. DHS/TSA has represented that "[c]urrent security algorithms rely on manual data mining to identify complex threats and translate them into coded rules for existing screening technologies" *See* https://www.dhs.gov/science-and-technology/news/2020/09/09/feature-article-st-tsl-evaluates-artificial-intelligence.

214. Based on the DHS/TSA description of the "security algorithm", the artificial intelligence agent used to unilaterally decide on threats and anomalies present in passenger data taken during AIT passenger screening is specified to handle those limited tasks.

215. Therefore, the artificial intelligence used under 49 C.F.R. Part 1540 by TSA during AIT passenger screening is, based on the commonly-accepted computer industry definition, "narrow" artificial intelligence.

216.   29 U.S.C. § 794 pertains to human disability.  Understanding human disability requires human empathy.  Human empathy is a state of mind.  Narrow artificial intelligence cannot, by well-established definition, have a state of mind.

217.   Therefore, narrow artificial intelligence cannot understand or display human empathy, understand or empathize with human disability, human feelings, human emotion or human dignity, or understand the meaning of the protections provided by Congress in 29 U.S.C. § 794.

218.   Therefore, the narrow artificial intelligence used during AIT passenger screening cannot, by default, apply or uphold 29 U.S.C. § 794, and the complete inability to offer travelers with disabilities the equal protection under the laws based on inviolable rules of computer science and logic is a violation of the Equal Protection Clause of Amendment V to the United States Constitution via reverse incorporation under *Bolling v. Sharpe,* 347 US 497 (1954).

219.   The Rule is arbitrary and capricious, and therefore unreasonable, because Defendants failed meaningfully to evaluate and address significant potential harms from the Rule, including its substantial chilling effect on travelers with disabilities based on the removal of protections granted by 29 U.S.C. § 794 due to the unauthorized use of artificial intelligence, and Defendants' conduct was facially unlawful and Defendants knew or should have known it at the time because 49 C.F.R. Part 1540 violated the express will of Congress by using modified AIT without disclosing it under 6 C.F.R. § 25.6(l)(2).

220.   The constitutional violation in this case is patently obvious based on the Federal Register, public court documents and rational deductive reasoning because no rational, reasonable state actor could have studied the situation represented by the above formulae and come to any other conclusion.

221.   Basic laws of logic and sound computer science knowledge demonstrate that every reasonable official would have no choice but to have completely understood how acting indifferently to the certain effects of replacing human beings with artificial intelligence agents at the TSA checkpoint would make upholding the equal protection of the laws required by the Equal Protection Clause of Amendment V to the United States Constitution technically impossible with regard to 29 U.S.C. § 794.

222.   Since attempting to violate well-established laws of computer science and fundamental logic is irrational and therefore in direct opposition to sound judgment and reasonable behavior, Defendants' conduct cannot be rationally related to a government objective because facially irrational activity cannot, by definition, be rational or reasonable, and any reasonable officer would have known at the time that such illogical actions were unreasonable and unlawful.

**A Class of One: A Constitutional Anomaly**

223.   Muir is treated differently than other similarly-situated individuals because in Muir's case the AIT millimeter wave scanner security portal becomes a potentially life-threatening architectural barrier that does not exist until Muir has

already passed through it, because if, through no fault of his own, his private health status regarding his hidden disability is judged by the artificial intelligence to be an "anomaly" based on the AIT algorithmic presupposition of an "ideal" human form due solely to the level of his uncontrollable symptom manifestation, then the advanced technology architectural barrier magically appears behind him and he cannot know that he should not submit to passenger screening until after he has already submitted, at which point the process cannot be ended for any reason, including a serious, disability-related health emergency.

224.   There is no other individual from whom the AIT passenger screening process is a state-created, techno-purgatory snake pit that arbitrarily and indifferently threatens to take their life based on arbitrary rules and the very limited capabilities of narrow artificial intelligence irrationally used to judge, without any possibility for review, Muir's passenger screening data code and decide on threats and anomalies regarding his private health information representing the human tissue and human tissue disability beneath his skin.

225.   49 C.F.R. Part 1540 is too intrusive and not within the scope of the relevant SAFETY Act Designation because travelers' private health information regarding the human tissue underneath their skin is not subject to search because it is not rationally related to the government interest of detecting objects that could be threat items on the surface of the skin as the skin is the natural, primary barrier of human privacy and the clearly-stated limit of AIT passenger screening.

## Permissible Construction Violation 4 - Abnormally Dangerous Activity

226.   Arizona and Illinois courts, as well as the Seventh and Ninth Circuit Federal Courts of Appeals recognize Restatement (2d) of Torts §§ 519, 520.

227.   AIT passenger screening is an abnormally dangerous activity based on the six factor test set forth in Section 520 because: (1) the technology and standard of care in artificial intelligence are insufficiently developed, (2) the use of artificial intelligence in a rapid, high-impact decision-making custodial interrogation situation related to common carrier contracts of carriage is inappropriate to the environment where it occurred, (3) the false alarm rate during AIT passenger screening is objectively terrible and Defendants had certain knowledge that false threat alarms led to unwelcome and invasive required pat-downs, (4) the risk of harm was great as there were no policies and procedures in place for the use of artificial intelligence with no human beings in the threat assessment decision-making loop, (5) the likelihood of harm was great because invasive pat-downs are a guarantee of bodily impacts and travelers had no ability to refuse a required pat-down, even for cases involving qualified disabilities and serious disability-related medical emergencies, and (6) Defendant L3 is the sole manufacturer of millimeter wave security portals and ATR software utilized by TSA, and artificial intelligence is not at all in common use.

228.   AIT passenger screening is a state-created danger because: (1) the harm is foreseeable and direct as Defendants had knowledge with substantial certainty that frequent false threat alarms generated by artificial intelligence led to invasive and unnecessary pat-downs that caused significant emotional disturbance for many travelers over a period of many years, (2) the state actor Defendants are acting in willful disregard for the safety of Muir because the they had ample time to reflect on their decision to remove human experience, judgment and empathy from the threat and anomaly decision-making loop through the deployment of artificial intelligence in the AIT passenger screening program, and Defendants also were directed by Congress to protect the privacy of screened passengers by employing AIT devices that create "visual images", which ensured that human beings with human judgment and empathy remained in the threat assessment decision-making loop, (3) a special relationship existed between the state and Muir as Defendant TSA Supervisors are voluntary custodians and owed Muir, a protectee, a special relationship affirmative duty of care under a voluntary custodian-protectee relationship, and (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur as Defendant TSA Supervisors' total control of Muir led directly to his private health information being unlawfully taken by Defendants while in a position of trust and authority.

229.   The TSA Checkpoint at IWA and PIA is a nexus of three separate and different § 314A special relationships because: (1) Defendants TSA Supervisors

John Doe at IWA and PIA both had a special relationship duty of reasonable care to Muir under a voluntary custodian-protectee relationship, (2) Defendant Allegiant owed Muir a special relationship duty of reasonable care under a common carrier-passenger relationship, and (3) Defendants PMGAA and MAAP owed Muir a special relationship duty of reasonable care under a business invitor-invitee relationship.

230.   A safety risk analysis with regard to a special relationship affirmative duty is therefore applicable.

231.   Does a safety risk exist? Yes. Defendants cannot act with reasonable care unless reasonable care is defined. The standard of care in the use of artificial intelligence is totally undeveloped, and in June 2019, did not exist. Therefore, Defendants could not act with reasonable care toward Muir during AIT passenger screening in August 2018 or June 2019 because it was technically impossible.

232.   Who created the safety risk? Defendants utilized federal resources (PNNL) and created the unavoidable danger under color of law. Defendants had total physical control of Muir and he had no choice but to comply with all TSA personnel commands during AIT passenger screening, *see* 49 C.F.R. § 1540.109.

233.   Is the safety risk open, obvious, or commonly known? No. It is impossible to know that Defendant L3 obtained a Safety Act Designation and Certification for its security portal based on a configuration of the device that was not in use at TSA Checkpoints as the U.S. government-issued documentation of

the Terms and Conditions of the Safety Act Designation and Certification are not in the public record and were only obtained via private lawsuit.

234.   Is the safety risk foreseeable? Yes.  Defendants had knowledge with substantial certainty that false threat alarms were frequent and led to invasive pat-downs, DHS sponsored the *Passenger Screening Algorithm Challenge* in an attempt to solicit new approaches to algorithm training in order to fix known problems with the existing passenger screening algorithm, and Defendants acknowledged, through the SAFETY Act Designation and Certification process, the very real potential for personal damages claims as a result of the deployment of the security portal device at commercial airports.

235.   Is the safety risk unreasonable? Yes. It is unreasonable because Muir's private health information is not within the scope of the AIT passenger screening process, and searching his human tissue beneath his skin for objects that could be threat items on the surface of his skin is irrational, and, therefore, unreasonable.

236.   Is the safety risk unnecessary? Yes.  The unreasonable safety risk is unnecessary because Muir would have simply chosen not to book an airline ticket or go to the airport if he had been given fair notice and warning of a passenger screening process occurring outside of the law.

237.   What is the burden? Thirteen simple words on a sign. "Warning: Encounters with this device may reveal private health information, including

hidden disabilities." This is similar to the burden on an airline pilot to give flight updates regarding unavoidable weather conditions, even though there is nothing the passengers can do about the weather.

238.   Is the burden reasonable? Yes. Not only is the burden clearly reasonable, but disclosure of the thirteen word warning based on Defendants' constructive knowledge with substantial certainty of the AIT passenger screening process is required by the special relationship affirmative duty owed to Muir by Defendants during AIT passenger screening.

239.   Defendants did not have a congressional mandate to deploy artificial intelligence during AIT passenger screening because the mandate from Congress for all AIT devices to use ATR software had nothing to do with removing the capability of AIT devices to create visual images or the complete removal of human beings from the threat and anomaly decision-making loop as the requirement to use ATR software does not include a requirement to use A.I.

240.   Utilization of artificial intelligence without the development of the technology and standards of care in such a novel and impactful area is negligent and uninsurable activity, and it is outrageous that Defendants would not include a single warning or notice about the secret abnormally dangerous activity occurring at the TSA Checkpoint of which they had certain knowledge because Defendants themselves created the details of the AIT passenger screening program contained in the SOP, which this Honorable Court may not even view.

241.   For the above-listed reasons, 49 C.F.R. Part 1540 is an impermissible construction of 49 U.S.C. § 44901 and the Court should declare it so in order to protect the well-established fundamental liberties of all citizen air travelers.

**Petition for a Writ of digital Habeas Corpus – 28 U.S.C. § 2241**

242.   A brief account of the writ's history and origins shows that protection for the habeas privilege was one of the few safeguards of liberty specified in a Constitution that, at the outset, had no Bill of Rights; in the system the Framers conceived, the writ has a centrality that must inform proper interpretation of the Suspension Clause. That the Framers considered the writ a vital instrument for the protection of individual liberty is evident from the care taken in the Suspension Clause to specify the limited grounds for its suspension: The writ may be suspended only when public safety requires it in times of rebellion or invasion. The Clause is designed to protect against cyclical abuses of the writ by the Executive and Legislative Branches. It protects detainee rights by a means consistent with the Constitution's essential design, ensuring that, except during periods of formal suspension, the Judiciary will have a time-tested device, the writ, to maintain the "delicate balance of governance." *Hamdi, supra,* at 536, 124 S.Ct. 2633. Separation-of-powers principles, and the history that influenced their design, inform the Clause's reach and purpose. *See Boumediene v. Bush*, 553 US 723, 128 S.Ct. 2229, 2235 (2008).

243.   The United States is not in a time of rebellion or invasion, so the Suspension Clause, Article I, Section 9, Clause 2, is inapplicable, and the Writ is available for the Court to compel production of Muir's digital full-body avatars in order to preserve individual liberty and the delicate balance of governance in the age of secret orders, artificial intelligence and advanced technology.

244.   "Corpus" (not defined by Section 2241), means "matter of any kind" or "a collection of facts or things". Muir's AIT scans are collections of facts, and a Writ of digital Habeas Corpus was first proposed by the European Parliament's LIBE (civil liberties) committee for the protection of citizens' privacy in 2014.

245.   The instant case requires the information forcing capabilities of a digital Habeas in order to counter the strict information hiding functions of the TSA SOP sensitive security information and AIT application programming interfaces obfuscating the "hidden layer" of threat and anomaly decision-making artificial intelligence in the TSA Checkpoint AIT passenger screening program.

246.   A Writ of digital Habeas Corpus must require Defendants to produce the "trace log" of Muir's digital full-body avatars' journey through the entire AIT passenger screening "application stack", and along the entire fiber "data path" on August 9, 2018, August 12, 2018, June 6, 2019 and June 9, 2019.

247.   Digital Habeas in the instant case also must require Defendants to produce Muir's digital full-body avatars for judicial examination by the Court for a factual return, as this in no way compromises national security, but instead will

clarify exactly how much private health data Defendants are taking, where it goes, who can access it, and most importantly, what they are doing with it.

248.   Digital Habeas is appropriate in this novel advanced technology case because medical examination of Muir has already been performed by Defendants and it is objectively outrageous and conscience-shocking that Muir's private health information representing the human tissue and human tissue disability beneath his skin can be used against him without his knowledge or consent during custodial interrogation amid a common carrier contract of carriage, but that Muir cannot use the same information for his private health care decisions.

### The SAFETY Act - 6 U.S.C. § 441 *et seq*.

249.   Defendants previously agreed and repeatedly insisted that the Technology at issue in this case was deployed in direct response to an act of terrorism. Defendant L3 represented that: (1) "[t]here is no question that Plaintiff's lawsuit arises out of or relates to the performance of L3's QATT for the specific purpose of preventing, detecting, identifying, or deterring acts of terrorism" (Case 1:20-cv-01280-JBM-JEH,  Doc. 37, p. 15), (2) "L3's QATT was deployed in defense against or response to or recovery from [an act of terrorism]" *Id* at 14, and (3) "[t]he technology contained in the L3 products targeted by Plaintiff [Muir] evolved as a direct result of the terrorist attacks of 9/11" (Case 2:19-cv-05887-DGC,  Doc. 22, p. 9 of 19).

250.   A question remains though. Why did Defendant L3 proceed with a renewal SAFETY Act Designation and Certification for AIT equipment that was not in use by TSA over seven months after DHS/TSA published final rule 49 C.F.R. Part 1540, and over three years after all modifications were completed?

## 6 C.F.R. § 25.6(l)(2) - *Significant Modification of Qualified Anti-terrorism Technologies*

251.   6 C.F.R. § 25.6(l)(2) states: "A Seller shall promptly notify the Department and provide details of any change or modification to a QATT that causes the QATT no longer to be within the scope of the Designation or Certification by submitting to the Department a completed "Notice of Modification to Qualified Anti-Terrorism Technology" form issued by the Under Secretary (a "Modification Notice"). A Seller is not required to notify the Department of any change or modification of a particular Qualified Anti-Terrorism Technology that is made post-sale by a purchaser unless the Seller has consented expressly to the modification."

252.   It is undisputed that the software used to create Muir's passenger screening data code is proprietary.

253.   Therefore, it is irrelevant whether or not the AIT device modification that changed the portal from the production of "visual images" to the creation of "internal code" was made post-sale by DHS/TSA as Defendant L3 has expressly consented to the modification because it expressly disclosed the proprietary

86

application interface specifications and credentials acceptance keys that allow Muir's passenger screening data to flow through the application stack to the artificial intelligence and then back to Defendant L3's *ATD* "software solution".

254.   The significant modification to the SAFETY ACT Technology at issue placed the security portal: (1) outside of the legal requirements for AIT devices set forth in Section 44901, (2) outside the scope of the SAFETY Act Designation "Terms and Conditions", as the device described by "Exhibit A, F-26-E" is not the device in use at IWA and PIA; (3) outside the scope of the SAFETY Act Section 443(a) liability insurance Certification; and (4) outside the scope of a reasonable airline passenger search under Amendment IV to the United States Constitution.

**Government Contractor Defense – 6 U.S.C. § 442(d)(1), 6 C.F.R. § 25.8 – Defendant L3**

255.   Defendant L3 represented that: "After selling the [millimeter-wave portals] to the TSA for airport passenger security screening purposes at the Phoenix-Mesa Gateway Airport and General Wayne A. Downing Peoria International Airport, neither L3Harris Technologies, Inc., nor any of its current or former corporate subsidiaries, exercised any degree of control or authority over the [millimeter-wave portals]" (*see* Central District of Illinois Case No. 1:20-cv-01280, Doc. 43-1, p. 2, Declaration of George Salimbas, Director of Contracts, Leidos Security Detection & Automation, Inc., a wholly owned subsidiary of Leidos, Inc.).

256.   It is therefore undisputed that alterations to the configuration of the millimeter wave security portal devices at issue were performed by the manufacturer, Defendant L3, before delivery to DHS/TSA because it is also undisputed that the AIT devices at issue in this case use proprietary software to create internal code of the passenger being screened and only Defendant L3 has the application programming interface specifications to allow Muir's data to flow to the artificial intelligence threat and anomaly decision-making algorithm.

257.   "Should a product liability or other lawsuit be filed for claims arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies approved by the Secretary, as provided in paragraphs (2) and (3) of this subsection, have been deployed in defense against or response or recovery from such act and such claims result or may result in loss to the Seller, there shall be a rebuttable presumption that the government contractor defense applies in such lawsuit. This presumption shall only be overcome by evidence showing that the Seller acted fraudulently or with willful misconduct in submitting information to the Secretary during the course of the Secretary's consideration of such technology under this subsection" 6 U.S.C. § 442(d)(1).

258.   A Safety Act Designation and Certification for AIT millimeter-wave portals that "produce three-dimensional images" (*see* Central District of Illinois Case No. 1:20-cv-01280,  Doc. 43-1, p. 17) is totally irrelevant to the instant action because it is undisputed that Defendant L3's security portal product in use at

IWA and PIA TSA Checkpoints does not create images, but instead, "internal code of the passenger using proprietary software", which means SAFETY Act protections do not apply to the equipment in this case per the "Terms and Conditions" of the DHS Designation and Certification (*see* Case No. 1:20-cv-01280, Doc. 43-1, pp. 5, 11) because the Designation and Certification of the security portal and its placement on the "Approved Products List for Homeland Security" is based on the technology described in "Exhibit A, F-26-E" (Case No. 1:20-cv-01280, Doc. 43-1, pp. 8, 17) and it is undisputed that the devices in use at IWA and PIA are not described by "Exhibit A, F-26-E" because, based on the inviolable law of non-contradiction, a "three-dimensional image" cannot be produced by a device that does not have the capability to produce images.

259.   Defendant L3's alleged lack of control or authority over its millimeter wave AIT devices after sale to TSA has nothing to do with access to passenger screening data and is irrelevant to its intellectual property ownership of the proprietary code language, software, and application programming interface credentials authentication keys.

260.   Defendant L3 cannot possibly produce a Safety Act Designation or Certification for millimeter-wave portals sold to the TSA that "create internal code of the passenger using proprietary software" because no insurance carrier in the world can write the Safety Act-required liability insurance policy (*see* 6 U.S.C. § 443(a)) for the abnormally dangerous activity of using unmonitored artificial

intelligence in a rapid, high-impact custodial interrogation with no human beings in the unreviewable decision-making loop and no A.I. standard of care in place. Defendant L3 only obtained the required liability insurance under the Safety Act for AIT devices that produce "three-dimensional images" because those visual images can be viewed by human TSOs in remote viewing booths, which keeps human vision, judgment, experience, and empathy in the AIT threat assessment decision-making loop, which is the only way to preserve Muir's human rights, statutory rights and constitutional rights during AIT passenger screening.

261.   Therefore, Defendant L3 is not entitled to "SAFETY Act" protections or the system of risk management set forth in 6 U.S.C. § 441 *et seq.*, cannot assert the government contractor defense, and has no immunity from this action.

## An Unnecessary, Unreasonable, and Foreseeable Safety Risk - Defendants' Knowledge with Substantial Certainty

262.   On Dec. 19, 2011, Michael Grabell and Christian Salewski published *Sweating Bullets: Body Scanners Can See Perspiration as a Potential Weapon*, which can be found at https://www.propublica.org/article/sweating-bullets-body-scanners-can-see-perspiration-as-a-potential-weapon

## Background

263.   For background, from the article: "During a Republican presidential debate in 1988, George H.W. Bush, pulled out a .22-caliber miniature revolver

made with only a small amount of metal to dramatize the new types of guns that could pass through airport metal detectors. "That weapon at this point cannot be detected," he said. "That weapon can kill the pilot of an airplane." The comments, along with concerns over a new Glock pistol made of plastic, spurred the Federal Aviation Administration, which was then in charge of security, to fund research into a millimeter-wave imaging system at the Pacific Northwest National Laboratory. After 9/11, the lab licensed the technology to a startup company, which was acquired by L-3 in 2006."

264.   Before the November 19, 2001 enactment of Pub. L. 107-71, the Aviation and Transportation Security Act, which established the TSA, and the subsequent creation of DHS, millimeter wave advanced imaging technology was tested by the government at PNNL. Background information in the article states: "Shortly after the machines were developed, preliminary tests at Seattle-Tacoma International Airport in 1996 resulted in a false alarm rate of 31 percent, according to a research paper presented at a conference the following year. During the tests, screeners who were new to the machine viewed images of people carrying various weapons, explosives and innocuous objects and had up to 27 seconds to identify them. According to the paper, researchers did test the results with layered clothing. In 2000, those same images were run through a primitive model of the automated detection and privacy software. The false alarm rate increased to 38.5 percent when the machine was set on high sensitivity but decreased to 17 percent when set on low sensitivity, according to another study by

the same researchers at the Pacific Northwest National Laboratory." (Emphasis added)

265.   It is therefore reasonable to conclude that the threat and anomaly detection algorithm existed at PNNL in the year 2000, and also reasonable to conclude that, similar to the millimeter wave scanning technology intellectual property captured there, the Department of Energy, via PNNL and Defendant Battelle, owns the artificial intelligence threat and anomaly decision-making algorithm underlying intellectual property, which is then licensed.

### Foreseeability

266.   A quote from the article, with regard to the AIT artificial intelligence algorithm, reads: ""As with many types of technology, there will be an <u>anticipated amount of false alarms</u> that are considered acceptable, and we continue to work with industry vendors to improve both the detection and operational capabilities for all of our technology," spokesman Greg Soule said." (Emphasis added).

267.   "Anticipate" is a synonym of "foresee", and the ability to quantify and evaluate the impacts of an anticipated false alarm rate is proof of Defendants' knowledge with substantial certainty of its existence.

268.   Dr. John Fortune, *DHS S&T Apex Screening at Speed* Program Manager stated: "Better ATR algorithms directly contribute to the passenger experience, reducing the need for pat-downs."

269.   Therefore, the safety risk was foreseeable.

**Unreasonableness**

270.   In 2017, DHS Science and Technology Directorate and TSA co-funded the $1.5 million "Passenger Screening Algorithm Challenge" and stated: "As part of the *Apex Screening at Speed Program*, <u>DHS has identified high false alarm rates</u> as creating significant bottlenecks at airport checkpoints. Whenever TSA's sensors and <u>algorithms predict a potential threat</u>, TSA staff must engage in a secondary, manual screening process that slows everything down. As the number of travelers increases every year and new threats develop, TSA's screening algorithms need to continually improve to meet increased demand." *See* https://www.dhs.gov/science-and-technology/dhs-prize-competition-16-01

271.   It is undisputed, based on many of Defendants' own unambiguous statements, that artificial intelligence unilaterally, and without the possibility for human review, decides on threats and anomalies during AIT passenger screening.

272.   In the same *DHS Prize Competition 16-01* public release, DHS also represented that: "Currently, TSA <u>purchases updated algorithms exclusively from the manufacturers of the scanning equipment used</u>. These <u>algorithms</u> are <u>proprietary</u>, expensive, and often take a long time to create. (Emphasis added)

273.   Based on this public statement and the undisputed dates of certain events in the relevant timeline, it is therefore reasonable to conclude that, in June

2019, Defendant L3 owned, and then, as a part of the federal contract, sold back to DHS/TSA/U.S. citizens at an "expensive" cost, the unmonitored artificial intelligence algorithm (which is based on intellectual property developed at United States citizens' expense and licensed to it from PNNL/Defendant Battelle) used in conjunction with its proprietary millimeter wave security portal software and *ATD* "software solution" during AIT passenger screening because the official statement was made after October 26, 2016, the relevant date of supposed SAFETY Act Designation and Certification of Defendant L3's AIT millimeter wave security portal device, and before May 4, 2020, when Defendant L3 sold all the rights to the Technology at issue in this case to Defendant Leidos.

274.   Defendant L3 is not the United States government and cannot self-insure for the use of artificial intelligence when no standard of care exists, and because Defendant L3 cannot produce a SAFETY Act Designation or Certification for a security portal that creates "internal code of the passenger using proprietary software" it is reasonable to conclude that both occurrences that are the subject of this lawsuit were uninsured events in violation of 6 U.S.C. § 443(a) and 6 C.F.R. § 25.5(a).

275.   Engaging in uninsured, abnormally dangerous activity, which is also a state-created danger executed under color of law, with no standard of care or policies or procedures in place is objectively unreasonable, which is why it was definitely not mandated by Congress, and why Defendant L3 is precluded from

obtaining the mandatory liability insurance under 6 U.S.C. § 443(a) and 6 C.F.R. § 25.5(a).

276.   Defendant United States, which is self-insured, is the only party in the world that can insure the negligent use of artificial intelligence during AIT passenger screening to the standard required by the SAFETY Act, but chose not to do so as Congress did not issue a direct and unambiguous mandate to remove human TSO's from the AIT passenger screening process, or to replace them with artificial intelligence, so the abnormally dangerous activity is not authorized.

**Unnecessariness**

277.   Another quote from the Dec. 2011 ProPublica article regarding the algorithm: "It looks for abnormalities," said Tom Ripp, president of L-3's security and detection division. "It looks for objects that are not supposed to be there.""

278.   And: "It never popped up where we said, 'Oh God, we're getting killed with false positives,'" Hawley [TSA administrator from 2005 to 2009] said. "I think it's a training issue, training the officers on interpreting the images."

279.   The article states: "The German interior ministry tested two L-3 body scanners with the automated detection software at Hamburg Airport, screening 809,000 airline passengers from September 2010 through July 2011", where "54 percent of all passengers who went through the scanners triggered true false alarms" -- meaning that no hidden objects were found on those people.

280.    Defendants knew with substantial certainty that, due to the realities of computer science, the narrow artificial intelligence could not understand human disability or feelings or be trained in 29 U.S.C. § 794, and also certainly knew that the algorithm was not being monitored for performance because, as the DHS OIG noted: "The Transportation Security Administration (TSA) does not monitor the Advanced Imaging Technology system (AIT) to ensure it continues to fulfill needed capabilities... Specifically... TSA did not monitor the AIT system's probability of detection rate and throughput rate requirements set forth in TSA's operational requirements document. These issues occurred because <u>TSA has not established comprehensive guidance to monitor performance of the AIT system.</u>" *see* https://www.oig.dhs.gov/sites/default/files/assets/2020 05/OIG-20-33-May20.pdf (Emphasis added)

281.    Armed with this constructive knowledge, and a special relationship affirmative duty to disclose known safety risks to air passengers during a state custodial interrogation, Defendants negligently failed to train and supervise the threat and anomaly decision-making A.I., while simultaneously failing to warn of the unavoidable danger and abnormally dangerous activity occurring during AIT passenger screening.

282.    Because a simple, thirteen-word warning of a process occurring outside of the law was all that was required to prevent Muir's injuries, the safety risk is totally unnecessary (and, based on the facts, totally unconscionable).

**Claim 1 – Conversion – Arizona – Defendant United States & Defendant L3**

283.   Claim 1 is brought against Defendant United States under the FTCA based on the conduct of Defendant IWA TSA Supervisor John Doe while acting within the scope of his employment at IWA on June 6, 2019, and against Defendant L3 under Restatement (2d) of Torts § 876 based on its conduct at IWA on June 6, 2019 with Defendant IWA TSA Supervisor John Doe.

