Mark G. Worischeck/Bar No. 011147
Ryan P. Sandstrom/Bar No. 029862
**SANDERS & PARKS, P.C.**
3030 North Third Street, Suite 1300
Phoenix, AZ 85012-3099
Phone: 602.532.5795
Mark.Worischeck@sandersparks.com
Ryan.Sandstrom@sandersparks.com

Michael G. McQuillen/IL Bar No. 6188166
(*admitted pro hac vice*)
Christopher J. Raistrick/IL Bar No. 6237922
(*admitted pro hac vice*)
Mark S. Susina/IL Bar No. 6201998
(*admitted pro hac vice*)
Richard C. Harris/IL Bar No. 6313005
(*admitted pro hac vice*)
**ADLER MURPHY & McQUILLEN, LLP**
20 S. Clark St., Suite 2500
Chicago, Illinois 60603
Phone: 312.345-0700
mmcquillen@amm-law.com
craistrick@amm-law.com
msusina@amm-law.com
rharris@amm-law.com

*Attorneys for Defendant L3Harris Technologies, Inc.*

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Gibson Muir, a natural man living in Tempe, Arizona,<br><br>Plaintiff,<br><br>v.<br><br>L3Harris Technologies, Inc., a Delaware for-profit corporation,<br><br>Defendant. | Case No. 2:19-cv-05887-DGC<br><br>**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFF'S COMPLAINT** |

Defendant, L3HARRIS TECHNOLOGIES, INC. ("L3"), in reply to Plaintiff's "Motion in Opposition to Defendant's Motion to Dismiss & Brief in Support,"[1] and in further support of its Motion to Dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), states as follows.

## I. INTRODUCTION

In his Response to L3's Motion to Dismiss, Plaintiff sheds some light on the basis for his claims. Accepting his allegations as true for purposes of L3's Motion to Dismiss, Plaintiff revealed that his previously unknown "congenital disability" is a hernia—an "irreducible intestine bulge" which presents on the right side of his scrotum. *See* Plaintiff's Response, Doc. No. 18, at 9-10. While this condition is no doubt a serious matter affecting Plaintiff's health, Plaintiff's desire to keep it between himself and his "Creator" (*id*. at 16) does not outweigh our Nation's need for airport passenger screening technologies meeting the standards discussed in L3's Motion to Dismiss. These standards require technologies capable of detecting **anomalies appearing on images of generic figures**, which is exactly what L3 manufactured and sold pursuant to government contracts. As a result, L3 is immune from Plaintiff's claims under the SAFETY Act.

As L3 explained in its Motion to Dismiss, Plaintiff's Complaint rests on his false premise that L3's "Qualifying Anti-Terrorism Technology" ("QATT") is "unlawful" because it is capable of detecting "human tissue information beneath the skin." On the contrary, Congress requires *whole-body imaging* technologies capable of detecting objects *underneath and near the surface of the skin*, such as medical implants. *See* L3's Motion to Dismiss, Doc. 14, at 7. In his Response, Plaintiff backs away from his theory that L3's QATT violates specific technological restrictions and instead supports his allegations of malfeasance with an entirely new theory.

Plaintiff now claims he is the victim of ongoing discrimination, alleging he is subject to unfair treatment at airports "solely because of his disability." Response, Doc. No. 18, at 4. However, "[d]iscrimination cannot exist in a vacuum; it can be found only in the unequal treatment of people in similar circumstances." *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187

---

[1] Hereinafter called Plaintiff's "Response" to L3's Motion to Dismiss.

1

(9th Cir. 1995). Plaintiff has made no allegations in his Complaint or Response that he was treated unequally *as compared to people with similar health conditions*. Thus, Plaintiff's new theory of discrimination has no merit, even assuming it is properly before the Court. *See Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990) (denying leave to amend a complaint where the moving party knew or should have known about the facts and theories supporting its new claims). Further, Plaintiff's new claims rely on Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against individuals with qualifying disabilities by specified entities receiving Federal financial assistance. 29 U.S.C. § 794(a). Plaintiff's blanket claims of discrimination include no efforts to show that he suffers from a qualifying disability or that L3 received Federal financial assistance such that it is bound by the Rehabilitation Act of 1973.

