## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| MICHAEL MUIR, | ) | |
| *Plaintiff,* | ) | 8:22-cv-01110 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES; et al. | ) | |
| *Defendants.* | ) | |

## L3HARRIS TECHNOLOGIES, INC.'S
## MOTION TO DISMISS
## AND MEMORANDUM OF LAW IN SUPPORT

Defendant, L3HARRIS TECHNOLOGIES, INC. ("L3"), by and through its attorneys, hereby moves to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and in support submits this incorporated Memorandum of Law.

## MEMORANDUM OF LAW

Plaintiff Michael Muir has filed a duplicative and frivolous lawsuit based on continued alleged harms that were previously ruled not actionable by the United States District Court for the Central District of Illinois and affirmed by the United States Court of Appeals for the Seventh Circuit. Those courts established that L3 did not breach any duties owed to Mr. Muir.

## I.    BACKGROUND

Mr. Muir asks the Court to take judicial notice of the electronic dockets in three federal courts (ECF 1, ¶80):

- **District of Arizona Case No. 2:19-cv-05887 ("AZ")**
- **Central District of Illinois Case No. l:20-cv-01280 ("CDIL")**
- **Seventh Circuit Court of Appeals Case No. 21-1312**

L3 agrees with Mr. Muir that the cases listed above should be noticed and closely examined. The public dockets of federal judicial proceedings are not subject to reasonable dispute. *Kaplan v. Regions Bank*, No. 8:17-cv-2701-T-36CPT, 2019 U.S. Dist. LEXIS 164195, at *35-36 (M.D. Fla. Sep. 25, 2019). Accordingly, L3 will draw from the records in the prior cases as an efficient means of sorting through Mr. Muir's vexatious 250-page Complaint, which serves as his improper *de facto* appeal from the dismissal of his prior claims that were fully adjudicated in the Seventh Circuit.

Like Mr. Muir's prior suit, his current suit alleges injuries sustained during two "pat-down" searches conducted by the Transportation Security Administration ("TSA") in August 2018. The TSA required the pat-downs after certain screening equipment manufactured by L3 detected Mr. Muir's bulging hernia as a potential security threat. In short, Mr. Muir believes the passenger screening equipment is unlawful because it is capable of detecting his "beneath the skin congenital disability." *See, e.g.,* ECF 1, ¶33.

**A. The SAFETY Act**

L3 manufactured the subject screening equipment pursuant to Department of Homeland Security ("DHS") guidelines, and the DHS certified the products for use under the Support Anti-Terrorism by Fostering Effective

Technologies Act of 2002 ("SAFETY Act") (6 U.S.C. § 441 *et seq.* (2018)).
Congress passed the SAFETY Act due to the vital role played by technology in
defending against terrorist threats. Alison M. Levin, *The Safety Act of 2003:
Implications for the Government Contractor Defense*, 34 PUB. CONT. L.J. 175,
176 (2004). Through the SAFETY Act, Congress enacted a set of liability
reforms to ensure that manufacturers would not be deterred from developing
critical anti-terrorism technologies. *Id.*

To become eligible for the "system of risk management" established by
the SAFETY Act, the manufacturer (or "Seller") of anti-terrorism technology
must first submit a "SAFETY Act Application Kit." 6 U.S.C. § 441(b) (2018); 6
CFR §§ 25.2, 25.6 (2018). There are broad nondisclosure protections for the
materials submitted to the DHS during the application process; all such
materials are deemed "SAFETY Act Confidential Information." 6 CFR §§ 25.2,
25.10 (2018). The liability protections available under the SAFETY Act are
triggered if the DHS awards certification as "Qualifying Anti-Terrorism
Technology" ("QATT"). 6 U.S.C. § 441(b) (2018); 6 CFR § 25.3 (2018).

The DHS certified L3's QAAT for passenger screening machines that use
"Automatic Target Detection" ("ATD") software, which "analyzes scanned data
and highlights threats and anomalies on a generic mannequin that resembles
a human outline for end-user interpretation." *See* CDIL, ECF 37, Ex. E. In

other words, if an "anomaly" is detected, the location of the anomaly is reflected on a three-dimensional image of a generic human mannequin.

Upon receiving certification under the SAFETY Act, L3 sold its QATT screening products to the TSA. Neither L3 nor any of its current or former corporate subsidiaries has since exercised any degree of control or authority over the QATT screening products. *See* CDIL, ECF 44 (declaration of George Salimbas, formerly employed by L3 Security & Detection Systems, Inc.). It is further undisputed that the TSA was in possession and control of the QATT at all times relevant to Mr. Muir's lawsuits. *See, e.g.,* AZ, ECF 15, ¶55, wherein Mr. Muir stated that L3's QATT "is used in a civilian setting by TSA, a nonmilitary sub-agency of the non-military Department of Homeland Security, within the borders of Arizona during peacetime and sold commercially by L3 on the open market on six continents."

