**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

MICHAEL MUIR,

     Plaintiff,

     v.

UNITED STATES, et al.,

     Defendants.

No. 8:22-cv-1110-MSS-CPT

## FORMER ADMINISTRATORS' MOTION TO DISMISS

Plaintiff Michael Muir has sued two former Transportation Security Administrators ("TSA") in their individual capacities, and purports to seek money damages from Defendants John S. Pistole and Peter V. Neffenger ("Former Administrators"). But Muir's Complaint fails to state any plausible cognizable claim against the Former Administrators, and any purported claims against them must be dismissed for lack of subject matter jurisdiction, and failure to state a claim.  F.R.C.P. 12(b)(1) and 12(b)(6). Moreover, even were the Court to find that Muir has stated any cognizable claim against the Former Administrators, they would nonetheless be entitled to qualified immunity.  The plaintiff opposes dismissal.

## INTRODUCTION

By statute, TSA is responsible for the "day-to-day Federal security screening operations for passenger air transportation," 49 U.S.C. § 114(e)(1). Among other things, TSA must "provide for the screening of all passengers" and aircraft-bound "property," 49 U.S.C. § 44901(a); *see* 49 C.F.R. § 1540.107(a). TSA employees who screen passengers pursuant to this congressional mandate "are tasked with assisting in a critical aspect of national security—securing our nation's airports and air traffic." *Vanderklok v. United States*, 868 F.3d 189, 207 (3d Cir. 2017).

This case arises from two of the millions of TSA's daily efforts to perform that critical function. Unidentified TSA personnel screened Plaintiff Michael Muir once at Phoenix Mesa Airport in Phoenix, Arizona, and again at the Peoria International Airport in Peoria, Illinois. Both screenings, Plaintiff contends, violated the United States Constitution, state law, and constituted tortious conduct.  Defendant Former Administrator John S. Pistole ("Former ADM Pistole") served as the Administrator for the TSA from June 25, 2010 until December 31, 2014.  Compl. ¶ 506.  Defendant Former Administrator Peter V. Neffenger ("Former ADM Neffenger") served as the Administrator for TSA from July 6, 2015 through January 20, 2017.  Compl. ¶ 516.  Both Former Administrators concluded their work and time at TSA well before the June 6, 2019 and June 9, 2019 screening experiences that Plaintiff describes in his Complaint.  Neither Former Administrator could have participated in the challenged screenings, and Plaintiff does not allege facts plausibly suggesting otherwise.

Plaintiff's claims against the Former Administrators may not proceed. As an initial matter, Plaintiff's complaints against them are time-barred.  Additionally, no federal statute gives Plaintiff a remedy in damages against Former ADMs Pistole and Neffenger personally, and, in this sensitive context—involving TSA's critical national-security mission and clear signs from Congress that it does not favor the damages remedy Plaintiff seeks—the Court ought not create one for Plaintiff under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), particularly in light of *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) and *Egbert v. Boule*, 142 S.Ct. 1793, 1800 (2022). Any *Bivens* claim is barred by qualified immunity in any event.  As a matter of law, then, former Administrators Pistole and Neffenger should be dismissed with prejudice from this lawsuit.

## PRIOR LITIGATION

As Plaintiff acknowledges, this is the third federal lawsuit in which Plaintiff alleges injuries

and damages sustained as a result of TSA passenger security screening.  Compl. at ¶¶ 33, 55 (referencing *Muir v. L3Harris Technologies, Inc.*, No. 2:19-cv-05887, (D. Az.)), originally filed in the Superior Court of Arizona, Maricopa County, removed to federal court, and voluntarily dismissed; and, *Muir v. TSA*, No. 20-cv-1280 (C.D. Ill.), which was dismissed and subsequently affirmed by the Seventh Circuit (No. 21-1312)).  The crux of Plaintiff's prior lawsuits is that he was injured when patted down after TSA's airport screening machinery twice identified a bulging hernia as a potential security threat, in Phoenix and Peoria, on August 8 and 12, 2018, respectively. *See Muir v. TSA*, No. 20-cv-1280 (C.D. Ill., Jan 22, 2021). With respect to the claims filed against the federal defendants in that case, the district court held that it lacked subject matter jurisdiction to review Plaintiff's constitutional and Rehabilitation Act claims against TSA insofar as they attacked TSA's Standard Operating Procedures ("SOP"), and such challenges could only be brought in the courts of appeals in accordance with 49 U.S.C. § 46110.

The district court in Illinois further determined that Plaintiff's *Bivens* action, brought against current TSA Administrator David Pekoske, was precluded by 49 U.S.C. § 46110 because it was inextricably intertwined with Plaintiff's challenge to TSA's SOP, and dismissed that count as moot.  Finally, the court considered and dismissed Plaintiff's claims brought pursuant to the FTCA because he had named an improper defendant, but the court also noted the FTCA claims would fail because "the Court can conceive of no possible scenario in which the United States officials had or breached the duty Plaintiff argues was owed to him."  *Muir v. TSA*, No. 20-cv-01280, Doc. 46 at p. 31 (C.D. Ill. Jan 22, 2021). Finding all of Plaintiff's claims against all of the named defendants meritless, the court dismissed Plaintiff's complaint entirely.  The Seventh Circuit agreed.  *Muir v. TSA*, No. 21-1312 (7th Cir. 2021) (unpublished).

**STANDARDS OF REVIEW**

**A.  Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." Id. (internal citations omitted). Such jurisdiction must be proven by a preponderance of the evidence. *Underwriters at Lloyd's, London v. Osting-Schwinn*, 613 F.3d 1079, 1085 (11th Cir. 2010). Challenges to subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) come in two forms:  facial and factual attacks.  *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990) (per curiam). Factual attacks challenge subject matter jurisdiction in fact, irrespective of the pleadings.  *Morrison v. Amway Corp.*, 323 F.3d 920, 924 n.5 (11th Cir. 2003). "On a facial attack, a plaintiff is afforded safeguards similar to those provided in opposing a Rule 12(b)(6) motion, meaning that the court must consider the allegations of the complaint to be true." *Fru Veg Marketing, Inc. v. Vegfruitworld Corp.*, 896 F. Supp. 2d 1175, 1179 (S.D. Fla. 2012).  If the Court determines that it lacks subject matter jurisdiction, it must dismiss the claim. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998).