284.   Muir reincorporates all paragraphs from above.

285.   To state a common law claim for conversion in Arizona, Muir must show that Defendants: (1) wrongfully exerted dominion and control over his personal property, and (2) "seriously interfered" with his rights in the same. *See Miller v. Hehlen*, 104 P. 3d 193, 203, 209 Ariz. Ct. App. 462, 472 (2005). An action for conversion ordinarily lies only for personal property that is tangible, or to intangible property that is merged in, or identified with, some document. *See* 18 Am.Jur.2d, Conversion § 7 (2004), Restatement § 242 cmt. a. *Id.*

286.   For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he does a tortious act in concert with the other or pursuant to a common design with him. *See* Restatement (Second) of Torts §  876(a) (1979). Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words and may be

implied and understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in concert, each becomes subject to liability for the acts of the others, as well as for his own acts. The theory of the early common law was that there was a mutual agency of each to act for the others, which made all liable for the tortious acts of any one. *See* Restatement (Second) of Torts § 876(a), cmt. (1979). To be found liable under section 876(a), one must have committed some tortious act. See §  876(a). *See Estate of Hernandez v. Flavio*, 187 Ariz. 506, 510-511, 930 P.2d 1309 (1997).

287.   Defendant IWA TSA Supervisor John Doe and Defendant L3 acted in accordance with an agreement to cooperate in the common design of the TSA AIT passenger screening program in order to control access to the airport sterile area at IWA in Arizona under 49 C.F.R. Part 1540.

288.   "Millimeter wave data is transmitted in a proprietary format that cannot be deciphered without the proprietary technology." *DHS Privacy Impact Assessment Update for TSA Whole Body Imaging*, July 23. 2009, page 9 (https://www.dhs.gov/sites/default/files /publications/privacy-tsa-pia-32-a-ait.pdf).

289.   In *Thyroff v Nationwide Mut. Ins. Co.,* 8 NY3d 283, 288-289 (2007) the Court suggested that plaintiff may maintain an action for conversion where its electronically stored data is misappropriated, regardless of whether plaintiff has been excluded from access to its intangible property. The Court noted that it

is the information which is stored in the computer that has "intrinsic value," rather than the "physical nature" of the document (*id*. at 292). *See NEW YORK RACING v. NASSAU OTB*, 29 Misc. 3d 539, 546 - NY: Supreme Court 2010.

290.   "In *Thyroff,* the plaintiff alleged that he no longer had access to his computer files and could establish the element of deprivation of his property. Further, in discussing the applicability of the tort of conversion to intangible property, the Court of Appeals specifically pointed to the situation where a thief transfers shares of stock from a person's financial account to the account controlled by the thief and the situation where electronic documents are converted by a third party by pressing the delete button — thereby depriving the owner of access to its documents. *Thyroff,* 8 N.Y.3d at 292. Based on the above pleadings, Muir alleges a similar deprivation here.

291.   Muir's protected health information regarding the human tissue and human tissue disability beneath his skin merged in proprietary computer code language exclusively controlled by Defendants at IWA on June 6, 2019 (and at IWA on August 9, 2018) is a single, unified documentation that has great value because it contains detailed information regarding Muir's most private of ailments that can be used to positively identify him and can also be used to assist with his private marital health care decisions regarding his disability.

292.   Defendant IWA TSA Supervisor John Doe and Defendant L3 exceeded their authority through an intentional exercise of control over Muir's

chattel using encrypted proprietary code which seriously interfered with Muir's right to control his protected health information and deprived Muir of its use because Defendant L3 alone controls the decryption and API keys.

293.   The interference with Muir's possessory interest is shocking, outrageous, abnormally dangerous, and deadly serious. The scalable, indifferent abuse of trust and authority made possible only by advanced technology and which led to the novel and intentional violation of the well-established constitutional right to privacy through the reckless use of artificial intelligence requires Defendants to pay full value of the private information they wrongly controlled because the interference and corresponding willful blindness of Defendants led to damages beyond the bounds of human decency which cannot be tolerated in a civilized society.

294.   The property's full value to Muir is very difficult to calculate in fiat monetary terms because Muir's August 9, 2018 IWA passenger screening scan code contains specific private health information regarding the unpredictable, life-threatening manifestations of his congenital disability he is unable to obtain in any other way, while his June 6, 2019 IWA passenger screening scan code contains detailed information regarding his body's amazing natural ability to withstand the occurrence of symptom onset during a serious medical emergency.

295.   Muir can only be made whole by the return of his passenger screening data (in a decrypted, image-translated, human-vision-useable form)

taken at IWA on August 9, 2018 and June 6, 2019 because those millimeter wave scans contain specific, space-and-time-sensitive protected health information that cannot possibly be re-obtained through conventional medical imaging because Muir cannot predict the onset of symptoms, the severity of his symptoms, or when his symptoms will be life-threatening as they were at IWA on August 9, 2018 and June 6, 2019.

## Claim 2 – Conversion – Illinois - Defendant United States & Defendant L3

296.   Claim 2 is brought against Defendant United States under the FTCA based on the conduct of Defendant PIA TSA Supervisor John Doe while acting within the scope of his employment at PIA on June 9, 2019, and against Defendant L3 under Restatement (2d) of Torts § 876 based on its conduct at PIA on June 9, 2019 with Defendant PIA TSA Supervisor John Doe.

297.   Muir reincorporates all paragraphs from above.

298.   To prove conversion in Illinois, a plaintiff must establish that (1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) the defendant wrongfully and without authorization assumed control, dominion, or ownership over the property. See *Cirrincione v. Johnson,* 184 Ill.2d 109, 114, 234 Ill.Dec. 455, 703 N.E.2d 67 (1998), *Loman v. Freeman*, 890 NE 2d 446, 461 - Ill: Supreme Court 2008.

299.   Muir has a right to his protected health information regarding the human tissue and human tissue disability beneath his skin because his "biometric information" is his property.

300.   Muir has an absolute and unconditional right to the immediate possession of his protected health information because under Article I, Section 6 of the Constitution of the State of Illinois "the individual's privacy interest in his physical person, as well as his privacy interest in his documents, must be protected." *Will County Grand Jury,* 152 Ill.2d at 391-92, 178 Ill.Dec. 406, 604 N.E.2d 929, and, under Article I, Section 2 of the Constitution of the State of Illinois, Muir cannot be deprived of his property without due process of law, which, in Illinois, includes, under BIPA, informed written consent to have his "biometric information" regarding the human tissue beneath his skin controlled and used by Defendants during AIT passenger screening because it is not required by federal law, which limits AIT passenger screening to objects on the surface of the skin.

301.   Muir made a demand for the return of his property on April 16, 2021 (Seventh Circuit Court of Appeals Case 21-1312, Document 15, Appellant's Brief, p. 30). Muir first demanded the return of his scan code property on November 1, 2019 via email correspondence with TSA.

302.   Defendants unlawfully, and without consent or authorization, assumed exclusive control over Muir's private protected health information

property regarding his human tissue and human tissue disability beneath his skin by converting it into encrypted proprietary code.

## Claim 3 – Trespass Upon Chattels – Arizona – Defendant United States & Defendant L3

303.   Claim 3 is brought against Defendant United States under the FTCA based on the conduct of Defendant IWA TSA Supervisor John Doe while acting within the scope of his employment at IWA on June 6, 2019, and against Defendant L3 under Restatement (2d) of Torts § 876 based on its conduct at IWA on June 6, 2019 with Defendant IWA TSA Supervisor John Doe.

304.   Muir reincorporates all paragraphs from above.

305.   To state a claim for trespass upon chattels in Arizona, Muir must show that Defendants: (1) intentionally assumed physical control over Muir's chattel, and (2) dealt with the chattel in a way that destructed Muir's possessory interest. *Koepnick v. Sears Roebuck & Co.*, 158 Ariz. 322, 331 (Ariz. Ct. App. 1988).

306.   Arizona courts follow the *Restatement (Second) of Torts* absent authority to the contrary. See *Fendler v. Phoenix Newspapers, Inc.,* 130 Ariz. 475, 636 P.2d 1257 (App. 1981). A dispossession may be committed by intentionally taking a chattel from the possession of another without the other's consent, or barring the possessor's access to a chattel. See *Restatement (Second)*

*of Torts* § 221 (1965). One who commits a trespass to a chattel is subject to liability to the possessor of the chattel if he dispossesses the other of the chattel or the possessor is deprived of the use of the chattel for a substantial time. See *Restatement (Second) of Torts* § 218 (1965). The *Restatement* recognizes that an award of nominal damages may be made, even in the absence of proof of actual damages, if a trespass to chattel involves a dispossession. *See* comment d; See *Koepnick v. Sears Roebuck & Co.*, 158 Ariz. 322, 330-331 (Ariz. Ct. App. 1988).

307.   "WBI [whole body imaging] creates an image of the full body, showing the surface of the skin and revealing objects that are on the body, not in the body." *DHS Privacy Impact Assessment for TSA Whole Body Imaging*, January 2, 2008, page 2.

308.   DHS/TSA has recognized the clear and unmistakable difference between <u>on</u> the body and <u>in</u> the body since January 2008.

309.   "TSA uses AIT solely for purposes of identifying objects that may be threat items." *DHS Privacy Impact Assessment Update for TSA Advanced Imaging Technology*, December 18, 2015, page 5.

310.   Muir did not consent to the conversion of his private protected health information representing his human tissue and human tissue congenital physical disability beneath his skin into Defendant L3's proprietary code, which destroyed his possessory interest in the property because the proprietary code cannot be accessed or understood without Defendant L3's proprietary decryption

key, proprietary application programming interface specifications, or credentials authentication.

311.   Defendants intentionally assumed physical control over Muir's chattel when they encoded Muir's private health information representing the human tissue and human tissue disability beneath his skin captured by the security portal sensors into Defendant L3's proprietary computer code language as part of the government contract, which is beyond the Section 44901(l) and DHS Privacy Impact Assessment stated limits of identifying objects that may be threat items because Muir's natural human tissue inside his body is not an object or an item on the surface of his skin, and natural human tissue cannot, by definition, be a threat object.

312.   Muir's right to control his private health information regarding the human tissue and human tissue disability inside his body was destroyed when Defendant L3 authorized the decryption of Muir's millimeter wave screening data and Defendant IWA TSA Supervisor John Doe authorized the disclosure of Muir's private health information to the artificial intelligence agent, which decided on threats and anomalies before it disclosed those results back to Defendant L3's proprietary "automatic target recognition" *ATD* "translation" and "overlay" software, which then simply displayed the results of the A.I. algorithms' instantaneous and unreviewable judgment on a generic, two-dimensional mannequin that resembles a human outline for end-user interpretation.

**<u>Claim 4 – IIED – Arizona – Defendant United States &</u>**
**<u>Defendant L3</u>**

313.   Claim 4 is brought against Defendant United States under the FTCA
based on the conduct of Defendant IWA TSA Supervisor John Doe while acting
within the scope of his employment at IWA on June 6, 2019, and against
Defendant L3 under Restatement (2d) of Torts § 876 based on its conduct at IWA
on June 6, 2019 with Defendant IWA TSA Supervisor John Doe.

314.   Muir reincorporates all paragraphs from above.

315.   To state a claim for IIED in Arizona, Muir must plead and prove
that: (1) the defendant's conduct was truly extreme and outrageous; (2) the
defendant either intended to cause emotional distress or recklessly disregarded
the near certainty that emotional distress would result; and (3) the plaintiff
indeed suffered severe emotional distress as a result of defendant's conduct.
*Shepherd v. Costco Wholesale Corp.*, 246 Ariz. 470, 476 (Ariz. Ct. App. 2019).

316.   "Extreme" is defined as being far beyond the norm, very intense, or
the most remote in any direction. Defendant IWA TSA Supervisor John Doe and
Defendant L3's conduct at IWA on June 6, 2019 was truly "extreme" because it
was: (1) unlawful - the AIT in use during passenger screening was significantly
modified outside the scope of Section 44901(l) and Defendant L3's SAFETY Act
Designation and Certification through the elimination of the individual image of
the passenger being screened and the unauthorized change to the creation of

internal code of the passenger being screened, which required the reckless, unauthorized use of narrow artificial intelligence to replace human TSOs as final decision-makers on threats and anomalies, (2) tortious - Defendants' intentional conduct pursuant to 49 C.F.R. Part 1540, based on Arizona courts' interpretation of Restatement (2d) of Torts, constitutes actionable conversion (*see* Claim 1), trespass upon chattels (*see* Claim 3), and intrusion upon seclusion (*see* Claim 5), and (3) unconstitutional - 49 C.F.R. Part 1540 is an impermissible construction of 49 U.S.C. § 44901 because it creates unconstitutional conditions, broadly-stifles fundamental personal liberties, and violates Muir's right to privacy, right to be free from unreasonable search and seizure, right to due process, and right to the equal protection of the laws. Unlawful, tortious, and unconstitutional conduct is, by definition, extreme, in that it is beyond the boundaries of what society is prepared to recognize as reasonable, which is why it is actionable and punishable.

317.    "Outrageous" is defined as being grossly offensive to decency or morality. Defendant IWA TSA Supervisor John Doe and Defendant L3's conduct at IWA on June 6, 2019 was truly "outrageous" because it was: (1) abnormally dangerous - the technology and standard of care with regard to narrow artificial intelligence were totally undeveloped, and in June 2019, did not exist, and exposure to an unavoidable state-created danger without fair warning is indecent, (2) uninsured – Defendants did not obtain the SAFETY Act-required liability insurance for the configuration of the AIT in use at IWA, and (3) a willfully blind, unconscionable abuse of trust and authority that treated Muir not like a living

human being but like a box, deliberately disregarded Muir's qualified protected disability and most private of ailments through the removal of human judgment and empathy from the passenger screening threat and anomaly decision-making process, and, without his consent, took his private protected health information representing his human tissue and human tissue disability beneath his skin, converted it into encrypted proprietary computer code Defendants alone controlled, and then judged it against a presupposed, "ideal" human form using unmonitored, narrow artificial intelligence, which caused Muir irreparable injuries that cannot be tolerated in a civilized, technologically-advanced society.

318.    Defendants recklessly disregarded the near certainty that emotional distress would result from their conduct as Defendants knew or should have known that: (1) unnecessary and invasive mandatory physical pat-downs based on false threat alarms generated by unmonitored artificial intelligence caused emotional distress at commercial airports on a daily basis, (2) it was a statistical certainty that travelers with disabilities would travel through airports with TSA checkpoints, (3) it was a statistical certainty that some travelers with disabilities have hidden disabilities, (4) AIT in use at commercial airports that creates proprietary code of the individual being screened emits electromagnetic energy that penetrates travelers' skin, (5) AIT in use at IWA and PIA creates ePHI (*See* "HIPAA" reference, Introduction, p. 263, D. McMakin et al., "New Improvements to Millimeter-Wave Body Scanners", in *Proc. of 3DBODY.TECH 2017 - 8th Int. Conf. and Exh. on 3D Body Scanning and Processing Technologies*, Montreal

QC, Canada, 11-12 Oct. 2017, pp. 263-271, which can be found at https://doi.org/10.15221/17.263, by Douglas MCMAKIN, et al., Pacific Northwest National Laboratory, Operated for the U. S. Department of Energy by Battelle Memorial Institute, Richland WA, USA) (6) AIT in use at IWA and PIA cannot differentiate between natural human tissue and foreign material, (7) narrow artificial intelligence "privacy algorithm software" used to analyze proprietary code screening data and decide on threats and anomalies cannot differentiate between natural human tissue and foreign material, (8) TSA checkpoint AIT passenger screening is a federal program bound by 29 U.S.C. § 794, (9) due to the unchanging laws of computer science, TSA checkpoint AIT passenger screening conducted pursuant to 49 C.F.R. Part 1540 made compliance with 29 U.S.C. § 794 a guaranteed impossibility, (10) it was a statistical certainty that travelers with hidden disabilities would travel through TSA checkpoints at commercial airports where millimeter wave AIT was in use, (11) it was therefore almost certain that some travelers' beneath the skin, hidden disabilities would be revealed by the AIT, (12) it was therefore almost certain that emotional distress would result because it was almost certain that travelers with disabilities, some hidden, who were part of an entire protected class denied equal protection of the laws that were enacted by Congress to protect them in public facilities of interstate travel, would be forced to undergo unnecessary and invasive physical pat-downs based on false threat alarms triggered solely due to the revelation of their qualified hidden disabilities.

319.   The degree of power or authority which a defendant has over a plaintiff can impact upon whether that defendant's conduct is outrageous. The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous. See Restatement (Second) of Torts § 46, comment *e,* at 74 (1965). Defendants had total control of Muir and the threat from Defendants is very clear: the uncontrollable physical manifestations of Muir's disability, if present to a sufficient, unpredictable, unknowable degree, will continue to be the sole reason for his cruel and unusual punishment during AIT passenger screening. Or put another, more honest way, "the beatings will continue", even if Muir's "morale" (his blind acceptance of the state's unlawful, tortious, and unconstitutional misconduct and deliberate indifference to his qualified disability and overall humanity) somehow, miraculously "improves".

320.   Defendants IWA TSA Supervisor John Doe and L3 violated Muir's constitutional right to the equal protection of the law under the due process clause of the Arizona Constitution when they modified the AIT without required notification under 6 C.F.R. §§ 25.6(l)(2), 25.6(g)(4)(i), recklessly removed human experience, judgment and empathy from the AIT passenger screening process, and totally precluded the possibility for Muir's equal protection of the laws by using A.I. to make the final decision on threats and anomalies in Muir's AIT screening code, rendering 29 U.S.C. § 794 moot for Muir and an entire protected class of travelers with disabilities as narrow A.I., by definition, cannot understand human disability or uphold qualified travelers' Section 504 rights.

321.   Muir indeed suffered severe emotional distress as a result of Defendants' conduct. Muir reincorporates paragraphs 51, 73, and 74 from above.

322.   The dehumanization Muir experienced changed him forever, and because of seriousness of the violation, Defendants must be held accountable.

## Claim 5 – Intrusion Upon Seclusion – Arizona – Defendant United States & Defendant L3

323.   Claim 5 is brought against Defendant United States under the FTCA based on the conduct of Defendant IWA TSA Supervisor John Doe while acting within the scope of his employment at IWA on June 6, 2019, and against Defendant L3 under Restatement (2d) of Torts § 876 based on its conduct at IWA on June 6, 2019 with Defendant IWA TSA Supervisor John Doe.

324.   Muir reincorporates all paragraphs from above.

325.   Arizona courts follow the four-part classification of invasion of privacy claims set forth in Restatement (Second) of Torts §§ 652A-E. See *Hart v. Seven Resorts Inc.,* 190 Ariz. 272, 279, 947 P.2d 846, 853 (App. 1997). An intrusion upon seclusion occurs when one "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns" and the intrusion is "highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. See *Shepherd v. Costco Wholesale Corp.*, 246 Ariz. 470, 476 (Ariz. Ct. App. 2019).

326.   "In Arizona the gravamen of an action for invasion of the right of privacy is the injury to the feelings of the plaintiff, and the mental anguish and distress caused thereby. [Citations omitted]. *Fernandez v. United Acceptance Corp.,* 125 Ariz. 459, 462, 610 P.2d 461, 464 (App. 1980).

327.   Defendants intentionally intruded upon the seclusion of Muir's private affairs when they exceeded the Congressionally-mandated limits of AIT passenger screening and took, without consent, Muir's protected health information regarding the human tissue and human tissue disability beneath his skin and encoded it into Defendant L3's proprietary computer code language.

328.   Defendants' intrusion is highly offensive to a reasonable person because the unauthorized judgment of Muir's private protected health information in order to board an airplane bore no reasonable relationship to the security needs of TSA to detect threat objects on the surface of his skin, and violated his well-established constitutional right to privacy found in *Griswold* and Article II § 8 of the Arizona Constitution.

329.   Defendants' physical intrusion under Muir's skin was clearly into a place in which Muir had secluded himself because the skin is a natural biological barrier separating the inside of Muir's body from the outside world.

330.   Defendants, with full knowledge that the security portal is "designed to detect objects located directly beneath the surface of the skin, [w]hether the object is a... medical implant, or a naturally occurring protrusion" (*see* Case 2:19-

cv-05887, Doc. 19, filing system p. 6), performed an investigation into Muir's private concerns when they unlawfully used advanced technology to examine his private health information representing the human tissue and human tissue disability beneath his skin by looking underneath his skin without his consent.

331.    "Where the damage alleged is emotional, the plaintiff must prove the elements of the tort of intentional infliction of emotional distress in addition to proving invasion of privacy." *Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 785 (1989). "A plaintiff alleging intentional infliction of emotional distress must show the defendant caused severe emotional distress by committing extreme and outrageous conduct with the intent to cause emotional distress or with reckless disregard of the near-certainty that such distress would result. *Watkins v. Arpaio,* 239 Ariz. 168, 170-71, ¶ 8, 367 P.3d 72, 74-75 (App. 2016). The conduct must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." See *Shepherd v. Costco Wholesale Corp.*, 246 Ariz. 470, 476 (Ariz. Ct. App. 2019).

332.    Defendants' belief that their objective was legitimate is not carte blanche to pursue that objective by outrageous means as "our system does not permit agencies to act unlawfully even in pursuit of desirable ends". Muir hereby reincorporates the IIED elements in Claim 4 from above. Defendants' conduct cannot be tolerated in Arizona or the United States of America.

## **Claim 6 – Intrusion Upon Seclusion – Illinois - Defendant United States & Defendant L3**

333.   Claim 6 is brought against Defendant United States under the FTCA based on the conduct of Defendant PIA TSA Supervisor John Doe while acting within the scope of his employment at PIA on June 9, 2019, and against Defendant L3 under Restatement (2d) of Torts § 876 based on its conduct at PIA on June 9, 2019 with Defendant PIA TSA Supervisor John Doe.

334.   Muir reincorporates all paragraphs from above.

335.   Actionable invasion of privacy exists based on an unreasonable intrusion upon the seclusion of another, see *American Civil Liberties Union of Ill. v. Alvarez*, 679 F. 3d 583, 605 (7th Cir. 2012), and Illinois has expressly recognized intrusion upon seclusion. See *Lawlor v. North American Corp. of Illinois*, 983 NE 2d 414, 424-425 - Ill: Supreme Court 2012.

336.   In Illinois, to state a cause of action for intrusion upon seclusion, a plaintiff must plead and prove: (1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) an intrusion that is offensive or objectionable to a reasonable person; (3) the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering. See *Melvin,* 141 Ill.App.3d at 789, 95 Ill.Dec. 919, 490 N.E.2d 1011.

337.   Defendants made an unauthorized intrusion upon the seclusion of Muir's private affairs when they exceeded the Congressionally-mandated limits of AIT passenger screening and took, without consent, Muir's protected health information regarding the human tissue and human tissue disability beneath his skin and converted it into Defendant L3's proprietary computer code language.

338.   Defendants' intrusion into Muir's private affairs using advanced technology is: (1) objectionable because of the reckless abuse of the trust and authority placed in them to construct a permissible rule administering 49 U.S.C. § 44901 , (2) outrageous because of the total physical control Defendant PIA TSA Supervisor John Doe had over Muir at the checkpoint and, (3) highly offensive to a reasonable person because the unauthorized judgment of Muir's private protected health information in order to board an airplane bore no reasonable relationship to the security needs of TSA to detect threat objects on the surface of his skin, and violated his well-established constitutional right to privacy found in *Griswold* and the privacy clause of article I, section 6, of the Illinois Constitution.

339.   A reasonable expectation of privacy exists when: (1) the claimant exhibits an actual (subjective) expectation of privacy; and (2) the expectation is one that society is prepared to recognize as reasonable. *United States v. French,* 291 F.3d 945, 951 (7th Cir.2002)." *Doe v. Heck*, 327 F. 3d 492, 511 (7th Cir. 2003),

340.   Muir had a reasonable expectation of privacy, and the matter upon which the intrusion occurred is private, because: (1) Muir exhibited an actual expectation of privacy with regard to his private protected health information representing the human tissue and human tissue disability beneath his skin because it is entirely beneath his skin and he did not consent to having his private medical information used during passenger screening, and (2) his expectation is one that society has recognized as reasonable as his protected health information representing the human tissue and human tissue disorder beneath his skin is highly personal medical information and the "confidentiality of personal medical information is, without question, at the core of what society regards as a fundamental component of individual privacy." *Kunkel,* 179 Ill.2d at 537, 228 Ill.Dec. 626, 689 N.E.2d 1047, and, "[s]uch information is generally contained in the very type of personal record or document that this court protected even prior to the enactment of the 1970 constitution.  See *Will County Grand Jury,* 152 Ill.2d at 391, 178 Ill.Dec. 406, 604 N.E.2d 929." *People v. Caballes*, 851 NE 2d 26, 51 - Ill: Supreme Court 2006.

341.   Therefore, "[i]n light of our society's concern for the security of one's person, it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable." [*Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 616 (1989)] (internal quotation marks omitted); *see also Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *United States v. Wright,* 215 F.3d

1020, 1025 (9th Cir.2000), and Defendants' physical intrusion under Muir's skin was clearly into a place in which Muir had secluded himself because the skin is a natural biological barrier separating the inside of Muir's body from the outside world.

342.   And, like in *Zboralski v. Monahan*, 446 F. Supp. 2d 879 (N.D. Ill. 2006), where the court allowed Plaintiff to bring an intrusion upon seclusion claim based on the fact that a Rapiscan machine can show "evidence of mastectomies, colostomy appliances, catheter tubes, and the size of a person's breasts" which are facts that one may wish to keep private, see *Zboralski* at 885, Muir's intrusion upon seclusion claim is based on the fact that a millimeter-wave machine can show evidence of Muir's internal human tissue disorder, which is a fact he wishes to keep private.

343.   Defendants' unauthorized, advanced technology intrusion was beyond the scope of a lawful search and caused severe anguish and suffering. Muir reincorporates IIED elements from Claim 8 below.

### Claim 7 – Public Disclosure of Private Facts – Illinois – Defendant United States & Defendant L3

344.   Claim 7 is brought against Defendant United States under the FTCA based on the conduct of Defendant PIA TSA Supervisor John Doe while acting within the scope of his employment at PIA on June 9, 2019, and against

Defendant L3 under Restatement (2d) of Torts § 876 based on its conduct at PIA on June 9, 2019 with Defendant PIA TSA Supervisor John Doe.

345.   Muir reincorporates all paragraphs from above.

346.   In Illinois, a successful cause of action for the public disclosure of private facts requires the plaintiff to prove that: (1) publicity was given to the disclosure of private facts; (2) the facts were private and not public facts; and (3) the matter made public would be highly offensive to a reasonable person. See *Miller v. Motorola, Inc.,* 202 Ill.App.3d 976, 978, 148 Ill.Dec. 303, 560 N.E.2d 900; *Johnson v. K Mart Corp.*, 723 NE 2d 1192, 1197 (Ill. Ct. App. 2000).

347.   Publicity was given to the disclosure of private facts when Defendants encoded Muir's private protected health information representing the human tissue and human tissue disability beneath his skin and disclosed it to the unmonitored artificial intelligence agents.

348.   The facts regarding Muir's completely beneath-the-skin human tissue disability were private and not public facts because the "confidentiality of personal medical information is, without question, at the core of what society regards as a fundamental component of individual privacy." See *Kunkel,* 179 Ill.2d at 537, 228 Ill.Dec. 626, 689 N.E.2d 1047.

349.   Making private health facts public and then judging a person on them as part of a common carrier contract of carriage is highly offensive to a

reasonable person, which is why travelers with disabilities are an explicitly

protected class, private biometric information is protected by law in Illinois

under article I, section 6, of the Illinois Constitution of 1970 and BIPA, and AIT

passenger screening is limited to objects on the surface of the skin by Congress in

49 U.S.C. § 44901 and the constitutional right to privacy found in *Griswold*.

350.   The court has held that egregious conduct resulting in disclosure to a

limited audience is actionable if "a special relationship exists between the

plaintiff and the `*public'* to whom the information has been disclosed."

(Emphasis added.) See *Miller,* 202 Ill.App.3d at 980, 148 Ill.Dec. 303, 560

N.E.2d 900. "According to *Miller,* if the plaintiff is not a public figure, such a

*public* may be fellow employees, club members, church members, family, or

neighbors. *Miller,* 202 Ill.App.3d at 980-81, 148 Ill.Dec. 303, 560 N.E.2d 900.

We adopt the position of the court in *Miller*. We too hold that the public

disclosure requirement may be satisfied by proof that the plaintiff has a special

relationship with the "public" to whom the information is disclosed. However, we

also believe that the rationale in *Miller* should be extended to include an

employer as a member of a particular public with whom a plaintiff may share a

special relationship." *Johnson v. K Mart Corp.*, 723 NE 2d 1192, 1197 (Ill. Ct.