L3 appreciates Plaintiff's privacy concerns and is compassionate to the needs of citizens with similar health conditions. However, it remains that L3 developed QATT pursuant to Department of Homeland Security ("DHS") guidelines for sale to the Transportation Security Administration ("TSA"). According to Plaintiff's allegations, the TSA used L3's QATT to successfully screen him by locating an anomaly that appeared on a generic figure. In other words, Plaintiff complains that L3's technology performed exactly the way the DHS intended, and any resulting emotional harm to Plaintiff was caused exclusively by the TSA. For these reasons, Plaintiff cannot state any viable causes of action against L3, and this Court should dismiss Plaintiff's Complaint with prejudice.

## II. THE SAFETY ACT

Plaintiff asserts four reasons why L3 is not entitled to protections under the SAFETY Act, none of which have any merit.

First, Plaintiff claims the QATT certified and designated by the DHS did not include L3's imaging software. Response at 12. Never mind that the QATT is described throughout the Certification and Designation as the Provision$^{TM}$ ATD and Provision$^{TM}$ 2—the very same products targeted in Plaintiff's Complaint—Plaintiff nonetheless claims the QATT label applies only to the "security portal" which uses L3's software. The suggestion is that the DHS approved L3's

2

1 *hardware* but not its *software*. Setting aside that this makes no sense from a practical standpoint, the Exhibit describing L3's QATT plainly states that the Provision™ ATD and Provision™ 2 are protected "models of Technology" under the SAFETY Act, meaning the products are protected as a whole. To wit, the final paragraph of the Exhibit states: "SAFETY Act protections only apply to **models of Technology that use the ADT software** and those models that have passed field testing by the U.S. Transportation Security Administration." (Emphasis added.)

Plaintiff attempts to create ambiguity where none exists, suggesting the DHS would have replaced the word "use" with the word "include" if it truly meant to extend SAFETY Act protections to L3's software. Response at 12. But this would produce an absurd result in that by certifying and designating L3's QATT under the SAFETY Act, the DHS intended to protect something other than the software specifically designed to keep our citizens safe. No amount of Plaintiff's linguistic gymnastics can distract from the fact that L3's QATT squarely includes the software used by the Provision™ ATD and Provision™ 2.

Plaintiff's second proffered reason why the SAFETY Act protections do not apply is that L3's QATT was "deployed directly due to privacy concerns," and not due to an "act of terrorism" as defined under the SAFETY Act. Response at 13. To suggest that L3's QATT was developed and deployed to address privacy concerns rather than national security concerns is to ignore that Congress passed the SAFETY Act in recognition of the vital role played by technology **in defending against terrorist threats**. *See* Alison M. Levin, *The Safety Act of 2003: Implications for the Government Contractor Defense*, 34 PUB. CONT. L.J. 175, 176 (2004). Plaintiff draws his misguided argument from *Electronic Privacy Information Center v. United States Department of Homeland Security*, 653 F.3d 1, 10 (2011), which notably held that the use of advanced imaging technology for airport passenger screening **does not violate the Fourth Amendment**. The *Electronic Privacy* court based this holding on the Supreme Court's repeated refusals to declare that searches must be *minimally intrusive* to be considered reasonable under the Fourth Amendment, and in recognition that the TSA had taken appropriate measures to safeguard personal privacy. *Id*. Hence, to support his contention that L3 violated his privacy, Plaintiff relies

3

on a case in which the court lauded government efforts to safeguard privacy interests. Although *Electronic Privacy* seems a puzzling choice for Plaintiff to cite in *support* of his claims, in all fairness to Plaintiff, there are no other cases that would have served him better. It is unavoidable that Plaintiff's lawsuit arises out of or relates to the performance of L3's QATT in preventing, detecting, identifying, or deterring acts of terrorism. Therefore, as L3 argued in its Motion to Dismiss, L3 is entitled to the rebuttable presumption of a government contractor defense under the SAFETY Act. Motion to Dismiss, Doc. 14, at 6.