### B. Summary of Mr. Muir's Prior Claims

Mr. Muir first sued L3 in the Superior Court of Arizona in Maricopa County, and L3 removed the suit to the United States District Court for the District of Arizona. AZ, ECF 1. Thereafter, Mr. Muir voluntarily dismissed his District of Arizona (AZ) suit (*id.*, ECF 25) and refiled in the United States District Court for the Central District of Illinois (CDIL).

The CDIL dismissed all of Mr. Muir's claims with prejudice, including those alleged against the added Defendants (who are also L3's co-Defendants

in the current suit). *Muir v. United States Transportation Security Administration*, No. 1:20-cv-01280, 2021 U.S. Dist. LEXIS 12240 (C.D. Ill. Jan. 22, 2021). Mr. Muir appealed, and the Seventh Circuit Court of Appeals affirmed the CDIL's dismissal in its entirety. *Muir v. Transportation Security Administration,* 857 F. App'x 251 (7th Cir. 2021).

The CDIL provided the following summary of Mr. Muir's allegations in his prior suit. Citations to the CDIL docket are included.

> Plaintiff claims he was psychologically and physically injured as a result of two encounters with Defendant TSA. (Doc. 12). On August 9, 2018, Defendant presented at the Phoenix-Mesa Gateway Airport in Mesa, Arizona, for mandatory pre-flight screening. (Doc. 12 at 5). While Plaintiff was in the "hands-up" position during the body scan portion of the screening, his hernia at his right groin became symptomatic; TSA officials informed Plaintiff that the body scan revealed an anomaly at Plaintiff's right groin, necessitating a pat-down search. (Doc. 12 at 5-7). Plaintiff ordered the TSA officials not to touch his right groin because he was experiencing a serious medical emergency and "being touched at his right groin would result in extreme physical pain and could endanger his life." (Doc. 12 at 7). The TSA officials persisted, and Plaintiff – against his will – submitted to the pat-down search. (Doc. 12 at 7).
>
> On August 12, 2018, Plaintiff presented at the Peoria International Airport in Peoria, Illinois, for mandatory pre-flight screening. (Doc. 12 at 8). Plaintiff's hernia again became symptomatic during the body scan, and TSA officials again required a physical pat-down of Plaintiff's right groin. (Doc. 12 at 8-11). Plaintiff again ordered the TSA officials not to touch his right groin because he was experiencing a serious medical emergency and physical contact "would result in immediate and extreme physical pain." (Doc. 12 at 10). He offered to instead lower his pants and underwear to show the TSA officials his hernia; the TSA officials declined and required the pat-down search. Plaintiff again reluctantly submitted to the pat down, desperate to end the interaction. (Doc. 12 at 11). As a result of these two incidents, Plaintiff suffers "severe ongoing psychological distress and disturbing physical manifestations." *Muir v. TSA*, No. 1:20-cv-01280, at *2-3.

In his current suit, Mr. Muir repackages the same claims he raised previously but identifies two new alleged occurrences at the same two airports. Whereas Mr. Muir's prior suit focused on two occurrences in **August 2018**, his current suit focuses on two occurrences in **June 2019** – although the current suit still references the four occurrences interchangeably and seeks relief for all of them. *See* ECF 1, ¶291; p. 245, ¶K; pp. 248-49, ¶L (seeking injunctive relief requiring the return of Mr. Muir's "scan code" that was allegedly taken during airport passenger security screenings on August 9, 2018, August 12, 2018, June 6, 2019, and June 9, 2019).

### C. Summary of Mr. Muir's current claims

Mr. Muir's current and prior claims are substantively the same but for one important distinction: unlike the August 2018 occurrences, the June 2019 occurrences did not result in TSA pat-downs.

As was the case in his prior suit, Mr. Muir's primary argument against L3 involves a federal statute, 49 U.S.C. § 44901(l), which establishes the "Limitations on use of advanced imaging technology for screening passengers." *Id.* at ¶¶96 – 103. The gist of Mr. Muir's lawsuits is that L3 developed airport passenger screening technology that violates 49 U.S.C. § 44901(l), because it is capable of detecting objects located directly beneath a person's skin. To wit, Mr. Muir argues the technology should not have identified his bulging hernia. *See id.* at ¶¶588-89.

Just as he alleged previously regarding the August 2018 occurrences, Mr. Muir claims in this suit that on June 6, 2019, at IWA, Mr. Muir was "uncontrollably and intermittently symptomatic at his right groin due to his hidden physical disorder and his private marital healthcare choices regarding that disorder…" ECF 1, ¶31. Mr. Muir makes these same allegations for the alleged occurrence on June 9, 2019, at PIA. *Id*. at ¶53.