**B.  Rule 12(b)(6)**

A court may also dismiss a complaint for failing to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it

rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted).  The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295-96 (11th Cir. 2007).  A pleading that offers "a formulaic recitation of the elements of a cause of action will not do."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

**C.  Pro Se Litigants**

Pro Se plaintiffs are constitutionally guaranteed access to the courts, *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983), and are otherwise entitled to have their pleadings construed liberally, *Sanders v. US.*, 113 F.3d 184, 187 (11th Cir. 1997), but they nevertheless must abide by the rules, *Moon v. Newsome*, 863 F.2d 835, 837 (11th Cir. 1989) ("[O]nce a pro se litigant is in court, he is subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure.").  That means that judges must not raise issues and arguments on plaintiff's behalf, but may only construe pleadings liberally given the linguistic imprecision that untrained legal minds sometimes employ.  *Miller v. Donald*, 541 F.3d 1091, 1100 (11th Cir. 2008).

## PLAINTIFF'S ALLEGATIONS

Plaintiff avers that he is forty-one years old, and currently resides in Sarasota, Florida. Compl. ¶ 7. He states that he is a married man, United States citizen, and an individual with a disability, which consists of a right-groin hernia. *Id*. The hernia, which is beneath his skin, constitutes his private protected health information representing his hidden disability and his

private marital healthcare choices. *Id*. Plaintiff claims that he presented for screening at Phoenix-Mesa airport on June 9, 2019, approximately two hours before his scheduled flight time. Compl. ¶ 30. He avers that while at the airport, his hidden disability at his right groin was "intermittently symptomatic." Compl. ¶ 31. He asserts that his disability symptom manifestation was at least ten percent worse than the screening of which he complained in 2018. Compl. ¶ 33.

Despite having traveled by commercial airline in 2018 (the subject of his prior three federal lawsuits), Plaintiff avers that he was not properly warned about the security screening. Compl. ¶ 35. And, though he claims that he did not consent to be screened by millimeter waves, after placing his items on the x-ray conveyor belt for screening, Plaintiff entered the TSA's Advanced Imaging Technology ("AIT") screening machine in the "hands-up" position. Compl. ¶¶ 36, 38, 39. Plaintiff asserts that the AIT machine created a digital full-body avatar of the Plaintiff, converting his private health information into chattel as a "biometric identifier" that can be used to identify him. Compl. ¶ 41. After proceeding through screening, Plaintiff was cleared to enter the sterile area of the Phoenix-Mesa Airport and flew to Peoria, Illinois. Compl. ¶ 50. He was not subject to a pat-down during the screening process. *Id*.

Three days later, on June 9, 2019, Plaintiff again traveled by commercial airplane, this time, from Peoria International Airport. Compl. ¶ 52. Again, he experienced his right groin hernia as uncontrollably "intermittently symptomatic." Compl. ¶ 53.  s with his flight from Phoenix, Plaintiff proceeded to the Peoria Airport TSA screening checkpoint and was required to enter the AIT at TSA.  Compl. ¶ 61. Despite having traveled only three days prior, and having traveled via commercial airline in 2018 (the subject of his three prior federal lawsuits), Plaintiff avers that he was not given fair notice or warning about TSA's screening process.  Compl. ¶ 57.  Plaintiff asserts that, as with the screening at Phoenix, his private digitized health information was converted to chattel which could be used to positively identify him.  Compl. ¶ 63.  Again, Plaintiff was cleared

through screening, and allowed to enter the sterile area to board his flight.  Compl. ¶ 70.

Plaintiff asserts that the screening experiences at Phoenix Mesa and Peoria airports caused the final "crystallization" of his 2018 checkpoint experiences in which he received a pat-down due to his right groin anomaly.  Compl. ¶ 73.  The 2019 screening experiences caused the "shocking sudden arrival of post-traumatic stress with intense anxiety, paranoia, painful and disturbing involuntary physical movements, and physical manifestations including throat constriction, shortness of breath, right groin pain, right leg pain, disturbing synesthesia, and a feeling of irreversible physical invasion.  *Id.*

Aside from bare assertions that the Former Administrators violated the Constitution, Plaintiff does not say what the Former Administrators did to Plaintiff to violate the Constitution, and Plaintiff's "continuing violation" theory does not meet the standards for stating a claim upon which relief may be granted. As the highest-ranking TSA official, the former Administrators oversaw the entirety of TSA's security operations, supervising a TSA workforce of nearly 60,000. For both Former Administrators, that authority was exercised through several layers of personnel responsible for implementing the TSA policy initiatives directed by the Former Administrators, both at TSA's headquarters in Virginia, and at airports nationwide. As a result, the Former Administrators did not personally screen passengers at IWA or PIA, and are not even alleged to have been physically present for Plaintiff's screenings; Plaintiff makes no contention to the contrary. All he offers against the Former Administrators is the sort of formulaic boilerplate insufficient to expose federal officials to the risk of a damages award and other burdens of litigation in a constitutional-tort lawsuit.