App. 2000).

351.   Defendant PIA TSA Supervisor John Doe, a voluntary custodian,

owed Muir, a protectee, a special relationship affirmative duty of care under a

voluntary custodian-protectee relationship (Restatement (2d) of Torts §§ 314, 314A (1965)).

352.   So, like in *Johnson*, due to the "special nature" of the relationship between Defendant PIA TSA Supervisor John Doe and Muir, disclosure to a limited audience (disclosure of Muir's private facts from Defendant L3 to Defendant PIA TSA Supervisor John Doe, then to the artificial intelligence agents, and finally back to Defendant L3 and Defendant PIA TSA Supervisor John Doe), like disclosure to the plaintiff's employer in *Johnson*, sufficiently satisfies the "public disclosure" element. *Id.* at 1197.

## Claim 8 - IIED – Illinois – Defendant United States & Defendant L3

353.   Claim 8 is brought against Defendant United States under the FTCA based on the conduct of Defendant PIA TSA Supervisor John Doe while acting within the scope of his employment at PIA on June 9, 2019, and against Defendant L3 under Restatement (2d) of Torts § 876 based on its conduct at PIA on June 9, 2019 with Defendant PIA TSA Supervisor John Doe.

354.   Muir reincorporates all paragraphs from above.

355.   In Illinois, a plaintiff claiming intentional infliction of emotional distress must plead and prove that: (1) the defendant's conduct was truly extreme and outrageous; (2) the defendant either intended to cause emotional distress or

recklessly disregarded the near certainty that emotional distress would result; and (3) the plaintiff indeed suffered severe emotional distress as a result of defendant's conduct. *Doe v. Calumet City*, 641 NE 2d 498, 506 - Ill: Supreme Court 1994, and, in doing so, a plaintiff must be "specific, and detailed beyond what is normally considered permissible in pleading a tort action." *McCaskill v. Barr,* 92 Ill.App.3d 157, 158, 47 Ill.Dec. 211, 414 N.E.2d 1327 (1980). A plaintiff must allege some facts which, if true, would support the conclusion that the emotional distress actually suffered as a proximate result of the defendant's conduct was severe. Merely characterizing emotional distress as severe is not sufficient." *Welsh v. Commonwealth Edison Co.*, 713 NE 2d 679, 684-685 - Ill: Appellate Court, 1st Dist., 4th Div. 1999, and, "[i]t is thus clear that the tort does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." (Restatement (Second) of Torts § 46, comment *d,* at 73 (1965).) Beyond this well-established limitation, however, application of the "outrageousness" requirement is necessarily difficult due to its vagueness. Nevertheless, Illinois case law, as well as comments to section 46 of the Restatement (Second) of Torts (1965), provides guidance in this regard. *McGrath v. Fahey*, 126 Ill.2d 78, 86 (1988). It is clear, for example, that the degree of power or authority which a defendant has over a plaintiff can impact upon whether that defendant's conduct is outrageous. The more control which a defendant has over the plaintiff, the more likely that defendant's conduct will be deemed outrageous. The Restatement mentions police officers, school

authorities, landlords and collecting creditors as examples of the many types of individuals who may be positioned to exercise power or authority over a plaintiff. Restatement (Second) of Torts § 46, comment *e,* at 74 (1965). *McGrath v. Fahey*, 126 Ill.2d 78, 86-87 (1988). Illinois cases in which intentional infliction of emotional distress has been sufficiently alleged have in fact very frequently involved a defendant who stood in a position of power or authority relative to the plaintiff. This concern was aptly addressed in *Milton v. Illinois Bell Telephone Co.* (1981), 101 Ill. App.3d 75, as follows: "As Dean Prosser pointed out, `The extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests. The result is something very like extortion.' [Citations.]" 101 Ill. App.3d at 79. *McGrath v. Fahey*, 126 Ill.2d 78, 87 (1988), and, another factor relevant in determining whether conduct is extreme or outrageous is defendant's awareness that the plaintiff is particularly susceptible to emotional distress because of a physical or mental condition or peculiarity. (*Public Finance Corp.,* 66 Ill.2d at 94, 4 Ill.Dec. 652, 360 N.E.2d 765; Restatement (Second) of Torts § 46, Comment *f,* at 75 (1965).) *Doe v. Calumet City*, 641 NE 2d 498, 507 - Ill: Supreme Court 1994.

356.   Defendant PIA TSA Supervisor John Doe and Defendant L3's conduct was truly extreme and outrageous because: (1) PIA TSA Supervisor John Doe had total control of Muir and had previously demonstrated how far his power extended on August 12, 2018 when his TSOs violated Muir with deliberate

indifference and total disregard for his humanity, and (2) for all the reasons listed in paragraphs 316 and 317 above, it is unlawful, tortious, and unconstitutional.

357.    Defendants recklessly disregarded the near certainty that emotional distress would result from their conduct. Muir reincorporates paragraphs 266-269 and 318 from above.

358.    Defendants PIA TSA Supervisor John Doe, Mayorkas, Easterly, Granholm, and Pekoske exceeded the limitations of AIT passenger screening set forth in 49 U.S.C. § 44901(l) and in doing so engaged in tortious conduct and violated the Due Process Clause of article I, section 2, of the Illinois Constitution of 1970 by controlling, using encrypted, proprietary computer code language, Muir's protected health information regarding the human tissue and human tissue disability beneath his skin, violated BIPA, violated Muir's right to privacy under article I, section 6, of the Illinois Constitution of 1970, and violated Illinois common law when they engaged in abnormally dangerous activity by using unmonitored artificial intelligence while administering the PIA TSA checkpoint as detailed under 49 C.F.R. Part 1540.

359.    Defendants PIA TSA Supervisor John Doe, Mayorkas, Easterly, Granholm, and Pekoske violated Muir's constitutional right to the equal protection of the law under the due process and equal protection clause of article I, section 2 of the Illinois Constitution of 1970 when they removed human experience, judgment and empathy from the AIT passenger screening process

and precluded the possibility for Muir's equal protection of the laws by using artificial intelligence agents to decide on threats and anomalies, rendering 29 U.S.C. § 794 moot for an entire protected class of travelers with disabilities because narrow artificial intelligence cannot understand human disability or uphold Muir's statutory rights regarding his disability during TSA checkpoint AIT passenger screening.

360.   Muir indeed suffered severe emotional distress as a result of Defendants' extreme and outrageous conduct. Muir reincorporates paragraphs 51, 73, and 74 from above.

### Claim 9 – NIED – Illinois - Defendant United States

361.   Claim 9 is brought against Defendant United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq*. based on the conduct of PIA TSA Supervisor John Doe within the scope of his employment at PIA on June 9, 2019. Claim 9 does not: (1) allege that Muir was injured or aggrieved by any particular TSA order; (2) attack the design, implementation of, or adherence to the TSA SOP; (3) allege the TSA SOP contains any notice requirement which was not followed; or (4) advocate for an amendment to the SOP adding such a requirement.

362.   Therefore, as the Honorable Court previously found (*See* Case 1:20-cv-01280, Doc. 46, p. 29), Muir's FTCA negligence claim is not precluded from this Court's exclusive jurisdiction by Section 46110.

363.   Muir reincorporates all paragraphs from above.

364.   To establish a claim for negligence in Illinois, a plaintiff must show that: (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach was the proximate cause of the plaintiff's injury. See *Roh v. Starbucks Corp.,* 881 F.3d 969, 973 (7th Cir. 2018); *Doe v. Coe*, 135 NE 3d 1, 12 - Ill: Supreme Court 2019. The same elements needed for a showing of ordinary negligence are generally required to show NIED, see *Lewis v. Citgo Petroleum Corp.*, 561 F. 3d 698, 702-703 (7th Cir. 2009), and a direct victim of alleged negligent infliction of emotional distress must satisfy the "impact" rule. *Id*; see also *Schweihs v. Chase Home Fin.,* LLC, 2016 IL 120041, para. 31, 77 N.E.3d 50, 58 (quoting *Corgan v. Muehling*, 143 Ill. 2d 296, 303, 574 N.E.2d 602, 605 (1991)). "Under the impact rule, a direct victim may not recover for emotional distress suffered as a result of the defendant's alleged negligence unless the emotional distress "was accompanied by a contemporaneous physical injury to or impact on the plaintiff." *Id*. A plaintiff claiming NIED must also show injuries that surpass a "threshold severity" to be cognizable. *Id*. at 707. In Illinois, certain special relationships may give rise to an affirmative duty to aid or protect another against unreasonable risk of harm. "Section 314A and this court recognize four such relationships: common carrier and passenger, innkeeper and guest, custodian and ward, and possessor of land who holds it open to the public and member of the public who enters in response to the possessor's invitation. Restatement (Second) of Torts § 314A (1965); *Fancil,* 60 Ill.2d at 560, 328 N.E.2d

538; *Hills,* 195 Ill.2d at 243-44, 253 Ill.Dec. 632, 745 N.E.2d 1166." *Marshall v. Burger King Corp.*, 856 NE 2d 1048, 1058 - Ill: Supreme Court 2006.

365.   In Illinois, "The touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff. *Happel v. Wal-Mart Stores, Inc.,* 199 Ill.2d 179, 186, 262 Ill.Dec. 815, 766 N.E.2d 1118 (2002); *Mieher,* 54 Ill.2d at 541, 301 N.E.2d 307. This court often discusses the policy considerations that inform this inquiry in terms of four factors: (1) the reasonable foreseeability of the injury, (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant. *Beretta U.S.A.,* 213 Ill.2d at 391, 290 Ill.Dec. 525, 821 N.E.2d 1099; *Ward v. K mart Corp.,* 136 Ill.2d 132, 140-41, 143 Ill.Dec. 288, 554 N.E.2d 223 (1990); *Lance v. Senior,* 36 Ill.2d 516, 518, 224 N.E.2d 231 (1967)." *Marshall v. Burger King Corp.*, 856 NE 2d 1048, 1057 - Ill: Supreme Court 2006.

366.   The reasonable foreseeability of the injury to Muir was definitively established by Defendants' public statements about the artificial intelligence algorithm during the DHS *Passenger Screening Algorithm Challenge*, and Defendant L3's Safety Act Designation and Certification process, as there is no reason for Congress and Defendant DHS/TSA to offer, and for Defendant L3 to seek, immunity from suit or to be required to purchase liability insurance for

third party claims with a per-occurrence level of no less than $60,000,000 (*see* Case No. 1:20-cv-01280, Doc. 43-1, p. 12) unless personal injury lawsuits are reasonably foreseeable (Muir also reincorporates paragraphs 266-269, 318), and Defendants knew or should have known with substantial certainty that: (1) for several years, excessive artificial intelligence algorithm false threat alarm rates led to unnecessary and invasive physical pat-downs that many travelers found highly objectionable, (2) invasive physical pat-downs based on false artificial intelligence algorithm threat alarms often led to significant emotional distress, (3) Defendant L3's AIT security portal was designed to detect objects located directly beneath the surface of the skin, (4) the AIT could not differentiate between natural human tissue and foreign material, (5) passengers with hidden disabilities travel via air, (6) passengers had no ability to refuse a physical pat-down if the A.I. threat and anomaly decision-making algorithm registers an anomaly, even for serious disability-related medical emergencies, (7) passengers had no ability to end the screening process, even for serious medical emergencies, and (8) Section 504 (29 U.S.C. § 794), due to the laws of computer science, could not and did not apply during passenger screening due to the unauthorized use of narrow artificial intelligence.

367.   The likelihood of the injury was great because unnecessary and invasive pat downs occurred often and led to emotional distress for many passengers, travelers with disabilities are explicitly protected because of the discrimination they face in transportation, and the advanced technology in use at

TSA checkpoints violated Muir's privacy and judged him based on his protected health information representing his protected, hidden, beneath the skin physical disability.

368.   The magnitude of the burden of guarding against the injury was so slight it's shocking and outrageous that Muir even has to mention it. All it would have taken to guard against this unconscionable injury was a simple notice (the "Thirteen Words", *see* paragraph 237 from above) about what the stakeholders knew, or, through constructive knowledge, should have known, something akin to: "This TSA security checkpoint operates outside federal law. Your legal rights are limited. Private health information may be taken, and hidden disabilities may be exposed by advanced technology in use. Enter at your own risk".

369.   The consequences of placing the burden on the defendant are so slight as to barely warrant mentioning as they amount to the printing of a few hundred signs bearing the required fair notice and warning for clear public display at the approximately four-hundred airports that have a TSA checkpoint.

370.   Therefore, under the Illinois duty analysis, which is not a challenge to the TSA SOP, Defendant PIA TSA Supervisor John Doe, a voluntary custodian, had a special relationship affirmative duty of care to Muir, a protectee, under a voluntary custodian-protectee relationship (Restatement (2d) of Torts §§ 314, 314A (1965)) when he totally controlled Muir during the TSA checkpoint security screening at PIA on June 9, 2019. See *Marshall* at 1058.

371.    The express will of Congress is to protect individuals with disabilities, especially in travel, and the Court in *Doe v. Renfrow*, 631 F. 2d 91, 93 (7th Cir. 1980) held that a nude search of a thirteen-year-old child was "a violation of any known principle of human decency" and suggested as strongly as possible that the conduct "exceeded the "bounds of reason" by two and a half country miles." The Court decided that it "is not enough for us to declare that the little girl involved was indeed deprived of her constitutional and basic human rights. We must also permit her to seek damages from those who caused this humiliation and did indeed act as though students "shed at the schoolhouse door rights guaranteed by * * * any * * * constitutional provision" (475 F.Supp. at 1023)." Muir did not shed his constitutional rights to due process and equal protection under the law when he entered the TSA checkpoint and what happened to Muir was worse than a strip search. It was an advanced imaging technology health exam conducted by untrainable, unmonitored, artificial intelligence algorithm. In fact, Muir made a reasonable offer to voluntarily consent to an actual strip search at PIA on August 12, 2018 in a desperate attempt to clear the false threat alarm at his right groin raised solely due to his serious medical emergency and his pleas were deliberately and indifferently ignored.

372.    Defendant PIA TSA Supervisor John Doe was required to warn Muir of the danger the TSA AIT passenger screening program posed to passengers with qualified disabilities under the Rehabilitation Act, codified as 29 U.S.C. § 701 *et seq.,* because: (1) a heightened duty of care can be imposed where a special

relationship exists between the parties, see *Iseberg v. Gross,* 227 Ill. 2d 78, 87, 879 N.E.2d 278, 284 (2007), (2) there was unequal actual and constructive knowledge that the AIT passenger screening program as administered under 49 C.F.R. Part 1540 created a dangerous condition for qualified passengers with hidden disabilities, and (3) Defendants knew or should have known that harm could occur if no warning was given. See *Hutchison,* 910 F.3d at 1022.

373.   And while it may be common knowledge that airline passengers at commercial airports must undergo TSA screening prior to boarding a flight, and Muir was generally aware that he had to pass through the TSA Checkpoint, the true conditions of TSA advanced imaging technology screening using millimeter wave scan security portals and artificial intelligence are totally novel and clearly not open or obvious, and it is ridiculous that Muir could be expected to be aware of a totally secret advanced technology process operating outside the clearly-defined parameters of federal law.

374.   Defendant PIA TSA Supervisor John Doe had a special relationship affirmative duty to warn Muir of unavoidable, foreseeable, state-created dangers, and to provide him fair notice of the AIT passenger screening process at PIA because: (1) AIT passenger screening at PIA conducted pursuant to 49 C.F.R. Part 1540 is based on an impermissible construction of Section 44901 and occurs outside of the privacy protection requirements set forth in 49 U.S.C. § 44901(l), (2) the AIT used at PIA has been modified so as to fall outside of the scope of

SAFETY Act Certification and was therefore uninsured in violation of 6 U.S.C. §
443(a), (3) AIT passenger screening at PIA is uninsurable, abnormally dangerous
activity because it utilizes artificial intelligence without a direct, unambiguous
congressional mandate, without policies and procedures in place, and without a
developed standard of care, (4) AIT passenger screening is not commonly known
because, even though relevant documents available for knowledge construction
are in the public domain, it is not an open and obvious condition because it takes
place using unauthorized, unidentified artificial intelligence and encrypted
proprietary code language inside computers and travelers have no idea that the
AIT does not produce images and that no human beings are involved in the threat
assessment decision-making loop and what happens during the six seconds of the
millimeter wave scan process is not only a mystery to the general flying public,
but part of a TSA SOP deemed Sensitive Security Information, placing it outside
of the purview of the general public, investigative reporters, and even this Court.

375.   Defendant PIA TSA Supervisor John Doe breached his duty to Muir
at PIA on June 9, 2019 when he: (1) exceeded the explicit limitations of passenger
screening set forth in 49 U.S.C. § 44901(l) through an impermissible execution of
the statute under 49 C.F.R. Part 1540.107, (2) failed to have A.I. policies in place
prior to disobeying Congress' precise AIT requirements through the reckless
replacement of living, human being TSOs with an artificial intelligence algorithm,
(3) failed to warn Muir of unavoidable ultrahazardous activity occurring outside
federal law at the TSA checkpoint, (4) failed to warn Muir that his private health

information would be taken during AIT passenger screening, (5) failed to warn Muir that his hidden, human tissue disability could be exposed by the advanced technology, (6) failed to supervise or in any way monitor the artificial intelligence in use during AIT passenger screening, despite repeated admonishments from the DHS Inspector General, (7) failed to train the artificial intelligence agent in use during AIT passenger screening in the legal requirements of 29 U.S.C. § 794, because, based on the laws of A.I. computer science, it is impossible, (8) failed to protect Muir from tortious conduct certain to occur during passenger screening, including intrusions upon his seclusion, conversion of his private property, and the public disclosure of his private facts, (9) violated Muir's rights under the Rehabilitation Act (29 U.S.C. § 701 et seq.) by denying him equal use of the TSA checkpoint due solely to his physical disability, (10) violated Muir's right to due process under Article I Section 2 of the Illinois Constitution by taking his health information without his consent, (11) violated Muir's right to privacy under Article I, Section 6, of the Illinois Constitution by searching code representing the human tissue and human tissue disability beneath his skin, (12) violated Muir's rights under the Fourth and Fifth Amendments to the United States Constitution by searching code representing the human tissue and human tissue disability underneath his skin and denying him the equal protection of the laws by replacing human beings with artificial intelligence, (13) violated Muir's rights under § 434(b)(1) of the FAA Reauthorization Act of 2018, and (14) violated Muir's rights under BIPA Section 15.

376.    The FTCA's private person standard with regard to PIA TSA Supervisor John Doe's conduct at PIA on June 9, 2019 is met by: (1) The practical application of 49 U.S.C. § 44920 because, although air passenger screening takes place at a purely "federal facility", it is undisputed that passenger screening is not a uniquely governmental activity because private security companies manage some commercial service airport checkpoints through the "Screening Partnership Program", which "contracts security screening services at commercial airports to qualified private companies. These companies run screening operations under federal oversight and must comply with all TSA security screening procedures." *See* https://www.tsa.gov/for-industry/screening-partnerships  and, (2) Title III of the ADA because, "one of the purposes of the ADA is to prohibit a public entity from discriminating against a disabled individual because of his or her disability. 42 U.S.C. § 12132 (2018) and the ADA is meant to protect individuals with disabilities and any such individuals who believe that their rights have been violated may bring suit under the Act." See *People v. Tapley*, 2020 IL App (2d) 190137 - Ill: Appellate Court, 2nd Dist. 2020; *Evans v. Page*, 755 NE 2d 105 - Ill: Appellate Court, 5th Dist. 2001. "Title III of the Act, in section 302(a), provides that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation" by the owner, lessee, or operator of such a place. 42 U.S.C. § 12182(a). The core meaning of this provision, plainly enough, is that the owner or operator of a store, hotel,

restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space, *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.,* 37 F.3d 12, 19 (1st Cir.1994)) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do. See *Doe v. Mutual of Omaha Ins. Co.*, 179 F. 3d 557, 558-559 (7th Cir. 1999).

377.   Defendants need not undertake the use of artificial intelligence. But once they decided to operate the AIT passenger screening program outside of the express legal limits set by Congress, they were obligated to use due care to make certain that the equipment was monitored and kept in good working order; and, if there were problems using the A.I., then Defendants were further obligated to use due care to discover these facts and to fix the problems or give warning that the process was not functioning inside the parameters of legal authority under 49 U.S.C. § 44901. Defendants failed in their duty and damage was thereby caused to Muir, and the United States is liable under the FTCA. See *Indian Towing* at 69.

378.   Based on the dictionary definitions and simple meaning of words, engaging in abnormally dangerous activity (using modified AIT under 49 C.F.R. Part 1540) cannot be acting with reasonable care, just as acquiescing in extremely risky conduct (utilizing artificial intelligence with no developed standard of care or policies and procedures in place) cannot be described as sound oversight.

379.   Therefore, Defendant PIA TSA Supervisor John Doe breached his affirmative duty of care to Muir at PIA on June 9, 2019 by failing to provide Muir fair notice of the AIT screening process occurring outside the scope of the law, as Muir never would have placed his personal property on the x-ray machine belt had he known he would be subject to unlawful passenger screening that could not be ended for any reason, including a disability-caused medical emergency.

380.   Defendant PIA TSA Supervisor John Doe had no ability to exercise discretion with regards to AIT passenger screening as administered under 49 C.F.R. Part 1540. Therefore, PIA TSA Supervisor John Doe, and by extension, Defendant United States, is not entitled to the 28 U.S.C. § 2680(a) discretionary function exception.

381.   Defendants PIA TSA Supervisor John Doe's reckless and outrageous conduct pursuant to 49 C.F.R. Part 1540 as published in Federal Register, Vol. 81, No. 42, Thursday, March 3, 2016 includes: (1) violating 49 U.S.C. § 44901(l) by altering the AIT passenger screening program (switching from the production of "three-dimensional images of subjects" viewed by living, breathing human beings (transportation security officers under supervision) to the creation of "internal code of the passenger using proprietary software" that is analyzed and decided on by computer code (unidentified artificial intelligence software agents under no supervision)), (2) removing Muir's equal protection of the law by making 29 U.S.C. § 794 impossible to implement because artificial intelligence agents by

definition do not have the human experience, judgment or empathy as necessary to understand human disability, (3) removing human experience, judgment and empathy from the AIT threat and anomaly decision-making process, (4) blindly entrusting final, unreviewable, rapid, high-impact decision-making to an unidentified, error-prone, unmonitored artificial intelligence software agent, and (5) failing to supervise or monitor the artificial intelligence software at any time during or after its performance at the TSA Checkpoint.

382.   The "impact" rule is satisfied by the basic laws of physics because it is undisputed that on June 9, 2019 at PIA, Defendant PIA TSA Supervisor John Doe made a contemporaneous physical impact on Muir using electromagnetic waves actively emitted from the security portal as "[t]he technology bounces electromagnetic waves off the body." (81 Fed. Reg. at 11,365).

383.   The proximate cause element is satisfied because, but for PIA TSA Supervisor John Doe's conduct when he totally controlled Muir at PIA on June 9, 2019, Muir's injuries would not have happened, and Defendants' extreme and outrageous tortious conduct in "standing up" the TSA checkpoint security screening program outside of federal law using an unmonitored, error-prone artificial intelligence to make the final custodial interrogation "pat-down" decision without human supervision or empathy in the decision-making loop and with no artificial intelligence policy in place at either DHS or TSA was the proximate cause of Muir's foreseeable, unnecessary, and unconscionable injuries.

384.   The injury "threshold of severity" is met because being haunted by a ghost despite knowing that it's impossible to be haunted by a ghost clearly surpasses the "threshold of severity". Defendants interfered in Muir's personal relationship with the Creator and made him question his own sanity. He now questions it on a daily basis. Did all of the named Defendants act in concert to violate his rights, or is that just an elaborate, well-reasoned conspiracy theory with documentable evidence? No person in a civilized society should be treated like Muir was treated - like a box instead of a human being. And what happened to Muir cannot be allowed to happen to another person because it is immoral.

385.   Muir suffered severe emotional distress as a result of Defendant PIA TSA Supervisor John Doe's conduct. Muir reincorporates paragraphs 51, 73 and 74 from above. Muir's extreme, irreversible psychological injuries by the sinister "ghost hands" of an unaccountable artificial intelligence software agent "Golem" are beyond what a citizen could be expected to endure in civilized society.

**In-Concert Liability – Arizona**

386.   "Arizona recognizes aiding and abetting as embodied in Restatement § 876(b), that a person who aids and abets a tortfeasor is himself liable for the resulting harm to a third person." (citations omitted) *Gomez v. Hensley*, 145 Ariz. 176, 178, 700 P.2d 874, 876 (Ct. App. 1984)).

387.   In Arizona, a claim for aiding and abetting tortious conduct requires proof that: (1) the primary tortfeasor engaged in conduct for which the primary

tortfeasor is or would be liable to the plaintiff; (2) the defendant was aware that the primary tortfeasor was going to engage in such conduct; and (3) the defendant provided substantial assistance or encouragement to the primary tortfeasor with the intent of promoting the conduct. See RAJI (Civil) 4th Intentional Tort 23 – Aiding and Abetting Tortious Conduct (citing *Ramirez*, 71 Ariz. at 243, 226 P.2d at 146; Restatement § 876(b)).

388.   In Arizona, a duty of inquiry can satisfy the second element of aiding and abetting liability. See *State v. Superior Court,* 123 Ariz. 324, 331-32, 599 P.2d 777, 784-85 (1979) ("There are three prerequisites to a finding that one has aided and abetted a . . . violation: (1) a primary violation has occurred; (2) knowledge of or a duty of inquiry with regard to the primary violation by the person charged; and (3) a necessary contribution to the underlying scheme by the person charged.").

## Claim 10 – In-Concert Liability – Products Liability – Negligent Design - Arizona - Defendant L3

389.   Claim 10 is brought against Defendant L3 under Restatement (2d) of Torts § 876 based on its conduct in acting in accordance with an agreement to cooperate in AIT passenger screening, and in aiding and abetting, and providing substantial assistance to, IWA TSA Supervisor John Doe at IWA on June 6, 2019.

390.   Muir reincorporates all paragraphs from above.

391.   A primary violation has occurred in Arizona under FTCA.

392.   In Arizona, in order to succeed on a negligent design claim, Muir must prove that Defendant L3 acted unreasonably at the time of design or manufacture in light of the foreseeable risk of injury from use of the product. *See Dart v. Wiebe Mfg., Inc.,* 147 Ariz. 242, 246-247, 709 P.2d 876, 880-81 (1985)*;* Restatement (Second) of Torts § 402A (1965)); *Mather,* 23 Ariz.App. at 411, 533 P.2d at 719 ("Under the negligence theory a `design defect' arises when the manufacturer has failed to use reasonable care to design its products so as to make it safe for intended uses."). In assessing the reasonableness of the manufacturer's actions at that time, the fact-finder considers the same risk/benefit analysis factors used to determine strict liability. See *Dart,* 147 Ariz. at 246, 709 P.2d at 880, *Golonka v. General Motors Corp.,* 65 P. 3d 956, 962 (Ariz. Ct. App. 2003).

393.   "The "risk/benefit analysis" asks the fact-finder to decide, in light of relevant factors, whether "the benefits of [a] challenged design... outweigh the risk of danger inherent in [the] design." *Id.* (quoting *Barker,* 143 Cal.Rptr. 225, 573 P.2d at 446). If not, the design was defective and unreasonably dangerous. *Dart,* 147 Ariz. at 245, 709 P.2d at 879." *See Golonka* at 962.

394.   In a negligent design case, the risk/benefit analysis factors are used to assess the reasonableness of the manufacturer's choice of design in light of the

knowledge available at the time of design or manufacture. *See Dart* at 247-48, 709 P.2d at 881-82; *Golonka* at 963.

395.   Foreseeability of risk: Defendants had knowledge with substantial certainty that: (1) false threat alarms were frequent and led to invasive pat-downs, (2) the AIT was designed to detect objects beneath the surface of the skin, and (3) the AIT did not have ability to differentiate between natural human tissue and foreign material; DHS sponsored the *Passenger Screening Algorithm Challenge* in an attempt to solicit new approaches to algorithm training in order to fix known problems with the existing passenger screening algorithm; and Defendants acknowledged, through the SAFETY Act Designation and Certification process, the very real potential for personal damages claims as a result of the deployment of the security portal device at commercial airports.