Plaintiff's third attempt to undermine L3's SAFETY Act protections is apparently an alternative argument in which Plaintiff concedes that L3 is entitled to a government contractor defense but insists that L3 does not have sovereign immunity. Response at 13. This qualifies as an argument best left unrebutted.

Plaintiff's fourth and final argument as to why the SAFETY Act protections do not apply is that L3 would suffer no "loss" if the Court granted injunctive relief requiring L3 to stop discriminating against him. Plaintiff argues that the absence of any "loss" takes this case outside the scope of the SAFETY Act's "system of risk management." Response at 4, 14. L3 agrees with Plaintiff only insofar as he acknowledges that the SAFETY Act, as applied in a manner set forth in L3's Motion to Dismiss, and as a result of Plaintiff's failure to rebut the applicability of the Government Contractor Defense, bars him from seeking monetary compensation in any suit against L3. Plaintiff's false suggestion that he is the victim of ongoing discrimination will be addressed *infra*.

For these reasons, the Court should hold that L3's QATT is entitled to a rebuttable presumption of a government-contractor defense under 6 U.S.C. § 442(d)(1) (2018). Because Plaintiff has not alleged that L3 acted fraudulently in submitting information to the DHS in its application for SAFETY Act protections (see 6 U.S.C. § 442(c) (2018)), and because no set of facts exists under which Plaintiff can prove the same, the Court should dismiss Plaintiff's Complaint with prejudice under Rule 12(b)(6).

///

4

### III. L3'S QATT IS NOT UNLAWFUL

The gravamen of Plaintiff's Complaint is that L3's QATT is "unlawful" because it revealed his "human tissue information beneath the skin." According to Plaintiff, the capabilities of L3's QATT must be limited to detecting objects appearing *on the surface of the skin*. *See* Plaintiff's Complaint, Doc. No. 1-3, at ¶¶ 14, 21. This is false.

The disputed provisions authorize the use of advanced imaging technologies which create "a visual image of an individual showing the surface of the skin and revealing other objects on the body" and "may include devices using backscatter x-rays or millimeter waves and devices referred to as whole-body imaging technology or body scanning machines." 49 U.S.C § 44901(l)(1)(A) (2018); 49 CFR § 1540.107 (2018). L3 previously noted that authorized whole-body imaging technologies and body scanning machines can detect objects located directly beneath the surface of the skin, such as medical implants. Motion to Dismiss, Doc. 14, at 8.

Plaintiff's Response says little about the "legality" of L3's QATT, save for a fleeting assertion that it is "defective" due to its "inability to differentiate between human tissue beneath [Plaintiff's] and foreign objects on the surface of his skin." In the same extended breath, Plaintiff argues that "a TSA agent would not have been required to 'pat-down' [Plaintiff's] right groin if L3's algorithm would have functioned within United States law and not searched data representing [Plaintiff's] entirely human tissue congenital disability beneath his skin." Response at 10.

This argument shows Plaintiff's refusal to accept that L3's QATT is both authorized and designed to detect objects located directly beneath the surface of the skin. Whether the object is a weapon of mass destruction, a medical implant, or a naturally occurring protrusion like Plaintiff's, it will appear as an anomaly on a generic mannequin resembling a human outline—which is why the DHS granted L3's application for SAFETY Act Certification and Designation.

In sum, there is no requirement that airport passenger screening technology must be able to decipher the physiological or mechanical make-up of objects located on the surface of the skin or directly beneath the skin, and Plaintiff has provided nothing to support his contention that

5

Congress imposed such an onerous burden. Because Plaintiff's Complaint rests on this flawed premise, it should be dismissed under Rule 12(b)(6) based on a dispositive issue of law.