Mr. Muir claims that during both June 2019 occurrences, due to the "barbaric and dehumanizing nature" of the August 2018 occurrences, he "deeply feared for his immediate physical safety" as he approached the TSA security checkpoints. *Id*. at ¶¶33, 55. However, unlike the August 2018 occurrences, the TSA did not require a pat-down during the June 2019 occurrences. *See* ECF 1, ¶¶49-51, at ¶¶71-73. Below is Mr. Muir's theory as to why the June 2019 occurrences did not result in TSA pat-downs:

> Defendants' threat and anomaly decision-making A.I agent unilaterally judged that, at the exact moment the electromagnetic waves emitted from the security portal penetrated Muir's skin and reflected back off his internal organs to the security portal sensors in order to create his passenger screening data, **Muir's symptoms of his hidden physical disability at his right groin had not manifested to the extent necessary for the threat and anomaly decision-making A.I. agent to trigger a false threat alarm at his right groin** (as had occurred at PIA on August 12, 2018 when Muir's natural human tissue and peritoneal fluid did, in sufficient measure, move through his inguinal canal into his right scrotum to present as a right groin hernia), as his tissue had unpredictably remained, according to the algorithm's pre-determined model of a "normal" human man, far enough inside his body cavity for Muir to be classified as "ok" to enter the airport sterile area to board his flight. *Id*. at ¶70 (Emphasis added).

## II.   ARGUMENT

This motion is brought under Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual allegations to state a claim for relief that is "plausible on its face." *Ashcroft v.Iqbal*, 556 U.S. 662, 678 (2009). It is not enough to allege a "sheer possibility that a defendant has acted unlawfully." *Id*. While a court must generally accept a plaintiff's factual allegations as true, it does not accept a plaintiff's legal conclusions that are merely couched as factual allegations. *Id*. In determining whether a complaint states a plausible claim for relief, a court must draw on its own judicial experience and common sense. *Id*. at 679.

A claim can also be dismissed under Rule 12(b)(6) based on a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). This applies with respect to *res judicata* and a statute-of-limitations defense, both of which are properly raised within a Rule 12(b)(6) motion for failure to state a claim. *See, e.g., Stovall v. Secretary*, 521 F. App'x 849, 851 (11th Cir. 2013).

### A. Mr. Muir has violated the rule against claim splitting

The chart below reflects the dates and airports at issue in Mr. Muir's current and prior lawsuits. *See* ECF 1, ¶291; p. 245, ¶K; pp. 248-49, ¶L.

| DATE | AIRPORT | LAWSUIT |
|---|---|---|
| August 9, 2018 | IWA (Phoenix-Mesa, AZ) | Prior |
| August 12, 2018 | PIA (Peoria, IL) | Prior |
| June 6, 2019 | IWA (Phoenix-Mesa, AZ) | Current & Prior |
| June 9, 2019 | PIA (Peoria, IL) | Current & Prior |

Notably, Mr. Muir filed his first lawsuit in the Arizona state court on December 2, 2019, which post-dates all four of the occurrences alleged in the current suit. *See* AZ, ECF 1. Mr. Muir eventually filed his First Amended Complaint in the CDIL on September 8, 2020 (CDIL, ECF 12), yet he still failed to add his allegations from the two alleged occurrences in June 2019.

As L3 observed in its Motion to Dismiss Mr. Muir's First Amended Complaint in the CDIL, if Mr. Muir planned to sue for additional occurrences but was still in the process of exhausting his administrative remedies against the TSA, then he needed to preserve his claims by filing suit and moving to stay the litigation for the completion of the administrative process. (CDIL Docket 37, p. 13, citing *Arrigo v. Link*, 836 F.3d 787, 798 (7th Cir. 2016)).

The Eleventh Circuit Court of Appeals follows the same well-establish rule followed in the Seventh Circuit in the *Arrigo* case. *See Jang v. United Technologies Corp.*, 206 F.3d 1147, 1149 (11th Cir. 2000) (noting that to avoid the effects of claim preclusion, plaintiffs should seek to stay the litigation, and "may not split causes of action to bring, for example, state law claims in one suit and then file a second suit with federal causes of action after receiving a 'right to sue' letter").

The cases cited above establish that, regardless of the reasons for the timing of Mr. Muir's separate lawsuits, he has violated the fundamental rule against claim-splitting, which prohibits plaintiffs from prosecuting their

claims by piecemeal, or presenting only a portion of the grounds upon which relief is sought, and then leaving the rest to be presented in a subsequent suit. The rule against claim splitting ensures fairness to defendants and conserves judicial resources. *See Vanover v. NCO Financial Services*, 857 F.3d 833, 841 (11th Cir. 2017).