## DISCUSSION

### A.  PLAINTIFF'S CLAIMS ARE TIME-BARRED.

As an initial matter, Plaintiff's claims against the Former Administrators are time-barred

by the applicable statute of limitations. A *Bivens* action is a judicially created action that does not carry its own specific statute of limitations. However, the circuits that have addressed the statute of limitations for a *Bivens* action have all held that it is the same as the statute of limitations for a 42 U.S.C.§ 1983 action: "*Bivens* actions are governed by the same statute of limitations as 42 U.S.C. § 1983 actions." *Sanchez v. United States,* 49 F.3d 1329, 1330 (8th Cir. 1995) (citing *Kurinsky v. United States,* 33 F.3d 594, 599 (6th Cir. 1994); *Industrial Constructors Corp. v. United States Bureau of Reclamation*, 15 F.3d 963, 968-69 (10th Cir. 1994); *Van Strum v. Lawn,* 940 F.2d 406, 410 (9th Cir. 1991); *Bieneman v. City of Chicago,* 864 F.2d 463, 469-70 (7th Cir. 1988); *Chin v. Bowen*, 833 F.2d 21, 23-24 (2d Cir. 1987)). The circuits that have addressed the issue have held that because of the similarities between the actions the same statute of limitations should apply.

The limitations period for a § 1983 action is governed by the statute of limitations for personal injury actions in the state in which the claim accrues. *See Wilson v. Garcia,* 471 U.S. 261, 280 (1985). "A federal claim is generally considered to accrue when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Corn v. City of Lauderdale Lakes,* 904 F.2d 585, 588 (11th Cir. 1990) (citation omitted). Here, both Arizona and Illinois recognize a 2-year statute of limitations for personal injury actions. *See* A.R.S. § 12-542 and 735 I.L.C.S. § 5/13/212. Plaintiff complains that he was injured during AIT screening at the TSA checkpoints at the Phoenix-Mesa Airport on June 6, 2019, and Peoria Airport on June 9, 2019. In his complaint, Plaintiff avers that he became aware of the injury on August 10, 2019. Compl. ¶ 698. Yet, he did not file the instant action against Former Administrators Pistol and Neffenger until May 13, 2022, nearly 3 full years after his screening experiences in June of 2019 and alleged awareness of his injuries on August 10, 2019.  Plaintiff offers no basis for the delay. As such, his claims against the Former Administrators are beyond the applicable statute of limitations and

must be dismissed.

### B.  THE FORMER ADMINISTRATORS HAD NO PERSONAL INVOLVEMENT IN PLAINTIFF'S CLAIMS.

Beyond the obvious fact that neither Former Administrator actually worked for the TSA during the time relevant to Plaintiff's complaint, it is axiomatic that to be liable in a *Bivens* claim, a defendant must have been personally involved in the deprivation of a constitutional right, and a causal connection between that involvement and the deprivation must be shown. *Zatler v. Wainright*, 802 F.2d 397, 401 (11th Cir. 1986); *see also Del Raine v. Williford*, 32 F.3d 1024, 1047 (7th Cir. 1994) (in general, the individual participation requirement for a *Bivens* action parallels the requirements of 28 U.S.C. § 1983). Moreover, because "vicarious liability is inapplicable to *Bivens* . . . suits, a plaintiff must plead that each Government-official defendant, <u>through the official's own individual actions,</u> has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (emphasis added). Likewise, a plaintiff cannot simply claim that a proposed *Bivens* defendant was the "'principal architect'" of an allegedly invidious policy or "'instrumental'" in its adoption and execution, as those are "formulaic recitations" that are unworthy of being assumed to be true. *Id.* at 681. Without more specific allegations of direct involvement, there can be no recovery. *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) ("Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise....").

In this case, Plaintiff fails to allege any direct personal involvement on the part of the Former Administrators; his alleged injuries were inflicted – if at all – by individuals well-removed from the Former Administrator's direct supervision.  Undaunted, Plaintiff appears to propose that because the Former Administrators once held the highest executive positions at TSA and worked to bring AIT screening to airports across the country, then they must necessarily be responsible for the

conduct of TSA personnel and, on that basis, personally liable to Plaintiff for any claimed misdeed. As indicated above, however, *Bivens* liability does not flow upward to a defendant based on the "knowledge or actions of persons they supervise." *Burks*, 555 F.3d at 593-94, as a result, Plaintiff's claims are founded on a flawed premise. On this basis alone, the Former Administrators should be dismissed from this action with prejudice.

### C. THE COURT SHOULD NOT EXTEND *BIVENS* TO PLAINTIFF'S CLAIMS.

In order to fully dispel any suggestion of liability on the part of the Former Administrators in this action, it is beneficial to further explain why Plaintiff's theory must fail. Constitutional-tort suits against state or local officials are governed by 28 U.S.C. § 1983. But Former Administrators Pistole and Neffenger, as federal officials, acted solely under color of <u>federal</u> law. As § 1983 does not apply to the Former Administrators, and "Congress did not create an analogous statute for federal officials," *Abbasi*, 137 S. Ct. at 1854, Plaintiff has no <u>statutory</u> claim against them. Instead, he invokes *Bivens*, which, in very limited circumstances, may provide a judicially implied, non-statutory damages remedy against a federal official who violates the Constitution. A *Bivens* remedy, however, "is not an automatic entitlement," *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007), and, indeed, it is "disfavored," *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009); *accord Abbasi*, 137 S. Ct. at 1857. The "antecedent" question here, then, as in any *Bivens* case, is whether the Court <u>should</u> create a non- statutory remedy, on its own, directly under the Constitution. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017) (*per curiam*).

For "the past 30 years" and counting, the Supreme Court's answer to that question has been an emphatic "no." *See Abbasi*, 137 S. Ct. at 1857 (collecting cases in which the Court has "refused" or "declined to create an implied damages remedy"). Just this year, the Supreme Court reiterated its limited application of *Bivens*. *See Egbert v. Boule*, 142 S. Ct. 1793, 1800 (2022). In *Egbert*, the Supreme Court considered two *Bivens* claims asserted against a Border Patrol agent—one for

Fourth Amendment excessive force and one for First Amendment retaliation. Applying *Abbasi's* two-step inquiry (although stating that "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy," 142 S. Ct. at 1803), the Court reversed the Ninth Circuit and held that a *Bivens* remedy was not available for either claim.  *Id.* at 1804. As the Court explained, it had "many reasons to think that Congress, not the courts, is better suited to authorize such a damages remedy." *Id.* Any plaintiff, the Court observed, "can turn practically any adverse action into grounds for a retaliation claim" and, even when the claim is "frivolous" or "'insubstantial,'" "'set off broad-ranging discovery'" and avoid "'summary disposition'" simply because "'an official's state of mind is easy to allege and hard to disprove,'" *id.* (citations omitted). As this case presents no reason for the Court to depart from that presumption, and many factors counsel against recognition of a *Bivens* remedy here, the Court should decline to create one against the Former Administrators and should dismiss them from the action with prejudice.