396.   Unreasonable conduct: Defendant L3's failure to follow 6 C.F.R. § 25.6 (l)(2), and its failure to inform its insurance carrier of the significant modification to the AIT device at issue is unreasonable conduct and objective proof that the modification to the millimeter wave security portal, from the creation of a visual image to proprietary code, was unreasonably dangerous.

397.   Defendant L3 had complete knowledge of the AIT modification and the total irreconcilability of the March 3, 2016 Federal Register promulgation of final rule 49 C.F.R. Part 1540 ("current versions of AIT do not have the capability to create an image; rather, they create internal code of the passenger using

proprietary software" (81 FR 11383)) and Defendant L3's October 26, 2016 Safety Act Designation and Certification "Exhibit A, F-26-E" ("The Technology is a security portal that uses millimeter-wave scanning technology to produce three-dimensional images of subjects") must be addressed and resolved by the Court, as Muir is unable to resolve the contradiction, despite considerable concentrated thought on the fundamentals of the matter.

398. Defendant L3 knowingly and willfully removed the most important safety feature in AIT passenger screening, which is the human being.

399. Applying the risk/benefit analysis to the instant case, it is clear that the danger presented by uninsured, abnormally dangerous activity occurring with no standard of care and no warning of the unavoidable state-created danger created by the process, which occurs outside the scope of the law and Safety Act Designation and Certification, and violates fundamental personal liberties and constitutional rights, outweighs the public utility of the instantaneous algorithmic judgment of an air passenger's private health information during airport passenger screening prior to boarding an airplane.

400. In light of the knowledge available to Defendant L3 at the time of the significant modification to the millimeter wave security portal, and considering the total lack of standards of reasonable care with regard to the use of A.I., Muir has a high likelihood of success on the merits because Defendant L3 cannot disregard 49 U.S.C. § 44901(l) or 6 C.F.R. § 25.6 (l)(2), and because Defendant

L3 cannot produce a Safety Act Designation or Certification for a millimeter wave security portal that creates proprietary code of the passenger, Defendant L3 is liable to Muir for negligent design under § 876.

## **Claim 11 – In-Concert Liability – Arizona – Defendant PMGAA**

401.   Claim 11 is brought against Defendant PMGAA under Restatement (2d) of Torts § 876 based on its conduct in aiding and abetting, and providing substantial assistance to, IWA TSA Supervisor John Doe at IWA on June 6, 2019, and for its breach of duty of reasonable care to Muir under Restatement (2d) of Torts § 314A.

402.   Muir reincorporates all paragraphs from above.

403.   A primary violation has occurred in Arizona under FTCA.

404.   Defendant PMGAA is sued under Restatement (2d) of Torts § 876(b) for providing substantial assistance to the TSA checkpoint scheme while simultaneously failing its duty of inquiry because it should have known through constructive knowledge that the TSA AIT passenger screening program was unlawful, unconstitutional, and tortious, and posed a safety risk to air passengers traveling through the airport.

405.   Defendant PMGAA could reasonably be expected to have obtained knowledge that TSA AIT passenger screening was being conducted outside the parameters of federal law when definitive proof of unauthorized, unlawful, and

abnormally dangerous activity (removal of human beings from the AIT threat assessment) was published in the Federal Register on March 3, 2016, as TSA AIT passenger screening is a core business activity at IWA, and one that which a very large percentage of Defendant PMGAA's invitees are guaranteed to experience.

406.   Defendant PMGAA gave substantial assistance to Defendants because the TSA checkpoint exists completely within PMGAA's property and there would be no TSA checkpoint without Defendant PMGAA operating IWA airport.

407.   Defendant PMGAA is also sued under Restatement (2d) of Torts § 876(c) for providing substantial assistance to the TSA checkpoint program while simultaneously breaching its affirmative duty to warn Muir under Restatement (2d) of Torts §§ 314A, 344.

408.   Defendant PMGAA, a business invitor, owed Muir, a business invitee, a special relationship duty of reasonable care under a business invitor-invitee relationship (Restatement (2d) of Torts §§ 314, 314A (1965)), which included a duty to warn.

409.   In Arizona, a possessor of land is under an affirmative duty to use reasonable care to make the premises safe for use by invitees. See *Markowitz v. Ariz. Parks Bd.,* 146 Ariz. 352, 355, 706 P.2d 364, 367 (1985) (quoting *Tribe v. Shell Oil Co.,* 133 Ariz. 517, 519, 652 P.2d 1040, 1042 (1982)). *McMurtry v.*

*Weatherford Hotel, Inc.*, 293 P. 3d 520, 528 - Ariz: Court of Appeals, 1st Div., Dept. C 2013.

410.   "The standard of reasonable care generally includes an obligation to discover and correct or warn of unreasonably dangerous conditions that the possessor of the premises should reasonably foresee might endanger an invitee. *See Markowitz,* 146 Ariz. at 355, 706 P.2d at 367; Revised Arizona Jury Instructions ("RAJI") (Civil) 4th, Premises Liability 1, Notice of Unreasonably Dangerous Condition, 98 (2005) (the owner of a business has a duty "to warn of or safeguard an unreasonably dangerous condition of which the [business] had notice."). "A reasonably foreseeable event is one that might `reasonably be expected to occur now and then, and would be recognized as not highly unlikely if it did suggest itself to the actor's mind.'" *Tellez v. Saban,* 188 Ariz. 165, 172, 933 P.2d 1233, 1240 (App.1996) (citation omitted). *McMurtry v. Weatherford Hotel, Inc.*, 293 P. 3d 520, 528-529 - Ariz: Court of Appeals, 1st Div., Dept. C 2013.

411.   A possessor of land has a duty to warn business invitees of the intentional acts of third parties if he knows or has reason to know that the acts of the third person are occurring, or are about to occur. "Therefore, we hold that when, as here, a business owner assumes a duty to provide security services, that duty is nondelegable, and the owner will not be insulated from liability for the tortious acts of security personnel hired as independent contractors." *Simon v. Safeway, Inc.*, 173 P. 3d 1031, 1037 - Ariz: Court of Appeals, 2nd Div., Dept. B

2007. A business invitor like Defendant PMGAA owes nondelegable duties to their business invitees to keep the premises reasonably safe, which includes the conduct of third-party security like TSA Defendant IWA TSA Supervisor John Doe.

412.   Restatement (2d) of Torts § 344 (1965) provides: A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give a warning adequate to enable the visitors to avoid the harm, or otherwise to protect them against it. Comment f to § 344 further provides: Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is a likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of the third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of

servants to afford a reasonable protection. RESTATEMENT (SECOND) OF TORTS § 344, Comment f (1965). Notwithstanding the existence of a duty, a landowner can be relieved of liability if the injury was caused by an open and obvious condition. *See, e.g., Daugherty v. Montgomery Ward,* 102 Ariz. 267, 270, 428 P.2d 419, 422 (1967). *McMurtry v. Weatherford Hotel, Inc.*, 293 P. 3d 520, 529 - Ariz: Court of Appeals, 1st Div., Dept. C 2013, and whether a landowner acted in accordance with its duty is a question that must be answered within the context of all of the facts and circumstances of the case. See *Udy,* 162 Ariz. at 14, 780 P.2d at 1062, *McMurtry* at 529.

413.    Defendant PMGAA knew or should have known that invasive, unnecessary, and harmful physical pat-downs resulting from AIT false threat alarms happened frequently as it was openly acknowledged by DHS/TSA.

414.    Even though relevant documents available for reasonable knowledge construction are in the public domain, AIT passenger screening is not an open and obvious condition because it takes place using encrypted proprietary code language inside computers and travelers have no idea that it uses artificial intelligence or how it actually works.

415.    The special relationship duty included a duty of inquiry and the construction of knowledge, and therefore, some kind of corresponding warning on IWA property that relays that constructive knowledge akin to: "The TSA Checkpoint operates outside of federal law. Your legal rights are limited."

416.    Defendant PMGAA breached its duty of care to Muir when it (1) failed its duty of inquiry as to what exactly was being done to its business invitees at the TSA checkpoint as administered under 49 C.F.R. Part 1540, (2) failed to construct knowledge of what occurred on its property during the TSA checkpoint AIT passenger security screening, and (3) failed to warn Muir of unlawful and abnormally dangerous activity, which was not open and obvious, regularly occurring inside its commercial interstate transportation facility.

417.    Defendant PMGAA's failure to warn Muir of the knowledge it had or should have had led directly to Muir's serious injuries because if Muir had simply been warned of what the airport operator should have known, he would never have booked an airline ticket, traveled to IWA, or approached the unlawful TSA checkpoint. He would have instead done all of the complicated, serious research into the TSA checkpoint (that Defendant PMGAA's attorneys easily could and should have done at every stage of the AIT rollout process) before he sustained his life-changing psychological injuries (which never would have happened if would have simply been warned), instead of after (when he can't go back to his life before being brutally violated and then haunted by a malevolent presence).

## Claim 12 – In-Concert Liability – Arizona – Defendant Allegiant

418.    Claim 12 is brought against Defendant Allegiant under Restatement (2d) of Torts § 876 based on its conduct in aiding and abetting, and providing

substantial assistance to, IWA TSA Supervisor John Doe at IWA on June 6, 2019, and for its breach of duty to Muir under Restatement (2d) of Torts §§ 314A, 302.

419. Muir reincorporates all paragraphs from above.

420. A primary violation has occurred in Arizona under FTCA.

421. FAA Reauthorization Act of 2018 § 435 states: "It is the sense of Congress that— (1) the aviation industry and every relevant stakeholder must work to ensure that every individual who experiences a disability has equal access to air travel; (2) as technology and ease of travel continue to advance, accessibility must be a priority; and (3) accommodations must— (A) extend to every airport and service or facility of an air carrier; and (B) be inclusive of every disability." (Emphasis added)

422. Defendant Allegiant, an aviation industry "relevant stakeholder", is sued under Restatement (2d) of Torts § 876(b) for providing substantial financial assistance to the TSA checkpoint scheme while simultaneously failing its duty of inquiry because it should have known through constructive knowledge of public documents and information that the TSA AIT passenger screening program was unlawful and tortious, but chose not to through willful blindness.

423. Defendant Allegiant, a common carrier, owed Muir, a passenger, a special relationship duty of reasonable care under a common carrier-passenger relationship (Restatement (2d) of Torts §§ 314, 314A (1965)), which includes a

duty of inquiry into all unavoidable elements of the contract of carriage. If Muir discovered unlawful, uninsured, abnormally dangerous activity at the TSA checkpoint, then Defendant Allegiant should have discovered it and warned Muir of it so that he could take protective and preemptive measures.

424.   Even though relevant documents available for knowledge construction are in the public domain, AIT passenger screening is not an open and obvious condition because it takes place using unidentified artificial intelligence and encrypted proprietary code language inside computers and travelers have no idea that the AIT does not produce images and that no human beings are involved in the threat assessment decision-making loop.

425.   Defendant Allegiant made a necessary contribution to the underlying scheme as 49 C.F.R. § 1510.9(c) provides that Allegiant is solely liable to TSA for the [security service] fee and must remit the fee as required in § 1510.13 regardless of whether or not the security service fee is collected from the passenger.

426.   Allegiant is the main commercial airline serving IWA. Therefore, Allegiant remits a large percentage of the total security service fees that fund the TSA checkpoint. Therefore, Defendant Allegiant's remittance of the fees is, by definition, a necessary contribution to the TSA checkpoint scheme at IWA because the AIT passenger screening scheme would not exist at IWA without Defendant Allegiant's significant funding.

427.   Defendant Allegiant's participation in the scheme was willful because operating a commercial airline serving IWA is a choice, and under 49 C.F.R. § 1510.13(b), profiting from the scheme by retaining accrued interest on collected security service fees is also choice Defendant Allegiant willfully made.

428.   Defendant Allegiant is also sued under Restatement (2d) of Torts § 876(c) for providing substantial financial assistance to the TSA checkpoint program while simultaneously breaching its affirmative duty to protect Muir under Restatement (2d) of Torts § 302.

429.   Whether the defendant owes the plaintiff a duty of care is a threshold issue. In Arizona, common carriers are often held to possess an affirmative duty to guard the safety of their passengers and common carriers have broader duties than ordinary actors as viewed under the objective, reasonable person standard in traditional negligence law. See *Nunez,* 271 P. 3d 1104, 1108 - Ariz: Supreme Court 2012.

430.   Defendant Allegiant, a common carrier, owed Muir, a passenger, a special relationship duty of reasonable care under a common carrier-passenger relationship (Restatement (2d) of Torts §§ 314, 314A (1965)).

431.   "Because common carriers have a special relationship with passengers, their duties traditionally have extended beyond the mere obligation not to create a risk of harm. *See* Second Restatement § 314A(1)(a) and cmt. b. The special relationship imposes a duty to avoid harm from "risks created by the

individual at risk as well as those created by a third party's conduct." Restatement (Third) of Torts ("Third Restatement"): Liability for Physical Harm § 40 cmt. g (Proposed Final Draft No. 1 2007)" *Nunez*, 271 P. 3d 1104, 1108 - Ariz: Supreme Court 2012.

432.    Defendant Allegiant breached its special relationship duty of reasonable care to Muir when it: (1) failed to warn Muir of unavoidable activity required by the contract of carriage and occurring outside of federal law at the TSA checkpoint, (2) failed to protect Muir from foreseeable and unreasonable tortious third party conduct including conversion, trespass upon chattels, and intrusion upon seclusion certain to occur during AIT passenger screening under 49 C.F.R. Part 1540 (see Restatement (2d) of Torts § 302B), (3) facilitated the unlawful AIT security screening (security service fee collection and remittance, retaining interest on collected fees) while simultaneously failing its duty of inquiry by willfully turning a blind eye, and (4) failed to provide a safe place for Muir and other travelers with hidden disabilities to board when it deliberately turned its back on Muir and ignored the substantial knowledge it should have constructed based on open-source materials which revealed that Muir's right to privacy under Article II, § 8 of the Arizona Constitution would be violated when his private health information representing the human tissue and human tissue disability beneath his skin was unlawfully analyzed and searched by unmonitored artificial intelligence agent as a non-negotiable term of the contract of carriage.

433.   49 U.S.C. § 41705(a) provides in relevant part; "In providing air transportation, an air carrier may not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities. (2) the individual has a record of such an impairment. (3) the individual is regarded as having such an impairment.

434.   Defendant Allegiant breached its duty of reasonable care to Muir when it discriminated against him in violation of § 41705(a) through its participation in the TSA checkpoint scheme because under Restatement (2d) of Torts § 876 a Defendant acting in concert with the primary tortfeasor is jointly and severally liable for all tortious conduct of all other Defendants in the scheme, regardless of whether or not, aside from funding it, Defendant Allegiant had any direct involvement in the screening at IWA on June 6, 2019.

435.   FAA Reauthorization Act of 2018 – Subtitle B – Aviation Consumers with Disabilities - Airline Passengers with Disabilities Bill of Rights - § 434(b)(1) guarantees the right of passengers with disabilities to be treated with dignity and respect.

436.   Defendant Allegiant breached its duty to Muir when, under an unavoidable part of the contract of carriage, it failed to protect Muir from being treated like cargo and scanned like a box instead of a living, breathing natural person with feelings, which violated Muir's § 434(b)(1) explicit right to be treated

with dignity and respect because Muir was dehumanized by the AIT passenger screening process when his equal protection of the laws was erased through the use of artificial intelligence because narrow A.I. cannot understand human disability or uphold Muir's rights under 29 U.S.C. § 794, and this cannot be classified as treating Muir with dignity or respect but instead with deliberate, indifferent disregard for his humanity.

### In-Concert Liability – Illinois

437.    In Illinois, "a tortfeasor who acts in concert with other individuals in causing a plaintiff's injury is held jointly and severally liable for that injury because the tortfeasor is legally responsible for the actions of the other individuals. See 27 Loy. U. Chi. L.J. at 909. A determination that a tortfeasor has acted in concert with other individuals establishes a legal relationship with those individuals. By virtue of this relationship, the tortfeasor becomes liable for the actions of those with whom he acted in concert. "In legal contemplation, there is a joint enterprise, and a mutual agency, *so that the act of one is the act of all,* and liability for all that is done is visited upon each." (Emphasis added.) W. Keeton, Prosser & Keeton on Torts § 52, at 346 (5th ed.1984)." *Woods v. Cole*, 693 NE 2d 333, 337 - Ill: Supreme Court 1998.

438.    "In-concert liability is a relationship between tortfeasors in which one tortfeasor acting in concert with others "is legally responsible for the actions

of the other individuals." *Woods v. Cole,* 181 Ill.2d 512, 230 Ill.Dec. 204, 693 N.E.2d 333, 337 (Ill. 1998).

439.   Illinois has adopted the Restatement (Second) of Torts § 876 to determine whether individuals have acted in concert to commit a tortious act. *See id.,* 230 Ill.Dec. 204, 693 N.E.2d at 335-36. Section 876 provides that a tortfeasor is liable for harm resulting to a third person from the tortious conduct of another if he (a) "does a tortious act in concert with the other or pursuant to a common design with him"; (b) "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself"; or (c) "gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement (Second) of Torts § 876.

440.   To be liable under § 876, the "defendant's conduct must be `more than benign,'" and "[t]he defendant must actively participate in the tortious conduct of another." *Rogers v. Reagan,* 355 Ill.App.3d 527, 291 Ill.Dec. 430, 823 N.E.2d 1016, 1020 (2005) (quoting *Sanke v. Bechina,* 216 Ill.App.3d 962, 160 Ill.Dec. 258, 576 N.E.2d 1212, 1218 (1991))." *Hutchison v. Fitzgerald Equipment Company, Inc.*, 910 F. 3d 1016, 1025 (7th Circuit 2018). "[S]ection 876 require[s] such affirmative conduct that one's own actions create a duty." *Id.* at 1026, citing *Sanke,* 160 Ill.Dec. 258, 576 N.E.2d at 1218.

## **Claim 13 – In Concert Liability – Products Liability – Illinois - Defendant L3**

441.   Claim 13 is brought against Defendant L3 under Restatement (2d) of Torts § 876 based on its conduct in acting in accordance with an agreement to cooperate in AIT passenger screening, and in aiding and abetting, and providing substantial assistance to, PIA TSA Supervisor John Doe at PIA on June 9, 2019.

442.   Muir reincorporates all paragraphs from above.

443.   A primary violation has occurred in Illinois.

444.   Under the risk-utility test, Muir may prevail in a strict liability design-defect case if he demonstrates that the magnitude of the danger outweighs the utility of the product, as designed. *See Lamkin,* 138 Ill.2d at 529, 150 Ill.Dec. 562, 563 N.E.2d 449. Stated differently, "[t]he utility of the design must therefore be weighed against the risk of harm created" and "[i]f the likelihood and gravity of the harm outweigh the benefits and utilities of the product, the product is unreasonably dangerous." 63A Am.Jur.2d *Products Liability* § 978, at 146-47 (1997)." *See Calles v. Scripto-Tokai Corp*., 864 NE 2d 249, 257 - Ill: Supreme Court 2007.

445.   "[T]he open and obvious danger of a product does not create a *per se* bar to a manufacturer's liability, nor does it preclude application of the risk-utility test. Rather, the open and obvious nature of a danger is one factor that

may be weighed in the risk-utility test. *Blue,* 215 Ill.2d at 103, 293 Ill.Dec. 630, 828 N.E.2d 1128. See also Restatement (Third) of Torts: Products Liability § 2, Reporters' Note, Comment *d,* at 85 (1998)" *Calles v. Scripto-Tokai Corp.*, 864 NE 2d 249, 260 - Ill: Supreme Court 2007.

446.   Under the risk-utility test, a court may take into consideration numerous factors. In past decisions, the court has held that a plaintiff may prove a design defect by presenting evidence of "the availability and feasibility of alternate designs at the time of its manufacture, or that the design used did not conform with the design standards of the industry, design guidelines provided by an authoritative voluntary association, or design criteria set by legislation or governmental regulation." *Anderson v. Hyster Co.,* 74 Ill.2d 364, 368, 24 Ill.Dec. 549, 385 N.E.2d 690 (1979). See also *Hansen,* 198 Ill.2d at 436, 261 Ill.Dec. 744, 764 N.E.2d 35 (feasibility of alternative design relevant); *Moehle v. Chrysler Motors Corp.,* 93 Ill.2d 299, 304, 66 Ill.Dec. 649, 443 N.E.2d 575 (1982) (evidence of compliance with governmental regulations relevant in design defect cases to determine whether a product is unreasonably dangerous); *Rucker v. Norfolk & Western Ry. Co.,* 77 Ill.2d 434, 436-39, 33 Ill.Dec. 145, 396 N.E.2d 534 (1979) (same); *Kerns v. Engelke,* 76 Ill.2d 154, 162-63, 28 Ill.Dec. 500, 390 N.E.2d 859 (1979) (feasibility of alternative design relevant). See *Blue,* 215 Ill.2d at 92, 293 Ill.Dec. 630, 828 N.E.2d 1128 (noting the rationale of *Anderson* "appears to partially set forth the risk-utility test"). *See Calles v. Scripto-Tokai Corp.*, 864 NE 2d 249, 260 - Ill: Supreme Court 2007.

156

447.   John W. Wade, dean and professor of law, emeritus, Vanderbilt University School of Law, has also identified several factors relevant when engaging in risk-utility analysis. These factors include: "(1) The usefulness and desirability of the product — its utility to the user and to the public as a whole. (2) The safety aspects of the product — the likelihood that it will cause injury, and the probable seriousness of the injury. (3) The availability of a substitute product which would meet the same need and not be as unsafe. (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility. (5) The user's ability to avoid danger by the exercise of care in the use of the product. (6) The user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions. (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance." J. Wade, *On The Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 837-38 (1973).

448.   (1) Usefulness of the product: It is undisputed that pre-boarding security searches at commercial airports have great utility to the traveling public as a whole.

449.   (2) Safety aspects of the product: The crucial safety aspect of the AIT product, a human being in the threat and anomaly assessment decision-making

loop, was totally removed, without required notification under 6 C.F.R. §§ 25.6(l)(2), 25.6(g)(4)(i), by the modification of the AIT millimeter wave security portal outside conformance to 49 U.S.C. § 44901(l) and outside conformance to Safety Act Designation and Certification.

450.   (3) Availability of a substitute product: There was a substitute product in use, that, before substantial modification, kept human experience, judgment, empathy and decision-making in the threat assessment decision-making loop through (in accordance with privacy protections set forth by Congress) production of an image of the individual being scanned, and therefore did not require the novel, uninsured use of artificial intelligence.

451.   (4) Ability to eliminate the unsafe character of the product: All that was required to eliminate the unsafe character of the modified security portal was for Defendants to configure the AIT device in conformance with Section 44901(l) privacy limitations and the Terms and Conditions of Safety Act Designation and Certification, as it had been, prior to, at the very latest, March 3, 2016.

452.   (5) The user's ability to avoid danger by the exercise of care in the use of the product: This is the central problem in the instant case, as the technology and standard of care in artificial intelligence is totally undeveloped, and in June 2019, did not exist. This makes it impossible to even formulate what the reasonable exercise of care looks like, because the definitions necessary to engage in the appropriate reasonable care analysis do not yet exist.

453.   (6) The user's anticipated awareness of the dangers inherent in the product: Defendants' intentionally coordinated their activity in the modification of the AIT device at issue, and due to the information hiding inherent in 49 C.F.R. Part 1540 and judicial interpretation of Section 46110, and because of the lack of general public knowledge with regard to the use of artificial intelligence and the total absence of suitable warnings with regard to the certain knowledge that encounters with AIT can and do lead to the revelation of hidden physical disabilities, travelers cannot reasonably anticipate the dangers of using artificial intelligence, while Defendants are acutely aware of the dangers presented by their failure to adhere to AIT device design criteria set by Section 44901(l) (creation of a "visual image") and failure to adhere to governmental regulation with regard to significant modification of AIT under 6 C.F.R. § 25.6(l)(2) (detailing any change that causes the QATT no longer to be within the scope of the Designation).

454.   (7) The feasibility of spreading the loss by carrying liability insurance: Not only is the purchase of liability insurance feasible, it is mandated by Congress in 6 U.S.C. § 443(a). A main issue in the instant case is the lack of Safety Act Designation and Certification for a millimeter wave portal that creates proprietary code and eliminates the "visual image" required by Section 44901.

455.   Therefore, the magnitude of the danger in an extralegal passenger screening process using advanced technology and artificial intelligence with no standard of reasonable care in place is, as demonstrated above, great.

456.   The utility of the product, as significantly modified by Defendant L3, is questionable because of its unlawfulness and the unconstitutional conditions it creates.

457.   The true conditions of TSA AIT passenger screening, as administered pursuant to 49 C.F.R. Part 1540, are not open and obvious.

458.   Application of the risk-utility analysis demonstrates that the risk created by Defendants' conduct in the significant modification of the millimeter wave security portal outside the scope of Section 44901(l) and the Safety Act Designation and Certification outweighs the utility to the general flying public of instantaneous algorithmic decisions on AIT passenger screening data.

## Claim 14 – In-Concert Liability – Illinois – Defendant MAAP

459.   Claim 14 is brought against Defendant MAAP under Restatement (2d) of Torts § 876 based on its conduct in aiding and abetting, and providing substantial assistance to, PIA TSA Supervisor John Doe at PIA on June 9, 2019, and for its breach of duty of reasonable care to Muir under Restatement (2d) of Torts § 314A.

460.   FAA Reauthorization Act of 2018 § 435 states: "It is the sense of Congress that— (1) the aviation industry and every relevant stakeholder must work to ensure that every individual who experiences a disability has equal access to air travel; (2) as technology and ease of travel continue to advance,

accessibility must be a priority; and (3) accommodations must— (A) extend to every airport and service or facility of an air carrier; and (B) be inclusive of every disability." (emphasis added).

461.   Defendant MAAP, a business invitor and aviation industry "relevant stakeholder", owed Muir, a business invitee traveler, a special relationship duty of reasonable care under a business invitor-invitee relationship (Restatement (2d) of Torts §§ 314, 314A (1965)), which included a duty to warn. See generally *Smalling v. LaSalle National Bank of Chicago*, 104 Ill.App.3d 894, 60 Ill.Dec. 671, 433 N.E.2d 713 (1982); *Watson v. J.C. Penney Co.,* 237 Ill.App.3d 976, 178 Ill.Dec. 929, 605 N.E.2d 723 (1992). Defendant MAAP had no duty to protect Muir from a dangerous third party because MAAP is a municipal corporation. See *Bilyk v. Chicago Transit Authority*, 125 Ill.2d 230, 241 - Ill: Supreme Court 1988.

462.   Defendant MAAP had a duty of inquiry with regard to activities that were guaranteed to occur at PIA as a business invitor under Restatement (2d) of Torts § 344 and because, as a general matter, "[a]"duty to warn exists where there is unequal knowledge, actual or constructive [of a dangerous condition], and the defendant[,] possessed of such knowledge, knows or should know that harm might or could occur if no warning is given." *Happel v. Wal-Mart Stores, Inc.,* 199 Ill.2d 179, 262 Ill.Dec. 815, 766 N.E.2d 1118, 1123 (Ill. 2002)" *Hutchison v. Fitzgerald Equipment Company, Inc.*, 910 F. 3d 1016, 1022 (7th Cir. 2018), and a heightened duty of care can be imposed where a special relationship exists

161

between the parties. See *Iseberg v. Gross*, 227 Ill. 2d 78, 87, 879 N.E.2d 278, 284 (2007).

463.   Defendant MAAP could reasonably be expected to have obtained knowledge that AIT passenger screening was being conducted outside the parameters of federal law when definitive proof of unlawful activity was published in the Federal Register on March 3, 2016, as TSA AIT passenger screening is a core activity at MAAP's PIA, and one that a very large percentage of its invitees are guaranteed to experience.

464.   Defendant MAAP knew or should have known that invasive, unnecessary, and harmful physical pat-downs resulting from AIT false threat alarms happened frequently as it was openly acknowledged by DHS/TSA.

465.   The special relationship duty required a heightened duty of care with regards to inquiry and the construction of knowledge, and therefore, some kind of corresponding warning on PIA property that relays constructive knowledge akin to: "This TSA Checkpoint operates outside of federal law. Your legal rights are limited."

466.   Defendants made a contemporaneous physical impact on Muir using electromagnetic waves actively emitted from the AIT security portal, which was installed at, and allowed to operate at, PIA with the express authorization of Defendant MAAP, which clearly provided substantial assistance to the passenger screening scheme because the TSA Checkpoint exists completely within PIA.