### IV. PLAINTIFF'S COMPLAINT STATES NO VIABLE CAUSES OF ACTION

In addition to seeking injunctive relief, Plaintiff's Complaint purports to raise the following causes of action: (1) Intrusion Upon Seclusion (Complaint at ¶ 30); (2) Public Disclosure of Private Facts (Complaint at ¶ 31); (3) False Imprisonment (Complaint at ¶ 32); (4) Common Law Product Liability Manufacturing Defect (Complaint at ¶ 33); (5) Product Liability for Information Defect (Complaint at ¶ 34); (6) Constitutional Tort – Right to Privacy – Arizona Constitution Article II Section 8 (Complaint at ¶ 35); (7) Intentional Infliction of Emotional Distress (Complaint at ¶ 36); (8) Taking of Chattels (Complaint at ¶ 37); (9) Conversion (Complaint at ¶ 38); (10) Unjust Enrichment (Complaint at ¶ 39); (11) A.R.S. § 47-2318 – Third Party Beneficiaries of Warranties Express or Implied (Complaint at ¶ 40); and (12) Constitutional Tort – Due Process – Arizona Constitution Article II Section 4 (Complaint at ¶ 41).

The fundamental problem with these claims continues to be a lack of causation. It is undisputed L3 lacked any degree of control or authority over the QATT once it was sold to the TSA. (*See* Declaration of Matt Weingast, L3's Vice President and General Counsel, attached as Exhibit B to L3's Motion to Dismiss.) Many of Plaintiff's purported causes of action also require a showing that the defendant's conduct would be considered highly offensive to a reasonable person. Plaintiff has not and cannot show that L3 violated this standard by merely developing QATT pursuant to the DHS guidelines for use by the TSA. These conclusions are buttressed by Plaintiff's allegations in his Response.

Upon revealing the nature of his previously unidentified "congenital disability," Plaintiff argues: "The fact that a TSA agent, using authority of the State, was the first person to violate Plaintiff's personal security and sanity and touch him at his right groin during an emergency when not even medical professionals or his wife had touched him there 'shocks the conscience' and cannot be tolerated in the United States of America." Response, pg. 11.

6

1  In his Complaint, Plaintiff attempted to bridge the causal gap between L3's conduct and his alleged injuries by alleging that L3 was "the direct cause of his damages," which "could not have happened without L3's reckless and unlawful actions." Complaint at ¶ 15. In his Response, Plaintiff continues to ignore the need for specific intent on the part of L3, arguing without any legal support that "[a] defendant's reckless disregard for a known outcome is equivalent to intentional conduct." Response, pg. 9. This novel proposition is apropos of nothing in the context of Plaintiff's purported claims.

For instance, to highlight the flaws in just a few of Plaintiff's claims, Plaintiff cannot state a cause of action against L3 for False Imprisonment, because L3 did not act with any intent to either directly or indirectly confine Plaintiff within boundaries fixed by L3. *See Hart v. Seven Resorts Inc.*, 190 Ariz. 272, 281 (Ariz. Ct. App. 1997). Furthermore, L3 was not present at the time of the alleged false imprisonment nor did L3 own, operate or control the QATT at the time of the alleged event. Similarly, Plaintiff cannot state a claim against L3 for Intentional Infliction of Emotional Distress, because Plaintiff cannot plausibly claim that L3's conduct in developing QATT pursuant to the DHS guidelines for use by the TSA was extreme and outrageous or intended in any way to cause him emotional distress. *See Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (1987).

Plaintiff's privacy-based claims fare no better. Plaintiff cannot state a claim against L3 for Intrusion Upon Seclusion, because L3 did not intentionally intrude upon Plaintiff's private affairs. *See Shepard v. Costco Wholesale Corporation*, 246 Ariz. 470, 476 (Ariz. Ct. App. 2019). By that same token, Plaintiff cannot state a claim against L3 for Public Disclosure of Private Facts, because L3 did not publish any matters to the public at large or place Plaintiff before the public in a false light. *See Shepard*, 246 Ariz. at 476; *Hurry v. Financial Industry Regulatory Authority Incorporated*, No. CV-02490-PHX-ROS, slip op. at 8 (D. Arizona Aug. 5, 2015); *Armato v. Doe*, No., 2012 U.S. Dist. LEXIS 190080, at *17 (D. Ariz. May 15, 2012). Again, L3 was not present at the time of the incident nor did L3 own, operate or control the QATT at the time of the alleged event.