When Mr. Muir filed his first lawsuit on December 2, 2019, L3 was entitled to notice of all claims arising from the transactions and occurrences known to Mr. Muir based on the same set of operative facts. The prior suit was the proper vehicle for Mr. Muir to prosecute all of his claims – and for L3 to defend against them. But instead of bringing his claims all at once, Mr. Muir has taken the improper piecemeal approach described above. By doing so he has invoked the doctrines of *res judicata* and collateral estoppel.

### B. Mr. Muir's claims are barred as *res judicata*

The doctrine of *res judicata*, or claim preclusion, bars the litigation of claims that were already litigated or **could have been litigated** during a prior action between the same parties. *Lobo v. Celebrity Cruises, Inc.*, 704 F.3d 882, 892 (11th Cir. 2013); *Delta Air Lines, Inc.*, 326 F.3d 1183, 1187 (11th Cir. 2003) ("Importantly, this bar pertains not only to claims that were raised in the prior action, but also to claims that could have been raised previously.").

To invoke *res judicata*, it must be shown that: (1) the prior judgment was rendered by a court of competent jurisdiction; (2) the judgment was final and

on the merits; (3) both cases involve the same parties or their privies; and (4) both cases involve the same claims or causes of action. *Bray v. Bank of America Corp.*, No. 8:15-cv-2532-T-35CPT, 2018 U.S. Dist. LEXIS 187674, at *5-6 (M.D. Fla. Aug. 20, 2018).

The following is a summary of the claims that were previously addressed and rejected on the merits by the CDIL and Seventh Circuit Court of Appeals. It is noteworthy that in his appeal to the Seventh Circuit, Mr. Muir attempted to advance different causes of action based on a conspiracy theory.

## CDIL Dismissal

In the CDIL, Mr. Muir purported to state causes of action against L3 for ordinary negligence, negligent infliction of emotional distress ("NIED"), and intentional infliction of emotional distress ("IIED"). Each claim was brought once under Arizona law and once under Illinois law. *See* CDIL, ECF 12 at pg. 27. In dismissing Mr. Muir's claims for negligence and NIED, the CDIL ruled as follows (with record citations included):

> Plaintiff alleges no facts from which the Court can infer Defendant L3 would or could have had any knowledge of Plaintiff's medical condition or that the equipment it developed would trigger the events which allegedly caused Plaintiff's damages.

> In sum, Plaintiff has failed to identify any legal theory which would impose a duty on Defendant L3 in this context. His claims for negligence and NEID must therefore be dismissed. Because the Court does not believe Plaintiff can amend his complaint to state facts sufficient to state claims for negligence and NIED, Counts IX, X, XII, and XIII are dismissed with prejudice. *Muir v. TSA*, No. 1:20-cv-01280, at *46-47.

Turning to Mr. Muir's claim for IIED, the CDIL ruled:

> The basis for Plaintiff's IIED claim against Defendant L3 is unclear. The Amended Complaint vaguely suggests various violations of state and federal constitutional rights, such as the right to privacy, constitute IIED (doc. 12 at 18, 20); the Response to Defendant L3's Motion to Dismiss fails to address IIED at all (*see* doc. 42 at 15-20). This is wholly insufficient to survive scrutiny under Rule 12(b)(6). Further, given Plaintiff had no direct interaction with Defendant L3, the Court finds amendment would be futile. Counts XI and XIV are therefore dismissed with prejudice. *Id.* at *47-48.

## Seventh Circuit Affirms

In his appeal to the Seventh Circuit Court of Appeals, Mr. Muir asserted a new theory of liability and claimed L3 had engaged in a conspiracy with Co-Defendants Allegiant Air and the TSA. The appellate court held that Mr. Muir waived his conspiracy claims by failing to raise them below, but nonetheless addressed the claims and dismissed them on the merits:

> … Muir's argument that he has a claim under 42 U.S.C. § 1983 fails because none of the defendants can be liable under that statute. Section 1983 requires that the defendants acted under the color of state law; it does not extend to private actors or those acting under color of federal law. [Citation.] If the plaintiff alleges a conspiracy to violate his civil rights, he still must show that the named private parties conspired with state actors. [Citations.] Here, the defendants are all federal agents or private actors, so § 1983 is not in play. *Muir,* 857 F. App'x at 253-54.

## Elements of *Res Judicata*

### 1. Prior judgment rendered by court of competent jurisdiction

For purposes of *res judicata*, a court of competent jurisdiction is one that had subject matter jurisdiction to rule on the prior claims. *See Laskar v.*

*Peterson*, 771 F.3d 1291, 1300 (11th Cir. 2014). As discussed further below, the CDIL and Seventh Circuit Court of Appeals clearly had subject matter jurisdiction over the claims against L3.