### a.  The Supreme Court Has Retreated From Implied Damages Remedies.

In 1971, the Supreme Court decided *Bivens* and, for the first time, created a damages remedy, "even absent statutory authorization," against federal officials based on their allegedly unconstitutional conduct. *Abbasi,* 137 S. Ct. at 1854. The "limited holding" of *Bivens*, *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001), was that the plaintiff could seek damages from federal law- enforcement officers who allegedly violated the Fourth Amendment when they entered and searched his home without a warrant and, while there, handcuffed and arrested him for narcotics violations. *Bivens*, 403 U.S. at 390, 397. Since then, the Supreme Court has extended *Bivens* only twice—for (1) a Fifth Amendment equal-protection, gender-discrimination claim brought against a Congressman who admitted firing a staffer because she was a woman, *Davis v. Passman*, 442 U.S. 228, 230-31, 234-35 (1979); and (2) an Eighth Amendment claim asserted

11

against federal prison officials for failing to provide vital medical treatment for an inmate's asthma, resulting in his death. *Carlson v. Green*, 446 U.S. 14, 18-19 (1980). In each case, the Court created an implied damages remedy only after finding no "special factors counselling hesitation in the absence of affirmative action by Congress." *Bivens*, 403 U.S. at 396; *Davis*, 442 U.S. at 245-49; *Carlson*, 446 U.S. at 18-19. "These three cases—*Bivens, Davis,* and *Carlson*— represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Abbasi,* 137 S. Ct. at 1855. After *Abbasi*, a court confronted with a *Bivens* claim must determine if it arises in a "new context." If so, then "a special factors analysis [is] required" before a court may allow the claim to proceed. *Id.* at 1857-60. "[A] *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.'" *Id.* at 1857 (certain internal quotation marks and citations omitted). This case unquestionably presents a new context, and multiple factors strongly counsel against the Court creating the damages remedy Plaintiff seeks.

**b. Plaintiff's Claims Present A New Context.**

"The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court"— *Bivens, Davis,* and *Carlson*—"then the context is new." *Id*. at 1859. The non-"exhaustive list of differences that are meaningful enough to make a given context a new one" includes:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859-60; *accord id*. at 1864-65. Even if a case "has significant parallels to one of the [Supreme] Court's [three] previous *Bivens* cases," it still may "seek to extend" one of those

cases "to a new context," as "even a modest extension is still an extension." *Id.* at 1864. *See also Johnson v. Burden*, 781 Fed. Appx 833, 836 (11th Cir. 2019) (noting that the expansion of *Bivens* beyond the three specific contexts recognized by the Supreme court is disfavored).

This case "is different in a meaningful way" from *Bivens, Davis,* and *Carlson. Id*. at 1859. The differences begin with an obvious difference of subject matter. At issue in this case is not an in-home raid by law-enforcement officers (*Bivens*) or a Congressman's gender-based employment discrimination (*Davis*). Rather, this case concerns a wholly different factual context—i.e., an airplane-passenger screening, in the sensitive, national-security setting of an airport, that was performed by TSA screeners (*i.e.*, Transportation Security Officers or TSOs), acting under the ATSA—a different "statutory or other legal mandate," *id.* at 1860. That detail underscores an important difference between this case and *Bivens* and shows that the Former Administrators (and those involved in airport screenings) present a "new category of defendants" for *Bivens* purposes. *Id.* at 1857. In *Bivens,* the defendants were traditional federal law-enforcement officers, 403 U.S. at 389, but that is not true of Former Administrators Pistole or Neffenger, or the unidentified TSA personnel who may be involved in this case. Although Congress conferred general law-enforcement authority on the TSA Administrator, 49 U.S.C. §§ 114(p), 44903, the Former Administrators were not law enforcement officers.  Nor has that authority has not been delegated to TSOs, who do not receive the sort of training provided to federal law-enforcement officers.[1]  This case simply does not arise in the "sphere" of federal "law enforcement" where, as *Abbasi* says, there "are powerful

---

[1] *See Vanderklok*, 868 F.3d at 208 ("TSA employees typically are not law enforcement officers and do not act as such"); *accord Pellegrino*, 2018 WL 3371699, at *5-6; *Corbett v. T.S.A.*, 568 F. App'x 690, 700-02 (11th Cir. 2014) (*per curiam*); *Tobey v. Napolitano*, 808 F. Supp. 2d 830, 850 (E.D. Va. 2011), *aff'd sub nom., Tobey v. Jones*, 706 F.3d 379 (4th Cir. 2013).

reasons to retain" *Bivens*. 137 S. Ct. at 1857. And given the national-security purpose underlying TSA's screening mission, a *Bivens* extension into this arena would pose a particular "risk of disruptive intrusion by the Judiciary into" a most critical "functioning of other branches," *id.* at 1860.