467.   Defendant MAAP breached its duty of reasonable care to Muir when it (1) failed its duty of inquiry as to what exactly was being done to its business invitees at the TSA checkpoint as administered under 49 C.F.R. Part 1540, and (2) failed to warn Muir of unlawful and abnormally dangerous activity regularly occurring inside its commercial transportation facility.

468.   Defendant MAAP's failure to warn Muir of the constructive knowledge it had or should have had led directly to Muir's serious injuries because if Muir had simply been warned that the "TSA Checkpoint operates outside of federal law" and that his legal rights were somehow "limited", he would never have booked a ticket, traveled to PIA or approached the unlawful TSA checkpoint. He would have instead done the serious research into the TSA checkpoint (that Defendant MAAP's attorneys easily could and should have done) before he sustained his life-changing psychological injuries (which never would have happened if would have simply been warned), instead of after (when he can't go back to his life before being brutally violated and then haunted by a malevolent presence).

## **Claim 15 – In-Concert Liability – Illinois – Defendant Allegiant**

469.   Claim 15 is brought against Defendant Allegiant under Restatement (2d) of Torts § 876 based on its conduct in aiding and abetting, and providing substantial assistance to, PIA TSA Supervisor John Doe at PIA on June 9, 2019, and for its breach of duty to Muir under Restatement (2d) of Torts §§ 314A, 302.

470.   Defendant Allegiant is sued under Restatement (2d) of Torts § 876(b) for providing substantial financial assistance to the TSA checkpoint scheme while simultaneously failing its duty of inquiry because it should have known through constructive knowledge of public documents and information that the TSA AIT passenger screening program was unlawful and tortious, but chose not to because of profit-motivated willful blindness.

471.   A primary violation has occurred in Illinois under FTCA.

472.   Defendant Allegiant, a common carrier, owed Muir, a passenger, a special relationship duty of reasonable care under a common carrier-passenger relationship (Restatement (2d) of Torts §§ 314, 314A (1965)), which includes a duty of inquiry into all unavoidable elements of the contract of carriage not required by law. If Muir discovered unlawful activity at the TSA checkpoint, then Defendant Allegiant should have discovered it and warned Muir of it.

473.   Even though relevant documents available for knowledge construction are in the public domain, AIT passenger screening is not an open and obvious condition because it takes place using encrypted proprietary code language inside computers and travelers have no idea that it uses artificial intelligence or how it actually works.

474.   Defendant Allegiant had a duty of inquiry with regard to activities that were guaranteed to occur as a part of the contract of carriage because, as a general matter, "[a] "duty to warn exists where there is unequal knowledge,

actual or constructive [of a dangerous condition], and the defendant[,] possessed of such knowledge, knows or should know that harm might or could occur if no warning is given." *Happel v. Wal-Mart Stores, Inc.,* 199 Ill.2d 179, 262 Ill.Dec. 815, 766 N.E.2d 1118, 1123 (Ill. 2002)" *Hutchison v. Fitzgerald Equipment Company, Inc.*, 910 F. 3d 1016, 1022 (7th Cir. 2018), and a heightened duty of care can be imposed where a special relationship exists between the parties. See *Iseberg v. Gross*, 227 Ill. 2d 78, 87, 879 N.E.2d 278, 284 (2007).

475.   "We do not equate failing to prevent certain conduct with actively encouraging that conduct." *Umble v. Sandy McKie & Sons, Inc.,* 294 Ill.App.3d 449, 228 Ill.Dec. 848, 690 N.E.2d 157, 159 (1998), but failing to prevent certain conduct is an actionable breach when the defendant is a common carrier with a special relationship affirmative duty under Restatement (Second) of Torts § 314A, so the Court's holding in *Umble* is inapplicable to this case.

476.   Defendant Allegiant made a necessary contribution to the underlying scheme as 49 C.F.R. § 1510.9(c) provides that Allegiant is solely liable to TSA for the [security service] fee and must remit the fee as required in § 1510.13 regardless of whether or not the security service fee is collected from the passenger.

477.   Allegiant is the main commercial airline serving PIA. Therefore, Allegiant remits a large percentage of the total security service fees that fund the TSA checkpoint. Therefore, Defendant Allegiant's remittance of the fees is, by

definition, a necessary contribution to the TSA checkpoint scheme at PIA because the AIT passenger screening scheme would not exist at PIA without Defendant Allegiant's significant funding.

478. Defendant Allegiant's participation in the scheme was willful because operating a commercial airline serving PIA is a choice, and under 49 C.F.R. § 1510.13(b), retaining accrued interest on collected security service fees is also a choice Defendant Allegiant willfully made.

479. Defendant Allegiant is also sued under Restatement (2d) of Torts § 876(c) for providing substantial financial assistance to the TSA checkpoint program while simultaneously breaching its affirmative duty to protect Muir under Restatement (2d) of Torts § 302.

480. In Illinois, a common carrier has a duty to its passengers to exercise the highest degree of care. See *Chicago Terminal Transfer R.R. Co. v. Schmelling,* 197 Ill. 619, 629, 64 N.E. 714 (1902); *Sheffer v. Springfield Airport Authority,* 261 Ill.App.3d 151, 154, 198 Ill.Dec. 458, 632 N.E.2d 1069 (1994); *Krywin v. Chicago Transit Authority*, 938 NE 2d 440 - Ill: Supreme Court 2010.

481. The relationship of passenger and carrier exists only when the person is in the act of boarding, is upon, or is in the act of alighting from the carrier's vehicle. *Katamay v. Chicago Transit Authority*, 53 Ill.2d 27, 289 N.E.2d 623 (1972) (*citing* IPI 100.09). The scope of "boarding" the conveyance has been held to include standing in line to get on a train (*Katamay*, *supra*) see *Garrett v.*

*Grant School Dist. No. 124*, 139 Ill.App.3d 569, 487 N.E.2d 699, 93 Ill.Dec. 874 (2d Dist.1985).

482.   A common carrier also owes the highest degree of care to protect its passengers from assault, injury, or abuse by other passengers or third parties. Where the common carrier knows, or from facts and circumstances known to it should anticipate the danger of assault to a passenger by a fellow passenger, then it has the duty to exercise the highest degree of care to protect a passenger from assault, injury or abuse. *Blackwell v. Fernandez*, 324 Ill.App. 597, 602-603; 59 N.E.2d 342, 344-345 (1st Dist.1945); *McCoy v. Chicago Transit Authority*, 69 Ill.2d 280, 371 N.E.2d 625, 13 Ill.Dec. 690 (1977); *Letsos v. Chicago Transit Authority*, 47 Ill.2d 437, 265 N.E.2d 650 (1970). This duty arises only when the carrier has actual notice of a danger or notice of facts and circumstances that a danger probably exists. The carrier's knowledge is a prerequisite to the imposition of the duty of the highest degree of care. *Anderson v. Yellow Cab Co.*, 28 Ill.App.3d 656, 329 N.E.2d 278 (1st Dist.1975).

483.   In order for any duty of protection to arise, the carrier must have notice of the actual danger, or notice from facts and circumstances known to it that the danger probably exists. *Morris v. Chicago Transit Authority*, 28 Ill.App.3d 183, 328 N.E.2d 208 (1st Dist.1975) (defendant had no notice of rock throwing incidents prior to occurrence); *Blackwell v. Fernandez*, 324 Ill.App. 597, 602-603; 59 N.E.2d 342, 344-345 (1st Dist.1945) (the carrier had notice

from the insulting behavior of a drunk that an assault was likely); *Neering v. Illinois Central R. Co.*, 383 Ill. 366, 378-380; 50 N.E.2d 497, 502-503 (1943) (the railroad was liable for an assault on a person waiting on a train platform by one of a group of hobos the railroad knew congregated in the area).

484.  These situations where notice of the danger is required before a duty to protect from it arises must be distinguished from those situations in which the accident was caused by the act of a third person but the carrier was negligent in not guarding against the occurrence. *Elgin, A. & S. Traction Co. v. Wilson*, 217 Ill. 47, 51-52; 75 N.E. 436, 437 (1905) (railroad liable for injuries to passenger when boys threw unlocked and unattended switch); Chicago, P. & St. L. Ry. Co. v. Lewis, 145 Ill. 67, 33 N.E. 960 (1893) (an instruction that the carrier was not liable if its tracks were "apparently" in good condition was held erroneous because the carrier had the duty to exercise the highest degree of care to discover the defects).

485.  In Illinois, an affirmative duty to aid or protect another against an unreasonable risk of physical harm or to control the conduct of another arises only within the context of a legally recognized "special relationship." *Doe-3 v. McLean County Unit District No. 5 Board of Directors,* 2012 IL 112479, ¶ 24, 362 Ill.Dec. 484, 973 N.E.2d 880; *Hills v. Bridgeview Little League Ass'n,* 195 Ill. 2d 210, 234, 253 Ill.Dec. 632, 745 N.E.2d 1166 (2000); see also Restatement (Second) of Torts §§ 314, 314A, 315 (1965). *Simpkins,* 2012 IL 110662, ¶ 20, 358

Ill.Dec. 613, 965 N.E.2d 1092. *Bogenberger v. Pi Kappa Alpha Corp.*, 104 NE 3d 1110 - Ill: Supreme Court 2018.

486.   It is not a requirement that the plaintiff be in physical contact with the conveyance in order to occupy the status of passenger. In *Katamay v. Chicago Transit Authority*, 53 Ill.2d 27, 289 N.E.2d 623 (1972), the Illinois Supreme Court held that a woman standing on the platform provided for boarding and alighting was in the "act of boarding" if with the intent to board a standing train she was moving toward the train for that purpose.

487.   Defendant Allegiant, a common carrier and aviation industry "relevant stakeholder", owed Muir, a passenger, a special relationship duty of reasonable care under a common carrier-passenger relationship (Restatement (2d) of Torts §§ 314, 314A (1965)).

488.   Defendant Allegiant breached its special relationship duty of reasonable care to Muir when it: (1) failed to warn Muir of unavoidable activity occurring outside of federal law at the TSA checkpoint, (2) failed to protect Muir from foreseeable, tortious third party conduct including conversion, intrusion upon seclusion, and the public disclosure of private facts certain to occur during AIT passenger screening under 49 C.F.R. Part 1540 (see Restatement (2d) of Torts § 302B), (3) facilitated the unlawful AIT security screening (security service fee collection and remittance, retaining earned interest on collected fees) while simultaneously failing its duty of inquiry by willfully turning a blind eye to the

details of the novel AIT process, (4) failed to provide a safe place for Muir and other travelers with hidden disabilities to board when it deliberately turned its back on Muir and ignored the substantial knowledge it should have constructed based on open-source materials which revealed that Muir's right to privacy under Article I, § 6 of the Constitution of the State of Illinois would be violated when his protected health information regarding the human tissue and human tissue disability beneath his skin was unlawfully searched by the unmonitored artificial intelligence algorithmic agent as a non-negotiable term of the contract of carriage, (5) violated FAA Reauthorization Act of 2018 – Subtitle B – Aviation Consumers with Disabilities - Airline Passengers with Disabilities Bill of Rights - § 434(b)(1), and (6) violated its duties under 14 C.F.R. § 382.

489.   Breach 1: Defendant Allegiant failed to give adequate warning regarding the boarding process, because a general "Electronic Surveillance of Passengers and Baggage" warning that states: "Passengers and their baggage are subject to inspection with an electronic detector with or without the passenger's consent or knowledge" (see Central District of Illinois Case 1:20-cv-01280, Doc. 31-1, p. 3) is inadequate because in Illinois, BIPA 740 ILCS 14/15, requires informed written consent that "biometric information" (a millimeter wave scan of Muir's face and hand geometry) is being collected, and while there may be no duty to warn of a process required by law, there is a duty to warn of a process occurring outside of lawful parameters and which is not required by federal law, like the modification of equipment to change from the creation of a visual image

to the encoding, into proprietary computer code language, of Muir's "biometric information" contained in the millimeter wave scans of his hands and face (as well as the protected health information representing Muir's human tissue and human tissue disability beneath his skin) as required by 49 C.F.R. Part 1540.

490.   Breach 2: Defendant Allegiant failed to protect Muir from foreseeable, tortious third party conduct including conversion, intrusion upon seclusion, and the public disclosure of private facts certain to occur during AIT passenger screening under 49 C.F.R. Part 1540 as it had notice from facts and circumstances known to it that the danger probably existed because, based on the technology of care in artificial intelligence, it is impossible to guarantee Muir's equal protection of the laws while using A.I. during the AIT passenger screening process, so it is reasonable to anticipate the unreasonable risk of injury to Muir during passenger screening (see Restatement § 314A, cmt. e).

491.   Breach 3: Defendant Allegiant facilitated the unlawful AIT security screening (security service fee collection and remittance, retaining interest on collected fees) while simultaneously failing its duty of inquiry by willfully turning a blind eye to what actually occurred during a mandatory part of the contract of carriage. Muir could not be aware of a boarding process administered contrary to the statutory requirements because he had no reason to believe that the law was not being followed at the TSA checkpoint and because Defendant Allegiant represented in its contract of carriage that: "all carriage is performed subject to

compliance with all applicable laws" (see 1:20-cv-01280, Doc. 31-1 at 15), which was not accurate because 49 C.F.R. Part 1540, while a governmental regulation, is an impermissible construction of 49 U.S.C. § 44901 and outside of the scope of the law and Defendant L3's SAFETY Act Designation and Certification for the security portal used during AIT passenger screening.

492.   Breach 4: Defendant Allegiant failed to provide a safe place for Muir and other travelers with hidden disabilities to board as Muir's right to privacy under Article I, § 6 of the Constitution of the State of Illinois was guaranteed to be violated when his protected health information regarding the human tissue and human tissue disability beneath his skin was unlawfully searched by an unmonitored artificial intelligence as a non-negotiable term of the contract of carriage, and the use of A.I. during AIT passenger screening totally removed the opportunity for passengers with disabilities to enjoy the equal protection of the laws because narrow A.I., by definition, cannot uphold 29 U.S.C. § 794 because it cannot understand human disability.

493.   Breach 5: Defendant Allegiant violated FAA Reauthorization Act of 2018 – Subtitle B – Aviation Consumers with Disabilities - Airline Passengers with Disabilities Bill of Rights - § 434(b)(1) - *The right of passengers with disabilities to be treated with dignity and respect*, as Muir was treated like chattel when his private health information representing his hidden disability was judged by the artificial intelligence and his human dignity was ignored

through the facts of computing and he was scanned like he was a box, or luggage, instead of a living, breathing human being. This is the opposite of respect.

494.   Breach 6: Defendant Allegiant violated 14 C.F.R. §§ 382.11(a)(3), 382.13(a) and committed general discrimination through its voluntary arrangement with Defendant MAAP and Defendants TSA and PIA TSA Supervisor John Doe to provide security as part of the airplane boarding process because the AIT passenger screening process as detailed in 49 C.F.R. Part 1540 unlawfully denies Muir the benefit of: (1) the TSA Checkpoint, (2) the airport sterile area, and (3) air transportation between the several states that is available to other persons by using his protected health information representing the human tissue and human tissue disability beneath his skin without authorization, and removes his guaranteed 29 U.S.C. § 794 protections through the use of artificial intelligence that cannot understand or recognize human disability.

**Continuing Violations Theory - Rehabilitation Act (29 U.S.C. § 701 *et seq*.) & Amendment V, Equal Protection Clause - Defendant Pistole and Defendant Neffenger in their Individual Capacities**

495.   Due to the extraordinary facts of this case, the deep constitutional questions presented by those facts, Defendants' totally irreconcilable statements regarding AIT passenger screening, and the slippery slope on which the novel use of artificial intelligence currently rests, the Court should, in recognition of the threat that Defendants' reckless conduct presents, depart from the presumption

against non-statutory remedies and create a *Bivens* remedy directly under the Constitution. (*See Hernandez v. Mesa*, 140 S. Ct. 735 - Supreme Court 2020)

496.   The judiciary must now intrude into the functioning of the executive branch because DHS/TSA are ignoring legislative action and the express will of Congress by using AIT that is outside the scope of 49 U.S.C. § 44901(l) and acting in opposition to measures put in place under the SAFETY Act (6 U.S.C. § 443(a)) that were supposed to ensure the privacy and safety of air travelers during AIT passenger screening.

497.   The statute of limitations for *Bivens* actions is the same as the statute of limitations for claims brought under Section 1983, which is governed by state law, which in this case is the two-year period for personal injury actions under Arizona and Illinois State law. (*See* paragraphs 82-86 from above).

498.   Because Muir's *Bivens* claims arise from the same conduct, transaction, and occurrences as Muir's FTCA claims, all *Bivens* claims must be pleaded in accordance with the expressly stated FTCA process.

499.   To be liable in a *Bivens* claim, a defendant must have been personally involved in the deprivation of a constitutional right, and a causal connection between that involvement and the deprivation must be shown. (*See Zatler v. Wainright*, 802 F.2d 397, 401 (11th Cir. 1986); *Del Raine v. Williford*, 32 F.3d 1024, 1047 (7th Cir. 1994); *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

500.   In the Seventh Circuit, the continuing violation doctrine "allows a complainant to obtain relief for a time-barred act of discrimination by linking it with acts that fall within the statutory limitations period. *See Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir.1992). Courts will then treat the series of acts as one continuous act ending within the limitations period, and will consider three factors in making this determination: (1) whether the acts involve the same subject matter; (2) the frequency at which they occur; and (3) the degree of permanence of the alleged acts of discrimination. The continuing violation doctrine is applicable only if it would have been unreasonable to expect the plaintiff to sue before the statute ran on the conduct, as in a case in which the conduct could constitute, or be recognized, as actionable only in the light of events that occurred later, within the period of the statute of limitations. *See Galloway v. General Motors Serv. Parts Operations,* 78 F.3d 1164, 1167 (7th Cir. 1996) (citation omitted); *Filipovic v. K & R Exp. Systems, Inc.*, 176 F. 3d 390, 396 (7th Cir. 1999).

501.   The Supreme Court's ruling in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), although discussing the continuing violation doctrine in the Title VII context, applies equally to § 1983 cases. *See Sharpe v. Cureton,* 319 F.3d 259, 267 (6th Cir.2003) (explaining the lack of a "principled basis upon which to restrict *Morgan* to Title VII claims" and thus applying it to § 1983 claims), *petition for cert. filed,* 72 U.S.L.W. 3093 (July 9, 2003); *RK Ventures, Inc. v. City of Seattle,* 307 F.3d

1045, 1058-61 (9th Cir.2002) (applying *Morgan* to § 1983 claims). *See*

*Hildebrandt v. ILLINOIS DNR*, 347 F. 3d 1014, n. 18 (7th Cir. 2003).

502.   The Seventh Circuit in *Heard v. Sheahan* considered whether the

continuing violation doctrine applied to a prisoner's Eighth Amendment claim

that prison officials delayed giving him medical attention despite his hernia and

disregarded the recommendation of doctors that he undergo surgery. 253 F.3d

316, 317-20 (7th Cir. 2001). The Seventh Circuit held that the continuing

violation doctrine applied because the prisoner's claim related to a "continuous

series of events giv[ing] rise to a cumulative injury." *Id.* at 320. This conclusion is

consistent with *Morgan's* application of the continuing violation doctrine to a

series of predicate acts forming the basis for a single claim. *See Morgan,* 536 U.S.

at 117-18, 122 S.Ct. 2061; *see also Heard,* 253 F.3d at 319-20 (noting that courts

"don't *want* the plaintiff to sue before the violation is complete," or to bring

separate lawsuits when a series of acts reasonably should be challenged as part of

one claim). *See Shomo v. City of New York*, 579 F. 3d 176, 181 (2nd Cir. 2009).

503.   In the Ninth Circuit's view, a plaintiff can establish a continuing

violation that allows recovery for claims filed outside of the statutory period in

one of two ways. First, a plaintiff may show "a series of related acts one or more

of which are within the limitations period." Such a "serial violation is established

if the evidence indicates that the alleged acts of discrimination occurring prior to

the limitations period are sufficiently related to those occurring within the

limitations period." The alleged incidents, however, "cannot be isolated, sporadic, or discrete." Second, a plaintiff may establish a continuing violation if he shows "a systematic policy or practice of discrimination that operated, in part, within the limitations period—a systemic violation." *See National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 107 (2002).

504.   To survive under this test, Muir must: (1) raise a genuine issue of disputed fact as to the existence of a continuing violation, be it serial or systemic, and (2) show the continuation of the violation into the limitations period.

505.   The critical inquiry is whether Muir was "exposed" to Defendants' systemically discriminatory policy during the period of limitations.

## Claim 16 – In Concert Liability – Constitutional Tort – Defendant Pistole in his Individual Capacity under *Bivens*

506.   Claim 16 is brought against Defendant John S. Pistole (Fifth Administrator of the TSA from June 25, 2010 thru December 31, 2014) in his individual capacity under *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971) and Restatement (2d) of Torts § 876.

507.   Muir reincorporates all paragraphs from above.

508.   Defendant Pistole, in his official role as Fifth TSA Administrator, personally approved (TSA Administrator personally approves the TSA SOP, *see Blitz v. Napolitano*, 700 F.3d 733, 736 (4th Cir. 2012)) the September 17, 2010

177

order directing the use of AIT in passenger screening, and in doing so, directly unleashed the use of A.I. on an unsuspecting traveling public and engaged in conduct which: (1) permanently established the ongoing, systemic discrimination against air passengers with hidden disabilities, (2) began the denial of, for air passengers with hidden disabilities, the fundamental right to privacy, the right to be free from unreasonable search and seizure under Amendment IV to the U.S. Constitution, and the right to due process and the equal protection of the laws under Amendment V to the U.S. Constitution, (3) directly caused the deprivation of Muir's fundamental liberties and well-established constitutional rights during AIT passenger screening, and (4) directly caused Muir's damages in June 2019.

509.   Defendant Pistole is not entitled to qualified immunity for his official conduct because: (1) AIT passenger screening conducted pursuant to Defendant Pistole's September 17, 2010 order cannot pass the rational relationship test because the algorithmic search of data representing passengers' human tissue and organs beneath their skin is not rationally related to a search for threat objects on the surface of their skin, and (2) Defendant Pistole acted with deliberate indifference to the effect of his actions on travelers with disabilities.

510.   (1) Whether the acts involve the same subject matter: The systemic discrimination involves the same subject matter because Defendant Pistole's September 17, 2010 order directing the use of AIT in air passenger screening was still in effect on June 6, 2019 and June 9, 2019, and continues to be in effect now.

178

511.    Due directly to Defendant Pistole's personally approved order, Muir is wrongfully denied his right to the benefit of the TSA Checkpoint and interstate air travel solely because of the ongoing systemic discrimination against travelers with hidden disabilities, who are, due to the realities of artificial intelligence and computer science, treated differently and objectively worse than travelers without hidden disabilities during AIT passenger screening.

512.    (2) The frequency at which the discriminatory acts occur: Muir continues and will continue to be denied his right to the benefit of the TSA Checkpoint every time he tries to travel between the several states by air, and it was unreasonable to expect Muir to sue during the sixty day window under Section 46110 following the September 17, 2010 order because: (1) the order was sensitive security information totally unknown to the public, and (2) Muir did not experience actionable conduct until over eight years later, in June 2019.

513.    Muir was exposed to Defendant Pistole's systemically discriminatory policy on June 6, 2019 at IWA and June 9, 2019 at PIA and Defendant Pistole's September 17, 2010 conduct therefore constitutes a continuing violation.

514.    (3) The degree of permanence of the alleged acts of discrimination: The systemic discrimination created by the use of artificial intelligence during AIT passenger screening will never cease because the laws of computer science completely preclude narrow A.I. from ever understanding human disability, and general A.I. is but a dream at this point in our technological development.

179

515.    Therefore, Defendant Pistole is personally liable to Muir for his injuries and the Court should, on its own, create a constitutional remedy to make Muir whole and to punish the reckless abuse of trust and authority displayed by Defendant Pistole.

## Claim 17 – In Concert Liability – Constitutional Tort – Defendant Neffenger in his Individual Capacity under *Bivens*

516.    Claim 17 is brought against Defendant Peter V. Neffenger (Sixth Administrator of the TSA from July 6, 2015 thru January 20, 2017) in his individual capacity under *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971) and Restatement (2d) of Torts § 876.

517.    Muir reincorporates all paragraphs from above.

518.    Defendant Neffenger, in his official role as Sixth TSA Administrator, personally approved TSA's final agency decision and final rule C.F.R. Part 1540, promulgated on March 3, 2016, Federal Register Vol. 81, No. 42.

519.    Defendant Neffenger's personal approval of a final TSA rule (still in effect) that expressly contradicts the congressional requirement for the use of AIT that "creates a visual image of an individual showing the surface of the skin and revealing other objects on the body" by directing the use of AIT that does not have the capability to create images (and is therefore also outside the scope of SAFETY Act Designation and Certification), constitutes a continuing violation.

520.    Defendant Neffenger acquiesced in continuing discriminatory conduct and violated 6 C.F.R. § 25.6(g)(4)(i) when he failed to provide a "detailed description of and detailed specifications for" Defendant L3's security portal AIT device when he had certain knowledge that the Technology described by "Exhibit A, F-26-E" did not describe the AIT device in use, and that the modification of the AIT portal placed the equipment outside the scope of SAFETY Act Designation.

521.    (1) Whether the acts involve the same subject matter: The acts involve exactly the same subject matter, in particular, the ongoing use of an unauthorized configuration of Defendant L3's millimeter wave security portal.

522.    (2) The frequency at which the discriminatory acts occur: The discriminatory act occurs every time Muir encounters the modified millimeter wave security portal because the March 3, 2016 TSA final rule is still in effect.

523.    (3) The degree of permanence of the alleged acts of discrimination: As previously demonstrated, the laws of computer science permanently preclude narrow artificial intelligence from understanding what it doesn't understand.

524.    Defendant Neffenger is not entitled to qualified immunity because he had knowledge with substantial certainty that the removal of human beings from the AIT threat assessment loop would make upholding Section 504 fully impossible and is therefore personally liable to Muir for his injuries based on the discriminatory and unconstitutional act of personally approving an unlawful, unconstitutional and impermissible construction of 49 U.S.C. § 44901.

### Biometric Information Privacy Act - 740 ILCS 14/1 *et seq*.

525.   The Biometric Information Privacy Act ("BIPA") is Muir's digital Bill of Rights in Illinois. Since October 3, 2008, BIPA has elevated to protectible status Muir's inherent right to control his own body, including his digital body and the associated biometric identifiers and information contained in his TSA AIT scan, and the violation or trespass upon that right is a concrete injury-in-fact for standing purposes. Section 5 of BIPA recognizes that "[t]he full ramifications of biometric technology are not fully known" and "[t]he public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information."

526.   There is a clear and well-developed market for the valuable private health information being wrongfully collected and used by Defendants during AIT passenger screening, as demonstrated by the *MarketScan* sale in January 2022 (which contained proprietary claims data and health information on 270 million Americans or 82% of the United States population) from IBM Watson Health to Francisco Partners for 1 billion dollars.

527.   The global medical diagnostic/imaging market was valued at $38.5 billion in 2020, and is projected to reach $68.8 billion by 2030. North America garnered the major share in the medical diagnostic/imaging market in 2020 and is expected to dominate the global market for at least the next decade (*See* https://www.alliedmarketresearch.com/medical-diagnostic-imaging-market).

**Claim 18 – FTCA/Biometric Information Privacy Act ("BIPA" 740 ILCS 14/1 *et seq.*) – Illinois – Defendants United States, Mayorkas, Easterly, Granholm, Pekoske, L3, Allegiant, MAAP**

528.   Claim 18 is brought against Defendant United States under the FTCA and BIPA based on the conduct of PIA TSA Supervisor John Doe within the scope of his employment at PIA on June 9, 2019, and against Defendants Mayorkas, Easterly, Granholm and Pekoske based on their conduct within the scope of their employment in executing 49 C.F.R. Part 1540 at PIA, and against Defendants L3, Allegiant, and MAAP under Restatement (2d) of Torts § 876 based on their conduct at PIA on June 9, 2019 with Defendants PIA TSA Supervisor John Doe, Mayorkas, Easterly, Granholm and Pekoske.