/ / /

7

1  Plaintiff is also unable to state a claim against L3 for the Taking of Chattels or Conversion,
2  because L3 has never assumed physical control over any of his chattels or personal property. *See*
3  *Koepnick v. Sears Roebuck & Co.*, 158 Ariz. 322, 331 (Ariz. Ct. App. 1988); *Miller v. Hehlen*,
4  209 Ariz. Ct. App. 462, 472 (2005). Similarly, Plaintiff cannot state a claim against L3 for Unjust
5  Enrichment, because L3 did not sell Plaintiff's personal information, and even if it did, Plaintiff
6  would not have been impoverished by the sale. *See Span v. Maricopa County Treasurer*, 246 Ariz.
7  222, 227 (Ariz. Ct. App. 2019).

8  In requesting injunctive relief, Plaintiff clings to the fallacy that L3 is somehow in
9  possession of his personal health information and seeks its return. This is perhaps the most
10 confusing aspect of Plaintiff's lawsuit. Plaintiff has not rebutted the Declaration from L3's Vice
11 President and General Counsel stating that L3 lacked control over the QATT once it was sold to
12 the TSA, so it is unclear why Plaintiff alleges that L3 possesses his "scan code."

13 In his Response, Plaintiff argues "it is reasonable to assume that there is in fact a large
14 prospective market of buyers for information deciphering the physiological makeup of
15 [Plaintiff's] very severe but statistically common health problem, including hostile foreign
16 governments and multinational corporations like L3." Response, at 18. To the extent Plaintiff
17 suggests there are prospective black-market buyers seeking L3's proprietary information for the
18 purpose of learning how to circumvent our Nation's airport security apparatus, L3 fully agrees.
19 This is the central reason that Congress passed the SAFETY Act and why L3 is thus immune from
20 this type of lawsuit. However, to the extent Plaintiff suggests there is a "large prospective market
21 of buyers" seeking access to the physiological makeup of his "irreducible intestine bulge," L3
22 respectfully disagrees. At any rate, Plaintiff's assumptions about the needs of the marketplace do
23 not satisfy the pleading standards under Rule 12(b)(6).

24 It is not enough for Plaintiff to allege the sheer possibility that L3 acted unlawfully. *See*
25 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, to survive L3's motion to dismiss, Plaintiff
26 must make sufficient factual allegations to state a claim for relief that is plausible on its face. *Id.*

8

Because Plaintiff cannot satisfy these standards with respect to any of his purported claims, the Court should dismiss his Complaint with prejudice.

### V. **PLAINTIFF FAILS TO STATE A CLAIM FOR DISCRIMINATION**

Plaintiff's Response is focused largely on establishing that he is the victim of ongoing discrimination, a claim he did not raise in his Complaint. Setting aside this procedural violation, Plaintiff's allegations make it clear he lacks any basis for making such a claim.

To begin, Plaintiff's Response is littered with assertions that L3 is bound by Section 504 of the Rehabilitation Act of 1973 and cannot escape the duties thereby imposed. Section 504 of the Rehabilitation Act of 1973 provides in relevant part: "[n]o otherwise *qualified individual with a disability* . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any *program or activity* receiving Federal financial assistance." (Emphasis added.) 29 U.S.C. § 794(a).

To qualify as being "disabled" under the Rehabilitation Act of 1973, one must have: (1) a physical or mental impairment that substantially limits one or more major life activities of such individual; (2) a record of such impairment; or (3) be regarded as having such impairment. *Marquez v. Glendale Union High School District*, 2018 U.S. Dist. LEXIS 173343, at *42 (D. Ariz. Oct. 9, 2018). A corporate entity like L3 can qualify as a "program or activity" bound by Section 504 if: (1) the entity receives federal assistance as a whole; or (2) it is principally engaged in the business of providing services related to education, health care, housing, social services, or parks and recreation. 29 U.S.C. § 794(b)(3)(A); *Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 940 (9th Cir. 2009); *see also Haybarger v. Lawrence County Adult Prob. & Parole*, 551 F.3d 193, 199 (3d Cir. 2008) (narrowly construing "program or activity" to reach "only the specific parts of a recipient's operation which directly benefited from federal assistance").