### 2. Prior judgment was final, and on the merits

The CDIL ruled that Mr. Muir's claims against L3 sounded in tort and dismissed them on the merits. See *Muir*, No. 1:20-cv-01280, at *40 n.15. Thereafter, the Seventh Circuit took up Mr. Muir's conspiracy claim under U.S.C. § 1983 and dismissed it on the merits. *See Muir*, 857 F. App'x at 254. Both courts had subject matter jurisdiction to enter their respective rulings (*see Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1188 (11th Cir. 2003)), and the Seventh Circuit entered a final judgment on the merits.

### 3. Both cases involve same parties or privies

A plaintiff cannot avoid the preclusive effect of *res judicata* by adding new defendants in a subsequent suit. *McDonald v. Hillsborough County School Board*, 821 F.2d 1563, 1566 (11th Cir. 1987); *Endsley v. City of Macon, Ga.*, 321 F. App'x 811, 814 (11th Cir. 2008). Here, Mr. Muir's addition of numerous defendants does this nothing to foreclose the application of *res judicata*.

### 4. Both cases involve same claims or causes of action

Regarding the fourth element noted above, in the Eleventh Circuit, the test for determining whether current and former causes of action are the same is whether the primary right and duty are the same in each case. A court must

compare the substance of the actions, not their form. If a current and former action arise out of the same "nucleus of operative facts," or from the same "transaction or series of transactions," or if they are "based on the same factual predicate," then they are considered the same "claim" or "cause of action" for *res judicata* purposes. *Kaiser Aero. & Electronics Corp. v. Teledyne Industries*, 244 F.3d 1289, 1296-97 (11th Cir. 2001); *Ragsdale v. Rubbermaid, Inc.,* 193 F.3d 1235, 1239 (11th Cir. 1999); *Wallis v. Justice Oaks II, Ltd. (In re Justice Oaks II, Ltd.),* 898 F.2d 1544, 1551-52 (11th Cir. 1990).

As noted, unlike the August 2018 occurrences, Mr. Muir did not require TSA pat-downs during the June 2019 occurrences. The only other distinction between this suit and the prior suit involves Mr. Muir's claims regarding what he calls "the Shadow," a reference Mr. Muir has made since the first time he sued L3. *See, e.g,* AZ, ECF 1-3, ¶42 (alleging "L3 instigated creation of 'the Shadow,' a menacing presence now constantly inhibiting Muir's waking psyche"). Mr. Muir's new revelation in this lawsuit is that the Shadow began afflicting him in August 2019. See below at ¶51 of his Complaint:

> "[P]rior to his encounter with TSA on June 6, 2019, the only way Muir could explain the savage brutality of what happened to him at the IWA Checkpoint on August 9, 2018 was that he was being punished by the Creator. After Muir was granted an unexplainable reprieve from what was likely to be another severely cruel and unusual punishment, Muir could not help but begin to wonder (when the Shadow suddenly appeared to him in August, 2019) if what had happened to him at IWA on August 9, 2018 wasn't really a result of the Creator's unfathomable will unfolding, but instead the disgusting, inhumane, and intolerable

14

result of his own government's unconscionable and outrageous wrongdoing."

Mr. Muir makes similar claims when discussing the June 9, 2019 occurrence at PIA. *Id.* at ¶¶59, 73. Mr. Muir later discusses the moment he first became "haunted" by the Shadow:

> The crystallization of Muir's June 6, 2019 and June 9, 2019 injuries did not occur until early August, 2019. The exact date is August 10, 2019 (approximately the one-year anniversary of Muir's dehumanization at the hands of his own government, which occurred on August 9, 2018 at IWA and on August 12, 2018 at PIA). Muir knows the exact date because he woke up that morning haunted by the Shadow and several hours later was informed by his wife that Jeffrey Epstein committed suicide. (ECF 1, at ¶698)

Thus, Mr. Muir claims that before Jeffrey Epstein committed suicide, Mr. Muir assumed "the Creator" was responsible for requiring the TSA pat-downs during the August 2018 occurrences, and for granting him a reprieve during the June 2019 occurrences. However, on August 10, 2019, when Mr. Muir learned of Mr. Epstein's suicide, Mr. Muir was overtaken by the Shadow, which brought about the "crystallization" of his June 2019 injuries.

While L3 continues to be sympathetic to Mr. Muir's physical and mental health issues, respectfully, none of his newly alleged facts have anything to do with L3's QATT. Mr. Muir continues to be upset that the TSA conducted pat-downs during the August 2018 occurrences after the screening software the TSA purchased from L3 detected an anomaly which turned out to be his hernia.

In sum, the August 2018 occurrences continue to be the focus of Mr.