Moreover, there is a significant difference in "the rank of the officers involved" in this case versus those in the relevant Supreme Court cases; the *Bivens* defendants' personal involvement in the underlying events; and "the extent of judicial guidance" as to how they should have acted. *Id.* at 1860, 1864-65. *Bivens* involved line law-enforcement officers—and *Davis* a Congressman—all of whom were allegedly the primary tortfeasors who personally violated the Constitution. But here, Plaintiff sues Former Administrators who had no involvement whatsoever in the challenged screenings, and were not leading TSA at the time of Plaintiff's screenings.  That alone makes this context new. *See Jangjoo v. Sieg*, 319 F. Supp. 3d 207, 215-217 (D.D.C. 2018) (declining to extend *Bivens* to defendant, who was the Director for the Persian News Network component of the Broadcasting Board of Governors, given defendant's "lack of participation" in the challenged conduct and plaintiff's "dependency on a *respondeat superior* theory"). Lastly, *Abbasi* specifically recognized that the presence "of potential special factors that previous *Bivens* cases did not consider" warrants a "new context" finding. *Id.* at 1859-60, 1864-65. As explained below, this case involves multiple potential special factors that *Bivens, Davis*, and *Carlson* did not consider and, thus, distinguish that precedent from this case. Consequently, this Court should undertake a special- factors analysis before allowing Plaintiff's *Bivens* claims to proceed against the Former Administrators.

### i.   Alternative, Existing Processes Preclude Plaintiff's Claims.

If "there is an alternative remedial structure present," that "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S. Ct. at 1858; *see id.* at 1863

("when alternative methods of relief are available, a *Bivens* remedy usually is not"); *accord id.* at 1865. Here, Plaintiff has "some procedure to defend and make good on his position" outside the *Bivens* arena. *Wilkie*, 551 U.S. at 552 (emphasis added). Passengers may potentially seek injunctive relief for ongoing constitutional violations,[2] and, for those seeking relief from TSA policies, Congress has provided for, and channeled, such relief through a petition for review in the appropriate federal court of appeals, 49 U.S.C. § 46110, of which Plaintiff is well-aware. *See* Section II, Prior Litigation, Supra. And as the Court of Appeals for the Third Circuit recognized in *Vanderklok*, an injured passenger may have a state-law tort claim against a TSO whose actions exceed the scope of employment, and an FTCA suit against the United States may be available in appropriate circumstances. 868 F.3d at 204.[3]

Apart from federal-court avenues, an "alternative remedial structure" under *Abbasi,* 137 S. Ct. at 1858, "can take many forms, including administrative, statutory, equitable, and state law remedies." *Vega v. United States*, 881 F.3d 1146, 1154 (9th Cir. 2018) (emphasis added). Congress has required TSA's parent agency, the Department of Homeland Security (DHS), to

---

[2] Indeed, as mentioned, Plaintiff seeks equitable relief in this lawsuit. *See Abbasi*, 137 S. Ct. at 1862-63, 1865 (injunctive relief was an alternative process in new-context and special-factors analyses); *Vance*, 701 F.3d at 205 ("[T]he normal means to handle defective policies and regulations is a suit under the [APA] or an equivalent statute, not an award of damages against the policy's author.") (citation omitted); *Zavala v. Rios*, 721 F. App'x 720, 722 (9th Cir. 2018) (no Bivens remedy for inmate challenging interference with mail as "[i]njunctive and declaratory relief would prevent future constitutional harm"); *W. Radio Servs. Co. v. United States Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) ("the APA leaves no room for *Bivens* claims based on agency action or inaction"); *Rager v. Augustine*, 2017 WL 6627416, *18 (N.D. Fla. Nov. 8, 2017) (M.J. Rec.) (inmate "could have filed a civil rights complaint seeking injunctive relief enjoining the unconstitutional conduct"), *adopted*, 2017 WL 6627784 (N.D. Fla. Dec. 28, 2017).

[3] Plaintiff is also pursuing FTCA relief. *See Andrews v. Miner*, 301 F. Supp. 3d 1128, 1134-35 (N.D. Ala. 2017) (acknowledging that, under *Carlson*, "[t]he FTCA remedy is not a substitute for a *Bivens* action," but still considering "an effective and available [FTCA] remedy"—whose "administrative prerequisites" the plaintiff "failed to follow"—in the mix with other "special factors"); *accord Abdoulaye v. Cimaglia*, 2018 WL 1890488, *7 (S.D.N.Y. Mar. 30, 2018); *Morgan v. Shivers*, 2018 WL 618451, *5-6 (S.D.N.Y. Jan. 29, 2018).

"establish a timely and fair redress process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat." 49 U.S.C. § 44926; 49 U.S.C. § 44903(j)(2)(G)(i) (similar). Under that authority, TSA administers the DHS Traveler Redress Inquiry Program ("TRIP") to address these concerns. Additionally, within DHS, Congress established the Office for Civil Rights and Civil Liberties to investigate, among other things, allegations of civil-rights abuses and "profiling on the basis of race, ethnicity, or religion, by employees and officials of the Department," including TSA employees. 6 U.S.C. § 345(a)(1) & (a)(6). DHS also employs a TSA-specific Ombudsman whose duties include ensuring that "TSA employees and the traveling public are treated in a fair and lawful manner, consistent with federal laws and regulations protecting privacy and individuals' rights, governing freedom of information, and prohibiting discrimination and reprisal while promoting diversity and inclusion." https://www.tsa.gov/leader-bios/office-civil-rights-and- liberties-ombudsman-and-travel-engagement (last visited September 29, 2022, as with all websites cited herein).

Plaintiff's allegation that the Former Administrators violated his Fifth Amendment due process rights, is even less tenable under *Bivens*. *Abbasi* suggests that the only valid contexts for constitutional claims against federal officers are those previously recognized by the Court under the Fourth, Fifth, and Eighth Amendments. *See Bivens*, 403 U.S. at 397 (Fourth Amendment unreasonable search and seizure); *Davis*, 442 U.S. at 230-31 (Fifth Amendment gender discrimination); *Carlson*, 446 U.S. at 18-19 (Eighth Amendment deliberate indifference to medical needs). Similarly, the Eleventh Circuit recently affirmed this Court's refusal to imply a *Bivens* remedy as a means of redressing alleged violations related to loss of electronically stored data on a hard drive that was seized pursuant to grand jury subpoena. *See Davis v. Dotson*, case no. 20-13123, 2021 WL 5353099 (11th Cir. Nov. 17, 2021).