529.   Muir reincorporates all paragraphs from above.

530.   "[S]ection 15 imposes various duties upon which an aggrieved person may bring an action under section 20. Though all relate to protecting biometric data, each duty is separate and distinct. A private entity could violate one of the duties while adhering to the others, and an aggrieved person would have a cause of action for violation of that duty. Moreover, as section 20 provides that a "prevailing party may recover for each violation" (740 ILCS 14/20 (West 2018)), a plaintiff who alleges and eventually proves violation of multiple duties could collect multiple recoveries of liquidated damages. *Id*. § 20(1), (2). *Tims v. BLACK*

*HORSE CARRIERS, INC.*, 2021 IL App (1st) 200563 - Ill: Appellate Court, 1st Dist., 6th Div. 2021.

531.    Section 10 states in relevant part: ""Biometric identifier" means a scan of hand or face geometry" and "Biometric identifiers do not include an X-ray, roentgen process, computed tomography, MRI, PET scan, mammography, or other <u>image</u> or film of the human anatomy used to diagnose, prognose, or treat an illness or other medical condition or to further validate scientific testing or screening." (Emphasis added).

532.    It is undisputed that Muir's AIT passenger screening scan "code" created and controlled by Defendants at PIA on June, 9, 2019 includes, as part of his whole body AIT scan, data representing a scan of his hand and face geometry.

533.    Therefore, Muir's indivisible AIT passenger screening scan "code" taken at PIA on June 9, 2019, which represents a scan of his hand and face geometry (and, also includes, without his consent, his private protected health information regarding his human tissue and human tissue disability beneath his skin), is a "biometric identifier" as defined in Section 10 of the Act.

534.    It is undisputed that AIT used during passenger screening does not produce an image ("[T]he individual image has been eliminated", *see* 81 FR 11383), is not used to treat medical conditions, is not used for scientific testing, and is therefore not an exception under Section 10.

535.    Defendant L3 represented, with regard to its AIT security portals in use at PIA, that "L3's [Technology] is both authorized and designed to detect objects located directly beneath the surface of the skin[,] [w]hether the object is a... medical implant, or a naturally occurring protrusion" (*See* District of Arizona Case No. 2:19-cv-05887,  Doc. 19, filing system p. 6).

536.    Section 10 of the Act also states: ""Biometric information" means any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual. Biometric information does not include information derived from items or procedures excluded under the definition of biometric identifiers."

537.    Muir's AIT passenger screening scan "code" is information which could be used to precisely identify him because it contains very specific details representing his particular hidden physical disorder, and it is not derived from an item or procedure on the exclusions list.

538.    Therefore, Muir's June 9, 2019 AIT passenger screening scan "code", including the code representing his human tissue and human tissue disability beneath his skin, is "biometric information" based on his "biometric identifier" (scan of his hand and face geometry)  as defined by Section 10 of the Act.

539.    Section 10 of the Act clarifies in relevant part that: ""Private entity" means any individual, partnership, corporation, limited liability company,

association, or other group, however organized. A private entity does not include a State or local government agency."

540.   Defendant L3 is a Delaware for-profit corporation and therefore a "private entity" under the Act.

541.   Defendant United States is not a State or local government agency and is sued for the conduct of Defendants PIA TSA Supervisor John Doe, Mayorkas, Easterly, Granholm, and Pekoske, who are clearly individuals, while acting within the scope of their employment in the administration of the TSA Checkpoint passenger screening program, which is an organized group activity.

542.   Defendant United States is therefore a "private entity" under the Act.

543.   "Section 15(b) of Illinois's Biometric Information Privacy Act (BIPA), 740 ILCS 14 (2008), regulates the collection, use, and retention of a person's biometric identifiers or information. It requires collectors of this material to obtain the written informed consent of any person whose data is acquired. This regime is designed to protect consumers against the threat of irreparable privacy harms, identity theft, and other economic injuries arising from the increasing use of biometric identifiers and information by private entities. As a matter of state law, anyone "aggrieved" by a violation of the disclosure and informed consent obligations is entitled to bring a private action against the alleged offender. The question now before us is whether, for federal-court purposes, such a person has suffered the kind of injury-in-fact that supports Article III standing. We conclude

that a failure to follow section 15(b) of the law leads to an invasion of personal rights that is both concrete and particularized. See *Spokeo, Inc. v. Robins,* ____ U.S. ____, 136 S. Ct. 1540, 194 L.Ed.2d 635 (2016)" *Bryant v. Compass Group USA, Inc.*, 958 F. 3d 617, 619 (7th Cir. 2020).

544.   In violation of section 15(a) of the Act, Defendants never made publicly available a retention schedule and guidelines for permanently destroying the biometric identifiers and information they were collecting and storing.

545.   In violation of section 15(b) of the Act, Defendants never: (1) informed Muir in writing that his biometric identifier (scan of his face and hand geometry, and which also included his protected health information regarding his human tissue and human tissue disability beneath his skin) was being collected or stored, (2) informed Muir in writing of the specific purpose and length of term for which his biometric identifiers were being collected, stored, and used, or (3) obtained Muir's written release to collect, store, and use his biometric identifiers and protected health information representing the human tissue and human tissue disability beneath his skin.

546.   Muir did not know that his private health information representing the human tissue and human tissue disability beneath his skin was being collected and used, nor why or how it was happening, nor that it was part of a security screening process occurring outside the lawful parameters of AIT passenger screening established by Congress in 49 U.S.C. § 44901(l). Defendant

Allegiant's insufficient boilerplate "Passengers and their baggage are subject to inspection with an electronic detector with or without the passenger's consent and knowledge" disclosure (*see* Contract of Carriage, Case 1:20-cv-01280, Doc. 31-1, p. 3, "Electronic Surveillance of Passengers and Baggage") and Defendant PIA TSA Supervisor John Doe's negligent failure to make the requisite BIPA disclosures regarding the AIT passenger screening process at PIA denied Muir the ability to give informed written consent as required by section 15(b) of the Act and Defendant PIA TSA Supervisor John Doe and Defendant Allegiant's failure to comply with section 15(b) the Act resulted, both for Muir and others similarly situated, in the loss of the right to control their biometric identifiers and private information.

547.    "Through the Act, our General Assembly has codified that individuals possess a right to privacy in and control over their biometric identifiers and biometric information. See *Patel v. Facebook Inc.,* 290 F.Supp.3d 948, 953 (N.D. Cal. 2018). The duties imposed on private entities by section 15 of the Act (740 ILCS 14/15 (West 2016)) regarding the collection, retention, disclosure, and destruction of a person's or customer's biometric identifiers or biometric information define the contours of that statutory right. Accordingly, when a private entity fails to comply with one of section 15's requirements, that violation constitutes an invasion, impairment, or denial of the statutory rights of any person or customer whose biometric identifier or biometric information is

subject to the breach." *Rosenbach v. Six Flags Entertainment*, 129 N.E.3d 1197, 1206 - Ill: Supreme Court 2019.

548.   A key part of Muir's right to control his biometric identifiers and biometric information in Illinois is the power to say no by withholding consent. Defendants failed to adhere to the statutory procedures (Defendant Allegiant unequivocally stated that Muir is subject to electronic inspection <u>without his consent</u>) and thereby denied Muir the ability to make an informed decision about whether to provide his biometric identifier, and his clearly defined right to maintain his biometric privacy vanished into thin air and the precise harm the Illinois legislature sought to prevent was then realized. The Illinois Supreme Court declared that such a violation "is no mere `technicality.' The injury is real and significant." *Id.*

549.   "As the Illinois Supreme Court recognized in *Rosenbach,* the informed-consent regime laid out in section 15(b) is the heart of BIPA. The text of the statute demonstrates that its purpose is to ensure that consumers understand, before providing their biometric data, how that information will be used, who will have access to it, and for how long it will be retained. The judgment of Illinois's General Assembly is that the sensitivity of biometric information and the risk of identity theft or other privacy or economic harm that may result from its dissemination, necessitates that people be given the opportunity to make informed choices about to whom and for what purpose they

will relinquish control of that information." *Bryant v. Compass Group USA, Inc*.,
958 F. 3d 617, 626 (7th Cir. 2020).

550.   As in *Robertson,* Defendants withheld substantive information to
which Muir was entitled and thereby deprived him of the ability to give the
informed consent section 15(b) mandates. Equipped with the missing required
information, Muir would have chosen not to submit to AIT passenger screening
at PIA. Muir did not realize that there was a choice to be made and what the costs
and benefits were for each option, and this deprivation is a concrete injury-in-fact
that is particularized to Muir. *See Bryant v. Compass Group USA, Inc*., 958 F. 3d
617, 626 (7th Cir. 2020).

551.   Recognizing the privacy and economic risks involved in the wide use
of biometric information, the Illinois General Assembly mandated in section
15(b) of BIPA that private entities make certain disclosures and receive informed
consent from consumers before obtaining such information. As alleged above,
Defendants did not make the requisite disclosures to Muir or obtain his informed
written consent before collecting his biometric information. By failing to do so,
Defendants inflicted the concrete injury BIPA intended to protect against, *i.e.*
Muir's loss of the power and ability to make informed decisions about the
collection, storage, and use of his biometric information, and Muir was directly
and permanently harmed in a way that the legislature clearly intended to
preclude. *See Bryant* at 626-627.

## Claim 19 – FTCA/BIPA – Illinois – Defendants United States, Mayorkas, Easterly, Granholm, Pekoske, Allegiant, MAAP, L3, Leidos

552.   Claim 19 is brought against Defendant United States under the FTCA and BIPA based on the conduct of PIA TSA Supervisor John Doe within the scope of his employment at PIA on June 9, 2019, and against Defendants Mayorkas, Easterly, Granholm and Pekoske based on their conduct within the scope of their employment in executing 49 C.F.R. Part 1540 at PIA, and against Defendants Allegiant, MAAP, and L3 based on their conduct at PIA on June 9, 2019 with Defendant PIA TSA Supervisor John Doe, and against Defendant Leidos based on its purchase of Defendant L3's Security & Detection Systems, Inc. on May 4, 2020.

553.   Muir reincorporates all paragraphs from above.

554.   In the instant case, for section 15(c) and section 15(d) claims against Defendant United States brought under the FTCA, 735 ILCS 5/13-201 conflicts with 28 U.S.C. § 2401(b) because Congress has expressly implemented a comprehensive regulatory scheme in the field of civil actions against the United States under 28 U.S.C. §§ 1346(b), 2671 *et seq.*, and because this is a permissible exercise of Congress' authority, the Supremacy Clause, U.S. Const. art. VI, cl. 2., squarely supports the legitimacy of giving precedence to federal law in this area, which under 28 U.S.C § 2401(b), sets the statute of limitations for all civil claims against the United States at two years. Therefore, the statute of limitations for

BIPA Section 15(c) and (d) claims against Defendant United States brought under the FTCA and, by extension, brought against Defendants Allegiant, MAAP, L3 and Leidos as co-defendants acting in concert, is, in this case, two years (instead of one year, see *Tims v. BLACK HORSE CARRIERS, INC.*, 735 ILCS 5/13-201), and Muir's BIPA Section 15(c) and (d) claims against Defendant United States and Defendants Allegiant, MAAP, L3, and Leidos are therefore timely as they were properly brought according to the FTCA administrative process clearly set forth in 28 U.S.C. § 2675.

555.   Section 15(c) states: "No private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information".

556.   In violation of section 15(c) of the Act, Defendant L3 profited from control of Muir's biometric information that was encoded in its proprietary code language during TSA AIT passenger screening at PIA on June 9, 2019 because it: (1) exclusively controlled the proprietary application programming interface specifications, credentials acceptance keys, and decryption key to its proprietary computer code language, and (2) by default, as no data retention or destruction schedule was published as required under section 15(a) of the Act, sold Muir's biometric information to Defendant Leidos (a HIPAA-aware entity via its USAID malaria vaccine project collaboration with GeoVax Labs, Inc.) on May 4, 2020 as part of the one billion dollar sale of its security and detection systems company.

557.    In violation of Section 15(c) of the Act, Defendants Allegiant and MAAP profited from Muir's unlawfully obtained biometric information as part of the TSA checkpoint scheme at PIA because travel through the airport is an essential requirement of their businesses and passengers cannot enter the sterile area of the airport to board their flights without submitting to TSA for security screening under 49 C.F.R. §§ 1540.107, 1540.109, therefore, facilitating the passenger security screening is at the core of their profit schemes because their businesses cannot otherwise exist.

558.    Section 15(d) of the Act states: "No private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information".

559.    In violation of section 15(d) of the Act: (1) Defendant L3 disclosed Muir's biometric identifiers and biometric information to Defendant PIA TSA Supervisor John Doe when it expressly allowed the use of its proprietary code decryption key on Muir's June 9, 2019 AIT passenger screening scan code (which included not only data representing his hand and face geometry, but also data representing the human tissue and human tissue disability beneath his skin), and (2) Defendant PIA TSA Supervisor John Doe redisclosed Muir's biometric information to Defendant L3 when the A.I. threat and anomaly decision-making algorithm returned its final decision to Defendant L3's *ATD* "software solution".

560.   Section 15(d)(1) of the Act does not apply because Muir did not consent to the disclosure in any way and did not give written consent as required by Section 15(b) of the Act, and section 15(d)(3) of the Act does not apply because the multiple disclosures of Muir's private health information representing the human tissue and human tissue disability beneath his skin between Defendant L3's *ATR* software and the unidentified artificial intelligence are not required by federal law because the creation of proprietary computer code representing Muir's human tissue and human tissue disability beneath his skin under 49 C.F.R. Part 1540 is outside of federal law, which, under 49 U.S.C. § 44901(l), limits AIT passenger screening to a "visual image of an individual showing the surface of the skin and revealing other objects on the body".

## Claim 20 – BIPA – Illinois – 28 U.S.C. § 1367 - Defendants PIA TSA Supervisor John Doe, Mayorkas, Easterly, Granholm, Pekoske, TSA, L3, Allegiant, MAAP

561.   Claim 20 is an Illinois state law claim brought against Defendants PIA TSA Supervisor John Doe, Mayorkas, Easterly, Granholm, Pekoske, TSA, L3, Allegiant, and MAAP under BIPA (740 ILCS 14/1 *et seq*.) and 28 U.S.C. § 1367. This claim is separate from BIPA claims brought against Defendant United States and co-conspirators under the FTCA.

562.   This Court has supplemental jurisdiction under 28 U.S.C. § 1367 for Muir's separate state law BIPA claim (*see* 740 ILCS 14/20) against Defendants

PIA TSA Supervisor John Doe, TSA, Mayorkas, Easterly, Granholm, Pekoske, L3, Allegiant, and MAAP, and Muir's claim is clearly within the five year statute of limitations, because, with regard to the statues of limitations for BIPA claims in Illinois, "[S]ection 13-201 governs actions under section 15(c) and (d) of the Act, and section 13-205 governs actions under section 15(a), (b), and (e) of the Act. 740 ILCS 14/15 (West 2018)." *Tims v. BLACK HORSE CARRIERS, INC.*, 2021 IL App (1st) 200563 - Ill: Appellate Court, 1st Dist., 6th Div. 2021.

563.   Muir reincorporates all paragraphs from above.

564.   In violation of section 15(a) of the Act, Defendants never made publicly available a retention schedule and guidelines for permanently destroying the biometric identifiers and information they were collecting and storing.

565.   In violation of section 15(b) of the Act, Defendants never: (1) informed Muir in writing that his biometric identifier (scan of his face and hand geometry, and additionally, an extralegal whole body scan which included his private health information representing his human tissue and human tissue disability beneath his skin that could be used to positively identify him) was being collected or stored, (2) informed Muir in writing of the specific purpose and length of term for which his biometric identifiers were being collected, stored, and used, or (3) obtained Muir's written release to collect, store, and use his biometric identifiers and private health information representing the human tissue and human tissue disability beneath his skin.

566.   Section 20 of the Act states in relevant part: "Any person aggrieved by a violation of this Act shall have a right of action… as a supplemental claim in federal district court against an offending party. A prevailing party may recover for each violation: other relief, including an injunction, as the… federal court may deem appropriate."

567.   Muir respectfully requests injunctive relief requiring Defendants return, in a decrypted, viewable with human retina image format as required by Section 44901(l), Muir's private health information representing the human tissue and human tissue disability beneath his skin wrongfully taken, controlled, and used by Defendants during AIT passenger screening at PIA on June 9, 2019.

**Strict Liability – Abnormally Dangerous Activity**

568.   Courts in Arizona and Illinois look to the Restatement (Second) of Torts §§ 519, 520 (1965) as authority in imposing strict liability for abnormally dangerous activity. *Correa v. Curbey,* 124 Ariz. 480, 605 P.2d 458 (App. 1979), *Martin v. Harrington and Richardson, Inc.*, 743 F. 2d 1200, 1202 (7th Circuit 1984).

569.   Whether an activity is abnormally dangerous is not a fact question; such determinations are for the court. *Cordova v. Parrett,* 146 Ariz. 79, 82, 703 P.2d 1228, 1231 (App. 1985); Restatement (Second) of Torts § 520 cmt. *l. Perez v. Southern Pacific Transp. Co.*, 180 Ariz. 187, 188 - Ariz: Court of Appeals, 2nd Div., Dept. A 1993.

570.    The Restatement requires the court to conduct a case-by-case analysis before imposing strict liability. *State Dept. of Environ. Protect. v. Ventron,* 94 N.J. 473, 468 A.2d 150 (1983).  In such an analysis properties of the particular substance involved are not determinative, rather the defendant's activity as a whole is analyzed. *Richmond, F. & P.R.R. Co. v. Davis Industries,* 787 F. Supp. 572 (E.D.Va. 1992). Strict liability, then, attaches only to abnormally dangerous activities, not substances. *See Indiana Harbor Belt R.R. Co. v. American Cyanamid Co.,* 916 F.2d 1174, 1181 (7th Cir.1990) ("ultra-hazardousness or abnormal dangerousness is, in the contemplation of the law at least, a property not of substances, but of activities")." *Perez v. Southern Pacific* at 188-189.

571.    "In analyzing whether an activity is abnormally dangerous, the court must engage in a balancing test using the six factors set forth in Restatement (Second) of Torts § 520. *Arlington Forest Associates v. Exxon Corp.,* 774 F. Supp. 387, 390 (E.D.Va. 1991). The factors are interrelated and the court "should consider them as a whole, apportioning weight to each in accordance with the facts in evidence."" *Id.*

## Abnormally Dangerous Activity - § 520 Six Factor Balancing Test

572.    (1) The inability to eliminate the risk by the exercise of reasonable care: Defendants' inability to eliminate the risk posed by AIT passenger screening conducted pursuant to 49 C.F.R. § 1540.107 was guaranteed, and Defendants had

knowledge with substantial certainty of their total inability to eliminate the risk by the exercise of reasonable care as the technology and standard of care in the use of artificial intelligence is insufficiently developed and policies are still being formulated for its use. Defendants could not, by definition, exercise reasonable care in the AIT passenger screening program because Defendants, like all similarly-situated authorities worldwide, are still in the early stages of defining the meaning of reasonable care as it pertains to artificial intelligence, and still formulating the very first policies and procedures with regard to advanced technology and the specific class of narrow artificial intelligence product that has been in daily use at over four hundred airports in the United States since at the very latest, March 3, 2016.

573.   "Although there is no uniformly agreed upon definition, AI generally is thought to refer to "machines that respond to stimulation consistent with traditional responses from humans, given the human capacity for contemplation, judgment and intention." According to researchers...these software systems "make decisions which normally require [a] human level of expertise" and help people anticipate problems or deal with issues as they come up. As such, they operate in an intentional, intelligent, and adaptive manner."" (internal citations omitted). *How artificial intelligence is transforming the world*, Darrell M. West and John R. Allen, The Brookings Institution, Tuesday, April 24, 2018. *See* https://www.brookings.edu/research/how-artificial-intelligence-is-transforming-the-world/.

574.   "AI is not a futuristic vision, but rather something that is here today and being integrated with and deployed into a variety of sectors. This includes fields such as finance, national security, health care… transportation, and smart cities. There are numerous examples where AI already is making an impact on the world and augmenting human capabilities in significant ways." *Id*.

575.   "Human choices about software development affect the way in which decisions are made and the manner in which they are integrated into organizational routines. Exactly how these processes are executed need to be better understood because they will have substantial impact on the general public soon, and for the foreseeable future. AI may well be a revolution in human affairs, and become the single most influential human innovation in history." *Id*.

576.   A.I. is already active in the TSA AIT passenger screening process at U.S. airports (without a direct mandate from Congress since, at the latest, March 3, 2016) and had a "substantial impact" on Muir less than four months after the Brookings Institute publicly predicted it, and it is outrageous and shocking that Defendants would ignore risks that were not only easily foreseeable to those with certain knowledge, but publicly prognosticated by those with no access to the SSI contained in Defendant Pistole's September 17, 2010 order, but who instead relied on the generally accepted principles of computer science and basic common sense. Defendants' use of A.I. during AIT passenger screening when the standard of reasonable care with regard to A.I. does not yet exist is negligence.

577.   (2) The inappropriateness of the activity to the place where it is carried on: Defendants' use of artificial intelligence in high-speed, high-impact decision-making custodial interrogations at the TSA checkpoint as a part of common carrier contracts for carriage is inappropriate to the place where it is carried on because the use of A.I. in related fields like radiology never gives the A.I. the final say with no human beings in the decision-making loop, Muir can't say no to a mandatory physical pat-down for any reason, including a serious, disability-related medical emergency unlawfully revealed through a violation of his privacy, and Defendant L3 is unable to, and did not, obtain liability insurance for its AIT that creates internal code of the passenger using proprietary software, as required by 6 U.S.C. § 443(a) and 6 C.F.R. § 25.5(a) and (g).

578.   "The big data analytics associated with AI will profoundly affect intelligence analysis, as massive amounts of data are sifted in near real time—if not eventually in real time—thereby providing commanders and their staffs a level of intelligence analysis and productivity heretofore unseen." *See How artificial intelligence is transforming the world*, Darrell M. West and John R. Allen, The Brookings Institution, Tuesday, April 24, 2018.

579.   The TSA AIT passenger screening program uses artificial intelligence to make instantaneous scan data comparisons, and the level of rapid, "real time" decision-making required by the TSA AIT passenger screening program is inappropriate for the novel deployment of artificial intelligence in place of human

TSOs, and the activity is outrageous and indifferent conduct because it involves a serious violation of privacy, there is no chance for the review of the A.I.'s decisions, there is no monitoring of the A.I.'s performance, and there are no human beings anywhere in the decision-making loop during the unauthorized, irrational judging of travelers' private health information representing their body cavities and the human tissue beneath their skin.

580.   (3) The extent to which its value to the community is outweighed by its dangerous attributes: The unmonitored narrow artificial intelligence in use during AIT passenger screening has a false threat alarm rate that is known to be terrible (*see* Passenger Screening Algorithm Challenge), and known to lead to unnecessary and highly invasive pat-downs. The removal of human experience, judgment and empathy from the threat assessment decision-making loop is to treat Muir as though he were a suitcase instead of a human being with feelings, and the modification to the AIT device makes the passenger screening program a state-created danger, which outweighs any value it may create for the community because TSA cannot expose the community to a known danger in order to keep the community safe from danger. That is contradictory, irrational and absurd.

581.   The state-created danger doctrine is viable in both the Seventh and Ninth Circuits (*See Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993) and *Wood v. Ostrander*, 879 F.2d 583, 589-90 (9th Cir. 1989)). "In order to employ the "state-created danger" theory, the plaintiff must "plead facts showing some

*affirmative act* on the part of the state that either created a danger to the plaintiff or rendered him more vulnerable to an existing danger." (Emphasis in original.) *Stevens v. Umsted,* 131 F.3d 697, 705 (7th Cir.1997); see also *D.R.,* 972 F.2d at 1374; *Reed,* 986 F.2d at 1125." *Lewis E. v. Spagnolo*, 710 NE 2d 798, 809 - Ill: Supreme Court 1999.

582.   "As stated by the Third Circuit in *Kneipp v. Tedder,* 95 F.3d 1199, 1208 (3d Cir.1996), the [state-created danger] exception has four elements.  First, "the harm" must be "foreseeable and fairly direct." Second, the state actors are acting "in willful disregard for the safety of the plaintiff." Third, "there existed some relationship between the state and the plaintiff." Finally, "the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur."" *Builes v. Nye*, 239 F. Supp. 2d 518, 526 - Dist. Court, MD Pennsylvania 2002. It is appropriate for the Court to engage in the four-element exception analysis because the United States District Court for the District of Arizona applied the state-created danger exception four-element test in *Rosciano v. Sonchik*, No. CIV-01-472-PHX-FJM,  2002 U.S. Dist. LEXIS 25419 (D. Ariz. Sept. 9, 2002).

**State-Created Danger Exception Four-Element Test**

583.   Element (1) The harm is foreseeable and fairly direct: Defendants had knowledge with substantial certainty that frequent false threat alarms generated by the unmonitored artificial intelligence agent led to invasive and

unnecessary pat-downs that caused emotional disturbance for many travelers over a period of years. Muir reincorporates paragraphs 266-269 from above.

584.   Element (2) The state actors are acting in willful disregard for the safety of the plaintiff: This element requires us to apply a "shocks the conscience" test to the Defendants actions. *See Nicini v. Morra,* 212 F.3d 798, 809-10 (3d Cir.2000)(en banc); *Brozusky v. Hanover Township,* 222 F.Supp.2d 606, 613-14 (M.D.Pa.2002). Because the Defendants had time to reflect on their decision to remove human experience, judgment and empathy from the threat and anomaly decision-making loop by replacing human TSOs with artificial intelligence, the Court should examine Defendants' conduct under the standard of deliberate indifference. *See Nicini, supra,* 212 F.3d at 810-11.  In part, an official is deliberately indifferent if he knows of and disregards an excessive risk to the health or safety of an individual under his control. *Id.* at 811. Here, the Defendants ignored the excessive risk of removing human experience and judgment from the custodial interrogation decision-making loop when Muir was under total control of Defendant IWA/PIA TSA Supervisor John Doe because Muir could not, due to the basics of computer science, attain an equal protection of the laws specifically designed to protect him during travel as an individual with a qualified disability. Muir reincorporates paragraph 317 from above.

585.   Element (3) There existed some relationship between the state and the plaintiff: Defendant IWA/PIA TSA Supervisor John Doe, a voluntary

custodian, owed Muir, a protectee, a special relationship affirmative duty of care under a voluntary custodian-protectee relationship (Restatement (2d) of Torts §§ 314, 314A (1965)).

586.   Element (4) The state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur: Defendant IWA/PIA TSA Supervisor John Doe's total control of Muir led directly to his private health information representing his human tissue and human tissue disability being unlawfully converted by Defendant L3 while in a position of trust, and then disclosed to the unmonitored artificial intelligence for an instantaneous and unreviewable medical judgment of Muir's private health information in excess of Defendants' authority, which deprived Muir of his well-established Fifth Amendment liberty interest in personal security.

587.   "[T]he language of the statute and not the rules must control" *Touche Ross & Co.* v. *Redington,* 442 U. S., at 577, n. 18. *Alexander v. Sandoval*, 532 US 275, 291 (2001).

588.   The affirmative acts on the part of the state that created a danger to Muir are the impermissible construction of 49 C.F.R. Part 1540.107, the violation of 6 C.F.R. § 25.6(g)(4)(i), and the non-discretionary decision to violate the clear, precise limitations of AIT passenger screening explicitly set forth by Congress in 49 U.S.C. § 44901(l), which exposed Muir to foreseeable harm from Defendant L3 when it took his private health information representing the human tissue and

human tissue disability beneath his skin (See District of Arizona Case No. 2:19-cv-05887, Doc. 19, filing system p. 6, "L3's [technology] is both authorized and designed to detect objects located directly beneath the surface of the skin") and converted it into proprietary code it alone could decrypt, which violated Muir's right to privacy, right to due process, and his right to be free from unreasonable search and seizure as Defendant United States cannot search Muir's private health information without the proprietary code decryption key, application program interface specifications, and credentials authentication key affirmatively provided by Defendant L3.

589.   "[T]he danger of getting the answers to these questions [Are we not to ignore any limitations? May we ignore some? If so, which ones?] wrong is greatest for some of today's most important inventions in computing, medical diagnostics, artificial intelligence, the Internet of Things, and robotics, among other things." *Smart Systems Innovations v. Chicago Transit Auth*., 873 F. 3d 1364, 1378 - Court of Appeals, Federal Circuit 2017 LINN, Circuit Judge, dissenting in part and concurring in part. Congress directly spoke on the issue of the technical limits of AIT passenger screening. Is TSA free to ignore Congress? Is TSA free to ignore and violate the inviolable law of non-contradiction and unilaterally invalidate the agreed upon meaning of common words like *surface*? The contours of Muir's right to privacy are delineated by his skin, the human body's largest organ and its barrier to the outside world. If Muir doesn't have privacy underneath his skin, does he really have it anywhere?