Here, Plaintiff has made no effort to show that his health condition qualifies him as being "disabled" under Rehabilitation Act of 1973, or that L3 qualifies as a corporate entity bound by Section 504. Instead he simply assumes as much and states: "[t]he capability of a body scanning machine to identify a hidden congenital disability does not authorize L3, an organization bound

9

by Section 504, to perform an unconstitutional and unlawful search of that private health information using its proprietary ATR software and then discriminate against [Plaintiff] solely because of the congenital disability it unlawfully revealed." Response, at 16.

Plaintiff's allegations of discrimination based solely on his medical condition show that he cannot state a claim for discrimination in any context, much less under the guise of a claim under the Rehabilitation Act of 1973. Any claim for discrimination requires a showing of unequal treatment compared to people in similar circumstances. *Freeman*, 68 F.3d at 1187. A plaintiff claiming discrimination must identify a similarly situated class, known as the control group, and then must isolate the factor allegedly subject to impermissible discrimination. *United States v. Aguilar,* 883 F.2d 662, 706 (9th Cir. 1989).

Here, in his attempt to quantify the demand for his personal health information, Plaintiff alleges that his condition—a hernia—occurs "in varying degrees of severity and for varying reasons (not all are the result of a congenital defect), in approximately 25% of all men." Response, at 18. (Parentheses in original.) Thus, Plaintiff has by happenstance identified a similarly situated class. But to state a claim for discrimination against L3, Plaintiff would need to allege that L3 designed its QATT to: (1) recognize the physiological makeup of all hernia's occurring in the control group; and (2) single out Plaintiff's hernia as the only one to register as an anomaly appearing on a generic mannequin. Suffice it to say, Plaintiff has made no such allegations.

## VI. CONCLUSION

It is worth noting that Plaintiff could have easily avoided the public humiliation he alleges was caused by his ordeal at the Phoenix-Mesa Gateway Airport on August 9, 2018. He could have simply opted for a pat-down that would have been conducted privately by an officer of the same sex. *See Electronic Privacy*, 653 F.3d at 3. This would have allowed Plaintiff to explain his condition in a safe space and alleviate his potential embarrassment to the greatest extent possible.

We now know that the anomaly TSA officials detected using L3's QATT was Plaintiff's naturally occurring health condition, but the TSA officials had no way of knowing that at the time. The anomaly could just as easily have been a concealed device which posed a safety threat.

10

1 Requiring L3's QATT to decipher the difference between the two objects would be to impose an impractical burden that would weaken our Nation's national security apparatus. That is why, contrary to Plaintiff's contention, Congress has imposed no such burden. Regardless, Plaintiff's Complaint should be dismissed for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) for the reasons set forth above.

WHEREFORE, for the foregoing reasons, Defendant, L3HARRIS TECHNOLOGIES, INC., respectfully requests that this Court dismiss Plaintiff's Complaint in its entirety with prejudice, and for such further relief as the Court may deem just.

**RESPECTFULLY SUBMITTED** this 20th day of March, 2020.

**SANDERS & PARKS, P.C.**

By  */s/ Mark G. Worischeck*
Mark G. Worischeck
Ryan P. Sandstrom
3030 North Third Street, Suite 1300
Phoenix, AZ  85012-3099

Michael G. McQuillen (admitted *pro hac vice*)
Christopher J. Raistrick (admitted *pro hac vice*)
Mark S. Susina (admitted *pro hac vice*)
Richard C. Harris (admitted *pro hac vice*)
**ADLER MURPHY & McQUILLEN, LLP**
20 S. Clark St., Suite 2500
Chicago, Illinois 60603
*Attorneys for Defendant L3Harris Technologies, Inc.*

11

# CERTIFICATE OF SERVICE

I hereby certify that on March 20, 2020, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing thereby transmitting a Notice of Electronic Filing to all CM/ECF registrants.

With a copy sent via U.S. Mail and email to:

Michael Gibson Muir
19 Inglewood Lane
Bloomington, IL 61704
blaxwan@yahoo.com
*Plaintiff Pro Per*

By: */s/ Lisa M. Podsiadlik*

12