Muir's lawsuit. Regardless of how he labels his claims, the Court must look to the substance of the actions rather than their form. The current suit is plainly based on the same alleged conduct, the same nucleus of operative facts, and the series of transactions that was alleged – or could have been alleged – in the prior suit. Both suits also depend on the same primary rights and duties. Hence, the two lawsuits clearly involve the same causes of action for purposes of *res judicata. See Kaiser Aero*, 244 F.3d at 1296-97; *Ragsdale,* 193 F.3d at 1239; *Wallis,* 898 F.2d at 1551-52.

### C. Mr. Muir's claims are barred by collateral estoppel

While *res judicata* generally involves the principle of **claim** preclusion, collateral estoppel refers to the principle of **issue** preclusion. Collateral estoppel precludes re-litigation of issues that were actually litigated in the original action, even if the subsequent action involves a different cause of action. *United States v. Beane*, 841 F.3d 1273, 1282-83 (11th Cir. 2016) (quoting *Johnson v. United States*, 576 F.2d 606, 611 (5th Cir. 1978).

Applying the doctrine of collateral estoppel requires establishing the following elements: (1) the issue at stake is identical to the one decided in the prior litigation; (2) the issue was actually litigated in the prior proceeding; (3) the prior ruling on the issue was a critical and necessary part of the judgment in that earlier decision; and (4) the standard of proof in the prior action was at least as stringent as the standard of proof in the subsequent case. *Steed v.*

*EverHome Mortgage Co.,* 308 F. App'x 364, 372 (11th Cir. 2009); *In re Southeast Banking Corp.*, 69 F.3d 1539, 1552 (11th Cir. 1995).

Regarding the second element above, Mr. Muir's prior suit was wide-ranging and covered a broad spectrum of issues that were "actually litigated" for purposes of collateral estoppel. *See Janjua v. Neufeld*, 933 F.3d 1061, 1066 (9th Cir. 2019) (holding that for purposes of collateral estoppel, "an issue is actually litigated when an issue is raised, contested, and submitted for determination"). The following is a list of rulings (with respect to L3) issued by the CDIL and Seventh Circuit Court of Appeals.

### CDIL

- Mr. Muir could not show that L3 had a duty to warn him about the technological capabilities of its QATT software or give an opportunity to avoid them by choosing not to fly. *Muir,* No. 1:20-cv-01280, at *46.

- Mr. Muir failed to establish that L3 had any knowledge of his medical condition. *Id.*

- Mr. Muir failed to establish that L3's QATT would trigger the events which allegedly caused Mr. Muir's alleged damages. *Muir*, No. 1:20-cv-01280. *Id.* at *46.

- Mr. Muir failed to identify any legal theory to impose a duty on L3 in the airport passenger screening context. *Id.* at *46.

- Mr. Muir could not amend his complaint to state any claims for negligence and NIED. *Id.* at *47.

- Mr. Muir could not rely on alleging various constitutional violations to support a claim for IIED. *Id.*

- Given that Mr. Muir had no direct interaction with L3, it would be futile to allow an amended claim of IIED. *Id.*

### Seventh Circuit

- Mr. Muir waived any appellate challenge to the CDIL judge's reasons for dismissal. *Muir v. TSA,* 857 F. App'x 251, 253 (7th Cir. 2021).

- Mr. Muir's claim under 42 U.S.C. § 1983 fails because L3 cannot be held liable under that statute. *Id.*

- Mr. Muir failed to allege that L3 participated in a conspiracy with a state official who had knowledge of Mr. Muir's medical condition. *Id.* at 254.

L3 respectfully submits that the issues raised in Mr. Muir's Complaint were "actually litigated" in his prior lawsuit. Moreover, the prior rulings on these issue were critical and necessary parts of the prior judgments, and the standard of proof in the prior action was at least as stringent as the standard of proof in this case. *See Steed,* 308 F. App'x at 372.

For all of these reasons, even if any of Mr. Muir's **claims** could slip through and avoid being *res judicata* (they cannot), it is unavoidable that the **issues** he would need to litigate have already been litigated, in which case they are barred by the doctrine of collateral estoppel.

### D. Mr. Muir cannot recover for the present effects of the August 2018 occurrences

Because Mr. Muir has again sued L3 for discrimination, L3 notes that the present effects of past discrimination are not actionable as independent violations and cannot sustain a "continuing violation" theory of recovery.

*Burger v. City of Daytona Beach,* 10 Fla. L. Weekly Fed. D 305 (U.S. M.D. Fla. 1996). Here, Mr. Muir has clearly alleged a continuing violations theory against all Defendants, including L3. *See, e.g.,* ECF 1, ¶319:

> [The United States and L3] had total control of Muir and the threat from Defendants is very clear: the uncontrollable physical manifestations of Muir's disability, if present to a sufficient, unpredictable, unknowable degree, will continue to be the sole reason for his cruel and unusual punishment during AIT passenger screening. Or put another, more honest way, "the beatings will continue", even if Muir's "morale" (his blind acceptance of the state's unlawful, tortious, and unconstitutional misconduct and deliberate indifference to his qualified disability and overall humanity) somehow, miraculously "improves".