### ii.  Other Special Factors Preclude Plaintiff's Claims.

In light of *Egbert,* the Court need not engage in further analysis under *Abbasi* and apply its two-step inquiry to Plaintiff's proposed *Bivens* claims.  But if the *Abbasi* analysis is considered, it requires dismissal. The Court still must "weigh[] reasons for and against the creation of a new cause of action," *Wilkie*, 551 U.S. at 554. "[T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi,* 137 S. Ct. at 1857-58. "[S]eparation-of-powers principles are or should be central to the analysis. The question is 'who should decide' whether to provide for a damages remedy, Congress or the courts? The answer most often will be Congress." *Id.* at 1857 (citations omitted). Against that backdrop, several additional factors counsel against a *Bivens* extension in this case.

Despite its "frequent and intense" interest in TSA screening, Congress has never created a damages remedy against TSA employees. Congressional intent is of paramount importance to the special-factors inquiry.[4] Legislative <u>inaction</u> as to the creation of a damages remedy counsels hesitation, especially where, as here, "Congressional interest" in an issue like TSA screening "has been frequent and intense." *Id.* at 1862 (citations omitted). Congress created the TSA in 2001, and has frequently amended the legislation governing it.[5] In none of that extensive legislation, however, has Congress authorized a damages action against TSA employees for their passenger screening. Instead, "Congress chose to <u>limit</u> the scope of judicial review of TSA actions. In creating the TSA,

---

[4] *See Abbasi*, 137 S. Ct. at 1862 (describing special-factors "inquiry [as] respecting the likely or probable intent of Congress"); *id.* at 1858 (the question is whether "Congress would want the Judiciary to entertain a damages suit in a given case").

[5] *See, e.g., Ruskai v. Pistole*, 775 F.3d 61, 63-64 (1st Cir. 2014); *Corbett v. T.S.A.*, 767 F.3d 1171, 1175 (11th Cir. 2014); and *Elec. Privacy Info. Ctr. v. U.S. D.H.S.*, 653 F.3d 1, 3 (D.C. Cir. 2011) (each discussing legislation enacted post-ATSA in 2004 and 2012, to improve TSA's airport- screening procedures).

Congress restricted judicial review to affirming, amending, modifying, or setting aside orders of the agency." *Vanderklok*, 868 F.3d at 208 (emphasis added) (citing 49 U.S.C. § 46110(c)). Moreover, when it legislated with respect to passenger grievances arising from TSA screening, Congress chose to establish only an <u>administrative</u> procedure, not a federal-court damages claim.[6] Additionally, Congress affirmatively provided a remedy for travelers claiming property damage as a result of TSA screening, by permitting the agency to "settle a claim for not more than $1,000 for damage to, or loss of, privately owned property." 31 U.S.C. § 3723. Such disputes proceed according to TSA's administrative-claims process. 28 U.S.C. § 2675(a). The same is true of claims that TSA screeners inflicted personal injury, including emotional distress, on a passenger.[7] The only time <u>Congress considered extending a damages provision for TSA</u> in a remotely similar context—the remedial scheme available to passengers aggrieved by their placement on the "No Fly List"—Congress considered, <u>but voted against</u>, an amendment that would have given such passengers a damages remedy against the government. H.R. Rep. No. 108-724, pt. 5, at 270-71 (2004).[8]

Lastly, when Congress partially waived the United States' sovereign immunity in the FTCA, allowing claims for certain intentional torts of its law-enforcement officers, 28 U.S.C. §

---

[6] *See Vanderklok*, 868 F.3d at 208 ("we cannot ignore that remedies in the airport security context are <u>circumscribed</u> as a direct result of Congressional decisions," and "Congress allowed the creation of an <u>administrative</u> mechanism by which to adjudicate certain TSA complaints") (emphasis added).

[7] *See Hernandez v. TSA*, 2014 WL 60048, *1 (D.N.J. Jan. 7, 2014) (passenger alleged "jewelry was stolen from her checked luggage"); *Weinraub v. United States*, 927 F. Supp. 2d 258, 260 (E.D.N.C. 2012) (passenger alleged "mental anguish and emotional distress over his treatment by the TSA screeners"). TSA makes claim forms "for damage, injury, or death" available to the public on-line. https://www.tsa.gov/sites/default/files/sf95cover_packagerevised07-08-15-508.pdf.

[8] *See Tanvir v. Lynch*, 128 F. Supp. 3d 756, 773 n.15 (S.D.N.Y. 2015) ("Congress considered the question of what remedies would be appropriate in the context of the No Fly List and specifically rejected the option of a civil remedy"), *rev'd on other grounds sub nom., Tanvir v. Tanzin*, 894 F.3d 449 (2d Cir. 2018), *cert. granted*, 140 S.Ct. 550 (Mem) (Nov. 22, 2019).

2680(h), it <u>barred</u> intentional-tort liability as to <u>non</u>-law-enforcement employees (whether TSA's screeners or, by extension, its Administrator). *See supra* n.5, & Doc. 14 (U.S. Br.), at 16-18 (upper-margin page numbers). This further demonstrates congressional intent to foreclose liability of the sort Plaintiff seeks here and counsels against a *Bivens* extension in this context.[9]

Despite Congress's clear recognition that disputes might arise over the propriety of TSA conduct, it has not provided the remedy Plaintiff seeks. The Court should respect that decision and not augment the processes Congress provided. *See Abbasi*, 137 S. Ct. at 1862 (congressional "silence" with respect to a damages remedy "is relevant . . . and . . . telling").