590.    Congress "established in the executive branch an independent Commission to review advances in artificial intelligence, related machine learning developments, and associated technologies." John S. McCain National Defense Authorization Act for Fiscal Year 2019 ("2019 NDAA"), Pub. L. No. 115-232, § 1051(a)(1), 132 Stat. 1636, 1962 (2018) and the President has launched an "American AI Initiative" by Executive Order...So the Government itself is prioritizing artificial intelligence. Yet the Commission "has operated almost entirely in secret." [P]olicy in this area could reshape privacy and human rights. See *EPIC v. Nat'l Sec. Comm'n on Artificial Intelligence* ("*NSCAI*"), 419 F. Supp. 3d 82, 83 (D.D.C. 2019). TSA should not have initiated the use of A.I. without human beings in the decision-making loop until <u>after</u> a standard of care was developed and fundamental A.I. policies had been formulated and enacted, and it is indisputable, based on the linear passage of time, that Defendants' conduct at issue in this case precedes the development of a standard of reasonable care.

591.    All four elements of the state-created danger exception test have been met. Therefore, AIT passenger screening conducted pursuant to 49 C.F.R. Part 1540 is a state-created danger and the value to the community is outweighed by the danger to the community because in this case, due to the total lack of standards of reasonable care in the use of A.I., the cure is worse than the disease.

592.    (4) The existence of a high degree of risk of some harm to the person, land or chattels of others: The degree of risk of harm was high as Defendants had

no policies or procedures in place for artificial intelligence deployment and were not monitoring the performance of the A.I. during passenger screening. Congress and the administrative branch talk about the "future" of A.I., when in reality it's already being used on over two million people a day at TSA Checkpoints.

593.   "Federal officials need to think about how they deal with artificial intelligence. As noted previously, there are many issues ranging from the need for improved data access to addressing issues of bias and discrimination. It is vital that these and other concerns be considered so we gain the full benefits of this emerging technology. In order to move forward in this area, several members of Congress have introduced the "Future of Artificial Intelligence Act," a bill designed to establish broad policy and legal principles for AI. It proposes the secretary of commerce create a federal advisory committee on the development and implementation of artificial intelligence. The legislation provides a mechanism for the federal government to get advice on ways to promote a "climate of investment and innovation to ensure the global competitiveness of the United States," "optimize the development of artificial intelligence to address the potential growth, restructuring, or other changes in the United States workforce," "support the unbiased development and application of artificial intelligence," and "protect the privacy rights of individuals." *How artificial intelligence is transforming the world*, Darrell M. West and John R. Allen, The Brookings Institution, Tuesday, April 24, 2018. https://www.brookings.edu/research/how-artificial-intelligence-is-transforming-the-world/

594.   "What deep learning can do in this situation is train computers on data sets to learn what a normal-looking versus an irregular-appearing [human physical characteristic] is." *Id*. Defendants' use of A.I. to judge Muir's private health information representing the human tissue and human tissue disability beneath his skin in order to decide if he is "normal" enough for travel presents a high degree of risk of harm to Muir because the uncontrollable and unpredictable manifestations of his physical disability will be classified as anomalous by the A.I. even though his disability is "normal" because it was how he was naturally born, over five million people in the United States suffer from a hernia each year (only about 15% seek medical help), inguinal hernias account for 75% of abdominal wall hernias, with a lifetime risk of 27% in men, and repair of inguinal hernia is one of the most common operations in general surgery, with, in the U.S., rates of 28 per 100,000. *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2223000/

595.   "[T]hese developments raise important policy, regulatory, and ethical issues. For example, how should we promote data access? How do we guard against biased or unfair data used in algorithms? What types of ethical principles are introduced through software programming, and how transparent should designers be about their choices? What about questions of legal liability in cases where algorithms cause harm?" *How artificial intelligence is transforming the world*, Darrell M. West and John R. Allen, The Brookings Institution, Tuesday, April 24, 2018. https://www.brookings.edu/research/how-artificial-intelligence-is-transforming-the-world/

596.   (5) The likelihood that the harm that results from it will be great: Required invasive pat-downs are a guarantee of significant bodily impacts and infringements on the personal security liberty interest of travelers, especially qualified individuals with disabilities, and Defendants had certain knowledge that unnecessary pat-downs based on false threat alarms caused travelers' emotional distress, and had been a topic of heated contention, over a period of several years.

597.   "Bias and discrimination are serious issues for AI. There already have been a number of cases of unfair treatment linked to historic data, and steps need to be undertaken to make sure that does not become prevalent in artificial intelligence. Existing statutes governing discrimination in the physical economy need to be extended to digital platforms. That will help protect consumers and build confidence in these systems as a whole." *How artificial intelligence is transforming the world*, Darrell M. West and John R. Allen, The Brookings Institution, Tuesday, April 24, 2018. https://www.brookings.edu/research/how-artificial-intelligence-is-transforming-the-world/

598.   (6) The extent to which the activity is not a matter of common usage: Artificial intelligence of the type at issue in this case is not at all in common usage. Only world governments, universities, research laboratories and multinational corporations have it, and as far open source research can reveal, only Defendants have given A.I. final, unreviewable decision-making authority in a real-time, real-world activity. Defendant Leidos, for example, is extensively

testing its "Skyborg" A.I. before deployment, as artificial intelligence is a novel field of danger posing unusual and unknown risks and removing human beings from the decision-making loop is still being evaluated at the most basic levels.

599.   "The liability arises out of the abnormal danger of the activity itself, and the risk that it creates, of harm to those in the vicinity. It is founded upon a policy of law that imposes upon anyone who for his own purposes creates an abnormal risk of harm to his neighbors, the responsibility of relieving against that harm when it does in fact occur. The defendant's enterprise, in other words, is required to pay its way by compensating for the harm it causes, because of its special, abnormal and dangerous character. Restatement (Second) of Torts § 519 cmt. d. *Id.* "[U]ltrahazardousness or abnormal dangerousness is, in the contemplation of the law at least, a property not of substances, but of activities" *Indiana Harbor Belt R.R. Co. v. American Cyanamid Co.,* 916 F.2d 1174, 1181 (7th Cir.1990).

600.   "Section 521 of the Restatement provides: The rules as to strict liability for abnormally dangerous activities do not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee or as a common carrier." *In re Hanford Nuclear Reservation Litigation*, 534 F. 3d 986, 1005 (9th Circuit 2007).

601.   "The comments to § 519 indicate that the public duty exception is part and parcel of strict liability. Comment "a" to § 519 states that "[t]he general

rule stated in this Section is subject to exceptions and qualifications, too numerous to be included within a single section. It should therefore be read together with §§ 520 to 524A, by which it is limited." RESTATEMENT (SECOND) OF TORTS, § 519 cmt. a. Comment "d" further limits the scope of strict liability and states that persons are accountable only for abnormally dangerous activities they undertake "for [their] own purposes." *Id.* § 519 cmt. d. A key corollary to this point is that strict liability does not apply to activities carried on in pursuance of a public duty the actor was legally obligated to perform. *See id.* § 521. *Id.* at 1005-1006.

602.   "Although widely adopted, the courts that have applied the public duty exception have generally done so only to the extent a defendant was <u>legally required</u> to perform the ultrahazardous activity. *See* RESTATEMENT (SECOND) OF TORTS, § 521, cmt. a." *Id.* at 1006. (Emphasis added). "The case law therefore illustrates that the duty involved is the legal obligation to perform the abnormally dangerous activity <u>in accordance with government orders</u>." *Id.* at 1006, emphasis added.

603.   There was no direct, unambiguous congressional mandate for TSA Supervisors to: (1) violate 49 U.S.C. § 44901(l), (2) use artificial intelligence at the TSA checkpoint, or (3) remove human TSOs from the TSA AIT threat assessment process. With regard to the use of advanced imaging technology, Congress only required that any AIT used during passenger screening be equipped with and

employ ATR software to display a generic image for end-user interpretation (*See* 49 U.S.C. § 44901(l)(2). Congress never said, "take travelers' protected private health information representing the human tissue beneath their skin, encode it in proprietary code instead of creating a visual image, and use artificial intelligence to make a final, unreviewable decision with no human actors or human judgment in the decision-making loop". The events giving rise to this litigation occurred before the government developed a standard of reasonable care or rules or the ability to control artificial intelligence. Defendants may well have been acting at the government's overall urging and in pursuit of a desirable end, but no matter how strongly Defendants may have felt a patriotic duty, they had <u>no legal duty</u> to violate 49 U.S.C. § 44901(l), violate 6 C.F.R. 25.6(l)(2), or to replace human TSOs with A.I., and are, therefore, not entitled to the § 520 public duty exception.

604.   Defendant United States is not entitled to qualified immunity for its abnormally dangerous activity because Muir's well-established liberties were violated by the execution of 49 C.F.R. Part 1540 at IWA on June 6, 2019 and at PIA on June 9, 2019, and a reasonable state actor would have known that his actions, viewed in the light of the law at the time, were irrational and unlawful.

605.   Defendant United States is not entitled to the discretionary function exception (28 U.S.C. § 2680(a)) with regard to its abnormally dangerous conduct because Congress spoke directly on the issue in question in 49 U.S.C. § 44901(l) and Defendants violated the precise, explicit limits of AIT passenger screening.

## **Claim 21 – Strict Liability – Arizona - Defendant United States**

606.   Claim 21 is brought against Defendant United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq*. and Restatement (2d) of Torts §§ 519, 520 (1965) based on the conduct of IWA TSA Supervisor John Doe within the scope of his employment at IWA on June 6, 2019, and the conduct of Defendants Mayorkas, Easterly, Granholm and Pekoske within the scope of their employment.

607.   Muir reincorporates all paragraphs from above.

608.   Based on the above paragraphs, Defendant IWA TSA Supervisor John Doe's activity in the administration of the TSA Checkpoint at IWA on June 6, 2019 pursuant to 49 C.F.R. Part 1540 is uninsured, abnormally dangerous activity in Arizona.

609.   Therefore, Defendant United States is liable to Muir for his damages.

## **Claim 22 - Strict Liability – Illinois – Defendant United States**

610.   Claim 22 is brought against Defendant United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq*. and Restatement (Second) of Torts §§ 519, 520 (1965) based on the conduct of PIA TSA Supervisor John Doe within the scope of his employment at PIA on June 9, 2019, and the conduct of Defendants Mayorkas, Easterly, Granholm and Pekoske within the scope of their employment.

611.    "Illinois recognizes strict liability under two theories: unreasonably dangerous defective products and ultrahazardous activities." *Martin v. Harrington and Richardson, Inc.*, 743 F. 2d 1200, 1202 (7th Cir. 1984).

612.    Muir reincorporates all paragraphs from above, including the six factor test from paragraphs 572-598.

613.    "Illinois has long recognized strict liability for damage caused by engaging in an abnormally dangerous or ultrahazardous activity, although it has never explicitly relied upon the Restatement factors in determining whether a given activity is abnormally dangerous. In *City of Joliet v. Harwood,* 88 Ill. 110 (1877), the Illinois Supreme Court held that blasting with dynamite in a residential area was intrinsically dangerous and gave rise to strict liability for the blaster." *Martin v. Harrington and Richardson, Inc.*, 743 F. 2d 1200, 1203 (7th Cir. 1984). "Cases requiring liability impose liability for the ultrahazardous activity as a result of the *use* of the product." *Martin v. Harrington and Richardson, Inc.*, 743 F. 2d 1200, 1204 (7th Circuit 1984) citing *Riordan v. International Armament Corp.,* 81 L 27923 (Circuit Court Cook County, Law Division, July 21, 1983) slip op. at 3 (emphasis in original).

614.    Based on the above paragraphs, Defendant PIA TSA Supervisor John Doe's activity in the administration of the TSA Checkpoint at PIA on June 9, 2019 pursuant to 49 C.F.R. Part 1540 is uninsured, abnormally dangerous activity in Illinois.

615.   The danger to the community posed by the use of A.I. in the TSA AIT passenger screening program with no developed standard of reasonable care in place outweighs the benefit to the community of the instantaneous algorithmic judgment of passenger screening data made possible by the artificial intelligence.

616.   Therefore, Defendant United States is liable to Muir for his damages and the Court must address and end Defendants' abnormally dangerous activity.

**Equitable Relief**

**Claim 23 – ADA - Title II – Defendants PMGAA, MAAP, L3, Allegiant, Leidos, Battelle**

617.   Claim 23 is brought against Defendants PMGAA, MAAP, L3, Allegiant, Leidos, and Battelle under Title II of the Americans with Disabilities Act ("ADA", 42 U.S.C. § 12101 *et seq*.).

618.   The ADA is valid legislation, which both private and public actors must follow, and although private litigation to enforce the ADA generally may not proceed in federal court (see *Erickson v. Board of Governors for NE Ill. Univ.*, 207 F. 3d 945, 952 (7th Cir. 2000)), this Court has subject matter jurisdiction (based on the same conduct, transaction and occurrences that took place at IWA on June 6, 2019 and at PIA on June 9, 2019) over Muir's private litigation to enforce the ADA in federal court due to supplemental jurisdiction under 28 U.S.C. § 1367.

619.    "The primary mandate of Title II is that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132." *Lacy v. Cook County, Illinois*, 897 F. 3d 847, 852 (7th Cir. 2018).

620.    775 ILCS 5/1-102 states in relevant part: "It is the public policy of this State: (A) To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her physical disability in connection with the availability of public accommodations." PIA is a "Place of public accommodation" under 775 ILCS 5/5-101(A)(8).  Illinois Human Rights Act (775 ILCS 5/5-102(A) – Public Accommodations. "It is a civil rights violation for any person on the basis of unlawful discrimination to: (A) Deny or refuse to another the full and equal enjoyment of the facilities, goods, and services of any public place of accommodation."

621.    "To prove a *prima facie* case of discrimination under Title II, a plaintiff must show: (1) "that he is a `qualified individual with a disability'"; (2) "that he was denied `the benefits of the services, programs, or activities of a public entity' or otherwise subjected to discrimination by such an entity"; and (3) "that the denial or discrimination was `by reason of his disability." *Love v. Westville Corr. Ctr.,* 103 F.3d 558, 560 (7th Cir. 1996) (quoting 42 U.S.C. § 12132)." *Id*. at 853. "Perhaps the most obvious example of such discrimination is

216

when structural barriers prevent people with disabilities from accessing otherwise available public services." *Id*.

622.   Muir reincorporates all paragraphs from above.

623.   49 C.F.R. § 27.71(b) makes Title II binding at an airport receiving Department of Transportation ("DOT") financial assistance.

624.   Defendants PMGAA and MAAP receive DOT financial assistance and are therefore entities bound by Title II.

625.   (1) Muir is a qualified individual with a disability because he has a congenital birth defect (Muir's intestine and human tissue move through his inguinal canal and into his right scrotum) that has caused him serious problems since at least the age of five and unpredictably presents as a physical impairment that substantially limits his ability to; (1) care for himself, (2) perform manual tasks, (3) eat, (4) stand, (5) learn, (6) concentrate, or (7) work, as well as (8) digest food, (9) expel intestinal gas, (10), move his bowels, and (11) urinate.

626.   Muir's latest onset of severe symptoms due to his disability began suddenly and unexpectedly in November 2016 (his first intestinal incarceration in thirteen years) and continues, intermittently and in varying degrees of severity, to the present day.

627.   In retrospect, over the longer timeframe of 2014 thru 2022, Muir's disability-related symptoms were in many ways the most severe from November

2016 to December 2018, during which time he suffered no fewer than five potentially life-threatening incidents due to incarceration or partial strangulation of his intestine, one of which (November 8, 2018) culminated in a police-documented first-responder incident at Chandler Gilbert Community College and Muir's withdrawal from his Calculus I class due to his inability to concentrate or work.

628.   Muir suffered serious medical emergencies due to his disability at IWA on June 6, 2019 and at PIA on June 9, 2019 that were as bad or worse than many incidents from 2016-2018, and at that time had no way of knowing when a partial intestinal incarceration could turn into a potentially life-threatening situation. In reality, he still has no way of knowing and probably never will and as a result, Muir fears for his safety every time he approaches the TSA checkpoint.

629.   Muir's debilitating disability-related symptom manifestations limit his major life activities for at least six months at a time, with the longest having lasted approximately two years.

630.   (2) Muir is wrongfully denied the benefits of the commercial airport because he can no longer approach the TSA checkpoint because he cannot know if he will be forced to submit to a pat-down at his right groin due solely to the serious symptom manifestation of his congenital physical disability until after he has already consented to something that he cannot consent to (having significant physical pressure applied directly to his right groin when he is symptomatic at his

right groin due to his disability in order to resolve the AIT false threat alarm triggered solely because of his hidden, beneath the skin disability).

631.    Muir is denied the benefits of the public airport, excluded from the commercial airport sterile area, and is, therefore, by extension, excluded from travel between the several states by air, solely because of his hidden congenital disability, his private marital healthcare choices regarding his disability, and the unlawful taking, conversion and use of his private health information representing his human tissue and human tissue disability beneath his skin.

632.    Muir's private marital healthcare choice regarding his physical disability is a protected factor impermissible to discrimination and the sole reason Muir was singled out and denied the benefits of the public airport.

633.    Defendants' ongoing conduct treats Muir unfavorably compared to other individuals with hidden physical disabilities because in Muir's case it creates an advanced technology architectural barrier that Muir doesn't know he can't pass without putting his life at risk until he's already been through it, which unlawfully prevents Muir from exercising his right to the benefit of travel by air under 49 U.S.C. § 40103(a)(2) because Muir cannot know if he will be singled-out due to his hidden physical disorder and his private marital healthcare choices regarding that disorder until after his freedom of movement has already been restricted and his screening data has been converted into proprietary code and searched by the "hidden layer" of artificial intelligence, and if the Artificial

Intelligence Decision-Making Software Agent produces a false threat alarm due to Muir's disability it is impossible for Muir to avoid either acting against his own best interest or subjecting himself to arrest and unwarranted civil and criminal penalties, which violates his due process and equal protection rights.

634.   6 C.F.R. § 15.49 states that: "no qualified individual with a disability shall, because the Department's facilities are inaccessible to or unusable by individuals with a disability, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity conducted by the Department.

635.   Defendants must therefore immediately stop; (1) denying Muir the benefits of IWA and PIA and all public commercial airports in the several states, (2) excluding Muir from the airport sterile area, (3) impermissibly singling-out Muir as compared to other similarly-situated travelers who are not symptomatic to the extent necessary to register as an anomaly, and (4) unlawfully denying Muir the benefit of the airport solely because of his private marital choice regarding his physical disability at his right groin.

636.   The information representing Muir's human tissue and human tissue disability beneath his skin is private marital property and Muir's consistent demand for the return of his August 9, 2018, August 12, 2018, June 6, 2019, and June 9, 2019 AIT scans falls, regardless of the overall validity of Defendant L3's October 26, 2016 SAFETY Act renewal Certification and Designation, completely

outside of the scope of the system of risk management established by the SAFETY Act, which applies only to causes of action for money damages.

637.   Therefore, because an injunction for the return of Muir's property is not a cause of action for money damages, and because Defendant L3 (with regard to a Writ of digital Habeas Corpus and a "trace log" of the data path that Muir's digital full-body avatars traveled) faces no risk of "loss" as defined by 6 U.S.C. § 444(5), SAFETY Act protections do not apply in the instant case and Muir can be made as whole as possible through the return of his information.

## Claim 24 – Rehabilitation Act Section 504 – Defendants United States, IWA TSA Supervisor John Doe, PIA TSA Supervisor John Doe, Mayorkas, Easterly, Granholm, Pekoske and TSA

638.   Claim 24 is brought against Defendants United States, IWA TSA Supervisor John Doe, PIA TSA Supervisor John Doe, Mayorkas, Easterly, Granholm, Pekoske, and TSA.

639.   Muir reincorporates all paragraphs from above.

640.   "Claims under section 504 of the Rehabilitation Act are treated as "functionally identical" and can be considered together with Title II claims. *Wagoner v. Lemmon,* 778 F.3d 586, 592 (7th Cir. 2015). *King v. HENDRICKS COUNTY COM'RS*, 954 F. 3d 981, 988 (7th Cir. 2020). "Title II was modeled after section 504, which was meant to combat discrimination that is "most often

the product, not of invidious animus, but rather of thoughtlessness and indifference — of benign neglect. *Alexander v. Choate,* 469 U.S. 287, 295, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)". *Lacy v. Cook County, Illinois*, 897 F. 3d 847, 863 (7th Cir. 2018).

641.   To qualify under Section 504, a one must show: (1) a physical or mental impairment that substantially limits one or more major life activities of such individual, (2) a record of such impairment, or (3) be regarded as having such impairment. *Marquez v. Glendale Union High School District*, 2018 U.S. Dist. LEXIS 173343, at *42 (D. Ariz. Oct. 9, 2018).

642.   To be entitled to injunctive relief in Arizona, Plaintiff must show that: (1) he has a strong likelihood of success on the merits, (2) he will suffer irreparable injury if the relief is not granted, (3) a balance of hardships favors Plaintiff, and (4) public policy favors an injunction. See *Shoen v. Shoen*, 167 Ariz. 58, 63, 804 P.2d 787, 792 (App. 1990).

643.   In Illinois, a party seeking preliminary injunction is required to demonstrate (1) a clearly ascertained right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case. *People ex rel. Klaeren v. Village of Lisle,* 202 Ill.2d 164, 269 Ill.Dec. 426, 781 N.E.2d 223 (2002); *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.,* 195 Ill.2d 356, 365, 254

Ill.Dec. 707, 748 N.E.2d 153 (2001). *Mohanty v. St. John Heart Clinic*, SC, 866 NE 2d 85, 91 - Ill: Supreme Court 2006.

644.   Muir's clearly ascertained rights in need of protection and favored by public policy are the constitutional right to privacy under *Griswold*, the Fourth Amendment right to be free from unreasonable search and seizure, the Fifth Amendment right to due process, the Fifth Amendment right to travel, and the Fifth Amendment right to equal protection of the laws via reverse incorporation.

645.   Muir faces irreparable injury in the absence of an injunction because he cannot approach the TSA checkpoint, gain entry to the airport sterile area, or exercise his right to the benefit of travel between the several states by air because of Defendants' unlawful control and use of his protected health information representing the human tissue and human tissue disability beneath his skin.

646.   Muir has no adequate remedy at law due to the jurisdictional funneling provision of 49 U.S.C. § 46110 because, under the provision, the Court of Appeals does not have the authority to enjoin Defendants from harming Muir.

647.   Public policy favors an injunction because "our system does not permit agencies to act unlawfully, even in pursuit of desirable ends" *see Alabama Association of Realtors v. DEPT OF HHS*, 141 S. Ct. 2485, 2490 (2021).

648.   Muir has a strong likelihood of success on the merits as evidenced by the instant Complaint, and because Defendants have violated his human dignity.

## Claim 25 – United States Constitution - Injunctive Relief – Defendants Mayorkas, Easterly, Granholm, Pekoske, IWA TSA Supervisor John Doe, PIA TSA Supervisor John Doe, PMGAA, MAAP, Allegiant, L3, Leidos, TSA, Battelle, and Department of Energy

649.   Claim 25 is brought against Defendants Mayorkas, Easterly, Granholm, Pekoske, TSA Supervisors, PMGAA, MAAP, L3, Leidos, TSA, Battelle, and Department of Energy under the United States Constitution.

650.   "Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; the injury is caused by the defendant's acts; and a judicial decision in the plaintiff's favor would redress the injury." *Bauer v. Shepard,* 620 F.3d 704, 708 (7th Cir.2010) (citing *Summers,* 129 S.Ct. 1142, and *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998))." *Ezell v. City of Chicago*, 651 F. 3d 684, 695 (7th Cir. 2011); *Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009); *COOK COUNTY, ILLINOIS v. Wolf*, Case No. 19-3169 (7th Cir. 2020).

651.   Muir has standing because the Supreme Court has recognized a fundamental right to interstate travel, *see Attorney General of New York v. Soto-Lopez,* 476 U.S. 898, 903, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (Brennan, J., plurality opinion), *Miller v. Reed*, 176 F. 3d 1202, 1205 (9th Cir. 1999), and Muir suffers a perpetual impending injury when he is denied the right to the benefit of travel between the several states by air under 49 U.S.C. § 40103(a)(2).

652.   A party seeking a preliminary injunction is required to demonstrate: (1) a clearly ascertained right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case. *People ex rel. Klaeren v. Village of Lisle,* 202 Ill.2d 164, 269 Ill.Dec. 426, 781 N.E.2d 223 (2002); *Callis, Papa, Jackstadt & Halloran, P.C. v. Norfolk & Western Ry. Co.,* 195 Ill.2d 356, 365, 254 Ill.Dec. 707, 748 N.E.2d 153 (2001). *Mohanty v. St. John Heart Clinic*, SC, 866 NE 2d 85, 91 - Ill: Supreme Court 2006.

653.   To win a preliminary injunction, Muir must show that he has: (1) no remedy at law and will suffer irreparable harm if a preliminary injunction is denied, and (2) some likelihood of success on the merits. *See Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir.2006); *Joelner v. Vill. of Wash. Park,* 378 F.3d 613, 619 (7th Cir.2004); *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11-12 (7th Cir.1992). If these threshold requirements are met, the court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied. *Christian Legal Soc'y,* 453 F.3d at 859, *Ezell v. City of Chicago*, 651 F. 3d 684, 694 (7th Cir. 2011).

654.   (1) Muir has clearly ascertained rights in need of protection, specifically, the right to: (1) privacy, (2) be free from unreasonable search and seizure, (3) due process, (4) equal protection of the laws, and (5) interstate travel.

655.   (2) Muir faces irreparable injury in the absence of an injunction because there is nothing to stop Defendants from their outrageous, inhumane treatment of Muir during AIT passenger screening because: (1) Muir cannot know, until after it is too late to end the screening process, whether or not the symptoms of his congenital disorder will manifest to the extent necessary to trigger a false threat alarm at his right groin, and (2) due to the unchanging rules of computer science, Muir is, in perpetuity, denied equal protection of the laws.

656.   (3) Muir, due to the overly-broad removal of his First Amendment right to plead his valid federal claim or petition his government for redress, has no adequate remedy at law as the Honorable Court found that it did not have jurisdiction over Constitutional and Rehabilitation Act claims due to inescapable intertwinement with the TSA SOP under 49 U.S.C. § 46110 (*See* Central District of Illinois case 1:20-cv-01280, Doc. 46, p. 28, n. 11, 12).

657.   (4) Muir has a strong likelihood of success on the merits of the case because he has pleaded all the elements required to survive dismissal under Rule 12(b)(6) as interpreted under the *Twombly* and *Iqbal* standard due to the narrowing of the issues and critical information revelation that have occurred since Muir filed his first TSA FTCA claim on September 5, 2019.

658.   Based on the normal dictionary definitions of words, unlawful, unconstitutional and irrational conduct cannot also be defined as reasonable. Therefore, basic logic and reasoning highly favor Muir's success on the merits.

659.   49 C.F.R. Part 1540 is too intrusive and travelers' private health information representing the human tissue underneath their skin is not subject to AIT search because it is not rationally related to the government interest of detecting threat objects on the surface of the skin.

660.   49 C.F.R. Part 1540 violates Muir's right to privacy and denies him the equal protection of the laws because the use of A.I. as the final decision-maker in the threat assessment process guarantees, through the unchanging facts of computer science, the inability to uphold Muir's rights under 29 U.S.C. § 794.

661.   The contours of Muir's clearly established rights under the "special relationship" doctrine of substantive due process at the time of the challenged conduct were well-defined, and "The Court suggested that it would apply the Constitution with special care in cases involving disabilities imposed on "discrete and insular minorities" (*Footnote Four, *United States v. Carolene Products*, 1938)." Equal Protection. (2005). In K. Hall (Ed.), The Oxford Companion to the Supreme Court of the United States (2nd ed., p. 298). Oxford, UK: Oxford University Press. "Accordingly, the Court has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws. *E. g., Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 100 (1976); *Buckley* v. *Valeo,* 424 U. S. 1, 93 (1976); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636, 638 n. 2 (1975); *Bolling* v. *Sharpe,* 347 U. S. 497, 500 (1954). *Vance v. Bradley*, 440 US 93, 94-95, footnote 1 - Supreme Court 1979.