While Mr. Muir's Complaint is difficult to decipher and anything but short and concise (*see* Fed. R. Civ. P. Rule 8[1]), he has made it clear that he suffered no harms during the occurrences on June 6, 2019 (at IWA in AZ), and June 9, 2019 (at PIA in IL). This fact renders him unable to recover under a continuing violations theory. It also means he cannot state a valid claim for which relief can be granted (discussed below).

### E. Mr. Muir cannot state a valid claim against L3

Mr. Muir has labeled 15 causes of action against L3. Some are labeled as Illinois claims, some are labeled as Arizona claims, and others purport to advance Constitutional claims. None of the labeled claims are viable.

### 1. State Law Tort Claims

---

[1] To avoid redundancies, L3 hereby joints, adopts, and incorporates Allegiant Air's Arguments I and III in its Motion to Dismiss, regarding Rule 8 "shotgun pleadings" and the untimeliness of Mr. Muir's claims, as if fully stated herein.

In total, Mr. Muir labels 10 state law tort claims, each brought under either Arizona or Illinois law. Without going through the elements of each claim, L3 respectfully submits that they each fail for the same reasons stated by the CDIL and Seventh Circuit. *See supra* at pp. 18-19. These findings establish that Mr. Muir cannot satisfy the basic elements of any of his purported state law tort claims.

Also, it remains undisputed that the TSA was in possession of L3's QATT at all times relevant to this suit, and L3 designed its QATT pursuant to DHS specifications. Consequently, Mr. cannot show that L3 wrongfully deprived him of any property, or knowingly trespassed on any of his chattels, or intruded upon a place of privacy, or publicly disclosed any facts, or or negligently designed its QATT. Moreover, Mr. Muir's own allegations establish that he cannot recover any tort damages for the events on June 6, 2019, and June 9, 2019, because he was not subjected to a TSA pat-down. The fact that the June 2019 occurrences were uneventful is not actionable.

- **Illinois Biometric Information Privacy Act**

Mr. Muir labels three claims against L3 based on the Illinois Biometric Information Privacy Act (BIPA) (740 ILSC 14/1 *et seq.*). BIPA prohibits private entities from obtaining biometric "identifiers" or "information" absent written consent. BIPA also prohibits private entities from selling biometric identifiers

and information and creates a private right of action for such violations. *Hazlitt v. Apple Inc.*, 543 F. Supp. 3d 643, 646 (S.D. Ill. 2021).

BIPA defines "biometric identifier" as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILSC 14/10. The Act defines "biometric information" as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.*

In his current Complaint, Mr. Muir cites a TSA rule change noting that airport passenger screening software creates an "internal code of the passenger." ECF 1, p. 9. Mr. Muir claims L3's "code" must have necessarily captured "data representing a scan of his hand and face geometry." *Id.* at p. 184. Mr. Muir's allegations are conclusory, unsupported, and do not satisfy the BIPA definition of a "biometric information." In fact, L3's QATT "analyzes scanned data and highlights threats and anomalies on a generic mannequin that resembles a human outline for end-user interpretation." *See* CDIL, ECF 37, Ex. E. Thus, Mr. Muir cannot state a valid claim under BIPA, and even if he could, it would be barred as res judicata and/or by collateral estoppel.

- **ADA – Title II**

L3 will not comment on Mr. Muir's discrimination claim under the Americans with Disabilities Act, other than to note that under Title II of the ADA, a plaintiff must prove intentional discrimination. *McCullum v. Orlando*

*Regional Healthcare System*, 768 F.3d 1135, 1147 (11th Cir. 2014). Mr. Muir is precluded from showing discrimination given the CDIL's rulings that L3 lacked knowledge of Mr. Muir's purported disability.

- **Injunctive relief (under Constitution)**

L3 comments only that the issues discussed above establish it had no control over its QATT and owed no duty to Mr. Muir at the time of the alleged occurrences. Thus, there is no conduct on the part of L3 that could be enjoined.

### F. Statute of Limitations

Whether Mr. Mui's claims are timely involves a choice-of-law question regarding Florida, Arizona, and Illinois. L3 notes that Florida courts resolve choice-of-law questions using the "most significant" relationship test outlined in the Restatement (Second) of Conflict of Laws § 145. Of the factors included in § 145, Florida courts hold that the state where the injury occurred should be the decisive consideration. *Pycsa Pan., S.A. v. Tensar Earth Techs., Inc.*, 625 F. Supp. 2d 1198, 1220 (S.D. Fla., Apr. 16, 2008).