**(ii) The national-security interests in TSA screening also counsel hesitation.** As mentioned, TSA was created as a <u>direct</u> response to the national-security threat posed by terrorists. Congress charged TSA with providing a safe and secure civil air-transportation system, and TSOs perform critical duties necessary to TSA fulfilling its mission. A central part of their work consists of screening all passengers before they board an airplane. 49 U.S.C. § 44901(a); 49 C.F.R. § 1540.107(a). In doing so, TSOs must make "decisions about safety and security in a fast-moving environment, with little margin for error."[10] "Matters intimately related to … national security" are "rarely proper subjects for judicial intervention," *Haig v.*

---

[9] *See United States v. Norwood*, 602 F.3d 830, 835-36 (7th Cir. 2010) (allowing criminal defendant to amend pleading to state *Bivens* claim challenging loss of property, even though such "[a] *Bivens* suit may fail . . . because of the exclusion" in § 2680(c), barring FTCA liability against the United States "for a property loss caused by law enforcement officers," and recognizing such a *Bivens* suit "might be thought an end run around the statutory exclusion of such claims when filed against the government itself"); *Hernandez v. Mesa*, 885 F.3d 811, 820-21 (5th Cir. 2018) *(en banc)* (citing FTCA's "foreign country" exception at § 2680(k), as among the special factors counseling against creation of *Bivens* remedy for Mexican citizen fatally wounded in Mexico when CBP Agent in Texas shot decedent across the border), *affirmed*, 140 S.Ct. 735 (2020); *accord Meshal v. Higgenbotham*, 804 F.3d 417, 430 (D.C. Cir. 2015) (Kavanaugh, J., concurring); *cf. Lee v. Hughes*, 145 F.3d 1272, 1276 (11th Cir. 1998) ("[C]ourts should be hesitant to provide an aggrieved plaintiff with a remedy where Congress intentionally has withheld one.").

[10] Airline Security: Special Joint Hr'g before H. & S. Comms. on Appropriations, 107th Cong. 2 (2001) (opening statement of Sen. Murray).

*Agee*, 453 U.S. 280, 292 (1981), because "[n]ational-security policy is the prerogative of the Congress and President," *Abbasi*, 137 S. Ct. at 1861. "These concerns are even more pronounced when the judicial inquiry comes in the context" of a money-damages claim, because "[t]he risk of personal damages liability is more likely to cause an official to second-guess difficult but necessary decisions concerning national-security policy." *Id.; see Vanderklok*, 868 F.3d at 208 (noting the "particularly pronounced" "hesitancy to imply a <u>Bivens</u> remedy in a case with national security implications"). "[E]lements of the Government's whole response to the September 11 attacks," *Abbasi*, 137 S. Ct. at 1861—including TSA screening policies at airport checkpoints with a "particularly acute" security interest, *City of Indianapolis v. Edmond*, 531 U.S. 32, 47-48 (2000)—plainly implicate "sensitive issues of national security," *Abbasi*, 137 S. Ct. at 1861; *see Vanderklok*, 868 F.3d at 206. Given these sensitivities, TSA's role "in securing public safety is so significant that we ought not create a damages remedy in this context." *Id.* at 209; *accord Pellegrino*, 2018 WL 3371699, at *17.

      (iii).    **Plaintiff cannot challenge TSA "policy" through *Bivens* claims.** Although Plaintiff may purport to bring his *Bivens* claims against the Former Administrators because they were principals in bringing AIT to U.S. airports, his claims still "call into question the formulation and implementation of a general policy." *Abbasi*, 137 S. Ct. at 1860. Indeed, he expressly challenges TSA screening policies and practices repeatedly throughout his complaint, asserting that he was exposed to the Defendants' systemically discriminatory policies. *See, e.g.*, Compl. ¶ 505. Plaintiff cannot do this through the guise of a *Bivens* action. *See Abbasi*, 137 S. Ct. at 1860 ("With respect to the claims against the Executive Officials, it must be noted that a *Bivens* action is not 'a proper vehicle for altering an entity's policy.'") (quoting *Malesko*, 534

U.S. at 74).[11]

  **(iv).**  **Multiple practical considerations also counsel hesitation**. Before allowing *Bivens* claims in the context of airport screening, the Court must assess the "impact" of such litigation "on governmental operations systemwide." *Abbasi*, 137 S. Ct. at 1858. TSA employs approximately 50,000 TSOs and "screens more than 2 million passengers daily and over 750 million every year."[12] Given the sheer volume of TSA's interactions with the public, it stands to reason that many passengers may often find something to fault with the TSA screeners they encounter at an airport. Given the requirement that an individual be personally involved in the alleged deprivation of a constitutional right, it is unusual for a *Bivens* claim to be filed against the TSA Administrator. But if a *Bivens* damages remedy were available to all passengers—all 750 million of them annually—there is an obvious concern that such "a new species of litigation," *Wilkie*, 551 U.S. at 562, might have a chilling effect on the Agency's TSOs. All 50,000 of the nation's TSOs perform "one of the most essential functions in our post-9/11 age: protecting air passengers from the threat of terrorism." *Tobey,* 706 F.3d at 394 (Wilkinson, J., dissenting). It should be up to Congress, then, to decide if airport-security screenings should give rise to damages liability against TSA personnel, including whether the Former Administrators should be answerable in damages for screenings performed by any one of the thousands of TSOs they oversaw.

  This case presents a context both novel for *Bivens* purposes and ill-suited to a personal-capacity damages remedy. The "special factors" are compelling, especially if considered in the

---

[11] *See also Malesko*, 534 U.S. at 71 (even if "an agency policy . . . led to . . . [a] constitutional deprivation," it is not "the purpose of *Bivens*" to "deter[] the conduct of a policymaking entity"); *accord F.D.I.C. v. Meyer*, 510 U.S. 471, 484-86 (1994).

[12] https://www.tsa.gov/sites/default/files/resources/tsabythenumbers_factsheet.pdf ("TSA by the Numbers Factsheet").

aggregate as the Supreme Court directs. *Abbasi*, 137 S. Ct. at 1857-58, 1860-63; *Chappell*, 462 U.S. at 304. And they warrant dismissal of Plaintiff's constitutional claims against the Former Administrators.