662.   "Even though there is no explicit equal protection clause in the Fifth Amendment, the equal protection guarantee in the Fourteenth Amendment has been read into the Due Process Clause of the Fifth Amendment through the process of reverse incorporation. *See Bolling v. Sharpe,* 347 U.S. 497, 500, 74 S.Ct. 693, 695, 98 L.Ed. 884 (1954); *Vance v. Bradley,* 440 U.S. 93, 94-95 n. 1, 99 S.Ct. 939, 942 n. 1, 59 L.Ed.2d 171 (1979) ("the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws")." *Gray v. First Winthrop Corp.*, 989 F. 2d 1564, 1573 (9th Cir. 1993).

663.   In Illinois, injunctive relief against a hazardous activity is a remedy. "To entitle one to injunctive relief he must establish, as against the defendant, an actual and substantial injury and not merely a technical inconsequential wrong entitling him to nominal damages, only. To warrant the allowance of the writ of injunction it must clearly appear that some act has been done or is threatened against the plaintiff which will produce an irreparable injury to him. (*Cleveland v. Martin,* 218 Ill. 73; *Girard v. Lehigh Stone Co.* 280 Ill. 479; *Dunn v. Youmans,* 224 Ill. 34; *Springer v. Walters,* 139 Ill. 419.) As this court observed in *Klumpp v. Rhoads,* 362 Ill. 412, `If the damages are of a nature which cannot be adequately compensated for in a suit at law, equity will afford relief by injunction. On the other hand, lawful and useful business may not be stopped on account of trifling or imaginary annoyances which do not constitute real injury.'" 393 Ill. 367, 375.) We would add that an injunction should be reasonable and should only be as broad as is essential to safeguard the rights of the plaintiff. *Toushin v. City of*

*Chicago* (1974), 23 Ill. App.3d 797, 804." *Village of Wilsonville v. SCA Services, Inc.*, 86 Ill.2d 1, 28-29 - Ill: Supreme Court 1981.

664.   Defendant PIA TSA Supervisor John Doe caused Muir an actual, substantial, and irreparable injury when he breached his affirmative duty of reasonable care to Muir through: (1) a violation of Muir's Constitutional right to privacy under *Griswold* and *Katz* (a tortious intrusion upon his seclusion), (2) a failure to train PIA TSOs on U.S. Constitution Amendment V Due Process and Equal Protection clauses with regard to serious, disability-caused medical emergencies, (3) a failure to train PIA TSOs on 29 U.S.C. § 794, (4) a failure to supervise the A.I. decision-making software agent, (5) a failure to monitor AIT equipment in use at the TSA Checkpoint, (6) a failure to supervise PIA TSOs, (7) a failure to protect Muir from the unmonitored, uninsured, unreviewable A.I. threat and anomaly decision-making software agent, (8) a violation of Muir's Fourth Amendment right to be free from unreasonable search and seizure (A.I. search of human tissue beneath the skin is irrational and not narrowly-tailored and violates Section 44901 and Muir's right to privacy), (9) a failure to develop and implement policies and procedures for the novel use of artificial intelligence in the TSA advanced imaging technology passenger screening program at PIA, and (10) the negligent failure to audit the AIT in use at PIA under his supervision.

665.   Muir is forever threatened by Defendants' unlawful use of his private health information at the TSA checkpoint during AIT passenger screening

because he cannot predict or control the symptoms of his physical disorder and TSA refuses to stop judging him on his private health information representing the human tissue and human tissue disability beneath his skin. Future injury at the Checkpoint is guaranteed by the laws of logic and physics, the basic laws of computer science, the continued execution of 49 C.F.R. Part 1540 at commercial airports, and Defendants' willful blindness and ongoing deliberate indifference to the realities of the unauthorized use of artificial intelligence agents during AIT passenger screening.

666.   Therefore, Muir respectfully requests injunctive relief requiring Defendants: (1) stop denying Muir equal use of the TSA Checkpoint based solely on his physical disability, (2) stop intruding upon Muir's seclusion by searching his private health information, (3) stop taking Muir's private protected health information representing his human tissue and human tissue disability beneath his skin during AIT passenger screening, (4) stop encoding Muir's private health information chattel into proprietary code language without Muir's express consent, (5) stop judging Muir's health information against a presupposed "normal" ideal human form during AIT passenger screening, (6) stop denying Muir his right to the benefit of travel between the several states by air, (7) stop all abnormally dangerous activity occurring during TSA AIT passenger screening administered pursuant to 49 C.F.R. Part 1540, and (8) return all of Muir's private protected health information chattel taken during AIT passenger screening.

## VI.   Constitutional Challenge to a Statute - 49 U.S.C. § 46110

667.   Muir hereby makes a constitutional challenge to 49 U.S.C. § 46110, as over-broadly amended by Pub. L. 107–71 §140(b)(1)(2001)  and Pub. L. 115–254 §1991(f)(1)(2018))  to back-import the TSA AIT passenger screening program in operation at TSA checkpoints at IWA and PIA.

668.   '[L]egislative enactments... carr[y] a strong presumption of constitutionality (*Bernier v. Burris* (1986), 113 Ill.2d 219, 227), and all doubts must be resolved in favor of [their] validity (*Harris v. Manor Healthcare Corp.* (1986), 111 Ill.2d 350, 363). Accordingly, the burden rests upon the plaintiff, as the challenging party, to rebut this presumption. *People v. Bales* (1985), 108 Ill.2d 182, 188." *Bilyk v. Chicago Transit Authority*, 125 Ill. 2d 230, 235 (1988). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 US 739, 745 (1987).

669.   "In a facial constitutional challenge, individual application facts do not matter. Once standing is established, the plaintiff's personal situation becomes irrelevant. It is enough that "[w]e have only the [statute] itself" and the "statement of basis and purpose that accompanied its promulgation." *Reno v. Flores,* 507 U.S. 292, 300-01,  113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); *see also* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution,* 62 STAN. L.REV.

1209, 1238 (2010) ("[F]acial challenges are to constitutional law what res ipsa loquitur is to facts—in a facial challenge, *lex ipsa loquitur:* the law speaks for itself."); David L. Franklin, *Facial Challenges, Legislative Purpose, and the Commerce Clause,* 92 IOWA L.REV. 41, 58 (2006) ("A valid-rule facial challenge asserts that a statute is invalid on its face as written and authoritatively construed, when measured against the applicable substantive constitutional doctrine, without reference to the facts or circumstances of particular applications."); Mark E. Isserles, *Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement,* 48 AM. U.L.REV. 359, 387 (1998) ("[A] valid rule facial challenge directs judicial scrutiny to the terms of the statute itself, and demonstrates that those terms, measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contains a constitutional infirmity that invalidates the statute in its entirety")."

*Ezell v. City of Chicago*, 651 F. 3d 684, 697-698 (7th Cir. 2011). "In a facial challenge…the claimed constitutional violation inheres in the terms of the statute, not its application. *See* Rosenkranz, *The Subjects of the Constitution,* 62 STAN. L.REV. at 1229-38. The remedy is necessarily directed at the statute itself and *must* be injunctive and declaratory; a successful facial attack means the statute is wholly invalid and cannot be applied *to anyone.* [The] law, if unconstitutional, is unconstitutional *without regard* to its application—or *in all* its applications, as *Salerno* requires." *Ezell v. City of Chicago*, 651 F. 3d 684, 698-699 (7th Cir. 2011).

**Amendment I**

670.   "The First Amendment right to petition the government for the redress of grievances extends to the courts in general and applies to litigation in particular. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *NAACP v. Button,* 371 U.S. 415, 429-30, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)." *Woodruff v. Mason*, 542 F. 3d 545, 551 (7th Cir. 2008).

671.   "The right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government... Equality of treatment in this respect... is granted and protected by the Federal Constitution. *Corfield* v. *Coryell,* 4 Wash. C.C. 371, 380, per Washington, J.; *Ward* v. *Maryland,* 12 Wall. 418, 430, per Clifford, J.; *Cole* v. *Cunningham,* 133 U.S. 107, 114, per Fuller, C.J.; *Blake* v. *McClung,* 172 U.S. 239, 252, per Harlan, J." *Chambers v. Baltimore & Ohio R. Co.*, 207 US 142, 148 (1907).

672.   "To prevail in such a facial challenge, a plaintiff must cross a high bar. A statute is facially overbroad only when "it prohibits a substantial amount of protected speech," *United States v. Williams,* 553 U.S. 285, 292, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008), and unconstitutionally vague only when its "deterrent effect on legitimate expression is ... both real and substantial." *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 60, 96 S.Ct. 2440, 49 L.Ed.2d 310

(1976) (internal quotation marks omitted)." *Center for Individual Freedom v. Madigan*, 697 F. 3d 464, 470-471 (7th Cir. 2012).

673.   "The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. Cf. *Schneider* v. *State,* 308 U.S. 147; *Cantwell* v. *Connecticut,* 310 U.S. 296; *Prince* v. *Massachusetts,* 321 U.S. 158. That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. Compare *United States* v. *Carolene Products Co.,* 304 U.S. 144, 152-153. For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation." *Thomas v. Collins*, 323 US 516, 529-530 (1945).

674.   As <u>all</u> state common law FTCA claims involving any aspect of the TSA AIT passenger screening program are, by the widely-held construction of Section 46110 by the courts, "inescapably intertwined" with a final order of TSA,

it stands to reason that <u>no</u> set of circumstances exists where a state law tort claim involving the TSA AIT passenger screening program can be brought against the United States under the FTCA, because, without implicit or explicit intent from Congress, Section 46110 significantly modifies three existing, carefully-crafted, well-established statutes: (1) 28 U.S.C. § 2679: The exclusive remedy for money damages against the United States is totally removed; (2) 28 U.S.C. § 2401(b): The statute of limitations for tort claims against the United States under the FTCA is reduced from two years to sixty days, but in reality is totally eliminated; and (3) 28 U.S.C. § 2680(h): The list of explicit exceptions to the limited waiver of sovereign immunity is automatically extended to include <u>all</u> activity involved in TSA AIT passenger screening, including abnormally dangerous, coercive, and conscience-shocking behavior. This means the TSA, an agency known for privacy intrusions and disturbing physical pat-downs, has a blank check to engage in outrageous, tortious conduct and to violate the well-established right to privacy, in all fifty states, of two million air passengers a day. This is clearly against the will of Congress, Amendment I to the United States Constitution, and the Due Process Clause and the Equal Protection Clause of Amendment V to the United States Constitution.

675.   ""The [FTCA] was the product of nearly thirty years of congressional consideration and was drawn with numerous substantive limitations and administrative safeguards."" *Beins v. United States,* 695 F. 2d 591, 598 (D.C. Cir. 1982).

676.   "[Given the] considerable care [taken] by Congress in crafting when and how the FTCA would be available to a claimant ... we are disinclined to add a jurisdictional exception....*Id.* at 597-98 (quoting *Indian Towing Co. v. United States,* 350 U.S. 61, 68, 76 S.Ct. 122, 100 L.Ed. 48 (1955)). *Merritt v. Shuttle, Inc*., 245 F. 3d 182, 190-191 (2nd Cir. 2001).

677.   "Whenever possible... we interpret statutes to avoid unreasonable results. *See Dougherty v. Carver Fed. Sav. Bank,* 112 F.3d 613, 624 (2d Cir.1997) (citing *Am. Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982))." *Merritt v. Shuttle, Inc*., 245 F. 3d 182, 191 (2nd Cir. 2001).

678.   "The broad and just purpose which the [FTCA] was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws. Of course, when dealing with a statute subjecting the Government to liability for potentially great sums of money, this Court must not promote profligacy by careless construction. Neither should it as a self-constituted guardian of the Treasury import immunity back into a statute designed to limit it." *Indian Towing Co. v. United States,* 350 U.S. 61, 68-69 (1955).

679.   The canon of statutory construction *expressio unius est exclusio alterius,* "creates a presumption that when a statute designates certain persons,

things, or manners of operation, all omissions should be understood as exclusions," *Silvers v. Sony Pictures Entm't, Inc.,* 402 F.3d 881, 885 (9th Cir.2005) (en banc) (internal quotation marks omitted)" *Webb v. Smart Document Solutions, LLC*, 499 F. 3d 1078, 1084 (9th Cir. 2007).

680.   Without either the explicit or implicit will of Congress, 49 U.S.C. § 46110, as amended by Pub. L. 107–71 §140(b)(1)(2001) and Pub. L. 115–254 §1991(f)(1)(2018)) to include the TSA AIT passenger screening program, imports sovereign immunity back into the statute specifically designed to limit it by substantially altering the FTCA in three significant ways.

681.   (1) 28 U.S.C. § 2679: The exclusive remedy for money damages against the United States is totally removed, even though the prime purpose of the FTCA is to compensate victims of negligent government conduct in money damages.

682.   The United States represented in Seventh Circuit Court of Appeals Case 21-1312, Doc. 20, p. 41 that, due to § 46110, all FTCA claims related to the use of AIT during passenger screening made after 60 days after September 17, 2010 are untimely. Therefore, all FTCA claims related to the use of AIT arising after November 16, 2010 are, forever and always, and regardless of any circumstances, untimely. Because TSA did not publish the details of its implementation of 49 C.F.R. Part 1540 until March 3, 2016, TSA pre-granted itself total immunity from suit under the FTCA for the unlawful and

ultrahazardous use of AIT and artificial intelligence more than five years before the deployment of artificial intelligence was publicly acknowledged in the federal register. This is wrong and against all measures of American jurisprudence.

683.   (2) 28 U.S.C. § 2401(b) states: "A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented."

684.   49 U.S.C. § 46110, as construed by authorities and the courts, reduces the FTCA statute of limitations from two years to sixty days. This goes against the express will and clear trajectory of Congress, which only changed the statute of limitations in the FTCA limited waiver of sovereign immunity once, in 1966, and in doing so, extended it from one year to two years (*See* Pub. L. 89–506, § 7, July 18, 1966, 80 Stat. 307).

685.   (3) 28 U.S.C. § 2680(h): "This extensive list [including § 2680(a)-(m)] reflects considerable care by Congress in crafting when and how the FTCA would be available to a claimant" *Beins v. United States*, 695 F. 2d 591, 598 (D.C. Cir. 1982).

686.   "[T]he label 'intentional tort exception' is something of a misnomer" because § 2680(h) not only (1) "excludes some torts that courts have held need not always be intentional;" but also (2) "fails to include all intentional torts in the

list of excluded causes of action"); David W. Fuller, Intentional Torts and Other Exceptions to the Federal Tort Claims Act, 8 U. ST. THOMAS L.J. 375, 379 – 80 (2011).

687.   ""This exception . . . includes most intentional torts (but perhaps not all, as trespass, conversion, invasion of privacy, and intentional infliction of emotional distress are not listed)."" Gregory C. Sisk, Official Wrongdoing and the Civil Liability of the Federal Government and Officers, 8 U. ST. THOMAS L.J. 295, 304 (2011).

688.   As currently interpreted and applied, § 46110 greatly expands the list of 2680(h) exceptions to the limited waiver of sovereign immunity automatically to include all activity regarding AIT passenger screening, including abnormally dangerous and conscience-shocking behavior, intrusion upon seclusion, trespass upon chattels, conversion, and the intentional infliction of emotional distress through deliberate indifference. The Court should not, on its own, and at this late date, forge an entire new class of exceptions not provided by Congress, especially considering the abnormally dangerous behavior the new exception class would allow, now and in the future, and because Congress has had several opportunities to amend the FTCA after court rulings and has chosen not to make any changes to the limited waiver of sovereign immunity.

689.   49 U.S.C. § 46110, as over-broadly amended by Pub. L. 107–71 §140(b)(1)(2001) and Pub. L. 115–254 §1991(f)(1)(2018)) to back-import the TSA

AIT passenger screening program in its entirety and with no regard for the dangers associated with the use of artificial intelligence before the standard of care is developed and policies are adopted and enacted, is unconstitutionally vague and prohibits a substantial amount of protected speech through widespread authoritative construction by the federal courts as measured against the applicable substantive constitutional doctrine found in Amendment I to the United States Constitution because it attacks the foundation of orderly government by giving the United States government the unchecked power of a tyrant king, that very thing our constitutional republic was founded to prevent and denies Muir the basic right to petition the government for the redress of grievances as explicitly granted by Congress under the FTCA.

690.   Congress cannot arbitrarily and vaguely give the United States absolute immunity from state law tort liability with regards to TSA AIT passenger screening when the complex statutory waiver of sovereign immunity that was thirty years in the making was not implicitly or explicitly modified as this shocks the conscience of a reasonable person in a civilized society because it opens the door to limitless abuses of power and authority using advanced technology and artificial intelligence in the protected area of freedom of movement.

**Amendment V – Procedural Due Process – Liberty**

691.   "When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented

in a fair manner. *Mathews* v. *Eldridge,* 424 U. S. 319, 335 (1976). This requirement has traditionally been referred to as "procedural" due process.""" *United States v. Salerno*, 481 US 739, 746 (1987).

692.   49 U.S.C. § 46110 is not applied evenly as the <u>only</u> set of <u>all</u> claims <u>automatically</u> and totally and forever pre-excluded from FTCA subject matter jurisdiction regarding the TSA are those involving AIT passenger screening accruing after November 16, 2010. This is unfair on its face as total blanket immunity was granted more than five years before the use of artificial intelligence agents was officially acknowledged under 49 C.F.R. Part 1540 on March 3, 2016.

693.   This facially unfair, overbroad back-importation "jurisdictional funnel" deprives Muir of a substantial procedural due process liberty interest at the root of ordered liberty itself, the first amendment right to petition the federal government for the redress of serious grievances made actionable under state law via the carefully-crafted FTCA.

## Inescapable-Intertwinement Inquiry – 49 U.S.C. § 46110

694.   "In the inescapable-intertwinement inquiry, a "critical point" is whether review of the order by a court of appeals would allow for adjudication of the plaintiff's claims and could result in the relief that the plaintiff requests. *Breen,* 474 F.Supp.2d at 5 (citing *Beins v. United States,* 695 F.2d 591, 597-98 & n. 11 (D.C.Cir.1982))" *Roberts v. Napolitano*, 798 F. Supp. 2d 7, 11 - Dist. Court, Dist. of Columbia 2011.

695.   49 U.S.C. § 46110 states in relevant part: "[A] person disclosing a substantial interest in an order issued by... the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration... in whole or in part under this part, part B, or subsection (l) or (s)[1] of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day. [T]he court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order".

696.   Muir cannot raise his FTCA claims before the Court of Appeals because: (1) there is no subject matter jurisdiction in the Court of Appeals to hear negligence claims, although "a finding of negligence [is] the linchpin of the FTCA" *Beins v. United States,* 695 F. 2d 591, 598 (D.C. Cir. 1982), and (2) Muir's disturbing psychological injuries and physical manifestations did not appear until after the 60 day timeframe required by § 46110.

697.   "[T]he test for determining whether [§ 46110] precludes a district court from hearing a particular claim is... whether the claim "could and should

have been" presented to and decided by a court of appeals." *Merritt v. Shuttle, Inc.*, 245 F. 3d 182, 188 (2d Cir. 2001) (quoting City of Tacoma, 357 U.S. at 339)" (Central District of Illinois Case No. 1:20-cv-01280,  Doc. 46, "Order and Opinion" p. 26).

698.   The crystallization of Muir's June 6, 2019 and June 9, 2019 injuries did not occur until early August, 2019. The exact date is August 10, 2019 (approximately the one-year anniversary of Muir's dehumanization at the hands of his own government, which occurred on August 9, 2018 at IWA and on August 12, 2018 at PIA).  Muir knows the exact date because he woke up that morning haunted by the Shadow and several hours later was informed by his wife that Jeffrey Epstein committed suicide.

699.   Muir could not have brought his claim within the 60 day window prescribed in § 46110 because Muir's injuries did not appear until after the 60th day following June 9, 2019, specifically, the sixty-second day after.

700.   Because the choice to create a dangerous situation is reviewable at the Court of Appeals, but a duty to warn of it is not, Muir could not have brought his claim in the Court of Appeals and the District Court has exclusive jurisdiction.

701.   And, unlike civil cases and a lot of tort cases, the Court of Appeals in a Section 46110 review of a TSA order lacks authority to compare negligence or apportion liability. Defendant United States could be eighty percent liable and Defendant Allegiant could be twenty percent liable, but if there's a TSA regulatory

allegation shown, Muir is going to lose because the Court of Appeals can't hold the United States in any way responsible. See *FAA v. Smedley,* No. SE-15798, 2000 WL 576184, at *3 (N.T.S.B. Apr. 6, 2000).

702.   Furthermore, while the prime purpose of the FTCA is to compensate victims of negligent government conduct, it is obvious that a petition for review under 49 U.S.C. § 46110 will not provide any remedy in damages because the Court of Appeals does not have the authority to assess TSA Supervisor official conduct under a state law negligence analysis because the Court of Appeals is limited to affirming, amending, modifying or setting-aside an order, and the assessment of PIA TSA Supervisor John Doe's conduct under state law is: (1) not affirming anything because the court is not ruling on whether or not the rule can stand, only whether the conduct is actionable under the FTCA, (2) not amending anything because the court is not altering, rephrasing, adding or subtracting anything, only applying state law according to the FTCA (3) not modifying anything because the court is not changing anything, but instead following federal law by applying state law under the FTCA, and (4) not setting-aside anything because the court is not discarding, dismissing or quashing anything, only rightfully assessing Muir's federal claims and supplemental state claims.

703.   Muir's claims do not challenge the TSA Standard Operating Procedure ("SOP") or require the Court to access the propriety of the SOP in any way as this lawsuit is based on the United States Code, the Federal Register,

published judicial decisions, public documents, and public federal court docket entries, but Muir cannot plead the required elements of his FTCA common law tort claims or statutory claims under Illinois state law, which include the clear, undisputed, public record facts of AIT passenger screening, without touching on a TSA rule, which makes it impossible for Muir to recover monetary damages from co-Defendants acting in concert with Defendant United States under state common law, Restatement (2d) of Torts § 876 and BIPA.

### Contraposition – Duty to Warn of an Extralegal Process

704.   "In logic and mathematics, contraposition refers to the inference of going from a conditional statement into its logically equivalent contrapositive, and an associated proof method known as proof by contraposition. The contrapositive of a statement has its antecedent and consequent inverted and flipped." *See* https://en.wikipedia.org/wiki/Contraposition

705.   The Honorable District Court in the Central District of Illinois held that Muir's 2018 FTCA failure to warn negligence claim fell outside of the jurisdictional funneling provision of Section 46110, *see* Case No. 1:20-cv-01280, Doc. 46, p. 30, and in doing so also held that there was no duty to warn of a passenger screening process required by law. *Id* at 19.

706.   It therefore stands to reason, based on the well-established theory of contraposition, that if there is no duty to warn of a process required by law, then there is a duty to warn of a process not required by law. The deployment of an

advanced technology passenger screening process occurring outside of the precise technical parameters explicitly set forth by Congress, along with the use of A.I. without a clear and direct mandate, creates for Defendant PIA TSA Supervisor John Doe, due to the inherent power imbalance, special relationship affirmative duty, and strong asymmetry of constructive knowledge, a duty to warn Muir of a foreseeable state-created danger he could not unilaterally avoid.

707.   In *An Essay Concerning Human Understanding*, John Locke argues that a common language is "the great bond that holds society together." Locke, John. [1690] 1975. An Essay Concerning Human Understanding, ed. Peter H. Nidditch. Oxford: Oxford University Press. This is a clear First Amendment case because the corruption of the meaning of the words used in 49 C.F.R. Part 1540 and Defendant L3's Safety Act Designation and Certification for the AIT at issue: (1) removes the foundation of an ordered society because United States citizens cannot rely on a legal system that allows the willful violation of the inviolable law of non-contradiction, and (2) nullifies the alternative to force because Muir's right to petition for redress is void if his ability to plead his valid federal claim is removed through an overly-broad back-importation of immunity that Congress never granted. In the instant case, the law of non-contradiction is inviolable, the language of the statute controls, and every word of the statute matters. Therefore, a device that does not have the capability to create an image cannot produce three-dimensional images, SAFETY Act protections do not apply, and Defendants are liable to Muir for his damages, which cannot be tolerated in civilized society.

246

## VII.  Prayer for Relief

WHEREFORE, Muir respectfully requests the following relief:

A.      A declaratory judgment that 49 U.S.C. § 46110, as over-broadly amended to back-import the TSA AIT passenger screening program, violates Amendment I to the United States Constitution, and the relevant amendments to § 46110 in Pub. L. 107−71 and Pub. L. 115−254 are therefore null and void with regard to the TSA AIT passenger screening program.

B.      A declaratory judgment that 49 C.F.R. Part 1540 is an impermissible construction of 49 U.S.C. § 44901.

C.      A declaratory judgment that 49 C.F.R. Part 1540 violates Muir's right to be free from unreasonable search and seizure under Amendment IV to the United States Constitution.

D.      A declaratory judgment that 49 C.F.R. Part 1540 violates Muir's right to due process under Amendment V to the United States Constitution.

E.      A declaratory judgment that 49 C.F.R. Part 1540 violates Muir's right to the equal protection of the laws via reverse incorporation under the Equal Protection Clause of Amendment V to the United States Constitution.

F.      A declaratory judgment that 49 C.F.R. Part 1540 violates Muir's constitutional right to privacy.

G.      A declaratory judgment that the AIT passenger screening program is abnormally dangerous activity under Restatement (2d) of Torts §§ 519, 520.

H.      Mandamus relief requiring government Defendants to acknowledge and clarify their use of artificial intelligence at the TSA airport checkpoint under 49 C.F.R. Part 1540.

I.      Permanent injunctive relief under the United States Constitution and the Rehabilitation Act prohibiting government Defendants involved in the TSA AIT checkpoint scheme from unlawfully denying Muir his right to the benefit of travel between the several states by air under 49 U.S.C. § 40103(a)(2).

J.      Permanent injunctive relief under Title II of the ADA requiring Defendants PMGAA, MAAP, Allegiant and Leidos to stop unlawfully denying Muir his right to the benefit of travel through IWA, PIA, and every other commercial airport in the United States.

K.      Injunctive relief under BIPA (Claim 20), in response to an ongoing violation reaching back to August 12, 2018, requiring Defendants to return Muir's scan code, in unencrypted, image translated, human vision interpretable form, taken during TSA checkpoint AIT passenger screening at PIA in Illinois on August 12, 2018 and June 9, 2019.

L.      Injunctive relief under the Rehabilitation Act and the United States Constitution, in response to ongoing discrimination reaching back to August 9,

2018, requiring Defendants to return Muir's scan code, in unencrypted, image translated, human vision interpretable form, taken during TSA checkpoint AIT passenger screenings at IWA on August 9, 2018 and June 6, 2019, and at PIA on August 12, 2018 and June 9, 2019.

M.    $100,000,000.00  in damages under the FTCA against Defendant United States for the June 6, 2019 Arizona occurrence, as originally claimed in TSA Claim No. 2021071271840.

N.    $100,000,000.00  in damages under the FTCA against Defendant United States for the June 9, 2019 Illinois occurrence, as originally claimed in TSA Claim No. 2021071271858.

O.    Actual damages for violations of BIPA Section 15(a) and (b).

P.    Actual damages for violations of BIPA Section 15(c) and (d).

Q.    Actual damages for Claim 20.

R.    $500,000,000.00  in damages against Defendant L3.

S.    Punitive damages against Defendant L3.

T.    $500,000,000.00  in damages against Defendant Allegiant.

U.    Punitive damages against Defendant Allegiant.

V.    $100,000,000.00  in damages against Defendant PMGAA.

W.   $100,000,000.00  in damages against Defendant MAAP.

X.   $500,000,000.00  in damages against Defendant Pistole.

Y.   Punitive damages against Defendant Pistole.

Z.   $500,000,000.00  in damages against Defendant Neffenger.

AA.   Punitive damages against Defendant Neffenger.

BB.   Cost of the action and any other relief the Court deems appropriate.

<u>CERTIFICATE OF CONFORMANCE</u>

I hereby certify that this document conforms to Middle District of Florida Local Rule 1.08 because it was written in thirteen-point, double-spaced, Georgia typeface.

DATED: this 13th day of May, 2022

Respectfully submitted,

s/Michael Muir_____

MICHAEL MUIR

MICHAEL MUIR
P.O. Box 1791
Sarasota, FL 34230
(712) 309-6121