Mr. Muir's alleged injuries occurred in Arizona and Illinois. Assuming *arguendo* that his causes of action did not accrue until August 10, 2019 (see ECF 1, ¶698), he did not file the instant complaint until well over two years later, on May 13, 2022. The CDIL previously observed that both Illinois and Arizona have a two-year statute of limitations for personal injury claims, meaning there was no conflict of law. *Muir v. TSA*, No. 1:20-cv-01280, at *8

n.4. Similarly, for the majority of Mr. Muir's claims in the current Complaint, there is no conflict of law that would allow Mr. Muir to bring his claim more than two years after the date of his alleged injuries. Accordingly, L3 respectfully submits that the following claims are time barred:

- **Conversion**: (AZ) (A.R.S. § 12-542);
- **Trespass Upon Chattels**: (AZ) (A.R.S. § 12-542);
- **IIED**: (AZ) (A.R.S. § 12-542);
- **IIED**: (IL) (735 ILCS 5/13-202);
- **Public Disclosure of Private Facts**: (IL) (735 ILCS 5/13-201);
- **In concert liability – Products Liability**: (AZ) (A.R.S. § 12-551);
- **In concert liability – Products Liability**: (IL) (735 ILCS 5/13-213);
- **Intrusion upon seclusion**: (AZ) (see *Mitcheson v. El Antro LLC*, 2020 U.S. Dist. LEXIS 226473 at *23 (Dist. Ct. Ariz., Dec. 3, 2020)).

### G.    Mr. Muir's claims are barred by the SAFETY Act

The SAFETY Act provides a rebuttable presumption of a government contractor defense for a "Seller" of QATT. This presumption applies in product liability suits relating to an "act of terrorism" when qualified QATT has been deployed in defense against or response to such act. 6 U.S.C. § 442(d)(1) (2018).

It could be argued that the occurrences described in Plaintiff's Complaint did not arise from an act of terrorism, but there is no question that L3's QATT was deployed in defense against or response to such an act. The SAFETY Act defines QATT as: "any product, equipment, service (including support services), device, or technology (including information technology) designed, developed, modified, or procured **for the specific purpose of preventing,**

**detecting, identifying, or deterring acts of terrorism or limiting the harm such acts might otherwise cause**, that is designated as such by the Secretary." (Emphasis added.) 6 U.S.C. § 444 (2018).

There is no question that Plaintiff's lawsuit relates to the performance of L3's QATT for the specific purpose of preventing and detecting acts of terrorism, as L3's QATT was developed as a direct result of the terrorist attacks of 9/11. To hold L3 liable for damages on grounds that its QATT invaded a passenger's privacy would deal a tremendous blow to our Nation's anti-terrorism defense apparatus and would also render the SAFETY Act virtually meaningless. Hence, if the Court does not grant the instant Motion to Dismiss, in the alternative, L3 is entitled to the rebuttable presumption of a government contractor defense under 6 U.S.C. § 442(d)(1) (2018).

### Local Rule 3.01(g) Certification

I, Richard C. Harris, one of the attorneys for Defendant L3Harris Technologies, Inc., hereby certify that I met and conferred with Plaintiff Michael Muir on July 28, 2022. We spoke via telephone for 27 minutes. We discussed L3's defenses and were unable to agree on a resolution on any part of the instant Motion.

### III.   CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant, L3HARRIS TECHNOLOGIES, INC., respectfully requests that this Court dismiss Plaintiff's Complaint with prejudice, and for such further relief as the Court may deem just.

Respectfully submitted,
ADLER MURPHY & McQUILLEN LLP

/s/Christopher J. Raistrick--------------------
One of the Attorneys for Defendant,
L3HARRIS TECHNOLOGIES, INC.

Christopher J. Raistrick
Richard C. Harris
ADLER MURPHY & McQUILLEN LLP
20 S. Clark Street, Suite 2500
Chicago, Illinois 60603
Telephone: (312) 345-0700
Facsimile: (312) 345-9860
craistrick@amm-law.com
rharris@amm-law.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2022, I electronically transmitted the

attached document to the Clerk's Office using the CM/ECF System for filing

thereby transmitting a Notice of Electronic Filing to all CM/ECF registrants.

With a copy sent via U.S. Mail and email to: Michael Muir, P.O. Box 1791,

Sarasota, FL 34230, (712) 309-6121, muirone@yahoo.com.

/s/Michael L. Forte-------------
Michael L. Forte
Florida Bar No. 0592161
RUMBERGER, KIRK &
CALDWELL, P.A.
100 N. Tampa St., Ste. 2000
Tampa, FL 33602
T: 813-223-4253
F: 813-221-4752
E: mforte@rumberger.com

16944668.v1