### D.  QUALIFIED IMMUNITY BARS ALL OF PLAINTIFF'S CLAIMS.

"In the limited settings where *Bivens* does apply," *Iqbal*, 556 U.S. at 675, any *Bivens* claim is still "subject to the defense of qualified immunity." *Malesko*, 534 U.S. at 72. Qualified immunity shields federal employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  There is "a two-step sequence for resolving government officials' qualified immunity claims," and the Court may address the steps in either order. *Pearson v. Callahan*, 555 U.S. 223, 232, 237-42 (2009).  It may decide, first, "whether the facts that [Plaintiff] has alleged . . . make out a violation of a constitutional right" by the Former Administrators and, if they do, the Court "must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. at 232 (citations omitted). A government official "violates clearly established law" if,

> at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would have understood that what he is doing violates that right." We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (emphasis added). "This requires a high 'degree of specificity.'" *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) (citation omitted). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) *(per curiam)* (citation omitted). If "a reasonable officer might not have known for certain" that the particular conduct ascribed to him "was unlawful," then he "is immune from liability." *Abbasi,* 137 S. Ct. at 1867 (emphasis added).

Setting aside Plaintiff's "legal conclusions" that "are not entitled to the assumption of

truth," and focusing instead on his (few) "well-pleaded factual allegations," *Iqbal*, 556 U.S. at 679, it is clear that he fails to allege that the Former Administrators personally participated in "the deprivation of an actual constitutional right at all," *Conn v. Gabbert*, 526 U.S. 286, 290 (1999); *see Siegert v. Gilley*, 500 U.S. 226, 23 (1991) (initial "determination" in qualified-immunity analysis is "whether the plaintiff has asserted a violation of a constitutional right at all"). At best, Plaintiff's Complaint shows that TSA seeks to further its statutory mission by screening all individuals who fly on passenger aircraft.  He would need to allege considerably more factual content to push his claim of purposeful discrimination into the realm of a plausible claim.  This falls woefully short of stating a constitutional violation given the pleading standards enunciated by the Supreme Court in *Iqbal* and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

Plaintiff cannot subject the Former Administrators to suit on his bare assertion that they instituted AIT screening, or on his conclusory allegation that their effort to prevent passengers from bringing prohibited items aboard aircraft constitutes a continuing constitutional violation. As mentioned, Plaintiff does not say that either Former Administrator was present for his screenings; that they physically took part in any aspect of them or instructed a subordinate to carry them out; or even that they were ever informed by a subordinate of any aspect of the screenings. Indeed, neither Administrator was in charge of TSA during the relevant time-period.

TSA screening policies and procedures are set forth in a Standard Operation Procedure (SOP) approved by the TSA Administrator himself. *See, e.g., Blitz v. Napolitano*, 700 F.3d 733, 736 (4th Cir. 2012). Although TSA has not published the SOP in the public domain,[13] the agency

---

[13] *See EPIC*, 653 F.3d at 3 ("The Congress generally has left it to the agency to prescribe the details of the screening process, which the TSA has documented in a set of Standard Operating Procedures not available to the public."); *Ventura v. Napolitano*, 828 F. Supp. 2d 1039, 1041 n.1 (D. Minn. 2011) (SOP "is considered to be secret for reasons of national security").

has confirmed on its website that TSA uses millimeter wave advanced imaging technology to screen checkpoints. www.tsa.gov/travel/security-screening.  Plaintiff cannot plausibly ascribe his routine screening to the Former Administrators, and the allegation, in any event, does not satisfy *Iqbal. Compare* 556 U.S. at 680-81 (rejecting as "conclusory," and "bald" or "bare assertions," the plaintiffs' allegations that Attorney General "was the 'principal architect'" of challenged detention "policy" and FBI Director "was 'instrumental' in adopting and executing it").  In sum, Plaintiff has pleaded no facts to support his claims against the Former Administrators. As they are not otherwise subject to suit under *Bivens* on the basis of *respondeat superior*, *see Abbasi*, 137 S. Ct. at 1860; *Iqbal,* 556 U.S. at 676-77; *see Vance*, 701 F.3d at 203 ("liability under a *Bivens*-like remedy is personal," and supervisors "are not vicariously liable for what their subordinates do"), Plaintiff has not satisfied the first prong of the qualified-immunity analysis. His claims, therefore, should be dismissed.

Although the Court need proceed no further, it could, in its *Pearson* discretion, also dismiss the Former Administrators at the second step of the qualified-immunity analysis. Whatever their role might have been in the creation or implementation of any TSA AIT screening, neither Administrator could "not have known for certain" that such a policy "was unlawful," *Abbasi,* 137 S. Ct. at 1867. No court has invalidated the "policy," or even questioned its constitutionality, and so the Former Administrators could have reasonably instituted the SOPs that applied AIT screening. Lastly, although the Court need not reach the point for present purposes, Plaintiff has not even alleged a clearly established constitutional violation against any unidentified line TSOs and Supervisors who screened him, thus making the case against the Former Administrators all the more untenable. For all of the forgoing reasons, all *Bivens* claims against the Former Administrators should be dismissed because, on the pleadings, the violated no "clearly established" law.

## CONCLUSION

For the foregoing reasons, Defendants Former Administrators Pistole and Neffenger

respectfully request that the complaint be dismissed with prejudice.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:    */s/ Lacy R. Harwell, Jr.*
LACY R. HARWELL, JR.
Assistant United States Attorney
Florida Bar No. 714623
400 North Tampa Street, Suite 3200
Tampa, Florida 33602
Telephone: 813-274-6000
Facsimile: 813-274-6200
E-mail: randy.harwell@usdoj.gov

Certificate of Service

I certify that on October 7, 2022, I filed the foregoing with the Clerk of the Court by

using the CM/ECF system, which will serve all registered users in this case.

I further hereby certify that on October 7, 2022, I caused a true copy of the foregoing to

be served by United States mail, first class postage prepaid, upon:

Michael Muir
P.O. Box 1791
Sarasota, FL  34230

*/s/ Lacy R. Harwell, Jr.*
Lacy R. Harwell, Jr.
Assistant United States Attorney

25